IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| JOHN C. FLOOD OF VIRGINIA, INC., et al. | ) | |
| | ) | |
| **Plaintiffs and Counter-Defendants,** | ) | |
| | ) | |
| v. | ) | Judge Richard J. Leon |
| | ) | Case No.: 1:06CV01311 |
| JOHN C. FLOOD, INC., et al. | ) | Deck Type: General Civil |
| | ) | |
| **Defendants and Counter-Plaintiffs.** | ) | |

---

**VIRGINIA FLOOD'S STATEMENT OF POINTS AND AUTHORITIES
IN OPPOSITION TO 1996 FLOOD'S MOTION FOR PARTIAL SUMMARY
JUDGMENT**

---

Summary judgment here is unfounded and premature, and therefore must be denied. Defendants' own documents filed in support of their motion for summary judgment demonstrate sufficient disputes of material fact that must be decided at trial. Additionally, Defendants have obstructed Plaintiffs' ("Plaintiffs" or "Virginia Flood") requests for production of documents, hamstringing Virginia Flood's ability to respond to the instant motion and rendering it premature. Despite the open discovery dispute, an order denying Defendants' motion for summary judgment is appropriate in light of the disputed material facts that Virginia Flood has shown below, even without the benefit of the discovery it requested.

This opposition is timely filed, pursuant to the Court's July 31, 2007 Minute Order, which set August 17, 2007 as the deadline to respond and granted the joint motion for extension of time to respond (doc. 38).

## I.    INTRODUCTION AND RELEVANT BACKGROUND

Virginia Flood Has Continuously and Extensively Used the FLOOD marks since 1989

Virginia Flood was formed in 1989.[1]  From Virginia Flood's formation, Moe Haislip and Jim Seltzer owned and controlled an equal 50% interest, along with co-investors and officers, Mark Crooks and Mel Davis.[2]  On July 19, 1991, Crooks and Davis resigned as officers of Virginia Flood.[3]  In September or October 1995, Haislip and Seltzer purchased the outstanding 50% interest in Virginia Flood, giving them 100% ownership interest in Virginia Flood.[4]

There is no dispute that, from its formation in 1989 through the present day, Virginia Flood has continuously and extensively used the FLOOD marks in commerce.[5]  As 100% owners in Virginia Flood, Haislip and Seltzer believed they possessed the legal right to use the FLOOD marks, and that no other person or entity possessed such right.[6]  On March 23, 1999, they filed registration applications with the U.S. Patent & Trademark Office ("USPTO"), seeking to register JOHN C. FLOOD as a Word and Logo mark.[7]  The USPTO granted Virginia Flood registrations to both the JOHN C. FLOOD Word and Logo marks on April 25, 2000 and June 6, 2000, respectively.[8]

1984 Flood Ceased to Exist and Stopped All Use of the FLOOD Marks on March 2, 1993

Defendants trace the roots of Defendant 1996 Flood back to an entity that Crooks and Davis formed in 1984, known as "John C. Flood, Inc." (hereinafter "1984 Flood"[9]).  On June 21,

---

[1] Virginia Flood's response to Defendants' Statement of Undisputed Material Facts ("SUMF") No. 1.
[2] Virginia Flood's response to SUMF No. 4.
[3] Id.; Virginia Flood's Statement of Add'l Material Facts Precluding MSJ No. 13.
[4] Virginia Flood's response to SUMF No. 13.
[5] Haislip Decl. ¶ 5 (attached hereto as Ex. A).
[6] Id. at ¶ 11; Virginia Flood's Statement of Add'l Material Facts Precluding MSJ No. 15.
[7] Id.
[8] Id. at ¶ 12; Virginia Flood's Statement of Add'l Material Facts Precluding MSJ No. 16.
[9] As noted above, throughout this response, Virginia Flood's references to *1984 Flood* refer specifically to the

1991, 1984 Flood filed Chapter 11 bankruptcy, along with Crooks, Davis and their wives.[10]

On March 2, 1993, a trustee was appointed in the bankruptcy case.[11]  On September 21, 1993, the Chapter 11 case was converted to a proceeding under Chapter 7.[12]

<u>Any Use of the FLOOD Marks by the Sham Entities was an Unlawful Use</u>

Over two years after a trustee was appointed, on May 17, 1995, the trustee filed a Verified Complaint to Avoid and Recover Fraudulent Conveyances, to Compel Turnover of Estate Assets, for the Appointment of a Receiver and for Other Relief ("Verified Complaint for Appointment of a Receiver").[13]  There the trustee averred under oath that as soon as a trustee was appointed on March 2, 1993, Crooks, Davis, and Robert and Joanne Smiley created sham entities to conceal assets of the bankruptcy estate from creditors.[14]  These sham entities included J.C.F. Inc., t/a J.C. Flood, Co., John C. Flood of MD, Inc., John C. Flood of D.C., Inc., MCMD, Inc., a/k/a Mark Crooks & Melville Davis, Inc., which the trustee referred to as "New Flood."[15]  Due to their fraudulent activity, the trustee named the Smileys and each of the sham entities as defendants in this adversary proceeding, despite the fact that they had not been parties to the original Chapter 11 bankruptcy filed on June 21, 1991.[16]

In the Verified Complaint for Appointment of a Receiver, the trustee averred that:

---

entity *"John C. Flood, Inc.,"* which was formed by Crooks and Davis in 1984 and which filed Chapter 11 bankruptcy on June 21, 1991 -- not to be confused with any other entity.

[10] Virginia Flood's response to SUMF No. 6.

[11] Rinn Decl. (doc. 37-4), ¶ 4, attached as Ex. B to Defendants' MSJ.

