**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **JOHN C. FLOOD OF VIRGINIA, INC., et al.** | ) | |
| | ) | |
| **Plaintiffs and Counter-Defendants,** | ) | |
| | ) | |
| **v.** | ) | **Judge Richard J. Leon** |
| | ) | **Case No.: 1:06CV01311** |
| **JOHN C. FLOOD, INC., et al.** | ) | **Deck Type: General Civil** |
| | ) | |
| **Defendants and Counter-Plaintiffs.** | ) | |

_____

**VIRGINIA FLOOD'S RESPONSE**
**TO 1996 FLOOD'S STATEMENT OFUNDISPUTED MATERIAL FACTS**
**& STATEMENT OF ADDITIONAL FACTS PRECLUDING SUMMARY JUDGMENT**

_____

Plaintiffs/Counter-Defendants, John C. Flood of Virginia, Inc., et al. ("Virginia Flood" or "Plaintiffs"), hereby submit the following responses to the statement of undisputed material facts filed by Defendants/Counter-Plaintiffs John C. Flood, Inc., et al. "1996 Flood" or "Defendants"). *Throughout this response, Virginia Flood's references to "1984 Flood" refer specifically to the entity "John C. Flood, Inc.," which was formed by Crooks and Davis in 1984 and which filed Chapter 11 bankruptcy on June 21, 1991 -- not to be confused with any other entity.*

1.      In 1984, Davis and Crooks formed a Maryland corporation called "John C. Flood, Inc." ("1984 Flood") and at that time began engaging in the plumbing, heating, and air conditioning business in the Washington, D.C. metropolitan area, trading under various names containing the dominant term JOHN C. FLOOD and FLOOD. *See* Counterclaims of Defendant-Counterclaim Plaintiff John C. Flood, Inc. ("Counterclaim"), ¶ 11, at 14, and Answers of Counter-Defendant John C. Flood of Virginia, and Third-Party Counterclaim Defendants John C. Flood, Inc., John C. Flood Contractors, Inc., and Answer by Individual Third Party Defendants

Clinton Haislip and James Seltzer ("Answers to Counterclaim"), Seventh Defense, ¶ 11

(allegation of Paragraph 11 of Counterclaim admitted); Plaintiff's First Amended Complaint, ¶6.

**RESPONSE: Admitted.**


2.      Between 1984 and June 1991, 1984 Flood, owned and controlled by Davis and

Crooks, continuously traded under and used the name JOHN C. FLOOD, INC. and other

variations containing the dominant element JOHN C. FLOOD and FLOOD as trade names and

service marks, in the Washington D.C., metropolitan area, including in Maryland, Virginia and

the District of Columbia, in connection with plumbing, heating, and air conditioning services.

During this period, 1984 Flood displayed continuously the name and mark JOHN C. FLOOD

and similar names and marks, and the phrase WE DO IT ALL, on service trucks, on contracts,

invoices, in telephone directory listings and ads, and/or in mass market advertising. Declaration

of Mel Davis, ¶¶ 4-5 (Exhibit A hereto, "Davis Dec., Ex. A"), and Att. A-1 thereto, (telephone

directory listings and advertisements showing use of JOHN C. FLOOD and WE DO IT ALL

from 1985 to 1991); *Counterclaim,* If 12; *Answers to Counterclaim,* Seventh Defense, ¶ 12, at 5

(admitted in part; admitted as to 1984 Flood, and admitted that Davis/Crooks owned and

controlled 1984 Flood until June 1991, when bankruptcy petitions filed).

> **RESPONSE: DENIED that 1984 Flood used the FLOOD Marks in DC or Virginia.
> (See Ex. 1 to David Decl. (doc. 37-3), which attaches telephone book advertisements
> solely from Maryland, and none from DC or Virginia).  DENIED that the authority
> cited by Defendants establishes sufficient extent of 1984 Flood's use of the FLOOD
> marks to overcome Virginia Flood's attack on its use as merely token.  DENIED
> that the authority cited above by Defendants references use of any mark other than
> "JOHN C. FLOOD, INC."  See id.  Further, Defendants have cited three of the
> exact same telephone book advertisements placed with the Telephone Company of
> Maryland in 1991 as authority for SUMF Nos. 2, 5 and 8.  See id. (bearing Bates
> stamps 771, 773 and 775).**
>
> **Otherwise, admitted.**

3.       In late 1989, some four years after they and 1984 Flood began using JOHN C. FLOOD and similar variants, and WE DO IT ALL, Davis and Crooks formed John C. Flood of Virginia, Inc., now the Plaintiff in this case ("Virginia Flood").  Davis and Crooks formed the company for the purpose of expanding in Northern Virginia the operations of 1984 Flood's JOHN C. FLOOD plumbing, heating and air conditioning business they already owned and controlled.  Davis Dec. Ex. A ¶ 6.

**RESPONSE**: Admitted.

4.       Davis and Crooks invited Third-Party Counterclaim Defendants Clinton Haislip ("Haislip") and James Seltzer ("Seltzer") to join Virginia Flood as shareholders. *Id.* ¶ 7.  From the inception of the company in 1989, to and including March 1995, Haislip and Seltzer owned a non-controlling equity interest in Virginia Flood.  From some point in 1989 to March 29, 1995, Davis and Crooks owned a 50% interest collectively, and Haislip and Seltzer owned collectively the other 50% interest.  *Counterclaim,* 1113-17; *Answers to Counterclaim,* Seventh Defense, ¶¶ 13 & 17.

> **RESPONSE: Virginia Flood DENIES any characterization that Crooks and Davis ever owned more than 50% interest in Virginia Flood and DENIES any characterization that Crooks and Davis ever controlled Virginia Flood, as their ownership interest was never more than 50%.  See Defendants' Statement of Undisputed Material Fact ("SUMF") No. 4 and underlying citations thereto. Further, on July 19, 1991, Crooks and Davis resigned as officers of Virginia Flood. Haislip Decl. at ¶ 7; see also Resolution of Board of Directors attached as Ex. A to Haislip Decl.**
>
> **Otherwise, admitted.**

5.       From about 1989 through and including June 1991, 1984 Flood and Virginia Flood were related companies, in which Davis and Crooks had substantial ownership interests,

and controlled the use of the FLOOD marks.  During this period, 1984 Flood used JOHN C. FLOOD and similar variants as trade names and service marks on trucks, business forms, and in advertising and promotional materials, subject to Davis' and Crooks' control and approval.  Davis Dec. Ex. A. ¶ 8 and At. A-2 thereto (telephone directory listings and ads from 1990-91). *Id.* ¶ 8.

> **RESPONSE:  DENIED that Crooks and Davis ever controlled the use of the FLOOD marks belonging to Virginia Flood, or that their ownership interest in Virginia Flood was ever more than 50%.  See Defendants' SUMF 4, and underlying citations thereto.  Further, on July 19, 1991, Crooks and Davis resigned as officers of Virginia Flood.  Haislip Decl. at ¶ 7; see also Resolution of Board of Directors attached as Ex. A to Haislip Decl.**
>
> **DENIED that 1984 Flood used the FLOOD Marks in DC or Virginia.  (See Ex. 2 to David Decl. (doc. 37-3), which attaches telephone book advertisements solely from Maryland, and none from DC or Virginia).  DENIED that the authority cited by Defendants establishes sufficient extent of 1984 Flood's use of the FLOOD marks to overcome Virginia Flood's attack on its use as merely token.  DENIED that the authority cited above by Defendants references use of any mark other than "JOHN C. FLOOD, INC."  See id.  Further, Defendants have cited three of the exact same telephone book advertisements placed with the Telephone Company of Maryland in 1991 as authority for SUMF Nos. 2, 5 and 8.  See id. (bearing Bates stamps 771, 773 and 775).**
>
> **Otherwise, admitted.**

6.      On June 21, 1991, 1984 Flood, Davis, Crooks and their wives each filed petitions for relief and reorganization under Chapter 11 of the U.S. Bankruptcy Code in the U.S. Bankruptcy Court for the District of Maryland.  Declaration of Michael Rinn, Esquire, (Exhibit B hereto "Rinn Dec. Ex. B") ¶ 4 & Att. B-1 thereto (Adversary Proceeding Complaint) ¶¶ 5-10. They intended to reorganize and to continue the JOHN C. FLOOD business.  Davis Dec, Ex A ¶ 9.

