IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

JOHN C. FLOOD OF VIRGINIA, INC., et al.    )
                                           )
        Plaintiffs and Counter-Defendants, )
                                           )
v.                                         )        Judge Richard J. Leon
                                           )        Case No.: 1:06CV01311
JOHN C. FLOOD, INC., et al.                )        Deck Type:  General Civil
                                           )
        Defendants and Counter-Plaintiffs. )
                                           )

---

## MEMORANDUM OF POINTS AND AUTHORITIES
## IN SUPPORT OF THE VIRGINIA FLOOD PARTIES'
## MOTION FOR SUMMARY JUDGMENT

---

## I.    INTRODUCTION

This is a case about two service marks, JOHN C. FLOOD and its abbreviated form, FLOOD, to which two sets of parties both claim exclusive rights.  Summary judgment hinges entirely on priority.  As explained more fully in this supporting Memorandum of Points and Authorities, the Virginia Flood Parties[1] are entitled to summary judgment on all counts in both the First Amended Complaint and the counterclaim because they can show priority. Plaintiff/Counter-defendant Virginia Flood[2] has been using the marks in question continuously since 1989, whereas 1996 Flood[3] did not begin using the marks until 1996, when it was incorporated.

---

[1] "Virginia Flood Parties" refers to the following related parties: Plaintiff/Counter-Defendant John C. Flood of Virginia, Inc.; Defendants John C. Flood, Inc. (a Virginia corporation) and John C. Flood Contractors, Inc. (all three corporations collectively referred to as the "Virginia Flood Corporate Parties"); and Third-party Defendants Clinton Haislip and James L. Seltzer, Jr.

[2] "Virginia Flood" refers to John C. Flood of Virginia, Inc., a Virginia corporation incorporated in 1989.

[3] "1996 Flood" refers to Defendant/Counter-Plaintiff John C. Flood, Inc., d/b/a John C. Flood of DC, Inc., which was incorporated in 1996.

As a matter of law, 1996 Flood is not the successor-in-interest to 1984 Flood.[4]  Even if the Court disagrees, there is a break in the chain of priority because 1996 Flood abandoned the marks.

Pursuant to Rule 56 of the Federal Rules of Civil Procedure and LCvR 7(a), (b) and (c) and LCvR 56.1, Virginia Flood respectfully seeks summary judgment in its favor on all counts in the First Amended Complaint, including monetary and injunctive relief, and for a declaration of the Virginia Flood Parties' priority over the 1996 Flood Parties[5], on Virginia Flood's counts of trademark infringement under 15 U.S.C. § 1114(1), unfair competition under 15 U.S.C. 1125(a), and common law service mark infringement and unfair competition, as well as dismissal with prejudice of the counterclaim; and such other or further relief as the Court deems just.

## II.     RELEVANT FACTS

Formation of 1984 Flood

In 1984, Defendants Mark Crooks ("Crooks") and Mel Davis ("Davis") incorporated John C. Flood, Inc. ("1984 Flood") in Maryland.[6]  1984 Flood provided plumbing, heating and air conditioning services, and it operated in Maryland, D.C. and Virginia.[7]  1984 Flood used the marks JOHN C. FLOOD and its abbreviated form, FLOOD, from 1984 through June 1991 on service trucks, contracts, invoices, telephone books, and advertising.[8]  Virginia Flood principals, Moe Haislip ("Haislip") and Jim Seltzer ("Seltzer")[9] began working for 1984 Flood in

---

[4] "1984 Flood" refers to the corporation "John C. Flood, Inc.," which was incorporated in 1984, and filed Chapter 11 bankruptcy in 1991, which was later converted to a Chapter 7 bankruptcy.
[5] "1996 Flood Parties" refers to 1996 Flood, as well as all other Defendants named in the First Amended Complaint.
[6] Virginia Flood Parties' Statement of Undisputed Material Fact ("SUMF") 1.
[7] SUMF 2.
[8] SUMF 3.
[9] Haislip and Seltzer are named as Third Party Defendants in the Counterclaim.

approximately 1987, where they worked as estimators and salesmen; they were not mechanics or technicians.[10]

Formation of Virginia Flood

In 1989, Crooks and Davis incorporated Virginia Flood to expand their presence in Virginia.[11]  Prior to incorporating Virginia Flood, Crooks and Davis had already been advertising and operating in Virginia through 1984 Flood.[12]  Virginia Flood provides plumbing, heating and air conditioning services, and it operates in Maryland, DC and Virginia.[13]

Crooks and Davis Licensed the FLOOD Marks to Haislip and Seltzer at Virginia Flood

In a verbal agreement in 1989, Crooks and Davis gave Haislip and Seltzer permission to use the marks JOHN C. FLOOD and its abbreviated form, FLOOD, in connection with plumbing, heating, and air conditioning services by Virginia Flood, and advertising those services in and on service trucks, contracts, invoices and telephone books, among other things.[14] In 1989, Crooks and Davis gave Haislip and Seltzer service trucks with which to start Virginia Flood, which said JOHN C. FLOOD on their sides.[15]  Davis testified in his deposition that Virginia Flood paid approximately $400-$500 each week to Crooks and Davis.[16]  According to Seltzer's Declaration, Haislip and Seltzer paid Crooks and Davis approximately $400 each week between late 1990 and continuing until 1992.[17]  Virginia Flood has used the marks JOHN C.