[12] <u>Id.</u>

[13] Verified Complaint to Appoint a Receiver attached as Ex. B-1 to Rinn Decl. (doc. 37-4).

[14] <u>Id.</u> at ¶¶ 28-30.

[15] <u>Id.</u> at ¶ 20.

[16] Virginia Flood's Statement of Additional Facts Precluding Summary Judgment No. 14.

Substantially all of the employees of [1984 Flood] were told to quit, were released, or were fired by Mr. Crooks and Mr. Davis after [the bankruptcy judge] announced his decision to appoint a trustee on March 2, 1993.[17]

Defendants informed substantially all of [1984 Flood's] employees that they should quit [1984 Flood] and go to work for [the sham entities]. [The sham entities] immediately hired substantially all of [1984 Flood's] employees.[18]

When the appointed trustee finally seized [1984 Flood's] corporate bank accounts, paychecks to [1984 Flood's] employees bounced.[19]

. . . .

The reasons cited by the Court for the appointment of a trustee included concern with the overall supervision of the financial transactions and the lack of compliance with the Bankruptcy Code.[20]

At the conclusion of the hearing on the appointment of a trustee, the Court also specifically warned Crooks and Davis and stated "I will caution the debtors that it is a bankruptcy crime to meddle with the assets of the estate and that's subject to criminal penalties."[21]

Despite the Court's warning, Crooks and Davis and the other Defendants proceeded to remove, transfer and use, and continue to use up to the present time, without Court authorization, estate assets. The removal of estate assets and property included, but was not limited to, removal of monies in bank accounts, cash, accounts receivable, Debtors' tradename, good will, trade secrets, corporate opportunities, corporate name, equipment, inventory, furniture, fixtures, customer lists, licenses, permits, certifications, and other tangible and intangible assets . . ..[22]

On March 22, 1993, the Court entered an order approving the appointment of Francis L. Hunt as Chapter 11 Trustee. On March 23, 1993, Hunt visited [1984 Flood's] principal place of business and determined that the Debtors' business had been shut down, its employees terminated and the principals of [1984 Flood], Crooks and Davis, were working for a competing business doing business as J.C. Flood, Inc. . . . .[23]

---

[17] Verified Complaint for Appointment of a Receiver ¶ 28, attached to Rinn Decl. (doc. 37-4) as Ex. B-1, which Defendants attached to their Motion for Summary Judgment ("MSJ").
[18] Id. at ¶ 29.
[19] Id. at ¶ 30.
[20] Id. at ¶ 38.
[21] Id. at ¶ 39.
[22] Id. at ¶ 40.
[23] Id. at ¶ 41 (emphasis added).

One employee of [1984 Flood] has stated that after the Court appointed a Trustee [on March 2, 1993], he was directed by Defendants to remove inventory, equipment and supplies from [1984 Flood] to a warehouse in Baltimore for the future use of [the sham entities].[24]

In his Verified Complaint for Appointment of a Receiver, the trustee asserted multiple claims against the adversary proceeding defendants, which included the sham entities, Crooks, Davis and the Smileys.[25]  In the simultaneously-filed memorandum in support, the trustee echoed the separateness of 1984 Flood from any of the sham entities.  In the section supporting his claim of "Unfair Competition in Appropriating and Infringing Trade Name," the trustee explained that: "Reasonable consumers would forseeably and understandably, but incorrectly, conclude that 'J.C. Flood, Inc.' is the same entity as JOHN C. FLOOD, INC. [or 1984 Flood]."[26]

On June 5, 1995, a temporary receiver was appointed.  At least until that date, any use of the FLOOD marks by the sham entities (including but not limited to J.C.F., Inc., J.C. Flood, John C. Flood of D.C., Inc., John C. Flood of Maryland, Inc., and MDMC, Inc., a/k/a Mel Davis and Mark Crooks, Inc.) was done in violation of the U.S. Bankruptcy Code.[27]


The Smileys' Purchase of 3 Sham Entities, which eventually formed Defendant 1996 Flood, did not Include any Good Will because of the Intervening Lack of *Bona Fide* Use, Above

Eventually, in a bankruptcy sale, the Smileys purchased the assets of three of the sham entities (John C. Flood of Maryland, Inc., John C. Flood of D.C., Inc., and MCMD, Inc.).  In the sale to the Smileys, the trustee purported to sell the good will and trade names of 1984 Flood. The Smileys received some tangible assets in exchange for their $425,000 purchase of stock of John C. Flood of Maryland, Inc., John C. Flood of D.C., Inc. and MCMD, Inc. at the bankruptcy

---

[24] Id. at ¶ 42.
[25] See Id. ¶¶ 58-150.
[26] See Mem. in Supp. of Verified Complaint for Appointment of Receiver at 13, attached to Rinn Decl. (doc. 37-4) as Ex. B-2.
[27] See Verified Complaint for Appointment of a Receiver ¶¶ 27-57.

sale on October 27, 2007, including but not limited to:

> real and personal [property], wherever located, including but not limited to stocks, bonds, investory equipment, supplies, accounts, bank accounts, accounts receivable, cash collections, work-in-progress, checks, promissory notes, commercial paper, vehicles, licenses, permits, certificates and assets of every kind and nature of [the above three sham entities], wherever located . . . .[28]

Later, in February 1996, the Smileys incorporated 1996 Flood. They trace its roots through the sham entities, all the way back to 1984 Flood, despite the break in the chain of title.