> **RESPONSE: DENIED that 1984 Flood intended to reorganize and continue 1984 Flood (whose official legal name was "John C. Flood, Inc.") when it filed Chapter 11 bankruptcy in 1991, as 1984 Flood's actions in hiding assets and attempting to deplete the bankruptcy estate led the Trustee to move to appoint a receiver to guard against fraudulent transfers, which objectively is at odds with any subjective intent**

to continue use of the marks by 1984 Flood.  See Rinn Decl.[1] (doc. 37-4) ¶¶ 5-7 and underlying documents cited therein (explaining how he sought the appointment of a receiver to protect assets from fraudulent transfers by 1984 Flood and its owners after learning that 1984 Flood had established sham entities, including J.C.F., Inc., trading as J.C. Flood, John C. Flood of D.C., Inc., John C. Flood of MD, Inc., and MDMC, Inc. a/k/a Mel Davis and Mark Crooks, Inc.).  Virginia Flood further DENIES that 1984 Flood is entitled to attribute to itself any use of the Flood marks by the sham entities, which the owners of 1984 Flood created through fraud.

See also Haislip Declaration at ¶ 9 (explaining that he monitored 1984 Flood's activities in the marketplace and its use of the FLOOD marks from June 1991, when Davis and Crooks resigned from Virginia Flood and when they and 1984 Flood filed bankruptcy.  Although other entities appeared to begin using the FLOOD marks, 1984 Flood's use of the Flood marks became *de minimus* after June 1991, and eventually curtailed completely.).

In discovery, Virginia Flood requested records related to the finances and corporate structure and organization of 1984 Flood and the sham entities its owners later created, and even agreed to a two-tiered confidentiality agreement, but Defendants have refused to produce such documents.  Virginia Flood intends to examine and use the withheld documents to further establish that 1984 Flood ceased to exist at the time it filed bankruptcy, attempted to hide assets from creditors, and ceased to use the FLOOD marks in anything more than a token manner after filing Chapter 11 bankruptcy on June 21, 1991, or alternatively at least as early as March 2, 1993 when a receiver was appointed.  1996 Flood cannot refuse to produce such documents and simultaneously claim that no dispute of material fact exists.  See Virginia Flood's Response to Defendants' Motion for Protective Order.

Admitted that 1984 Flood, Davis, Crooks and their wives filed Chapter 11 bankruptcy.

7.     From June 21, 1991 through and including March 1993, Davis and Crooks continued to control and operate 1984 Flood, which continued to conduct business and trade under and use JOHN C. FLOOD names and marks, and Davis and Crooks continued to hold their stock in 1984 Flood and Virginia Flood, as debtors-in-possession for the Chapter 11 bankruptcy estate.  Davis Dec. Ex A at ¶ 10; Rinn Dec, Ex B ¶ 4.

---

[1] Defendants submitted the Rinn Declaration in support of their motion for summary judgment as Exhibit B to their motion.  It actually helps Virginia Flood establish disputes of material fact.  The Rinn Declaration contains two paragraphs labeled number "5."

**RESPONSE:  DENIED that Davis and Crooks continued to control and operate 1984 Flood after filing Chapter 11 through March 1993, as 1984 Flood discontinued to use the FLOOD marks when it hid assets and depleted the bankruptcy estate, which led the Trustee to move to appoint a receiver to guard against fraudulent transfers.  See Rinn Declaration ¶¶ 5-7 and underlying documents cited therein (explaining how he sought the appointment of a receiver to protect assets from fraudulent transfers by 1984 Flood and its owners after learning that 1984 Flood had established sham entities, including J.C.F., Inc., trading as J.C. Flood, John C. Flood of D.C., Inc., John C. Flood of MD, Inc., and MDMC, Inc. a/k/a Mel Davis and Mark Crooks, Inc.).  Virginia Flood further DENIES that 1984 Flood is entitled to attribute to itself any use of the Flood marks by the sham entities, which the owners of 1984 Flood created through fraud.**

**Haislip monitored 1984 Flood's activities in the marketplace and its use of the FLOOD marks from June 1991, when Davis and Crooks resigned from Virginia Flood and when they and 1984 Flood filed bankruptcy.  Although other entities appeared to begin using the FLOOD marks, 1984 Flood's use of the Flood marks became *de minimus* after June 1991, and eventually curtailed completely.).  Haislip Decl. ¶ 9.**

**In discovery, Virginia Flood requested records related to the finances and corporate structure and organization of 1984 Flood and the sham entities its owners later created, and even agreed to a two-tiered confidentiality agreement, but Defendants have refused to produce such documents.  Virginia Flood intends to examine and use the withheld documents to further establish that 1984 Flood ceased to exist at the time it filed bankruptcy, attempted to hide assets from creditors, and ceased to use the FLOOD marks in anything more than a token manner after filing Chapter 11 bankruptcy on June 21, 1991, or alternatively at least as early as March 2, 1993 when a receiver was appointed.  1996 Flood cannot refuse to produce such documents and simultaneously claim that no dispute of material fact exists.  See Virginia Flood's Response to Defendants' Motion for Protective Order.**

**Admitted that Davis and Crooks remained owners of 50% interest in Virginia Flood from its organization in 1989 until approximately March, 1995.**

8.    During this period [June 1991 through March 1993], 1984 Flood, under Davis' and Crooks' day to day direction and control as Chapter 11 debtors-in-possession, continued to use JOHN C. FLOOD and FLOOD to advertise and promote plumbing, heating and air conditioning business in the Washington D.C. metropolitan area.  Davis Dec, Ex. A at ¶ 11. They continued to display JOHN C. FLOOD on service trucks, signage, business forms,

brochures and advertising.  Davis Dec. Ex. A at ¶ 11 & Att. A-3 (telephone directory ads and

listings from June 1991 to September 1993; 1991 *Washington Post* ad proof Bates 00710;1992

back cover *Washington Post TV Week* ads Bates 0711-0716; and work orders, invoices,

contracts, etc.) thereto.

> **RESPONSE**: **DENIED that 1984 Flood continued to use the FLOOD marks after it filed Chapter 11 bankruptcy on June 21, 1991, when it hid assets and depleted the bankruptcy estate, which led the Trustee to move to appoint a receiver to guard against fraudulent transfers.   <u>See</u> Rinn Declaration ¶¶ 5-7 and underlying documents cited therein (explaining how he sought the appointment of a receiver to protect assets from fraudulent transfers by 1984 Flood and its owners after learning that 1984 Flood had established sham entities, including J.C.F., Inc., trading as J.C. Flood, John C. Flood of D.C., Inc., John C. Flood of MD, Inc., and MDMC, Inc. a/k/a Mel Davis and Mark Crooks, Inc.).  Virginia Flood further DENIES that 1984 Flood is entitled to attribute to itself any use of the Flood marks by the sham entities, which the owners of 1984 Flood created through fraud.**
>
> **DENIED that the ads and invoices that Defendants attached as Ex. A-3 to Davis Decl. (doc. 37-3, attached to Defendants' MSJ) support the proposition that 1984 Flood continued to use the FLOOD marks in any *bona fide* manner after it filed bankruptcy in June 1991.   To the contrary, Defendants' attachments show advertisements and invoices as early as February 1991 where Crooks and Davis apparently held themselves out as "Third Generation Flood, Inc.," rather than "John C. Flood, Inc."  (Doc. 37-3, Bates nos. 710, 1242, 1241, 1243, 1238, 1239, 1237, 1233, 1244).  For 1993, the attached ads show them holding themselves out as "J.C. Flood Co." (doc 37-3, Bates nos 1039, 1043, 1038).  These cast doubt on 1984 Flood's viability as an existing entity both before and after it filed bankruptcy in June 1991.**
>
> **Haislip monitored 1984 Flood's activities in the marketplace and its use of the FLOOD marks from June 1991, when Davis and Crooks resigned from Virginia Flood and when they and 1984 Flood filed bankruptcy.  Although other entities appeared to begin using the FLOOD marks, 1984 Flood's use of the Flood marks became *de minimus* after June 1991, and eventually curtailed completely.).  Haislip Decl. ¶ 9.**
>
> **In discovery, Virginia Flood requested records related to the finances and corporate structure and organization of 1984 Flood and the sham entities its owners later created, and even agreed to a two-tiered confidentiality agreement, but Defendants have refused to produce such documents.  Virginia Flood intends to examine and use the withheld documents to further establish that 1984 Flood ceased to exist at the time it filed bankruptcy, attempted to hide assets from creditors, and ceased to use the FLOOD marks in anything more than a token manner after filing Chapter 11 bankruptcy on June 21, 1991, or alternatively at least as early as March 2, 1993 when a receiver was appointed.   1996 Flood cannot refuse to produce such**

documents and simultaneously claim that no dispute of material fact exists.  **See Virginia Flood's Response to Defendants' Motion for Protective Order.**

Further, Defendants have cited three of the exact same telephone book advertisements placed with the Telephone Company of Maryland in 1991 as authority for SUMF Nos. 2, 5 and 8.  **See id.** (bearing Bates stamps 771, 773 and 775).