---

[10] SUMF 4.
[11] SUMF 5.
[12] SUMF 6.
[13] SUMF 7.
[14] SUMF 8.
[15] SUMF 9.
[16] SUMF 10.
[17] Seltzer Declaration at ¶ 6.

FLOOD, and its abbreviated form FLOOD, or JOHN C. FLOOD OF VIRGINIA continuously since 1989.[18]

There was never an operating agreement for Virginia Flood.[19]

Crooks and Davis Initially Monitored & Controlled Quality at Virginia Flood

Initially, Crooks and Davis owned 51 percent, and Haislip and Seltzer owned the remaining 49 percent, of the stock of Virginia Flood.[20]  When Crooks and Davis first incorporated Virginia Flood in 1989, they maintained the corporate books to monitor the performance of Haislip and Seltzer, and had input on "everything" that Haislip and Seltzer were doing, including advertising.[21]  Crooks and Davis placed a manager at the Virginia Flood office in 1989 to get the business "running right" and even Davis, himself, worked there for two to three months.[22]  Initially, Crooks and Davis lent their expertise to the operations of Virginia Flood.[23]  According to Davis, Haislip and Seltzer were mere salespeople who did not understand the technical part of the job.[24]  Between November 1989 and June 1991, Crooks and Davis themselves performed the technical part of the job at Virginia Flood and helped Haislip and Seltzer with it.[25]  During this period, Crooks and Davis met with Haislip and Seltzer at 1984 Flood's office in Maryland every one to two weeks to examine Virginia Flood's "paperwork and what was expected and this and that and sales figures and everything else."[26]

---

[18] SUMF 11.
[19] SUMF 12.
[20] SUMF 13.
[21] SUMF 14.
[22] SUMF 15.
[23] SUMF 16.
[24] SUMF 17.
[25] SUMF 18.
[26] SUMF 19.

Crooks & Davis Relinquished Control Over Virginia Flood Some Time Between 1991 and 1993

At some point between June 1991 (when Crooks, Davis and 1984 Flood filed bankruptcy under Chapter 11) and September 1993 (when the case was converted to a Chapter 7 proceeding), Crooks and Davis stopped monitoring and controlling Virginia Flood, its use of the marks, and the quality of its services. (Crooks, Davis and 1984 Flood's consolidated bankruptcy cases are referred to hereinafter as the "Underlying Bankruptcy"). In his deposition, **_Davis testified that, from the moment the Underlying Bankruptcy was filed in June 1991, control of Virginia Flood was vested in Haislip and Seltzer._**[27]

> Q:    Were you involved in Virginia Flood at a corporate level after you filed bankruptcy in June 1991?
>
> A:    After bankruptcy?
>
> Q:    Yes.
>
> A:    No, we bowed out.
>
> Q:    Tell me what you mean when you say you bowed out.
>
> A:    Well, after – after they first – after we went Chapter 11, we talked to them for a little while. And then we – the company completely separated. They – they [Haislip and Seltzer] went on their own and . . . from that point on they ran it [Virginia Flood] themselves.

Davis Deposition at 26-27, attached to the Virginia Flood Parties' Notice of Filing at Ex. F.

According to Seltzer, when Virginia Flood was incorporated in 1989, Crooks and Davis owned 51 percent of the stock of Virginia Flood between the two of them, and Haislip and Seltzer owned the remaining 49 percent.[28] At the time the Underlying Bankruptcy was commenced in June 1991, Crooks and Davis sold their extra 1% stock in Virginia Flood to Haislip and Seltzer, so that Crooks and Davis collectively owned 50 percent, and Haislip and

---

[27] SUMF 21.
[28] Seltzer Declaration at ¶ 8.

Seltzer collectively owned the other 50 percent of the stock of Virginia Flood.[29]  By the time they commenced the Underlying Bankruptcy, Crooks and Davis participated less and less in the governance of Virginia Flood, and on July 19, 1991, Crooks and Davis resigned as officers of Virginia Flood.[30]  By June or July 1991, Crooks and Davis handed over the reins of Virginia Flood to Haislip and Seltzer.[31]  By this point, Crooks and Davis had given Haislip and Seltzer the books and records of Virginia Flood.[32]  From this point forward, Haislip and Seltzer alone made all business decisions for Virginia Flood, including use of the marks JOHN C. FLOOD and its abbreviated form, FLOOD, and they no longer reported any information to, or sought approval from, Crooks or Davis.[33]

Davis testified later in his deposition that he and Crooks stopped monitoring Virginia Flood after the conversion to Chapter 7.[34]  (A Trustee was appointed on March 22, 1993, and the Underlying Bankruptcy case was converted to a proceeding under Chapter 7 on September 21, 1993.)[35]

> Q:     I was asking you earlier about how you monitored what was happening at Virginia Flood.  And you said you maintained the books and records all the way up until the time that you converted to a Chapter 7, right?
>
> A:     Pretty close.  I don't have the exact date.
>
> Q:     How did that change after you converted to a Chapter 7?  How did your monitoring Virginia Flood's activities change, if at all?
>
> A:     For monitoring?
>
> Q:     Yes.