## No Evidence in the Record of Anything More than Mere Token Use of the FLOOD Marks by 1984 Flood after it Filed Bankruptcy in 1991, or by Defendants or the Sham Entities

The advertisements and invoices that Defendants attached to their summary judgment motion[29] support the proposition that 1984 Flood did <u>not</u> continue to use the FLOOD marks in any *bona fide* manner after it filed bankruptcy in June 1991.[30]  To the contrary, Defendants' attachments show advertisements and invoices as early as February 1991 where Crooks and Davis apparently held themselves out as "Third Generation Flood, Inc.," rather than "John C. Flood, Inc."[31]  For 1993, the attached ads show Defendants' holding themselves out as "J.C. Flood Co."[32]  These cast doubt on 1984 Flood's viability as an existing entity both before and after it filed bankruptcy in June 1991.  Additionally, the reason the court appointed a trustee in the first place on March 2, 1993 was because Crooks, Davis and the Smileys were failing to comply with the Bankruptcy Code.[33]

Further, Haislip monitored 1984 Flood's activities in the marketplace and its use of the FLOOD marks from June 1991, when Davis and Crooks resigned from Virginia Flood and when

---

[28] <u>See</u> Motion for Entry of Order Authorizing Private Sale of Stock and Other Assets, ¶ 3, attached as Ex. 10 to Rinn Decl. (doc. 37-4); Order Granting Motion, attached as Ex. 13 to Rinn Decl. (doc. 37-4)
[29] <u>See</u> Ex. A-3 to Davis Decl. (doc. 37-3, attached to Defendants' MSJ).
[30] Virginia Flood's Response to SUMF No. 8.
[31] <u>See</u> Ex. A-3 to Davis Decl. (doc. 37-3), Bates nos. 710, 1242, 1241, 1243, 1238, 1239, 1237, 1233, 1244.
[32] <u>Id.</u> , Bates nos 1039, 1043, 1038.

they and 1984 Flood filed bankruptcy.[34]   Although other entities appeared to begin using the
FLOOD marks, 1984 Flood's use of the Flood marks became *de minimus* after June 1991, and
eventually curtailed completely.[35]

Nor is there proof in the summary judgment record that 1984 Flood used the FLOOD
marks in DC or Virginia.[36]   Further, there is no proof in the record as to the *extent* of use of the
FLOOD marks by 1984 Flood in any jurisdiction, other than the limited telephone book ads that
Defendants have produced.  Virginia Flood has requested financial records seeking to examine
the extent of use of the FLOOD marks by 1984 Flood and other entities, but Defendants have
refused to cooperate.  For example, such information presumably would indicate, for 1984 Flood
and the other entities, the volume of work conducted, the investment spent on advertising, the
number of employees in the field, among other things – all signs of how strong or weak the
entities' presence in the marketplace was for each given year.


<u>No Proof in the Record of Anything More than Assignment in Gross of the FLOOD Marks</u>

Defendants claim that 1996 is the rightful heir to the good will and trademarks that
originated with 1984 Flood.  There is no proof in the summary judgment record, however, that
there was anything more than an assignment in gross of the FLOOD marks.[37]   Instead, the trustee
merely proposed to include in the sale of assets the "tradenames of John C. Flood, Inc. and
Flood, Inc., and <u>any</u> good will and phone numbers related thereto . . . ."[38]

---

[33] Verified Complaint for Appointment of a Receiver ¶ 38, attached as Ex. A-1 to Rinn Decl. (doc. 37-4).
[34] Haislip Decl. ¶ 9, attached hereto as Ex. A.
[35] <u>Id.</u>
[36] <u>See</u> Exs. 1 and 2 to David Decl. (doc. 37-3), which attach telephone book advertisements solely from Maryland, and none from DC or Virginia, between 1984 and June 1991.
[37] <u>See</u> Motion for Entry of Order Authorizing Private Sale of Stock and Other Assets, attached as Ex. 10 to Rinn Decl. (doc. 37-4); Order Granting Motion, attached as Ex. 13 to Rinn Decl. (doc. 37-4)

## II.    SUMMARY JUDGMENT STANDARD

Summary judgment may be granted only if the pleadings and evidence "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  In considering a summary judgment motion, all evidence and the inferences to be drawn from it must be considered in the light most favorable to the nonmoving party. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

"[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any which it believes demonstrate the absence of a genuine issue of material fact.'"  Id. at 323.

Here, there has been inadequate time for discovery: discovery is still ongoing and Defendants have refused to produce documents, despite Virginia Flood's willingness to enter into a two-tiered protective order.[39]  As the Supreme Court explained in Celotex: "In our view, the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  Id. (emphasis added).

---

[38] Id. at ¶ 6 (emphasis added).
[39] See July 2, 2007 email from Virginia Flood's attorney Stephen Zralek to Defendants' attorney Ben Lambiotte, attached as Ex. B to Virginia Flood's Response to Defendants' Motion for Protective Order.

### III.     LEGAL ARGUMENT

**A.     VIRGINIA FLOOD ULTIMATELY SUCCEEDS AT TRIAL BECAUSE IT CAN SHOW PRIORITY AND DEFENDANTS CANNOT.**

1.     Virginia Flood's Registrations for the FLOOD Word and Logo Marks Constitute *Prima Facie* Evidence of Virginia Flood's Ownership of the FLOOD Marks.