9.      On March 22, 1993, a Chapter 11 Trustee was appointed for 1984 Flood, Davis and Crooks, and Davis and Crooks ceased to be debtors-in-possession.  On September 21, 1993, each of 1984 Flood's, Davis', Crooks' and their wives' cases were converted to proceedings under Chapter 7 of the Bankruptcy Code, and all of the cases were consolidated and administered under the Chapter 7 case styled *John C. Flood, Inc, et alia,* 91-4-3011 SD, Rinn Dec., Ex. B. ¶ 4.

**RESPONSE: Admitted that Rinn's declaration speaks for itself.**

10.      After the Chapter 11 receiver was appointed for 1984 Flood in March 1993, the individual debtors, Davis and Crooks, and the Smileys (who were members of Davis' family) continued to carry on the plumbing, heating and air conditioning business of 1984 Flood in the Washington D.C. metropolitan area.  They traded and advertised under various corporations and trade names, using variations of JOHN C. FLOOD and FLOOD, including J.C.F., Inc., J.C. Flood, John C. Flood of D.C, Inc., and John C. Flood of MD, Inc.  These entities displayed FLOOD names and marks on service trucks, signage, business forms, brochures and advertising, continuously, through and after June 1995, when a receiver was appointed by the Bankruptcy Court to take control of the entities.  Davis Dec. Ex. A 1 112 & Att. A-3 through A-4 (3/93-6/95 work, orders; invoices); Rinn Dec. Ex. B ¶ 5-8 & Att. B-2 Exhibit A (J.C. Flood *Merchandiser* ad).

**RESPONSE:  DENIED.  See response to Number 8, above.**

**In addition, it is also DENIED that the documents Defendants attached as A-4 to the Davis Decl. support Defendants' proposition that 1984 Flood continued to use the FLOOD marks after the receiver was appointed on March 2, 1993.  To the contrary, Defendants' attachments fail to show a single instance in which 1984 Flood ("John C. Flood, Inc.") is referenced.  Instead, the advertisements and invoices attached as A-4 to the Davis Decl. refer to the following entities: J.C. Flood Co., John C. Flood of MD, Inc., and John C. Flood of D.C., Inc., and J.C.F. Inc. t/a J.C. Flood Company – each of which was a sham entity created by Defendants in an effort to fraudulently transfer and conceal assets from creditors.  (See documents attached as A-4 to the Davis Decl. (37-3)).**

11.    As of March 1995, Haislip and Seltzer had filed certain claims against the estates of 1984 Flood, Davis and Crooks.  FAC ¶ 12.

**RESPONSE:  Admitted.  (Defendants' citation, above, should be to paragraph 26, rather than paragraph 12, of the First Amended Complaint.)  Paragraph 26 of the First Amended Complaint states: "Upon information and belief, Virginia Flood, Haislip and Seltzer filed claims in the consolidated bankruptcy cases against 1984 Flood, Davis and Crooks in the liquidated amount of $100,000.00, in addition to other unspecified and unliquidated amounts."  Ultimately, Virginia Flood, Haislip and Seltzer settled their claims against 1984 Flood, Davis and Crooks by receiving the remaining 50% ownership interest in Virginia Flood in exchange for payment of $55,000.  See First Amended Complaint at ¶ 27; SUMF No. 13.**

12.    Haislip and Seltzer had knowledge of the bankrupt debtors' use of the FLOOD name, and documentation of their advertising under those names. Michael G. Rinn, Esquire, by then the Chapter 7 Trustee of 1984 Flood, Davis and Crooks' bankruptcy estates ("Rinn," or "Trustee") planned to elicit their testimony and introduce such documentation in proceedings against the debtors arising from such use.  Rinn Dec. Ex, B 9 & Att. B-3 & B-5 thereof (subpoenas).

**RESPONSE:  DENIED.  See response to Number 8, above.**

**Haislip monitored 1984 Flood's activities in the marketplace and its use of the FLOOD marks from June 1991, when Davis and Crooks resigned from Virginia**

> **Flood and when they and 1984 Flood filed bankruptcy. Although other entities appeared to begin using the FLOOD marks, 1984 Flood's use of the Flood marks became *de minimus* after June 1991, and eventually curtailed completely.). Haislip Decl. ¶ 9.**
>
> **As owners of Virginia Flood, Haislip and Seltzer believed they possessed the legal right to use the FLOOD marks, and that no other person or entity possessed such right, and caused Virginia Flood to file registration applications with the United States Patent and Trademark Office on March 23, 1999, seeking to register JOHN C. FLOOD as a Word and Logo mark. Haislip Decl. ¶ 11.**
>
> **Further, it is immaterial what testimony Trustee Rinn *intended* to elicit in bankruptcy proceedings. As his own declaration indicates, such hearing never occurred. Rinn Decl. ¶ 10.**

13.    In or about March 1995, Haislip and Seltzer, and the Trustee reached a settlement of Haislip's and Seltzer's claims. The Trustee agreed to sell to them Davis' and Crooks' 50% interest in Virginia Flood stock held by the estates, for $55,000. As part of the consideration for the sale, the Trustee agreed to release Haislip, Seltzer and Virginia Flood from claims, causes of action or disputes the Trustee may hold against them, and Virginia Flood agreed to release the bankruptcy debtors and their estates, and assign to the Trustee any claims, causes of action or disputes Virginia Flood had with respect to the consolidated bankruptcy cases. First Amended Complaint ¶ 27; Rinn Dee. Ex. B ¶ 24 & Att. B-14 (March 16, 1995, Letter from Sweeny to Weltmann re terms of Sale of Virginia Flood stock, Bates No. DCDC 2437-38, 2442-43). Notice of the settlement was given to creditors on March 28, 1995, and the deadline for objections to the settlement described in the Notice ran without any being filed on April 20, 1995. Rinn Dec, Ex. B ¶ 24 B-15 (April 20, 1995, Clerk's Certificate of No Objections and March 25, 1995, Notice of Settlement). However, the formal Stock Purchase Agreement transferring the stock was not fully executed until October 1995, as Rinn signed it in September, and Haislip and Seltzer in mid-

October, 1995.  Rinn Dec. Ex. B ¶ 24 & Att. B-14 (signed and notarized Stock Purchase

Agreement, Bates Nos. Flood DCDC 2132-36).

> **RESPONSE: Admitted for purposes of summary judgment only.  (Contrary to Defendants' citations above, neither ¶ 27 of the First Amended Complaint nor Rinn Decl. ¶ 24 states that the Trustee agreed to release Haislip, Seltzer and Virginia Flood from claims that the Trustee may hold against them.)  Other than identifying the above dates as the time at which Haislip and Seltzer received the remaining 50% ownership interest in Virginia Flood, the above SUMF is immaterial.**

14.    On May 17, 1995, Rinn, Trustee of the consolidated bankruptcy estates of 1984

Flood, Davis and Crooks, commenced an adversary proceeding in the bankruptcy case (the

"Adversary Proceeding") against JCF, Inc. t/a J.C. Flood, John C. Flood of MD, Inc., John C.

Flood of DC, Inc., MDMC, Inc. a/k/a Mel Davis and Mark Crooks, Inc., and the persons

operating and controlling those entities, namely Davis, Crooks and the Smileys.  Rinn Dec. Ex. B

¶ 6 & Att. B-1 thereto (Verified Adversary Proceeding Complaint).

> **RESPONSE: Admitted.  As the underlying documents referenced in the Rinn Declaration establish, the Trustee filed a "Verified Complaint to Avoid and Recover Fraudulent Conveyances, to Compel Turnover of Estate Assets, [and] for the Appointment of a Receiver."  See Rinn attachment B-1 (providing a substantial account of Defendants' fraudulent activity prompting the appointment of a receiver).**

15.    In the Adversary Proceeding, the Trustee exercised his powers to avoid fraudulent

transfers and compel turnover of estate assets to the Trustee pursuant to the Bankruptcy Code.