---

[29] Id.
[30] Id. at ¶ 9.
[31] Id. at ¶ 10.
[32] Id.
[33] Id.
[34] SUMF 22.
[35] SUMF 23.

{00300714.2}

> A:     Well, then there was no monitoring.  We gave them their own books.  And then, like I say, then phone calls stopped in between both of us.

Davis Deposition at 99-100, attached to the Virginia Flood Parties' Notice of Filing at Ex. F. According to Davis, he and Crooks waited to transfer the books and records of Virginia Flood to Haislip and Seltzer until 1993.  Regardless of whether the transfer of books and records occurred in June 1991 or September 1993, it is undisputed that Haislip and Seltzer took full control of Virginia Flood at some point between 1991 and 1993.

Haislip and Seltzer were creditors in the Underlying Bankruptcy.[36]  They never were debtors in the Underlying Bankruptcy.  Id.


Crooks and Davis Resigned as Officers of Virginia Flood in July 1991

A month after Crooks and Davis instituted the Underlying Bankruptcy, on July 19, 1991, Crooks and Davis resigned as officers of Virginia Flood.[37]


Haislip & Seltzer Have Had 50% Ownership Interests in Virginia Flood Since At Least 1991

Crooks and Davis sold their extra 1% stock interest to Haislip and Seltzer some time between November 1990 and June 1991, at which time Crooks and Davis collectively owned 50 percent, and Haislip and Seltzer collectively owned the other 50 percent of the stock of Virginia Flood.[38]  On February 14, 1995, the bankruptcy Trustee entered an oral agreement with Haislip and Seltzer to transfer the remaining 50 percent interest of Virginia Flood, formerly owned by Crooks and Davis, to Haislip and Seltzer.[39]  On March 28, 1995, the Trustee filed a "Notice of

---

[36] SUMF 25.
[37] SUMF 26.
[38] SUMF 27.
[39] SUMF 28.

{00300714.2}

Settlement" with the Bankruptcy Court regarding the agreement to transfer the remaining 50 percent interest in Virginia Flood to Haislip and Seltzer.[40]  From and after March 29, 1995, Haislip and Seltzer, not Crooks and Davis, fully owned Virginia Flood.[41]

## 1984 Flood Stopped All Operations No Later Than September 21, 1993

At the peak of operations, prior to filing bankruptcy, 1984 Flood had yearly sales of $10 million, over 200 workers, operated over 90 trucks, generated monthly sales over $700,000.00, and had an advertising budget that ran close to one million dollars a year.[42]  After the conversion to Chapter 7, Davis handed the keys to the door of 1984 Flood to the Trustee.[43]  1984 Flood never had any sales after the conversion to Chapter 7: all the telephones were turned off, and its sales dropped to zero.[44]

## 1996 Flood Was Not Established until 1996

On February 20, 1996, a Bill of Sale was executed, in which the Trustee and Receiver sold to Defendants Joanne and Robert Smiley (the daughter and son-in-law of Davis) the stock of John C. Flood of MD, Inc., John C. Flood of D.C., Inc., and MCMD, Inc., along with the tradenames John C. Flood, Inc. and Flood, Inc.[45]  The Bill of Sale states that the sale is only "as fully and completely as [the Trustee and Receiver] . . . might or should sell . . . ."[46]  1996 Flood was not incorporated until February 5, 1996.[47]

---

[40] SUMF 29.
[41] SUMF 30.
[42] SUMF 31.
[43] SUMF 32.
[44] SUMF 33.
[45] SUMF 34.
[46] SUMF 35.
[47] SUMF 36.

Confusion Exists in the Marketplace Regarding Source of Origin of the Flood Marks

1996 Flood operates and advertises in Maryland, D.C., and Virginia.[48]  1996 Flood uses the marks JOHN C. FLOOD and its abbreviated form, FLOOD, whether separately or combined with other words.[49]  1996 Flood and Virginia Flood compete directly for the same customers in the same geographic region in the same lines of trade and business, and advertise and promote their businesses in the same channels of trade.[50]  Confusion exists among consumers regarding the source of origin of the marks JOHN C. FLOOD and FLOOD.[51]

Virginia Flood owns the Registration to Two FLOOD Marks

On April 25, 2000, the U.S. Patent & Trademark Office issued Registration No. 2,345,161 to Virginia Flood for the word mark JOHN C. FLOOD, attached as Exhibit A to the Virginia Flood Parties' SUMF.[52]  On June 6, 2000, the U.S. Patent & Trademark Office issued Registration No. 2,355,004 to Virginia Flood for the following logo mark, attached as Exhibit B to the Virginia Flood Parties' SUMF:

---

[48] SUMF 37.
[49] SUMF 38.
[50] SUMF 39.
[51] SUMF 40.
[52] SUMF 41.