Section 7(b) of the Lanham Act states that a certificate of registration on the principal register is *prima facie* evidence of the registrant's ownership of the mark, of the validity of the registration and of the registrant's exclusive right to use the mark in commerce on the goods or services specified therein. 15 U.S.C.A. § 1057(b); See American Ass'n for Advancement of Science v. Hearst Corp., 498 F. Supp. 244 (D.C.D.C. 1980). McCarthy instructs that when the application is signed by a declaration under 18 U.S.C.S. Section 1001, the signing person declares that "[1] he or she believes the applicant to be the owner of the trademark/service mark sought to be registered; [2] to the best of his/her knowledge and belief no other person, firm, corporation, or association has the right to use the above-identified mark in commerce, … and [3] that all statements made of his/her own knowledge are true and all statements made on information and belief are believed to be true." McCarthy on Trademarks, Section 31.21(3)(d)(i) Analyzing the Oath; Lanham Act section 1(a)-(b), 15 U.S.C.S. Section 1051(a)-(b). The oath is phrased in terms of subjective belief – an averment of the declarant's good faith belief that no one else has the legal right to use the mark. "There is nothing in the oath or statute which requires an applicant to disclose anyone who in fact may be using the mark, but not, in the applicant's belief, possess the legal right to use the mark." Id. Thus, if an applicant has a good faith belief that it is the senior user, the oath cannot be fraudulent. Id.

Virginia Flood submitted its applications to the USPTO on March 23, 1999. The USPTO granted Virginia Flood registrations to both the JOHN C. FLOOD Word and Logo marks on April 25, 2000 and on June 6, 2000, respectively, based on its belief that no other users had the

legal right to use the marks. Pursuant to 15 U.S.C. § 1057(b), the certificates of registration that the USPTO issued to Virginia Flood constitute *prima facie* evidence of Virginia Flood's ownership of the marks, the validity of the Marks, and of Virginia Flood's exclusive right to use the marks with the goods or services specified in the certificates. Moreover, Virginia Flood was not obligated to list any other users on its registration applications because its owners believed, and believe, that no one else possessed the legal right to use the marks.[40]

Nowhere in Defendants' motion for summary judgment or statement of undisputed material facts do they attack Virginia Flood's continued or extensive use of the FLOOD marks from 1989 to the present date. To the contrary, the only proof in the record on summary judgment is that Virginia Flood has used the FLOOD marks continuously and extensively from 1989 to the present date.[41] Haislip and Seltzer owned 50% of Virginia Flood from its formation in 1989, until acquiring the remaining 50% ownership interest in Virginia Flood in September or October 1995.[42] Indeed, Defendants cannot succeed with such an attack, as Virginia Flood's registration of the marks[43] serves as an imprimatur of its priority over, and ownership of, the marks.

As owners of Virginia Flood, Haislip and Seltzer believed they possessed the legal right to use the JOHN C. FLOOD mark, and that no other person or entity possessed such right, and caused Virginia Flood to file registration applications with the United States Patent and Trademark Office on March 23, 1999, seeking to register the JOHN C. FLOOD INC. as a Word and Logo mark.[44]

---

[40] Haislip Decl. ¶ 11 (attached hereto as Ex. A).
[41] See Haislip Decl. ¶ 5 (attached hereto as Ex. A).
[42] See Virginia Flood's responses to SUMF Nos. 4 and 13.
[43] Virginia Flood's Stmt. of Add'l Facts No. 16.

2.    Virginia Flood Has Priority Over the FLOOD Marks.

"[I]t is a fundamental trademark principle that the exclusive right to a trademark belongs to the one who first uses it in connection with a trade in certain goods or services, or at least with an active or public attempt to establish such a trade." Satinine Societa in Nome Collettivo di S.A. e M. Usellini v. P.A.B. Produits et Appareils de Beaute, 209 U.S.P.Q. 958, 962 (T.T.A.B. 1981) (citing Sheila's Shine Products, Inc. v. Sheila Shine, Inc., 179 U.S.P.Q. 577 (5th Cir. 1973); Clairol Incorporated v. Holland Hall Products Inc., 165 U.S.P.Q. 214 (T.T.A.B. 1970)). See also 3 McCarthy on Trademarks and Unfair Competition § 16:18 (4th ed. 2007) (trademark ownership rights "flow only from prior use, either actual or constructive").

At trial, Virginia Flood will establish its priority over the FLOOD marks. "To prove entitlement to protection, [a] plaintiff[] must show prior use and ownership. To show prior use, plaintiff[] must demonstrate that (1) [plaintiff] acquired trademark rights prior to the date of defendant[s'] acquisition, (2) plaintiff['s] use of the [mark] has continued since a date prior to defendant[s'] acquisition and (3) that plaintiff['s] prior use is on products with respect to which infringement has been shown." Mele v. Davidson & Assoc., Inc., 2006 WL 1644693, at *4 (W.D.N.Y. 2006) (internal citations omitted). As stated above, the only proof in the record on summary judgment is that Virginia Flood has used the FLOOD marks continuously and extensively from 1989 to the present date.[45] Haislip and Seltzer owned 50% of Virginia Flood from its formation in 1989, until acquiring the remaining 50% ownership interest in Virginia Flood in September or October 1995.[46]

Unlike Virginia Flood, Defendants cannot establish priority. "In order to assert a prior use defense, defendants must prove four elements: (1) present rights in the mark; (2) acquired

---

[44] Haislip Decl. ¶ 11 (attached hereto as Ex. A).
[45] See Haislip Decl. ¶ 5 (attached hereto as Ex. A).

{00222597.4}

prior to the date of registration; (3) continual use of the mark since that date; and (4) use prior to the registrant on the goods or services that are in issue." Pilates, Inc. v. Current Concepts, Inc., 120 F. Supp. 2d 286, 311 (S.D.N.Y. 2000) (citing Dial-A-Mattress, 841 F. Supp. at 1353-54). "Defendants must affirmatively demonstrate an unbroken continuum of use without significant interruption from a date prior to the maturation of plaintiff's rights in the mark. Sporadic use is insufficient to overcome the strong policy behind the Lahnam Act of rewarding those who first seek registration." Id. (emphasis added).