Among his grounds was that the foregoing "New Flood" entities (as he called them) were the

successors of 1984 Flood.  He sought to compel the defendants to deliver to the estate, account

for, refrain from further use, and to have the Court appoint a receiver to take control of, assets

rightfully belonging to the estate, to preserve them for the creditors of the estate.  He also sought

appointment of a receiver immediately, *ex parte,* to take control of the assets and administer

them for the benefit of the bankruptcy estate. The assets specifically included the FLOOD trade names and goodwill, which the Trustee alleged were being infringed and misappropriated by the individual debtors and their family members. Rinn Dec. Ex. B ¶ 6 & Att. B-1 thereto (Verified Adversary Proceeding Complaint), *passim* & ¶ 7 & Att B-2 thereto (Verified Motion and Memorandum in Support of Verified Motion for Appointment of a Receiver) ¶¶ 12-13.

> **RESPONSE**: DENIED that any goodwill existed to be transferred from 1984 Flood to any other entity because 1984 stopped any *bona fide* use of the FLOOD marks when it filed Chapter 11 bankruptcy in 1991 or, alternatively, at least as early as when the trustee was appointed on March 2, 1993. See Verified Complaint for Appointment of a Receiver, at ¶¶ 27-57 (explaining that all employees quit or were fired, that all funds were depleted, and that Crooks and Davis, among others, attempted to hide assets and defraud the bankruptcy trustee and court), attached as Ex. B-1 to Rinn Decl.

> It is further DENIED that any continuity exists between 1984 Flood and 1996 Flood, or that the sham entities were legal successors in interest to 1984 Flood. Although the trustee declares that he considered the sham entities to be successors in interest to 1984 Flood and that he sought orders declaring such, see Rinn Decl. ¶ 6, Defendants have failed to produce any chain of title showing that the sham entities were legally the successors in interest to 1984 Flood.

> It is further DENIED that 1984 Flood's use of the FLOOD marks was anything more than mere token use. See id. In discovery, Virginia Flood requested records related to the finances and corporate structure and organization of 1984 Flood and the sham entities its owners later created, and even agreed to a two-tiered confidentiality agreement, but Defendants have refused to produce such documents. Virginia Flood intends to examine and use the withheld documents to further establish that 1984 Flood ceased to exist at the time it filed bankruptcy, attempted to hide assets from creditors, and ceased to use the FLOOD marks in anything more than a token manner after filing Chapter 11 bankruptcy on June 21, 1991, or alternatively at least as early as March 2, 1993 when a receiver was appointed. 1996 Flood cannot refuse to produce such documents and simultaneously claim that no dispute of material fact exists. See Virginia Flood's Response to Defendants' Motion for Protective Order.

> It is further DENIED that any assignments of the FLOOD marks occurred in compliance with the requirements of trademark law. 1984 Flood's affairs wound down as of at least March 2, 1993. See Verified Complaint for Appointment of Receiver at ¶¶ 28-30, attached as Ex. B-1 to Rinn Decl. The only evidence in the record regarding the chain of title passing from 1984 Flood to the sham entities is premised on (a) an unlawful use (in violation of the Bankruptcy Code by hiding assets from the trustee), Id. at ¶¶ 27-57; (b) that the trustee considered the sham

entities to be successors in interest to 1984 Flood and sought orders regarding the same, Rinn Decl. at ¶ 6; and (c) that he eventually transferred the assets in a sale to the Smileys. Copy of order transferring assets of 3 sham entities (John C. Flood of MD, Inc. John C. Flood of DC, Inc. and MCMD, Inc.) to the Smileys, attached as Ex. B-13 to Rinn Decl.

Defendants are not entitled to overcome arguments of abandonment by relying on their unlawful use of the FLOOD marks. Thus, it is DENIED that use of the FLOOD marks by the sham entities constituted a lawful use. Instead, as the Trustee noted in his Verified Complaint for Appointment of a Receiver, the sham entities siphoned off the assets of 1984 Flood at least by the same time it ceased to exist on March 2, 1993, in violation of the Bankruptcy Code. Verified Complaint for Appointment of Receiver at ¶¶ 38-41, 46-47.

16.     On or about June 5, 1995, the Bankruptcy Court entered a Stipulated and Consent Order for a preliminary injunction and temporary appointment of a receiver. Roman Fedirka, still the temporary receiver, was appointed to serve as temporary receiver, to operate, preserve and protect the New Flood assets, including the JOHN C. FLOOD and FLOOD names and related goodwill during the bankruptcy proceeding. Rinn Dec. Ex. 1 311 10 & Att. B-4 (June 1995 Temporary Receivership Order). Among the powers and duties the Court expressly conferred on the receiver were to: "take immediate possession and charge of the right title and interest of all tangible and intangible property of New Flood, wherever located . . . and assets of every kind and nature (collectively the "Assets") and to manage, operate, secure, and control same so as to protect and preserve New Flood as ongoing business entities until further Order of the Court." *Id.* On August 17, 1995, the Court entered a Second Stipulated and Consent Order continuing the receivership under Mr. Fedirka, and charging him with the identical powers and duties. Rinn Dec. Ex. B ¶ 12 & Att. B-6 (August 1995 Second Temporary Receivership Order).

RESPONSE: See response to SUMF 15, above, denying that any goodwill existed to be sold or transferred; denying lack of abandonment by 1984 Flood of the FLOOD marks; denying continuity between 1984 Flood, the sham entities and ultimately 1996 Flood; denying anything more than mere token use of the FLOOD marks by 1984 Flood, the sham entities and 1996 Flood; setting forth the unlawful use by the

**sham entities and related inability to defend against abandonment in light of such unlawful use; and explaining Defendants' obstruction in refusing to respond to discovery requests that seek information related to all of the above.**

**Otherwise, admitted.**

17.    By September 7, 1995, after lengthy negotiations, Rinn and the Adversary Proceeding defendants reached a settlement agreement in principal whereby the estate would, after due notice to all creditors, sell the stock in certain of the New Flood corporations and the JOHN C. FLOOD, INC. and FLOOD, INC. trade names and goodwill, to Davis, Crooks, and Joanne and Robert Smiley on certain terms, including a release of the claims against them. Pending resolution of the details, grant or denial of the motion approving the sale after an opportunity for creditors to object or to submit higher and better bids, and a sale of the assets, the parties consented that Mr. Fedirka would be appointed permanent receiver, with powers similar to those granted in the previous Temporary Receivership Orders.  Rinn Dec. Ex. B ¶13.

> **RESPONSE: <u>See</u> response to SUMF 15, above, denying that any goodwill existed to be sold or transferred; denying lack of abandonment by 1984 Flood of the FLOOD marks; denying continuity between 1984 Flood, the sham entities and ultimately 1996 Flood; denying anything more than mere token use of the FLOOD marks by 1984 Flood, the sham entities and 1996 Flood; setting forth the unlawful use by the sham entities and related inability to defend against abandonment in light of such unlawful use; and explaining Defendants' obstruction in refusing to respond to discovery requests that seek information related to all of the above.**
>
> **Otherwise, admitted.**

18.    A hearing on the consent motion for permanent appointment of a receiver before the Bankruptcy Court was held on September 7, 1995, at which a court reporter was present. Rinn Dec. Ex. B ¶14 & Att. B-7.  The transcript summarizes the details of the contemplated settlement as proposed at the time.  A lawyer, Mr. Gary Weltmann, appeared for John C. Flood

of Virginia, Inc., and attended the hearing. *Id.* & Aft, B-7, cover (showing Weltmann's appearance and client).

**RESPONSE: Admitted, but immaterial.**

19.    On September 7, 1995, the Bankruptcy Court entered a Consent Order Appointing Permanent Receiver and Granting Permanent Injunctive Relief. Rinn Dec. Ex B ¶15 & Att. B-8 thereto. ("Permanent Receivership Order") Among the powers and duties the Court expressly conferred on the receiver were to: "take immediate possession and charge of the right title and interest of all tangible and intangible property of New Flood, wherever located ... and assets of every kind and nature (collectively the "Assets") and to manage, operate, secure, and control same so as to protect and preserve New Flood as ongoing business entities until consummation of sale to a purchaser, subject to further Order of this Court." Att. 8, Permanent Receivership Order, ¶ 1. He was also charged expressly "[t]o prohibit any confusingly similar or otherwise infringing uses of the common law tradename JOHN C. FLOOD, INC., by any individual or entity...." *Id. ¶ 3.*

> **RESPONSE: <u>See</u> response to SUMF 15, above, denying that any goodwill existed to be sold or transferred; denying lack of abandonment by 1984 Flood of the FLOOD marks; denying continuity between 1984 Flood, the sham entities and ultimately 1996 Flood; denying anything more than mere token use of the FLOOD marks by 1984 Flood, the sham entities and 1996 Flood; setting forth the unlawful use by the sham entities and related inability to defend against abandonment in light of such unlawful use; and explaining Defendants' obstruction in refusing to respond to discovery requests that seek information related to all of the above.**
>
> **Defendants have misquoted the Permanent Receivership Order. Otherwise, Virginia Flood admits that the above Order speaks for itself.**

20.    During the entire period of the temporary and permanent receiverships, from June 1995 through and after the sale of the names and goodwill in 1996, the businesses in receivership

never ceased trading and advertising under the JOHN C. FLOOD and FLOOD names and marks. The companies continued to perform plumbing, heating and air conditioning services throughout the Metropolitan Washington, D.C. area, and to use variations of JOHN C. FLOOD and FLOOD, on service trucks, on business forms, and in advertisements, and the like. Smiley Dec. ¶¶ 4-5 & Att. C-1 thereto (representative samples of business forms and ads used during the receivership). The Smileys continued to work in the business, under the supervision of the receiver. *Id.* ¶ 4.