{00300714.2}



53

## III.    SUMMARY JUDGMENT STANDARD

A party is entitled to summary judgment if the pleadings and evidence demonstrate that there is no genuine issue of material fact in dispute and that the moving party is entitled to judgment as a matter of law.  <u>See</u> Fed. R. Civ. P. 56(c); <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986).  Under the summary judgment standard, Defendants, as the moving party, bear the "initial responsibility of informing the district court of the basis for [its] motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits which [it] believe[s] demonstrate the absence of a genuine issue of material fact." <u>Celotex</u>, 477 U.S. at 323.

In response to a motion for summary judgment, the non-movant "must come forward with 'specific facts showing that there is a genuine issue for trial,'" and "the court may properly look to the nonmovant for rebuttal evidence from testimony and to do other than cast 'metaphysical doubt' on credibility of movant's evidence." <u>Matsushita Elec. Indus. Co. v. Zenith Radio</u>, 475 U.S. 574, 587 (1986) (citation omitted); <u>Doe v. Gates</u>, 981 F.2d 1316, 1323 (D.C. Cir. 1993).  Although a court should draw all justifiable inferences from the supporting

---

[53] SUMF 42.

record submitted by the non-movant in the non-movant's favor, the mere existence of a factual dispute, by itself, is not sufficient to bar summary judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). To demonstrate the existence of a genuine, material issue of fact precluding summary judgment, a non-moving party must establish more than a scintilla of evidence in support of its position, and "there must be evidence on which [the factfinder] could reasonably find for" the nonmovants. Id. at 252; Chappel-Johnson v. Bair, ___ F. Supp. 2d ___, 2008 WL 4058674, at *3 (D.D.C. Sept. 3, 2008).

Not all disputes that arise in litigation constitute "genuine" issues of "material" fact. A dispute about a material fact is genuine, and thus sufficient to survive summary judgment, "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248.

## IV.    LEGAL ARGUMENT

### A.    Virginia Flood Is Entitled to Summary Judgment Because It Has Priority and, Thus, Ownership of the Marks

As stated above, this case hinges on the issue of priority. Because Virginia Flood can establish priority over the 1996 Flood Parties to use the marks JOHN C. FLOOD and its abbreviated form, FLOOD, it is entitled to summary judgment on all of its claims: (a) trademark infringement in violation of 15 U.S.C. § 1114(1) against all 1996 Flood corporate defendants; (b) unfair competition in violation of 15 U.S.C. § 1125(A) against all 1996 Flood corporate defendants; (c) common law service mark infringement and unfair competition against all 1996 Flood corporate defendants; and (d) declaration of Virginia Flood's priority over all 1996 Flood defendants and its right to registration of its two marks.

{00300714.2}

Similarly, because Virginia Flood can establish priority, all of the claims asserted by counterclaim plaintiff 1996 Flood fail as a matter of law, entitling Virginia Flood to summary judgment on all of the counterclaims: (a) false designation of origin against the Virginia Flood Corporations; (b) cancelation of Virginia Flood's two registrations based on claims of 1996 Flood's prior use; (c) cancelation of Virginia Flood's two registrations based on accusations they were obtained by fraud; (d) cancelation of Virginia Flood's registrations based on grounds of misrepresentation of source; (e) declaration of 1996 Flood's priority over the marks FLOOD AND JOHN C. FLOOD; and (f) common law service mark infringement and unfair competition.

The critical facts are not in dispute.  The only dispute between the parties is which conclusion of law should be drawn from the facts.

As explained more fully below, the only reasonable conclusion of law that can be reached is that Virginia Flood has priority over the marks FLOOD and JOHN C. FLOOD.  It is undisputed that Virginia Flood has used the marks continuously since 1989.  It is also undisputed that 1996 Flood did commence using the marks until 1996, the year it was incorporated. Virginia Flood's prior use of over six years establishes its priority and entitles it to the exclusive right to use the marks.  See, e.g., Volkswagenwerk Aktiengesellschaft v. Wheeler, 814 F. 2d 812, 815 (1st Cir. 1987).

Even if 1996 Flood is considered the successor-in-interest to 1984 Flood, it is undisputed that Crooks and Davis stopped monitoring and controlling Virginia Flood and its use of the marks as early as June 1991, but in any event no later than September 1993.  It is also undisputed that from that point forward Haislip and Seltzer alone controlled Virginia Flood and its use of the marks, and that they alone monitored and controlled the quality of services delivered by Virginia Flood.  Crooks' and Davis' failure to control quality at Virginia Flood from and after September

1993 interrupts any claim of priority that 1984 Flood may have had, as a matter of law.  See, e.g., Sheila's Shine Products, Inc. v. Sheila Shine, Inc., 486 F. 2d 114, 123-24 (5th Cir. 1973) (holding that the failure to control and supervise the licensee for a significant period of time may estop the licensor from challenging the use of the mark and the business developed by the licensee).

***Because Virginia Flood can establish priority, it succeeds as a matter of law on all of its claims.***

To establish servicemark infringement under 15 U.S.C. § 1114(1), a plaintiff must establish (a) that it owns a mark that is registered with the U.S. Patent and Trademark Office, and (b) that the defendant used the mark in commerce without plaintiff's consent, which use is likely to cause confusion.  15 U.S.C. § 1114(1).  The elements are virtually the same to establish unfair competition under 15 U.S.C. § 1125(a).  Globalaw Ltd. v. Carmon & Carmon, 452 F. Supp. 2d 1, 25 (D.D.C. 2006).  False designation of origin, asserted by 1996 Flood in its counterclaim, is a form of unfair competition under the Lanham Act.  See 15 U.S.C. § 1125(a); see also Tommy Hilfiger Licensing, Inc. v. Goody's Family Clothing, Inc., 2003 WL 22331254, at *30 (N.D. Ga. May 9, 2003) (unpublished) (confirming that the elements to prove false designation are the same as trademark infringement).