1984 Flood ceased to exist by at least March 2, 1993. Although sham entities owned and controlled by Crooks, Davis and the Smileys appear to have used the FLOOD marks after that date, such use was an unlawful means of diverting bankruptcy assets away from creditors until at least the time a temporary receiver was appointed on June 5, 1995. This period of non-use for over two years constitutes abandonment, as discussed below. Further, Defendants cannot show an unbroken chain of title that links 1984 Flood to 1996 Flood. 1996 Flood's first use of the FLOOD marks should be attributed to the date it was incorporated in February 1996, long after Virginia Flood's first and uninterrupted use of the marks in 1989. 1996 may argue that its first use dates back to the appointment of the temporary receiver on June 5, 1995, or earlier, but such argument must fail. It must fail because is based on unlawful interim use and an assignment in gross, not to mention over two years of non-use by 1984 Flood, indicating abandonment and that no good will existed for 1996 to purchase when it eventually bought assets of three sham entities at a bankruptcy sale. Accordingly, 1996 Flood will be unable to show priority over the FLOOD marks.

---

[46] See Virginia Flood's responses to SUMF Nos. 4 and 13.

**B.**    **1984 FLOOD ABANDONED ITS RIGHTS TO THE FLOOD MARKS AND DEFENDANTS CANNOT SHOW AN UNBROKEN CHAIN OF TITLE BETWEEN 1984 FLOOD AND 1996 FLOOD.**

1984 Flood never used the FLOOD marks after March 2, 1993.[47]  By that date, 1984 Flood was no longer a going concern.[48]  Its owners, Crooks and Davis, had depleted all assets of 1984 Flood, and all employees had either quit or been fired by March 2, 1993 – the date on which a bankruptcy trustee was appointed.[49]

A temporary receiver was appointed on June 5, 1995, in response to fraudulent transfers by Crooks, Davis and the Smileys.[50]  The fraudulent transfers were in violation of the U.S. Bankruptcy Code.[51]  By at least March 2, 1993, Crooks, Davis and the Smileys set up sham entities, which the Trustee referred to as "New Flood."[52]  Any use of the FLOOD marks by the sham entities was unlawful and is not attributable to 1984 Flood for purposes of overcoming abandonment, as argued below.  Regardless of Crooks' and Davis' subjective intent, the objective evidence shows a lapse of use of the FLOOD marks by 1984 Flood for at least two years, which is *per se* abandonment, as argued below.

Defendants committed fraud on the bankruptcy court, dispersed assets in an attempt to hide them from their creditors, stopped operating as 1984 Flood and formed new sham entities in the process.[53]  They now wish to benefit from their underlying fraud, as evidenced by their

---

[47] Virginia Flood's Stmt. of Add'l Facts No. 1.  1984 Flood may have ceased use of the marks prior to this date; discovery, however, is ongoing.

[48] Id. at No. 2.

[49] Id. at Nos. 3-4; Verified Complaint to Avoid and Recover Fraudulent Conveyances, to Compel turnover of Estate Assets, for the Appointment of a Receiver and for Other Relief ("Verified Complaint to Appoint a Receiver") at ¶¶ 28-30, attached as Ex. B-1 to Rinn Decl. (doc. 37-4), attached to Defendants' MSJ.

[50] Verified Complaint to Appoint Receiver at ¶ 10, attached as Ex. B-1 to Rinn Decl. (doc. 37-4); Ex. 4 thereto is a copy of the Order Appointing a Temporary Receiver.

[51] Id. at ¶ 38.

[52] Id. at ¶¶ 28-32; see also id. at ¶ 20.

[53] See Verified Complaint to Appoint Receiver, attached as Ex. B-1 to Rinn Decl.; Mem. in Supp. of Verified Motion to Appoint Receiver, attached as Ex. B-2 to Rinn Decl. (doc. 37-4).  As Defendants set forth in their own memorandum in support of summary judgment, the Verified Motion was well taken and the parties entered into a consent order appointing a temporary receiver, see Rinn Decl. (doc. 37-4) at ¶ 16.  Ultimately a permanent receiver

attempt to draw an unbroken chain of continuity between 1996 Flood and 1984 Flood, which they cannot do. 1996 Flood glosses over the fraudulent activity and the cessation of use of the FLOOD marks by 1984 Flood. Viewing 1996 Flood as the ultimate successor to 1984 Flood, however, would require the Court to overlook the fact that Defendants intentionally drove 1984 Flood out of business by at least March 2, 1993, that Defendants created sham entities in an effort to hide assets from creditors, and that any use of the FLOOD marks by Defendants was unlawful from at least March 2, 1993 through at least June 5, 1995 when a temporary receiver was appointed.[54]

Defendants have failed to produce any documents showing that a legal chain of title exists that connects 1996 Flood to 1984 Flood. Defendants trace 1996 Flood's roots to the sham entities, which Defendants claim continued use of the FLOOD marks under the supervision of the receiver. Such argument fails to overcome 1984 Flood's abandonment of use of the FLOOD marks for over two years, as the first temporary receiver was not appointed until June 5, 1995.[55] Any use of the marks by the sham entities during the over-two-year period was unlawful and, by law, cannot inure to the benefit of 1996 or any other entity, as argued below.

1. **1984 Flood Abandoned its Rights to the Flood Marks on March 2, 1993.**

"[T]he right to exclusive use of a trademark derives from its appropriation and subsequent use in the marketplace. The user who first appropriates the mark obtains an

---

was appointed. See Notice of Consent Order Appointing Permanent Receiver and Granting Permanent Injunctive Relief, attached as Ex. B-9 to Rinn Decl. (doc. 37-4).