> **RESPONSE: DENIED. See** response to SUMF 15, above, denying that any goodwill existed to be sold or transferred; denying lack of abandonment by 1984 Flood of the FLOOD marks; denying continuity between 1984 Flood, the sham entities and ultimately 1996 Flood; denying anything more than mere token use of the FLOOD marks by 1984 Flood, the sham entities and 1996 Flood; setting forth the unlawful use by the sham entities and related inability to defend against abandonment in light of such unlawful use; and explaining Defendants' obstruction in refusing to respond to discovery requests that seek information related to all of the above.

21.    The Adversary Proceeding settlement proposal contemplated that the ultimate asset sale would be pursuant to 15 U.S.C. § 363, which permits the Trustee to sell estate assets free and clear of all adverse liens, claims, and encumbrances, after due notice to all creditors and parties in interest and an opportunity to object and submit higher and better bids. Rinn Dec. Ex. B ¶ 15 & Att. B-7, Permanent Receiver Motion Hearing Transcript, at 5-17. On September 15, 1995, the Trustee gave formal notice of the appointment of a permanent receiver, to all creditors and parties in interest. *Id.* Rinn Dec. Ex. B ¶ 17 & Att. B-9 (Notice of Permanent Receivership). The Notice provided that: "all creditors will receive additional notice prior to any sale and the notice of the sale will provide for a period of time for creditors and parties in interest to respond and also provide for a hearing to be held." *Id.* & Att. B-9.

> **RESPONSE: See** response to SUMF 15, above, denying that any goodwill existed to be sold or transferred; denying lack of abandonment by 1984 Flood of the FLOOD marks; denying continuity between 1984 Flood, the sham entities and ultimately 1996 Flood; denying anything more than mere token use of the FLOOD marks by

**1984 Flood, the sham entities and 1996 Flood; setting forth the unlawful use by the sham entities and related inability to defend against abandonment in light of such unlawful use; and explaining Defendants' obstruction in refusing to respond to discovery requests that seek information related to all of the above.**

**Otherwise, admitted.**

22.     Early in October, 1995, Rinn reached a settlement with the Adversary Proceeding parties, whereby the trade names and goodwill in and to JOHN C. FLOOD, INC. and FLOOD, INC., and the stock of John C. Flood of MD, Inc. and John C. Flood of DC, Inc. were to be sold, along with the operating assets and liabilities of those companies, pursuant to 15 U.S.C. § 363, free and clear of all adverse liens, claims and interests, to Davis, Crooks, and the Smileys, for $300,000 on terms.  Rinn Dec. Ex. B ¶ 18.  To effectuate the settlement, on October 5, 1995, Rinn filed in the Bankruptcy Court a Motion for Entry of Order Authorizing Private Sale of Stock and Other Assets Free and Clear of Liens and For Approval of Settlement.  *Id.* & Att. B-l0 (with Exhibits A and B) ("Motion for Approval of Sale Free and Clear of Liens").

> **RESPONSE**: <u>See</u> **response to SUMF 15, above, denying that any goodwill existed to be sold or transferred; denying lack of abandonment by 1984 Flood of the FLOOD marks; denying continuity between 1984 Flood, the sham entities and ultimately 1996 Flood; denying anything more than mere token use of the FLOOD marks by 1984 Flood, the sham entities and 1996 Flood; setting forth the unlawful use by the sham entities and related inability to defend against abandonment in light of such unlawful use; and explaining Defendants' obstruction in refusing to respond to discovery requests that seek information related to all of the above.**

**Otherwise, admitted.**

23.     On October 6, 1995, Rinn caused to be served all creditors and parties in interest with a Notice of the Motion for Approval of Sale Free and Clear of Liens, to which was attached the Motion, and exhibits thereto identifying the operating assets and liabilities of the New Flood entities whose stock was to be sold.  Gary Weltmann, counsel to Haislip, Seltzer and John C.

Flood of Virginia, Inc., was served with a copy.  Rinn Dec. Ex. B ¶ 19 & Aft. B-11 (Motion for

Approval of Sale Free and Clear of Liens, including Certificate of Service on Weltmann, *et alia*).

> **RESPONSE: <u>See</u>** response to SUMF 15, above, denying that any goodwill existed to be sold or transferred; denying lack of abandonment by 1984 Flood of the FLOOD marks; denying continuity between 1984 Flood, the sham entities and ultimately 1996 Flood; denying anything more than mere token use of the FLOOD marks by 1984 Flood, the sham entities and 1996 Flood; setting forth the unlawful use by the sham entities and related inability to defend against abandonment in light of such unlawful use; and explaining Defendants' obstruction in refusing to respond to discovery requests that seek information related to all of the above.

> **Immaterial that Gary Weltman was served with a copy of the Notice.**

> **Otherwise, admitted.**


24.    On October 20, 1995, Haislip and Seltzer, through their counsel, Mr. Weltmann,

filed an objection to the Motion to Approve Sale Free and Clear of Liens.  They objected on the

grounds that the Trustee should not settle the case or sell the assets to the proposed purchasers,

Davis, Crooks and Joanne and Robert Smiley, because they had engaged in fraud, and diverted

and concealed assets of the estate.  Rinn Dec. Ex, B ¶ 20 & Att. B-12 (Haislip/Seltzer Objection

to Sale).

> **RESPONSE: <u>See</u>** response to SUMF 15, above, denying that any goodwill existed to be sold or transferred; denying lack of abandonment by 1984 Flood of the FLOOD marks; denying continuity between 1984 Flood, the sham entities and ultimately 1996 Flood; denying anything more than mere token use of the FLOOD marks by 1984 Flood, the sham entities and 1996 Flood; setting forth the unlawful use by the sham entities and related inability to defend against abandonment in light of such unlawful use; and explaining Defendants' obstruction in refusing to respond to discovery requests that seek information related to all of the above.

> **Otherwise, admitted, but immaterial.**


25.    As part of their Objection to Sale, Haislip and Seltzer made an offer to purchase

only the tradenames JOHN C. FLOOD, INC. and FLOOD, INC. for $225,000, on terms, but not

the stock of the New Flood entities.  They noted that, according to the proposed terms of sale, the

purchasers' operation of the business had to be monitored by the Trustee until the purchase price

was paid due to their past history, causing an expense that would cause the estate to derive a

lower net recovery than under Haislip/Seltzer's counteroffer.  Rinn Dec. Ex. B ¶¶ (20-21 & Att.

B-12, Haislip/Seltzer Objection to Sale, ¶ 9.

> **RESPONSE: See** **response to SUMF 15, above, denying that any goodwill existed to be sold or transferred; denying lack of abandonment by 1984 Flood of the FLOOD marks; denying continuity between 1984 Flood, the sham entities and ultimately 1996 Flood; denying anything more than mere token use of the FLOOD marks by 1984 Flood, the sham entities and 1996 Flood; setting forth the unlawful use by the sham entities and related inability to defend against abandonment in light of such unlawful use; and explaining Defendants' obstruction in refusing to respond to discovery requests that seek information related to all of the above.**

> **Otherwise, admitted, but immaterial.**


26.      Haislip and Seltzer's objection did not claim or assert that the estate lacked the

right to sell, or lacked title and interest in and to the JOHN C. FLOOD, INC. and FLOOD, INC.,

trade names and associated goodwill.  Nor did their objection claim or assert that the sale was

invalid because, previously, in or about March 1995, the Trustee had settled their claim against

the estates of Davis and Crooks by selling to Haislip and Seltzer the 50% Virginia Flood interests

owned by debtors Davis and Crooks, as Virginia Flood claims here.  Virginia Flood's Answer to

Counterclaim, ¶ 22; Rinn Dec. Ex. B ¶¶ 20, 23 & Att. B-12, Haislip/Seltzer Objection to Sale.