Similarly, for 1996 Flood to establish common law servicemark infringement, it must prove: (a) that Virginia Flood used the marks in commerce, (b) in connection with its services, (c) which is likely to be confused with 1996 Flood's service marks, (d) in which 1996 Flood possesses the right to use to designate its services.  15 U.S.C. § 1114.  Since Virginia Flood has priority over the marks, 1996 Flood cannot establish element (d) of its *prima facie* case.

It is undisputed that both parties use the marks JOHN C. FLOOD and FLOOD; that confusion exists in the marketplace over the source of origin of the marks; that the parties

operate in the same three locations: Virginia, Maryland and D.C.; and that they provide the same services. Accordingly, Virginia Flood has established the requisite elements of trademark infringement under 15 U.S.C. § 1114(1) and unfair competition under 15 U.S.C. § 1125(a).

Virginia Flood is the owner of two registered trademarks, which is *prima facie* evidence (and which confers a presumption) of validity of, of ownership of, and of the exclusive right to use the marks. 15 U.S.C. §§ 1057(b) and 1115(a). Where a defendant challenges a registration as defective or subject to a defense, the defendant bears the burden of proof, which it must establish by a preponderance of the evidence. See, e.g., Material Supply Int'l, Inc. v. Surmatch Indus. Co., Ltd., 146 F. 3d 983, 990-91 (D.C. Cir. 1998) (on review of a summary judgment by the TTAB, the court stated that the party seeking cancellation of a registered mark bears the burden of proof). In the present case, 1996 Flood has challenged Virginia Flood's two registrations. The Court, therefore, must examine further the issue of ownership, but the burden of proof in stripping Virginia Flood of its two registrations rests with the 1996 Flood Parties.

Typically, a party establishes ownership of a mark by being the first to use the mark in commerce. Globalaw, 452 F. Supp. 2d at 27; citing 4 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 26:5.

Virginia Flood has priority over 1996 Flood regarding the marks because Virginia Flood began using them continuously in 1989, and 1996 Flood did not begin using them until 1996. Unless the Court views 1996 Flood as the successor-in-interest to 1984 Flood, then Virginia Flood's continued use of the marks from 1989 gives Virginia Flood priority and, thus, ownership. See e.g., Ford Motor Co., 930 F.2d at 292. Accordingly, Virginia Flood has priority over the marks even if the Court views 1996 Flood as the successor-in-interest to 1984 Flood

because, as explained below, 1984 Flood abandoned the marks through naked licensing, breaking the chain of any priority it otherwise would have enjoyed.

Thus, the only question remaining for summary judgment is whether 1984 Flood abandoned the marks through naked licensing.

B.    1984 Flood Abandoned the Marks through Naked Licensing

Crooks and Davis gave Haislip and Seltzer a naked license when they ceded control of Virginia Flood some time between June 1991 and September 1993. A "naked license" arises when the trademark owner fails to control the quality of the goods or services associated with the marks.

> A trademark carries with it a message that the trademark owner is controlling the nature and quality of the goods or services sold under the mark. Without quality control, this message is false because without control of quality, the goods or services are not truly 'genuine.' This dissonance and deception erodes the significance of the designation as an accurate indication of origin: a trademark.

McCarthy, supra, at § 18:48. When a trademark owner licenses its marks, it not only has the right to control the licensee's quality, but also the *duty*. Id.

The burden is on the licensee to show that the licensor has abandoned a mark through naked licensing. Courts have required a high degree of proof since naked licensing may result in forfeiture of trademark rights. McCarthy, supra, at § 18:48.

Here, since Crooks and Davis completely transferred control of Virginia Flood to Haislip and Seltzer between 1991 and 1993, rather than merely minimizing their own role in controlling quality, Haislip and Seltzer can easily meet the burden of proof.

### 1.  Crooks and Davis Fail Test for Controlled Licensing, Which is "Meaningful Supervision"

In analyzing whether a licensor has abandoned the mark through naked licensing, the focus is on whether the licensor "engage[d] in any meaningful supervision or inspection" of its licensees.  First Interstate Bankcorp v. Stenquist, 16 U.S.P.Q. 1704, 1990 WL 300321, at *4 (N.D. Cal. July 13, 1990) (unpublished) (cited with approval in Barcamerica Int'l USA Trust v. Tyfield Importers, Inc., 289 F.3d 589, 598 (9th Cir. 2002)).  There, the court concluded that the licensor had abandoned its rights to the marks through naked licensing, where it did not supervise the licensee or tell him how to run his business; did not supervise the licensee's agents or employees; did not mandate any sales procedures or materials; and did not interfere with the operation of the business.  Id.