[54] See notes 47-52, supra, and accompanying text.

[55] See note 50, supra, and accompanying text. To the extent Defendants attempt to claim automatic protection against Virginia Flood's argument of abandonment by pointing to the existence of a trustee, such claim must fail. The Trustee's duty to marshal assets does not overcome the lack of official corporate records establishing any successor-in-interest relationship: the trustee's job is always to marshal assets. Additionally, Defendants have produced no evidence of anything more than assignment in gross of the marks, which is insufficient under trademark law to establish lawful ownership of a mark after transfer from one owner to another, as explained below.

enforceable right to exclude others from using it, as long as the initial appropriation and use are accompanied by an intention to continue exploiting the mark commercially. To prove *bona fide* usage the proponent of the trademark must demonstrate that his use of the mark has been deliberate and continuous, not sporadic, casual or transitory." <u>Satinine Societa in Nome Collettivo di S.A. e M. Usellini v. P.A.B. Produits et Appareils de Beaute</u>, 209 U.S.P.Q. 958, 962 (T.T.A.B. 1981) (citing <u>La Societe Anonyme des Parfums le Galion v. Jean Patou</u>, 181 U.S.P.Q. 545 (2d Cir. 1974)).

When one party abandons a mark, and the other party uses it continuously, the latter party is deemed to have superior rights to it. <u>See e.g.</u>, <u>Beech-Nut Packing Co. v. P. Lorillard Co.</u>, 273 U.S. 629 (1927). Where a party has discontinued use of a mark with intent not to resume such use, that party is deemed to have "abandoned" the mark. <u>See</u> 15 U.S.C. § 1127 (2006).

Intent to abandon can be inferred. M. L. Cross, Annotation, <u>Abandonment of Trademark or Tradename</u>, 3 A.L.R. 2d 1226 (2007). "The law currently provides that three consecutive years of nonuse is *prima facie* evidence of abandonment." <u>Pilates, Inc. v. Current Concepts, Inc.</u>, 120 F. Supp. 2d 286, 307 (S.D.N.Y. 2000); <u>See</u> 15 U.S.C. § 1127. However, during the period prior to 1996, the law provided that nonuse during "two consecutive years was sufficient." <u>Id.</u>; <u>see</u> <u>also</u> <u>Marshak v. Treadwell</u>, 240 F.3d 184, 199 (3d Cir. 2001); <u>Rivard v. Linville</u>, 133 F.3d 1446, 1449 (Fed. Cir. 1998); <u>Stetson v. Howard D. Wolf & Assocs.</u>, 955 F.2d 847, 850 (2d Cir. 1992) (applying the two-year abandonment rule for abandonment that presumably occurred prior to 1996; Section 1127 of Title 15 of the United States Code was amended in 1994, to be effective January 1, 1996).

Here, there is no question that the use in question of the FLOOD marks occurred prior to the change in the law, which became effective January 1, 1996. When 1984 Flood ceased to

operate, fired its employees and depleted its assets on or before March 2, 1993, it also ceased

using the FLOOD marks. It never resumed such use. Instead, sham entities began using similar

marks, and the Smileys eventually purchased assets from three of the sham entities on October

28, 1995,[56] prior to incorporating and forming 1996 Flood in February 1996. 1984 Flood's non-

use for more than two years indicates *prima facie* abandonment.


      2.      <u>To The Extent Defendants Rely on the Use of the FLOOD Marks by the Sham Entities, Such Use was Unlawful and Cannot Inure to Defendants' Benefit.</u>

"Trademark rights cannot accrue from unlawful commerce . . . ." <u>Weight Watchers Intl,</u>

<u>Inc. v. I. Rokeach & Sons, Inc.</u>, 211 U.S.P.Q. 700, 707 (T.T.A.B. 1981) (citing <u>Nome Collettivo</u>

<u>di S.A. e M. Usellini v. P.A.B. Produits et Appareils de Beaute</u>, 209 U.S.P.Q. 958, 966 (T.T.A.B.

1981)).

"It has been the consistent position of [the Trademark Trial and Appeal] Board and the

policy of the Patent and Trademark Office that a 'use in commerce' means a 'lawful use in

commerce,' and the shipment of goods in violation of federal statute ... may not be recognized

as the basis for establishing trademark rights." <u>The Clorox Company v. Armour-Dial, Inc.</u>, 214

U.S.P.Q. 850, 851 (T.T.A.B. 1982) (citing <u>In re Silenus Wines, Inc.</u>, 189 U.S.P.Q. 533 (T.T.A.B.

1975); <u>In re Stellar International, Inc.</u>, 159 U.S.P.Q. 48 (T.T.A.B. 1968); <u>Clairol, Incorporated v.</u>

<u>Holland Hall Products, Inc.</u>, 165 U.S.P.Q. 214, 218 (T.T.A.B. 1970)).

"The TTAB has provided that use in commerce should be held to be unlawful 'only when

the issue of compliance has previously been determined (with a finding of noncompliance) by an

entity, such as a court or government agency, having competent jurisdiction under the statute in

question, or when there has been a per se violation of a statute regulating the sale of a party's

---

[56] <u>See</u> Rinn Decl. (doc. 37-4) ¶ 22.

{00222597.4}

goods.'" <u>Advertising to Women, Inc. v. Gianni Versace S.P.A.</u>, 2000 WL 1230461, at *5 (N.D. Ill. 2000) (citing <u>Satinine Societa</u>, 209 U.S.P.Q. at 964).