> **RESPONSE: See** **response to SUMF 15, above, denying that any goodwill existed to be sold or transferred; denying lack of abandonment by 1984 Flood of the FLOOD marks; denying continuity between 1984 Flood, the sham entities and ultimately 1996 Flood; denying anything more than mere token use of the FLOOD marks by 1984 Flood, the sham entities and 1996 Flood; setting forth the unlawful use by the sham entities and related inability to defend against abandonment in light of such unlawful use; and explaining Defendants' obstruction in refusing to respond to discovery requests that seek information related to all of the above.**

> **Otherwise, admitted, but immaterial.**

27.    In response to the issues that were raised in the objection, Davis and Crooks withdrew from the proposed bid, and the Smileys increased their offer from $300,000 to $425,000, on terms.  Rinn Dec. Ex. B ¶ 22; Smiley Dec. Ex. C ¶¶ 6-7.

**RESPONSE: <u>See</u> response to SUMF 15, above, denying that any goodwill existed to be sold or transferred; denying lack of abandonment by 1984 Flood of the FLOOD marks; denying continuity between 1984 Flood, the sham entities and ultimately 1996 Flood; denying anything more than mere token use of the FLOOD marks by 1984 Flood, the sham entities and 1996 Flood; setting forth the unlawful use by the sham entities and related inability to defend against abandonment in light of such unlawful use; and explaining Defendants' obstruction in refusing to respond to discovery requests that seek information related to all of the above.**

**Otherwise, admitted, but immaterial.**

28.    A hearing was held before Judge Keir on October 26, 1995.  Rinn Dec. Ex. B. ¶ 22.  Mr. Weltmann appeared at the hearing.  *Id*.  On October 28, 1995, after considering Haislip and Seltzer's objections and counteroffer, the Court entered an Order approving the sale of the Flood stock and trade name including the trade names JOHN C. FLOOD, INC and FLOOD, INC., and goodwill, to the Smileys and the corporations they were to operate, for the sum of $425,000, on the terms set forth in the Order and the instruments recited therein.  *Id.* & Att. B-13 thereto.  (October 28, 1995, Order authorizing Sale Free and Clear).

**RESPONSE: DENIED that any assets of 1984 Flood were sold to the Smileys. Instead, only assets of John C. Flood of Maryland, Inc., John C. Flood of D.C., Inc. and MCMD, Inc. were sold to the Smileys.  <u>See</u> Oct. 27, 1995 Order attached as Ex. B-13 to Rinn Decl.**

**<u>See also</u> response to SUMF 15, above, denying that any goodwill existed to be sold or transferred; denying lack of abandonment by 1984 Flood of the FLOOD marks; denying continuity between 1984 Flood, the sham entities and ultimately 1996 Flood; denying anything more than mere token use of the FLOOD marks by 1984 Flood, the sham entities and 1996 Flood; setting forth the unlawful use by the sham entities and related inability to defend against abandonment in light of such unlawful use; and explaining Defendants' obstruction in refusing to respond to discovery requests that seek information related to all of the above.**

**Otherwise, admitted.**

29.     On October 5, 1995, the day before he filed the Motion for Approval of Sale Free and Clear of Liens, the Trustee sent a letter to Mr. Weltmann demanding that his clients cease and desist using JOHN C. FLOOD in certain telephone directory advertising without the distinguishing designator "of Virginia."  Rinn wrote: "[w]ithout belaboring the point, I consider your client's use of the Name without the clarification as John C. Flood of Virginia in the same category as the issues which led to litigation of the received entities."  Rinn Dec. Ex. B. ¶, Att. B-l6.

**RESPONSE: Admitted.**

30.     At no time during or after the sale approval process did Mr. Weltmann, Haislip, Seltzer, or anyone else acting for or on behalf of John C. Flood of Virginia, Inc., ever claim or assert before or in connection with the bankruptcy case that the estate lacked the right to sell, or lacked title and interest in and to the JOHN C. FLOOD, INC. and FLOOD, INC., trade names and associated goodwill, despite notice and opportunity to do so.  Nor did they ever claim or assert there that the sale was invalid because, previously, in or about March 1995, the Trustee had settled their claim against the estates of Davis and Crooks by selling to Haislip and Seltzer the 50% ownership interest Davis and Crooks had in John C. Flood of Virginia, Inc.  Virginia Flood's Answer to Counterclaim, ¶ 22; Rinn Dec. Ex. B ¶¶ 20, 23 & Att. B-12 (Haislip/Seltzer Objection to Sale); Smiley Dec, SMF Ex. C ¶ 7-8.  Insofar as the Receiver is concerned, they acted in a manner contrary to such contentions in offering $225,000 for the very same assets. Rinn Dec. SMF Ex. B ¶ 23.

**RESPONSE:** <u>See</u> response to SUMF 15, above, denying that any goodwill existed to be sold or transferred; denying lack of abandonment by 1984 Flood of the FLOOD marks; denying continuity between 1984 Flood, the sham entities and ultimately 1996 Flood; denying anything more than mere token use of the FLOOD marks by 1984 Flood, the sham entities and 1996 Flood; setting forth the unlawful use by the sham entities and related inability to defend against abandonment in light of such unlawful use; and explaining Defendants' obstruction in refusing to respond to discovery requests that seek information related to all of the above.

**Also, immaterial.**


31.     In or about February 1996, the Smileys, John C. Flood, Inc., a newly-formed Maryland corporation (Defendant and Counterclaim Plaintiff here), and the "New Flood" entities in receivership (collectively, "1996 Flood") entered into a Settlement and Forbearance Agreement.  Certain of them executed and delivered a number of associated debt and security instruments with the Trustee (including a Bill of Sale) effectuating, and memorializing the terms of the court-approved purchase of the JOHN C. FLOOD, INC. and FLOOD, INC. tradenames and goodwill, and the stock of the New Flood entities John C. Flood of DC, Inc. and John C. Flood of MD, Inc.  Smiley Dec. Ex. C ¶ 6 & Att. C-2.  The instruments obliged each of the Smileys and those entities to pay the estate the purchase price of $425,000, in monthly installments of $6,666.66 each, and a balloon payment at maturity in December 2000. *Id.*

**RESPONSE:** <u>See</u> response to SUMF 15, above, denying that any goodwill existed to be sold or transferred; denying lack of abandonment by 1984 Flood of the FLOOD marks; denying continuity between 1984 Flood, the sham entities and ultimately 1996 Flood; denying anything more than mere token use of the FLOOD marks by 1984 Flood, the sham entities and 1996 Flood; setting forth the unlawful use by the sham entities and related inability to defend against abandonment in light of such unlawful use; and explaining Defendants' obstruction in refusing to respond to discovery requests that seek information related to all of the above.

**Additionally, Virginia Flood served discovery requests explicitly asking for proof of payment of the purchase price by the Smileys, but Defendants objected, refused to produce it, in addition to calling such request "irrelevant".  <u>See</u> Defendants' Response to Virginia Flood's Request for Production No. 30 (pertinent pages from Response attached hereto as Ex. B).**

32.    The Smileys and 1996 Flood entered into the Settlement and Forbearance Agreement, and executed and delivered the associated debt and security instruments, in reliance on the Court's approval of the purchase - as modified in response to the issues which Haislip and Seltzer had raised in their objection to the original proposal. Smiley Dec. Ex. C ¶ 8. They also relied on the Trustee's right to sell the FLOOD trade names and goodwill free and clear of any and all adverse claims, encumbrances and interests, including any claims and interests which could have been asserted and litigated before the Bankruptcy Court by parties in interest who had received notice of the proposed sale. *Id.* Their expectation in agreeing to buy the assets was that there were no such claims or adverse interests that had not been resolved by the Court. *Id.*

**RESPONSE:    DENIED.    See response to SUMF 15, above, denying that any goodwill existed to be sold or transferred; denying lack of abandonment by 1984 Flood of the FLOOD marks; denying continuity between 1984 Flood, the sham entities and ultimately 1996 Flood; denying anything more than mere token use of the FLOOD marks by 1984 Flood, the sham entities and 1996 Flood; setting forth the unlawful use by the sham entities and related inability to defend against abandonment in light of such unlawful use; and explaining Defendants' obstruction in refusing to respond to discovery requests that seek information related to all of the above.**