"[I]t is well established that where a trademark owner engages in naked licensing, without any control over the quality of goods produced by the licensee, *such a practice is inherently deceptive and constitutes abandonment* of any rights to the trademark by the licensor."  Barcamerica, 289 F.3d at 598 (emphasis added); see also Boersma v. Executive Travel Club, Inc., 256 F. Supp. 289, 290 (D.D.C 1966) (recognizing that licensor may license mark so long as agreement is not a mere naked license).  In Barcamerica, the court held that the licensor had abandoned the mark through naked licensing.  Id.  There the licensor, who licensed the mark to a vineyard, "played no meaningful role in holding the wine to a standard of quality – good, bad, or otherwise."  Id.  Accordingly, the licensor forfeited its rights in the mark, and the court concluded that cancelation of the licensor's registration of the mark was appropriate.  Id.

The Stenquist Court distinguished the lack of control by the licensor there with other cases in which the licensor was found to have asserted sufficient control, leading those courts to reject arguments of naked licensing.  See Stenquist, 16 U.S.P.Q. 1704, 1990 WL 300321, at *4

(distinguishing its facts with those in <u>Transgo, Inc. v. Ajac Transmission Parts Corp.</u>, 768 F.2d 1001, 1017-18 (9th Cir. 1985) (no naked license where licensor of trademark for auto parts kit was consulted on all product changes and periodically tested individual parts); <u>Stock Pot Restaurant, Inc. v. Stockpot, Inc.</u>, 737 F.2d 1576, 1580 (Fed. Cir. 1984) (no naked license where licensor of restaurant trademark lived on the premises of the restaurant and provided constant supervision); <u>see also</u> <u>SM Licensing Corp. v. U.S. Medical Care Holdings LLC</u>, No. 0-20293-CIV, 2007 WL 2051009, *14 (July 13, 2007) (finding requisite level of control in a related-company case where licensor "maintained almost complete control over the trademarked products, as they were manufactured and packaged by his own company")).  All of these cases are distinguishable from the present case because by September 1993 at the latest, Crooks and Davis had relinquished all control over Virginia Flood.  This is not a case where the licensor's control was arguably not meaningful enough; here, it was *non-existent* after September 1993, at the latest.

From the time they incorporated Virginia Flood in 1989 until the time they filed bankruptcy and resigned as officers in the summer of 1991, Crooks and Davis had input on "everything" at Virginia Flood.  They monitored the use of the marks in advertising, and provided the technical knowledge that shaped the quality of services delivered.  They provided expertise to Virginia Flood during the initial two-year period.  They provided a manager to run Virginia Flood and, after he suffered a heart attack, Davis then ran the office himself.  Every other week, Haislip and Seltzer traveled to Crooks' and Davis' Maryland office to meet with them and review their projects and what was expected.  During this time, Crooks and Davis controlled the books and records of Virginia Flood, which Davis testified allowed them to monitor performance at Virginia Flood.  Whether this initial level of control was sufficient is

immaterial because it came to an abrupt halt at some point between June 1991 and September 1993.

It is undisputed that between June 1991 and September 1993, Crooks and Davis stopped controlling and monitoring Virginia Flood. From that point forward, Haislip and Seltzer controlled all aspects of Virginia Flood, including use of the marks and quality control of the services. By Davis' own admission in his deposition, Haislip and Seltzer controlled Virginia Flood from the time Crooks and Davis filed Chapter 11 on June 21, 1991. This is consistent with Seltzer's declaration. Although Davis later testified that he and Crooks gave the Virginia Flood books and records to Haislip and Seltzer as of the conversion to Chapter 7 in September 1993, either way, as a matter of law, Crooks and Davis must be found to have abandoned their rights in the marks through naked licensing, no later than September 1993.

### *2. Crooks' and Davis' Intent Is Irrelevant Regarding Naked Licensing*

***Intent is irrelevant in analyzing abandonment through naked licensing***. Abandonment by naked licensing "must be distinguished from abandonment from nonuse of a mark, which occurs only if some intent to abandon can be inferred." McCarthy, supra, at § 18:48. Unlike other forms of abandonment of a mark, abandonment through naked licensing "is purely an 'involuntary' forfeiture of trademark rights, for it need not be shown that the trademark owners had any subjective intent to abandon the mark." Id. at 596 (citing McCarthy, supra, at § 18:48). In fact, "the mark owner probably has no subjective intent to abandon the mark," but his or her intent is irrelevant. Yocum v. Covington, 216 U.S.P.Q., 210, 215-16, 1982 WL 52024 (TTAB 1982) (quoting McCarthy, supra, at § 18.15 (1973)). "[W]hile lack of intent to abandon would be relevant to voluntary relinquishment of the mark, it is not a sufficient defense against [the

licensor's] naked licensing activity." Id. at 216.  Thus, it is immaterial whether or not Crooks or Davis *intended* to abandon their rights to the marks.