Here there is no question that the sham entities' use of the FLOOD marks was unlawful. As discussed previously, such use was done in an effort to abscond with estate assets and hide them from creditors. Crooks, Davis and the Smileys fired employees of 1984 Flood and depleted its assets while simultaneously instructing employees to begin work for the sham entities and to hide 1984 Flood equipment so that the sham entities could begin using them. The fraudulent activity was in violation of the Bankruptcy Code.[57] It was so flagrant that the trustee had to seek *ex parte* appointment of a receiver. Accordingly, Defendants cannot now enjoy the fruits of their past unlawful use of the FLOOD marks.

3.   <u>If Defendants Can Overcome the Abandonment and Unlawful Use Arguments, They Cannot Show Any Assignment of Rights in the Marks Other Than In Gross.</u>

The sham entities did not possess any good will that could be transferred to 1996 Flood because the sham entities, themselves, did not receive any good will from 1984 Flood after it became defunct. "An owner of a trademark or service mark may not assign the rights to that mark 'in gross,' i.e., divorced from the appurtenant good will that the mark engenders." <u>Pilates, Inc.</u>, 120 F. Supp. 2d at 310 (citing <u>Dial-A-Mattress Operating Corp. v. Mattress Madness, Inc.</u>, 841 F. Supp. 1339, 1350 (E.D.N.Y. 1994)). "Good will is 'the value attributable to a going concern apart from its physical assets[sic]—the intangible worth of buyer momentum emanating from the reputation and integrity earned by the company. A trademark or services is merely the symbol by which the public recognizes that reputation and hence has no independent significance apart from the owner's good will.'" <u>Id.</u>

---

[57] Verified Complaint for Appointment of a Receiver ¶ 38.

In Pilates, at the time of the transfer of the marks, the mark user's business operation was defunct, with the business location closed, the equipment sold, and ample evidence that the business had no substantial assets or income. Id. Thus, the court held that the transferor did not possess any good will with which the marks could have been transferred. Id. In response to the argument that "a naked transfer of a trademark is not invalid per se," the court observed that "it is correct that assignments without a corresponding transfer of physical assets will be upheld where the assignee is producing a product or providing a service which is substantially similar to that of the assignor and where consumers will not be deceived or harmed." Id. at 311 (citing Marshak v. Green, 746 F.2d 927, 930 (2d Cir. 1984)). However, in further response to the argument that "the predecessor's and the successor's services were similar [and] the assignment of the marks was [thus] valid even in the absence of good will," the court held that this rule was inapplicable were the transferor business did not "possess[] good will at the time of the transfer." Id. Accordingly, "the transfer of the mark was an invalid assignment in gross." Id.

Similarly here, any assignment of rights to the FLOOD marks to 1996 Flood was an invalid assignment in gross. E.g., id. With 1984 Flood becoming defunct on or before March 2, 1993, no good will existed that could eventually be transferred to the Smileys in their purchase of assets of three sham entities in the bankruptcy sale on October 28, 1995. Further, as discussed below, questions of material fact exist as to the extent of use of the FLOOD marks by 1984 Flood as early as the time it filed bankruptcy on June 21, 1991.[58]

## C.    EVEN IF DEFENDANTS OVERCOME ABANDONMENT, DEFENDANTS' USE OF THE FLOOD MARKS IS MERELY TOKEN, MEANING NO GOOD WILL EXISTED AT THE TIME THE SMILEYS PURCHASED 3 SHAM ENTITIES THAT FORM THE BASIS OF 1996 FLOOD.

Even if Defendants can overcome abandonment and the fact that the chain of title is

---

[58] Haislip Decl. ¶ 9.

broken, which they cannot, the record establishes that 1984 Flood never used the FLOOD marks after March 2, 1993.[59]  If the Court overlooks this fact, and examines use of the marks by the sham entities between March 2, 1993 and the appointment of a receiver on June 5, 1995, the only evidence in the record of use of the marks is mere token use.[60]  Similarly, the only evidence in the record of use of the FLOOD marks by the sham entities from June 5, 1995 through the establishment of 1996 Flood by the Smileys in 1996 again is mere token use.[61]  Without *bona fide* use of the marks, such use is merely token, as explained below.  To transfer the rights to a trademark, there must be good will.  For good will to exist, there must be *bona fide* use.  Minimal use, such as minimal advertising in a telephone book, establishes nothing more than token use.  Although Defendants argue that they purchased the FLOOD marks and good will at the bankruptcy sale, a dispute of material fact exists as to whether any good will existed at the time of the sale as the extent of use was too token to constitute good will.  (There is also a question of material fact as to the extent of use of the FLOOD marks by 1984 Flood from the time it filed bankruptcy in June 1991[62]; as explained below, however, the record is incomplete on this and many other issues.)

"Use does not include the promotional use of the mark on goods in a different course of trade nor mere token use." Mele v. Davidson & Assoc., Inc., 2006 WL 1644693, at *5 (W.D.N.Y. 2006) (citing Emergency One v. Am. Fireeagle, Ltd., 228 F.3d 531, 536 (4th Cir. 2000).  "Furthermore, advertising alone is not sufficient to constitute use unless it reaches a substantial portion of the public." Id. (citing Lucent Info. Mgmt., Inc. v. Lucent Tech., Inc., 986 F. Supp. 253, 259 (D. Del. 1997), aff'd, 186 F.3d 311 (3d Cir. 1999)).

---

[59] See note 47, supra, and accompanying text.
[60] See Virginia Flood's response to SUMF Nos. 8 & 10.
[61] See Virginia Flood's response to SUMF No. 15.
[62] See Virginia Flood's response to SUMF Nos. 2 & 5.