33.    They agreed to buy the assets with the understanding that no one, including Haislip and Seltzer or Virginia Flood, had objected on the grounds that the Trustee lacked the right to sell or did not own the trade names and goodwill and that they would acquire the trade names and goodwill free and clear of adverse claims, and interests other than those set forth in the purchase documents. *Id. ¶¶ 7-8.*

**RESPONSE: DENIED.    See response to SUMF 15, above, denying that any goodwill existed to be sold or transferred; denying lack of abandonment by 1984 Flood of the FLOOD marks; denying continuity between 1984 Flood, the sham entities and ultimately 1996 Flood; denying anything more than mere token use of the FLOOD marks by 1984 Flood, the sham entities and 1996 Flood; setting forth the unlawful use by the sham entities and related inability to defend against abandonment in light**

**of such unlawful use; and explaining Defendants' obstruction in refusing to respond to discovery requests that seek information related to all of the above.**

34.    After execution and delivery of the Settlement and Forbearance Agreement and associated debt and security instruments, Defendants continued engaging in the plumbing, heating and air conditioning business in the Washington D.C. metropolitan area under the JOHN C. FLOOD and FLOOD tradenames substantially as it had been conducted under the auspices of the receiver.  *Id.* ¶ 9.  As required in the settlement, until the purchase price was paid in full, Defendants' operations were monitored by and conducted under the supervision of the receiver, Roman Fedirka.  *Id.*

> **RESPONSE: See response to SUMF 15, above, denying that any goodwill existed to be sold or transferred; denying lack of abandonment by 1984 Flood of the FLOOD marks; denying continuity between 1984 Flood, the sham entities and ultimately 1996 Flood; denying anything more than mere token use of the FLOOD marks by 1984 Flood, the sham entities and 1996 Flood; setting forth the unlawful use by the sham entities and related inability to defend against abandonment in light of such unlawful use; and explaining Defendants' obstruction in refusing to respond to discovery requests that seek information related to all of the above.**
>
> **Otherwise, admitted.**

35.    From 1996 through early 2001, 1996 Flood made the monthly payments as required, and, in January 2001, had paid the $425,000 purchase price in full.  *Id.* ¶ 10.

> **RESPONSE: See response to SUMF 31, above.**

36.    From 1996 to and including the present date, 1996 Flood has at all times actively traded under and used JOHN C. FLOOD and variations of FLOOD as trade names and servicemarks to promote their business, through a variety of means, including on service trucks, signage, business forms, in telephone directory ads and listings, in periodical and cable television

ads, and on the Internet.  Smiley Dec. Ex. C. ¶ 11.  Virginia Flood is and has been aware of these

facts.  Virginia Flood's Answer to Counterclaim, ¶ 29; First Amended Complaint ¶¶ 47, 57.

**RESPONSE: DENIED.  See response to SUMF 15, above, denying that any goodwill existed to be sold or transferred; denying lack of abandonment by 1984 Flood of the FLOOD marks; denying continuity between 1984 Flood, the sham entities and ultimately 1996 Flood; denying anything more than mere token use of the FLOOD marks by 1984 Flood, the sham entities and 1996 Flood; setting forth the unlawful use by the sham entities and related inability to defend against abandonment in light of such unlawful use; and explaining Defendants' obstruction in refusing to respond to discovery requests that seek information related to all of the above.**

**Haislip monitored 1984 Flood's activities in the marketplace and its use of the FLOOD marks from June 1991, when Davis and Crooks resigned from Virginia Flood and when they and 1984 Flood filed bankruptcy.  Although other entities appeared to begin using the FLOOD marks, 1984 Flood's use of the Flood marks became *de minimus* after June 1991, and eventually curtailed completely.).  Haislip Decl. ¶ 9.**

**As owners of Virginia Flood, Haislip and Seltzer believed they possessed the legal right to use the FLOOD marks, and that no other person or entity possessed such right, and caused Virginia Flood to file registration applications with the United States Patent and Trademark Office on March 23, 1999, seeking to register JOHN C. FLOOD as a Word and Logo mark.  Haislip Decl. ¶ 11.**

**In discovery, Virginia Flood requested records related to the finances and corporate structure and organization of 1984 Flood and the sham entities its owners later created, and even agreed to a two-tiered confidentiality agreement, but Defendants have refused to produce such documents.  Virginia Flood intends to examine and use the withheld documents to further establish that 1984 Flood ceased to exist at the time it filed bankruptcy, attempted to hide assets from creditors, and ceased to use the FLOOD marks in anything more than a token manner after filing Chapter 11 bankruptcy on June 21, 1991, or alternatively at least as early as March 2, 1993 when a receiver was appointed.   1996 Flood cannot refuse to produce such documents and simultaneously claim that no dispute of material fact exists.  See Virginia Flood's Response to Defendants' Motion for Protective Order.**

37.    1996 Flood spends substantial sums for advertising using the JOHN C. FLOOD

and FLOOD marks, and advertised continuously since 1996.  Smiley Dec. ¶ 12.

**RESPONSE: DENIED.  In discovery, Virginia Flood requested records related to the finances and corporate structure and organization of 1984 Flood and the sham entities its owners later created, and even agreed to a two-tiered confidentiality**

agreement, but Defendants have refused to produce such documents. **Virginia Flood intends to examine and use the withheld documents to further establish that 1984 Flood ceased to exist at the time it filed bankruptcy, attempted to hide assets from creditors, and ceased to use the FLOOD marks in anything more than a token manner after filing Chapter 11 bankruptcy on June 21, 1991, or alternatively at least as early as March 2, 1993 when a receiver was appointed. 1996 Flood cannot refuse to produce such documents and simultaneously claim that no dispute of material fact exists.** <u>See</u> **Virginia Flood's Response to Defendants' Motion for Protective Order.**

38.     Virginia Flood was aware in 1996 that the Smileys and 1996 Flood purchased the JOHN C. FLOOD and FLOOD tradenames and goodwill in a sale approved by the Bankruptcy Court, and planned to use them, because Virginia Flood participated actively in the proceedings. *See* Paragraphs 18-27 hereof, *supra,* and declarations and materials cited in support thereof.

**<u>RESPONSE</u>: DENIED. <u>See</u> response to SUMF No. 36.**

**Admitted only that Virginia Flood was aware that the Smileys purchased assets of sham entities in 1996 from the bankruptcy trustee.**

39.     On June 11, 1996, John P. Morrissey, counsel for 1996 Flood wrote to Haislip and Seltzer complaining that Virginia Flood was infringing the tradenames 1996 Flood had purchased from the Trustee, by using "John C. Flood" in telephone directory advertising, on service trucks, on signage, and in other advertising. Smiley Dec. Ex C, 1113 & Att. C-3 (June 11, 1996 Morrissey to Haislip/Seltzer). He demanded, as the Trustee had in October 1995 before him (*see ¶ 27, supra*), that Virginia Flood stop using "John C. Flood" without the distinguishing designator "of Virginia," to avoid confusion. On August 21, 1996, Virginia Flood, through Mr. Weltmann, wrote a letter to Mr. Morrissey essentially acceding to Mr. Morrissey's demands. In particular, Weltmann wrote that he had personally seen the newest telephone directory ads, and "they contain the words 'of Virginia, Inc.' after 'John C. Flood.'" He also agreed that his client

would have the words "of Virginia, Inc., "added to building and service truck signage.  *Id.* & Att. C-3 (August 21, 1996, Weltmann to Morrissey).  Weltmann did not in this letter, or in any other communication with 1996 Flood about the issue at this time, take the position that 1996 Flood's use infringed Virginia Flood's rights.  *Id.* ¶ 13.

> **RESPONSE:  <u>See</u> response to SUMF 15, above, denying that any goodwill existed to be sold or transferred; denying lack of abandonment by 1984 Flood of the FLOOD marks; denying continuity between 1984 Flood, the sham entities and ultimately 1996 Flood; denying anything more than mere token use of the FLOOD marks by 1984 Flood, the sham entities and 1996 Flood; setting forth the unlawful use by the sham entities and related inability to defend against abandonment in light of such unlawful use; and explaining Defendants' obstruction in refusing to respond to discovery requests that seek information related to all of the above.**
>
> **Otherwise, admitted that the above correspondence speaks for itself, but also immaterial.**

40.    Since 1996, Virginia Flood has been aware that 1996 Flood has used and continues to use those names and marks in connection with directly competitive services in the same geographic in the same lines of trade and business as those offered by Virginia Flood. Plaintiff's First Amended Complaint, ¶¶ 43, 59.