### 3.  The Effect of Crooks' and Davis' Naked License Is that They Lost Any Priority They May Have Enjoyed in the Mark

Naked licensing may result in several outcomes, three of which are applicable here: "*abandonment of rights in the mark; a break in the chain of continuous use necessary to prove priority of use over another;  . . . or that the licensor is estopped from challenging the licensee's uncontrolled use.*"  McCarthy, supra, at § 18.48. Where a licensor abandons a mark through naked licensing, the effect is to negate any priority of use that the licensor may have established in earlier years, divesting the licensor of origin-indicating-significance.  Yocum, 216 U.S.P.Q. at 215-16.  There, the TTAB held that the licensor had abandoned rights to the mark PIED PIPERS through naked licensing where he failed to control or monitor use of the mark in connection with musical recordings.  Id.  The licensor "made no inquiry of what was being recorded [or] what arrangements were being used, and made no request to monitor the sessions." Id. at 215.  Holding that the licensor's priority was interrupted by his own abandonment through naked licensing, the TTAB dismissed the licensor's petition to cancel, and allowed the respondent to keep its registration in effect.  Id. at 217.  The TTAB explicitly held that the petitioner's naked licensing *"produced a break in the chain of petitioner's continuous use necessary to prove priority over respondent . . . ."* Id. at 213.

In reaching its holding in Yocum, the TTAB cited directly to the definition of "abandonment" in the Trademark Act: "A mark shall be deemed to be 'abandoned' . . . (2) [w]hen any course of conduct of the owner, including acts of omission as well as commission, causes the mark to become the generic name for the goods or services on or in connection with

which it is used or otherwise to lose its significance as a mark." Id. at 216 (quoting 15 U.S.C. §
1127).  The TTAB explained that this provision of the Act applies in analyzing naked licensing
abandonment even where it is not the initial user who has registered the marks.  Id.; see also
CNA Financial Corp. v. Brown, 922 F. Supp. 567, 574 (M.D. Fla. 1996) (holding that licensor
forfeited its rights in the mark where it failed to adequately control its licensees' services).

     Here, in the event the Court views 1996 Flood as the successor-in-interest to 1984 Flood,
the effect of Crooks' and Davis' naked licensing is (a) abandonment of rights in the mark; (b) a
break the chain of continuous use necessary for 1996 Flood to prove priority of use over Virginia
Flood; and (c) an estoppel that prevents that 1996 Flood from challenging the Virginia Flood's
use.  See, e.g., McCarthy, supra, at § 18.48.


          _4.  Haislip & Seltzer Are Entitled to Assert the Naked License Defense to 1996_
          _Flood's Claim of Priority_

     Here, there is no question that Haislip and Seltzer are entitled to assert the defense of
naked licensing to combat the attacks made by the 1996 Flood Parties on their priority and rights
in the marks.  The licensee of a naked license may invoke the defense of abandonment through
naked licensing.  Shiela's Shine Prods., Inc., 486 F.2d at 123-24; Pride Pub'g Group Inc. v.
Edwards, No. 1:08-cv-94, 2008 WL 2201516, at *2 (E.D. Tenn. May 23, 2008) ("[f]ailure to
exercise such control and supervision for a significant period of time may estop the trademark
owner from challenging the use of the mark and business which the licensee has developed
during the period of such unsupervised use").  In Pride Pub'g Group Inc. v. Edwards, the court
held that the licensor had abandoned the mark by naked licensing where the only supervision he
exerted was weekly post-publication review of a newspaper.  No. 1:08-cv-94, 2008 WL
2201516, at *2 (E.D. Tenn. May 23, 2008).  There, the plaintiff licensor started a newspaper in

1990 identified by the mark CHATTANOOGA COURIER. Id. at *1. In 1992, the licensor contracted with the defendants/ licensees for operation of a newspaper to be called the COURIER. Id. at *1. By 1998 or 1999, the plaintiff and defendant began to depart from much of the agreement. Id. In 2005, the defendants took over the layout of the paper, and the next year they took over printing. Between 2006 and 2007, the plaintiff's supervision was limited to review of each paper after it was published. Id. at *1-2. In September 2007, the plaintiff revoked the license agreement, and it filed its petition for a temporary restraining order in April 2008, which was treated as a motion for a preliminary injunction. Id. at *1.

The court concluded that the licensor's failure to supervise or control the goods and services resulted in abandonment through naked licensing. "For at least one year, Defendants were granted total control over the paper's layout, advertising, management, accounting, and most importantly, its editorial content." Id. at *2. The licensor waited to communicate any objections to the licensee until *after* each edition was published. Id. To withstand a finding of naked licensing, "Plaintiff must have been able to exert more control over Defendants' editorial process." Id. Accordingly, the court denied the plaintiff's motion for preliminary injunction. Id. at *1-2, 5.

### 5. Crooks and Davis Cannot Rely on a Long-Standing Relationship to Ensure Quality

When confronted with parties who have had a long-standing and close working relationship, some courts have held that such relationship alone allows an absent licensor to withstand a finding of naked licensing. Crooks and Davis, however, cannot rely on such long-standing relationship to shield them from a finding that they gave a naked license to Haislip and Seltzer when they relinquished control of Virginia Flood.