"Use sufficient to establish common law trademarks rights must be 'sufficiently public to identify or distinguish the marked goods in an appropriate segment of the public mind as those of the adopter of the mark.'" <u>Lucent Info. Mgmt., Inc. v. Lucent Tech., Inc.</u>, 986 F. Supp. 253, 259 (D. Del. 1997), <u>aff'd</u>, 186 F.3d 311 (3d Cir. 1999) (citing <u>Blue Bell, Inc. v. Farah Mfg. Co., Inc.</u>, 508 F.2d 1260, 1265 (5th Cir. 1975)). "The activities 'must have substantial impact on the purchasing public.'" <u>Id.</u> "To establish prior use and the resulting ownership of a trademark, actual sales of goods are not necessarily required." <u>Id.</u> "While a sale or sales is not the '*sine qua non* of a use', it is good evidence of 'activity which would create an association in the mind of the consumer public between the owners of the mark and said mark." <u>Id.</u> (internal citations omitted).

"Several courts have held that advertising alone can not be enough to constitute use." <u>Id.</u> (citing <u>Blue Bell, Inc. v. Farah Mfg. Co., Inc.</u>, 508 F.2d 1260, 1265 (5th Cir. 1975); <u>Steer Inn Sys., Inc. v. Laughner's Drive-In, Inc.</u>, 56 C.C.P.A. 911, 405 F.2d 1401 (C.C.P.A. 1969) ("finding that use of the mark on an office door sign, letterheads and architectural drawings was not enough to prove prior use")). "For advertising alone to constitute use it must be 'of sufficient clarity and repetition to create the required identification [and] must have reached a substantial portion of the public that might be expected to purchase the service.'" <u>Id.</u> (citing <u>T.A.B. Systems v. Pactel Teletrac</u>, 77 F.3d 1372, 1377 (C.A. Fed. 1996)).

Here, there is no question that 1984 Flood ceased using the FLOOD marks on or before March 2, 1993. Prior to that date, however, without the benefit of Defendants' cooperation in discovery, questions remain as to whether 1984 Flood used the FLOOD marks to "reach a substantial portion of the public." <u>E.g.</u>, <u>Mele</u>, 2006 WL 1644693, at *5. Unless 1984 Flood's pre-March 2, 1993 use of the FLOOD marks had a "substantial impact on the purchasing

public," which remains unknown but appears unlikely (reference Haislip declaration; appointment of the trustee as a result of fraudulent activity by Crooks, Davis and Smileys; and limited advertisements produced by Defendants in support of their summary judgment motion), such use was merely token and no good will was present. Lucent, 986 F. Supp. at 259.

As noted above, several courts have held that "advertising alone can not be enough to constitute use." Id. Advertising, however, is all that Defendants have produced in support of their motion for summary judgment to demonstrate use of the FLOOD marks by 1984 Flood. Although Defendants produced purchase orders that the sham entities used, they did not produce any such documents for 1984 Flood. Even if they had, Virginia Flood maintains that financial records are needed in order to capture an accurate picture of the extent of use by 1984 Flood for each relevant time period.

**D.    SUMMARY JUDGMENT IS INAPPROPRIATE WHERE THE MOVING PARTY HAS FAILED TO COOPERATE IN DISCOVERY.**

The above arguments are sufficient to defeat summary judgment, even though they are made without the benefit of full discovery. Virginia Flood has requested discovery, including financial documents, to determine the continuity between, and the extent of use, if any, by 1984 Flood, the sham entities and 1996 Flood, but Defendants have refused to produce such documentation.[63] Virginia Flood agreed to enter into a confidentiality agreement that limits disclosure to attorneys' eyes only, but Defendants nevertheless refused to cooperate in discovery.[64] As a result, Virginia Flood is hamstrung and should not be forced to disprove Defendants' summary judgment arguments without the opportunity to review documents that Defendants continue to withhold.

---

[63] See Virginia Flood's response in opposition to Defendants' motion for protective order.
[64] Id.

{00222597.4}

Defendants cannot refuse to produce requested information and simultaneously hide behind an MSJ and unfounded motion for protective order, where the requested information (if produced) would further demonstrate a dispute of material fact.  See also Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (explaining the need for adequate discovery and how summary judgment is permitted only if there is no genuine issue as to any material fact).


## IV. <u>CONCLUSION</u>

Despite Defendants' unwillingness to cooperate in discovery, Virginia Flood has established that summary judgment is inappropriate based on the limited record.  Had Defendants' cooperated in discovery, additional material facts would be in dispute, further precluding summary judgment.

Respectfully submitted,

_____/s/ Stephen J. Zralek_____
Stephen J. Zralek, *appearing pro hac vice*
Erica Stiff-Coopwood, *appearing pro hac vice*
**BONE McALLESTER NORTON PLLC**
511 Union Street, Suite 1600
Nashville, TN  37219
(615) 238-6300 – phone
(615) 238-6301 – facsimile
szralek@bonelaw.com
estiff-coopwood@bonelaw.com

and

Lisa Dunner, DC Bar # 452004
**DUNNER LAW**
1010 Wisconsin Ave., N.W.
Washington, DC 20007
(202) 298-6002 – phone
(202) 403-3030 – facsimile
ldunner@dunnerlaw.com

*Counsel for John C. Flood of Virginia, Inc.,*
*John C. Flood, Inc. (a Virginia corporation),*
*John C. Flood Contractors, Inc., and the Individual*
*Defendants, Clinton Haislip & James L. Seltzer, Jr.*

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing was served via email to Benjamin J. Lambiotte, Esq. & Steve Varholik, Esq., **GARVEY SCHUBERT BARER**, 1000 Potomac Street, Fifth Floor, Washington, D. C. 20007 on this the 17th day of August 2007.

_____/s/ Stephen J. Zralek_____