> **RESPONSE:  Admitted, <u>but see</u> response to SUMF 15, above, denying that any goodwill existed to be sold or transferred; denying lack of abandonment by 1984 Flood of the FLOOD marks; denying continuity between 1984 Flood, the sham entities and ultimately 1996 Flood; denying anything more than mere token use of the FLOOD marks by 1984 Flood, the sham entities and 1996 Flood; setting forth the unlawful use by the sham entities and related inability to defend against abandonment in light of such unlawful use; and explaining Defendants' obstruction in refusing to respond to discovery requests that seek information related to all of the above, especially here regarding the extent of use of the FLOOD marks by 1996 Flood.**

41.    Virginia Flood did not commence or file any suit or action at law or in equity against any of Defendants seeking injunctive, monetary or declaratory relief arising from their

allegedly infringing use of JOHN C. FLOOD and/or FLOOD until it commenced this action, on

July 25, 2006.   Complaint for Trademark Infringement and Unfair Competition, Case No.

1:06CV01311, dated July 25, 2006.

> **RESPONSE:   Admitted, <u>but see</u> response to SUMF 15, above, denying that any goodwill existed to be sold or transferred; denying lack of abandonment by 1984 Flood of the FLOOD marks; denying continuity between 1984 Flood, the sham entities and ultimately 1996 Flood; denying anything more than mere token use of the FLOOD marks by 1984 Flood, the sham entities and 1996 Flood; setting forth the unlawful use by the sham entities and related inability to defend against abandonment in light of such unlawful use; and explaining Defendants' obstruction in refusing to respond to discovery requests that seek information related to all of the above.**

### ADDITIONAL MATERIAL FACTS THAT ARE IN DISPUTE, SUBMITTED BY VIRGINIA FLOOD

Virginia Flood submits the following additional material facts that are in dispute, precluding summary judgment:

1.      1984 Flood never used the FLOOD marks after March 2, 1993.  Verified Complaint for Appointment of a Receiver ¶¶ 28-31, attached as Ex. 1 to Rinn Decl.

2.      1984 Flood was no longer a going concern at least as early as March 2, 1993. (Verified Complaint to Avoid and Recover Fraudulent Conveyances, to Compel Turnover of Estate Assets and for Appointment of a Receiver and for Other Relief ("Verified Complaint for Appointment of a Receiver"), ¶¶ 27-57, attached as Ex. B-1 to Rinn Decl.).

3.      1984 Flood assets were depleted at least as early as March 2, 1993.  Id. at ¶ 30.

4.      1984 Flood had no employees at least as early as March 2, 1993.  Id. at ¶¶ 28-29.

5.      The owners of 1984 Flood, Crooks and Davis, directed at least one employee to "remove inventory, equipment and supplies from [1984] Flood to a warehouse for future use [by the sham entities]," on or about March 2, 1993.  Id. at ¶ 42.

6.      In his Verified Complaint for Appointment of a Receiver, the Trustee averred that the "[Adversary Proceeding] Defendants' actions in shutting down [1984] Flood's operating and transferring the assets and property of the estate and in obtaining employment with [the sham entities] constituted a breach of Crooks' and Davis' fiduciary duty to [1984] Flood and a fraud on [1984] Flood's creditors [which included Virginia Flood, Haislip and Seltzer].  Id. at ¶ 46.

7.      The trustee asserted an unfair competition claim, among others, against Crooks, Davis and the Smileys in the adversary proceeding.  He noted that the sham entities that Defendants refer to as "New Flood" were legally separate entities from 1984 Flood.  He wrote: "Reasonable consumers would foreseeably and understandably, but incorrectly, conclude that

"J.C. Flood, Inc." [one of the sham entities] is the same entity as JOHN C. FLOOD, INC. [or 1984 Flood]."   (Mem. in Supp. of Verified Complaint for Appointment of Receiver at 13, attached to Rinn Decl. as B-2).

8.     By at least as early as the time a Chapter 11 Trustee was appointed on March 2, 1993, 1984 Flood ceased to exist and was no longer using the FLOOD marks in even a token manner. <u>See id.</u>; Verified Complaint for Appointment of a Receiver ¶¶ 28-31, attached as Ex. 1 to Rinn Decl.

9.     A receiver was appointed on June 5, 1995 in response to the Trustee's Verified Complaint for Appointment of a Receiver, which detailed the actions of Crooks, Davis and their family members (including the Smileys) in fraudulently transferring assets out of the bankruptcy estate.  Rinn Decl. ¶ 10; <u>see</u> Verified Complaint for Appointment of a Receiver, attached as Ex. 1 to Rinn Decl.

10.     At least until the receiver was appointed on June 5, 1995, any use of the FLOOD marks by the sham entities (including but not limited to J.C.F., Inc., J.C. Flood, John C. Flood of D.C., Inc., John C. Flood of Maryland, Inc., and MDMC, Inc., a/k/a Mel Davis and Mark Crooks, Inc.) was done in violation of the U.S. Bankruptcy Code.  <u>See</u> Verified Complaint for Appointment of a Receiver ¶¶ 27-57.

11.     By the time 1984 Flood filed Chapter 11 bankruptcy on June 21, 1991, 1984 Flood's use of the FLOOD marks was merely token.  <u>See</u> Haislip Decl. ¶ 9.

12.     The Smileys received some tangible assets in exchange for their $425,000 purchase of stock of John C. Flood of Maryland, Inc., John C. Flood of D.C., Inc. and MCMD, Inc. at the bankruptcy sale on October 27, 2007, including but not limited to "real and personal [property], wherever located, including but not limited to stocks, bonds, invesory equipment,

supplies, accounts, bank accounts, accounts receivable, cash collections, work-in-progress, checks, promissory notes, commercial paper, vehicles, licenses, permits, certificates and assets of every kind and nature of [the above three sham entities], wherever located . . . ." See Motion for Entry of Order Authorizing Private Sale of Stock and Other Assets, ¶ 3, attached as Ex. 10 to Rinn Decl.; Order Granting Motion, attached as Ex. 13 to Rinn Decl.

13.     On July 19, 1991, Crooks and Davis resigned as officers of Virginia Flood. Haislip Decl. ¶ 7, and Ex. A thereto (copy of Resolution of Board).

14.     The bankruptcy Trustee named Robert and Joanna Smiley (present-day owners and officers of 1996 Flood and Defendants in the present action) as defendants in the adversary proceeding when he filed the Verified Complaint for Appointment of a Receiver, in which he alleged they had committed fraudulent activities in violation of the U.S. Bankruptcy Code. Verified Complaint for Appointment of a Receiver ¶¶ 23, 24, 27-57.

15.     As owners of Virginia Flood, Haislip and Seltzer believed they possessed the legal right to use the JOHN C. FLOOD mark, and that no other person or entity possessed such right, and caused Virginia Flood to file registration applications with the United States Patent and Trademark Office on March 23, 1999, seeking to register the JOHN C. FLOOD INC. as a Word and Logo mark.  Haislip Decl. ¶ 11.

16.     The USPTO granted Virginia Flood registrations to both the JOHN C. FLOOD Word and Logo marks on April 25, 2000 and on June 6, 2000, respectively.  Haislip Decl. ¶ 12; (Copies of registrations attached as collective Exhibit B to Haislip Decl.).

Respectfully submitted,


        /s/ Stephen J. Zralek
Stephen J. Zralek, *appearing pro hac vice*
Erica Stiff-Coopwood, *appearing pro hac vice*
**BONE McALLESTER NORTON PLLC**
511 Union Street, Suite 1600
Nashville, TN  37219
(615) 238-6300 – phone
(615) 238-6301 – facsimile
szralek@bonelaw.com
estiff-coopwood@bonelaw.com

and

Lisa Dunner, DC Bar # 452004
**DUNNER LAW**
1010 Wisconsin Ave., N.W.
Washington, DC 20007
(202) 298-6002 – phone
(202) 403-3030 – facsimile
ldunner@dunnerlaw.com

*Counsel for John C. Flood of Virginia, Inc.,*
*John C. Flood, Inc. (a Virginia corporation),*
*John C. Flood Contractors, Inc., and the Individual*
*Defendants, Clinton Haislip & James L. Seltzer, Jr.*



## CERTIFICATE OF SERVICE

    I hereby certify that a true and correct copy of the foregoing was served via ECF to Benjamin J. Lambiotte, Esq., and Steve Varholik, Esq., **GARVEY SCHUBERT BARER,** 1000 Potomac Street, Fifth Floor, Washington, D. C. 20007 on this the 17th day of  August 2007.


        /s/ Stephen J. Zralek