{00300714.2}

Although Haislip and Seltzer had worked for two years at 1984 Flood prior to helping start Virginia Flood in 1989, they were mere salesmen who did not have the technical background needed to run a plumbing, and heating and cooling company. In fact, Davis criticized Haislip and Seltzer for their lack of technical knowledge, and explained how he had to employ a manager to run Virginia Flood. When the manager suffered a heart attack, Davis took his place and ran Virginia Flood himself. It was only after Crooks and Davis filed bankruptcy in June 1991 that they transferred control to Haislip and Seltzer, illustrating that Crooks' and Davis' decision to transfer control was rooted in their other financial distractions.

In Barcamerica, the Court rejected the licensor's argument that it could rely on a close relationship with the licensee to withstand a finding of naked license. 289 F.3d at 597 (distinguishing several cases in which a close relationship was found). The Stenquist Court also rejected the licensor's argument that control was evidenced by the fact he had known his licensee professionally and socially for six to seven years, and trusted "his integrity, experience and professionalism." Id. at *5. Our case is similar to Stenquist and Barcamerica, and distinguishable from those cases in which courts have found a close working relationship. Cf. Transgo, Inc. v. Ajac Transmission Parts Corp., 768 F.2d 1001, 1017-18 (9th Cir. 1985) (holding no naked license where licensee and licensor worked closely together for 10 years, and had the same type of responsibilities, and where the licensor produced 90 percent of the goods sold by the licensee, periodically tested those goods, and was consulted on any changes to the product); Doeblers' Pennsylvania Hybrids, Inc. v. Doebler, 442 F.3d 812, 824-25 (3d Cir. 2006) (finding that a "special relationship may exist [where] the litigants were closely-held business entities owned and managed by family members which included a high degree of interlocking ownership and control"). Accordingly, Crooks and Davis cannot rely on a theory of a close relationship

with Haislip and Seltzer as a means of avoiding a finding of abandonment through naked licensing.

C.    Because Virginia Flood Can Establish Priority, All of 1996 Flood's Claims Fail as a Matter of Law; Further, Defendants' Assertions of Fraud Fail as a Matter of Law.

Virginia Flood has established its priority over 1996 Flood, either directly based on its prior use from 1989 compared with 1996 Flood's use beginning in 1996, or by finding that 1984 Flood allowed its priority to lapse through naked licensing. Having established priority, the Virginia Flood Parties are entitled to summary judgment on all of their claims and to dismissal of the counterclaim in its entirety.

The only remaining issue is the 1996 Flood Parties' claims that Virginia Flood obtained its registration of the two marks through fraud, by asserting that Seltzer was aware of 1996 Flood's rights in the mark at the time he submitted his oath with the USPTO application. The standard applied to oaths submitted during the application process is *subjective* belief. Kemlin Industries, Inc. v. Watkins Products, Inc., 192 U.S.P.Q. 327 (TTAB 1976) Seltzer testified that he believed Virginia Flood owned 100% of Virginia Flood including its marks and the goodwill symbolized thereby after they purchased the remaining 50% of the stock out of the bankruptcy estate.[54] Thus, Virginia Flood satisfies the subjective test, and 1996 Flood's claim seeking cancelation of Virginia Flood's registrations on grounds of fraud must fail.

Additional support for this conclusion is found in Yocum, supra. Having found that the licensor abandoned its rights in the mark through naked licensing, the TTAB in Yocum rejected the petitioner's argument that the respondent's registration was obtained through fraud. 216 U.S.P.Q. at 213, 216. The TTAB found that the respondent had superior rights in the mark PIED

---

[54] Seltzer Declaration at ¶ 14.

PIPERS, and that the oath accompanying the application for registration accordingly was not false.  Id. at 213.  In light of the fact that the petitioner forfeited its priority with regard to the mark, the respondent was entitled to "legitimately adopt and use" the mark in question.  Id. at 216 (citing cases).  For the same reasons, the claims of fraud must fail in the present case.


## V.    CONCLUSION

For the foregoing reasons, the Virginia Flood Parties respectfully request that their motion for summary judgment be granted in its entirety, that all the relief they seek in their First Amended Complaint be granted, and that the 1996 Flood Parties' counterclaim be dismissed in its entirety and with prejudice; and for such other or further relief as the Court deems just.

Respectfully submitted,


_____
Stephen J. Zralek, *appearing pro hac vice*
Paul W. Kruse, *appearing pro hac vice*
**BONE McALLESTER NORTON PLLC**
511 Union Street, Suite 1600
Nashville, TN  37219
 (615) 238-6300 – phone
 (615) 238-6301 – facsimile
szralek@bonelaw.com
pkruse@bonelaw.com


and

Lisa Dunner, DC Bar # 452004
**DUNNER LAW**
1010 Wisconsin Ave., N.W.
Washington, DC 20007
(202) 298-6002 – phone
(202) 403-3030 – facsimile
ldunner@dunnerlaw.com

{00300714.2}

*Counsel for John C. Flood of Virginia, Inc.,*
*John C. Flood, Inc. (a Virginia corporation),*
*John C. Flood Contractors, Inc., and*
*Clinton Haislip & James L. Seltzer, Jr.*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 12th day of September, 2008, a true and correct copy of the foregoing document was served via ECF upon:

Benjamin J. Lambiotte, Esq.
**GARVEY SCHUBERT BARER**
1000 Potomac Street, Fifth Floor
Washington, D. C. 20007

_____