```
 1              IN THE UNITED STATES DISTRICT COURT
                FOR THE DISTRICT OF COLUMBIA
 2
       - - - - - - - - - - - - - - - - x
 3
       JOHN C. FLOOD OF VIRGINIA,        :
 4     INC.

 5              Plaintiff                 :

 6     vs.                               :  No. 1:06CV01311

 7     JOHN C. FLOOD, INC.                :

 8              Defendant                 :

 9     - - - - - - - - - - - - - - - - x

10                    June 4, 2008

11                    Washington, D.C.

12     DEPOSITION OF:

13                    MELVILLE DAVIS

14          was called for examination by counsel for the

15     Plaintiff, pursuant to notice, taken at Garvey

16     Schubert Barer, 1000 Potomac Street, N.W., Suite 500,

17     Washington, D.C., commencing at 9:15 a.m., before

18     Misty Klapper, a Notary Public in and for the District

19     of Columbia, when were present on behalf of the

20     respective parties:

21

22
```

COPY

EXHIBIT F

4b64bd44-f10a-4d4d-8285-412befbe2ae0

Page 25

1        A.    Yes.

2        Q.    And you can also testify about Virginia

3   Flood's use of those for a certain period of time,

4   correct?

5        A.    Yes.

6        Q.    What period of time can you testify about

7   it for Virginia Flood?

8        A.    When they first -- when it was first

9   incorporated, naturally I went over there.  They came

10  back over here.  And -- and we helped them with their

11  advertisement and they used our contracts and

12  whatever.  So, I mean --

13       Q.    If it's correct that you incorporated

14  Virginia Flood in 1989 --

15       A.    Yes.

16       Q.    -- and you filed bankruptcy in, I

17  believe, June 1991, and then it was converted to a

18  Chapter 7 from a Chapter 11 in approximately March

19  1993 --

20       A.    Okay.

21       Q.    -- so if that time frame helps jog your

22  memory, what period of time can you tell me about the

Page 26

1    use of trademarks by Virginia Flood?

2        A.    Are we talking about John C. Flood of

3    Virginia now?

4        Q.    Yes.

5        A.    What do you want to know, from the

6    beginning until then or what do you want to know?

7        Q.    I want to know are you the witness who

8    can tell me about the use of the trademarks by

9    Virginia Flood from 1989 when it was incorporated up

10   until what period?

11       A.    Yes.

12       Q.    Up until what time?

13       A.    Until it went bankrupt.

14       Q.    Until June 1991?

15       A.    Yes.

16       Q.    Were you involved in Virginia Flood at a

17   corporate level after you filed bankruptcy in June

18   1991?

19       A.    After bankruptcy?

20       Q.    Yes.

21       A.    No, we bowed out.

22       Q.    Tell me what you mean when you say you

EXHIBIT F

4b64bd44-f10a-4d4d-8285-412befbe2ae0

1    bowed out.

2        A.    Well, after -- after they first -- after

3    we went Chapter 11, we talked to them for a little

4    while.  And then we -- the company completely

5    separated.  They -- they went on their own and I guess

6    they thought they could open -- the bankruptcy

7    wouldn't come after them being John C. Flood of

8    Virginia, but we owned part of it, so they did.  So

9    from that point on they ran it themselves.

10        Q.    Would you read back the last statement,

11    please?

12            (The record was read as requested.)

13            BY MR. ZRALEK:

14        Q.    So your testimony is that Seltzer and

15    Haislip completely separated from you in some manner

16    after you filed bankruptcy?

17        A.    Yes, in a period of time.

18        Q.    And is it your testimony also that they

19    believed, Seltzer and Haislip believed, that the

20    bankruptcy wouldn't come after that, but you owned

21    part of Virginia Flood and then the bankruptcy court

22    did come after them also?

4b64bd44-f10a-4d4d-8285-412befbe2ae0

Page 28

1          A.    Yes.

2          Q.    What do you mean that the bankruptcy

3    proceeding or court or trustee came after them also?

4    What do you mean?

5          A.    Well, I mean, they wanted to know all of

6    our assets.  That was part of our assets.  So we only

7    assumed when they asked for our assets and they found

8    out they owned part of it that they would go to ask

9    them and tell them that they're going to take half the

10   assets or whatever.  I can't speak for the bankruptcy

11   court.

12         Q.    But they were never involved as parties

13   in your bankruptcy, were they?

14         A.    That I couldn't answer you.

15         Q.    They were never -- they were never sued

16   as defendants in the adversary proceeding when the

17   trustee asserted a complaint against you and

18   Mr. Crooks and Mr. Smiley and Mrs. Smiley and your

19   wives and sought the appointment of a receiver?

20              MR. LAMBIOTTE:  Objection, compound and

21   calls for speculation.

22              You may answer.

Page 33

1          A.    Not that I'm aware of.

2          Q.    Tell me about your background.

3                Were you born and raised in the area?

4          A.    I was born in Washington, D.C., raised

5     for a little while in Washington, D.C. and moved to

6     Hyattsville, Maryland.

7          Q.    When were you born?

8          A.    1948, May 6th.

9          Q.    And Joanne Smilely is one of your

10    daughters.

11                Do you have any other children?

12         A.    Yes, I have Sherianne Davis.

13         Q.    How old is Joanne?

14         A.    I think she's 38.

15         Q.    Are you still married?

16         A.    Yes.

17         Q.    What's your education?

18         A.    Let's see.  I finished high school, went

19    to a community college, taught plumbing school, taught

20    mechanical school at the University of Maryland.  I've

21    been on the board of Plumbing, Heating and Cooling

22    Contractors, travelled all over, a number of different

Misty Klapper & Associates
703-780-9559

EXHIBIT F

4b64bd44-f10a-4d4d-8285-412befbe2ae0

Page 34

1    things in the plumbing industry.

2         Q.    What was your first job after school?

3         A.    I worked for James Vito, Incorporated.

4         Q.    Doing what?

5         A.    A plumber's helper.

6         Q.    And then after that?

7         A.    After I left Vito?

8         Q.    Yes.

9         A.    You've got to be kidding me, right?

10        Q.    I'm just wondering -- you incorporated

11   1984 Flood in 1984.

12              What were you doing prior to that?

13        A.    I was in the plumbing trade my whole

14   life.  I don't remember who I worked for.  I think I

15   went to work for George F. Warner.

16        Q.    How did you come to incorporate 1984

17   Flood?

18        A.    In 1984 I was -- well, in 1983 I was

19   working for a company called Johnny B. Quick along

20   with most of us sitting at this table.  I felt the guy

21   that owned it had some very good ideas, but I didn't

22   agree with all of them.  So, therefore, I went in

EXHIBIT F

4b64bd44-f10a-4d4d-8285-412befbe2ae0

1    business and opened a business and revamped some of

2    his ideas and my ideas together and opened the

3    corporation.

4            Q.    Were you working with Mr. Crooks at

5    Johnny B. Quick?

6            A.    Yes.

7            Q.    Where was your first office of 1984

8    Flood?

9            A.    Bladensburg Road up in Cottage City.

10           Q.    That's Cottage City, Maryland?

11           A.    Yes.

12           Q.    Was that your only office in 1984?

13           A.    Yes.

14           Q.    Where is the next office that you opened

15    or branch or location?

16           A.    Gee, I don't remember.  I really don't.

17    I can't recall which one we opened next.

18           Q.    I'm not looking for specific addresses.

19    I'm looking for locations.  So where else --

20           A.    I would say it was in Washington, D.C.

21    It was on Georgia Avenue, 3912 Georgia Avenue.

22           Q.    Was that soon after 1984?

EXHIBIT F

4b64bd44-f10a-4d4d-8285-412befbe2ae0

1          A.     No, not soon, because, I mean, when we

2     first opened, we only had three employees.  So it

3     was -- it was fairly a few years after that.

4          Q.     The three employees, the two of you and

5     then three additional ones?

6          A.     We had Mark Crooks, my father at the time

7     and two people in the truck.

8          Q.     Who was your father?

9          A.     Shell C. Davis, Jr.

10         Q.     Why did you choose the name John C.

11    Flood?

12         A.     Well, there was a Flood called J. C.

13    Flood and it was James Flood.  What he did was he went

14    to Florida, so he closed down entirely.  So I called

15    him up in Florida and got his name and said look, I'd

16    like to have permission to use the Flood name, but

17    John C. Flood.  And I sent him $1 and he said fine,

18    use anything you want.

19              Now, at the time we didn't know Flood,

20    Incorporated was in business.  And when we found out

21    they were in business, we bumped heads a little bit on

22    a name.  And Tom Flood called me up and said look,

EXHIBIT F

4b64bd44-f10a-4d4d-8285-412befbe2ae0

1    we've got to do something about this, either you buy

2    me out or I buy you out.

3            And we went over and made a deal with him

4    and bought him out.  He wanted to get out and wanted

5    to retire.

6        Q.    Did you have a formal contract or

7    agreement with him?

8        A.    Oh, yeah.  Absolutely.

9        Q.    And how about with J. C. Flood?

10       A.    No.  We sent him $1.  He closed down and

11   abandoned the corporation and everything.

12       Q.    When you say you butted heads with Tom

13   Flood --

14       A.    Yeah, we went on a job where a customer

15   called John C. Flood and called Flood, didn't know

16   which Flood they called.  We met on the job, him and

17   one of his employees, and we walked off the job

18   because it was their job.  And then afterwards he

19   called me up and we went over and talked a couple of

20   times and then we ended up buying him out and he went

21   to Florida.

22       Q.    What research did you do before you chose

EXHIBIT F

4b64bd44-f10a-4d4d-8285-412befbe2ae0

Page 51

1          Q.    So you started with three employees in

2    1984?

3          A.    Um-hmm (affirmative).

4          Q.    By the time that you incorporated John C.

5    Flood of Virginia, Virginia Flood, in 1989, you had

6    quite a number of employees, correct?

7          A.    Yes.

8          Q.    I mean, you were a very successful

9    corporation, weren't you?

10         A.    Right.

11         Q.    So you had grown from three employees to

12   approximately how many by 1989?

13         A.    I couldn't give the exact amount.

14         Q.    100?

15         A.    I would say somewhere in that area, maybe

16   less than 100, maybe a little bit over 100.

17         Q.    Do you know what your revenues were at

18   the time?

19         A.    No.  I mean --

20         Q.    In the millions?

21         A.    Oh, yeah, in the millions.

22         Q.    Within a five-year period?

EXHIBIT F

4b64bd44-f10a-4d4d-8285-412befbe2ae0

1        A.     Yeah.

2        Q.     How did you get drawn from the Cottage

3    City office into Washington, D.C. and into Northern

4    Virginia?  Tell me about that progression.

5        A.     Well, to me you almost have to be in

6    Washington, D.C. if you're going to work in that area.

7    So we were in Cottage City.  We bought the building

8    and we left somebody at Cottage City to be in the

9    Maryland office.

10            And then we -- we opened up 3912 Georgia

11   Avenue and put a small office in there for D.C.  So we

12   stayed there.  And then we were advertising in

13   Virginia already.  I think we had a half page

14   everywhere.

15            And Jim and Moe were running all the

16   leads in Virginia and, therefore, we went over and

17   bought a building and opened up over in Virginia.

18       Q.     So you had a half page ad everywhere?

19       A.     Half page, whole page.  I can't tell you

20   what the advertisement -- I just don't remember.

21       Q.     In all locations, correct?

22       A.     Again, I don't remember.  More than

EXHIBIT F

4b64bd44-f10a-4d4d-8285-412befbe2ae0

1     likely all locations, but I can't answer that without

2     looking.

3          Q.    Okay.  But you know that you were

4     advertising in Virginia?

5          A.    Absolutely.

6          Q.    Okay.  And that you had been doing that

7     for some time prior to the time that you incorporated

8     Virginia Flood, correct?

9          A.    Yes.

10         Q.    As CEO of these corporations, prior to

11    incorporating Virginia Flood approximately what

12    percentage of your work came out of Maryland or D.C.

13    or Virginia?

14         A.    I wouldn't even attempt to guess, because

15    that's all it would be is a guess.

16         Q.    When did you first meet Mr. Haislip and

17    Mr. Seltzer?

18         A.    They were employees of ours.  We met them

19    over at Johnny B. Quick.  And then when we opened in

20    Cottage City, they came to work for us as salespeople.

21               And then as we became friends and kept on

22    working, we were in Virginia and they lived in

4b64bd44-f10a-4d4d-8285-412befbe2ae0

Page 54

1    Virginia, so they were running the leads in Virginia.

2    So that's when we said well, let's open an office over

3    there and -- and run -- and call it John C. Flood of

4    Virginia.

5            We incorporated John C. Flood of Virginia

6    in 1989.  We took it in Maryland and put it -- a

7    Maryland corporation and put -- if I recall right, it

8    says John C. Flood of Virginia can only operate under

9    John C. Flood of Virginia and no other entity or

10   advertise in the State of Maryland, if I'm not

11   mistaken, somewhere --

12           Q.    That was approximately 1993, I believe;

13   is that correct?

14           A.    I don't know.  I think it was as soon as

15   we incorporated John C. Flood of Virginia we did that.

16           Q.    That doesn't make sense to me because

17   this was your business that you were hoping to be able

18   to use everywhere, correct?

19           A.    Right.

20           Q.    At the time?

21           A.    Right.

22           Q.    And my assumption is that you wanted

EXHIBIT F

4b64bd44-f10a-4d4d-8285-412befbe2ae0

1    these businesses to have access everywhere, right?

2        A.    Correct.

3        Q.    So it makes sense to me that that would

4    have happened after you filed bankruptcy and after

5    there was sort of a split between the businesses.

6        A.    No, it was done before.

7        Q.    So you said that you were friends with

8    Mr. Haislip and Mr. Seltzer?

9        A.    Yes.

10       Q.    Can you explain that a little more?

11       A.    I don't know what you call friends.

12   They've been over my house.  I think it was a birthday

13   or whatnot.  I don't know what it was.  And I've been

14   over their house.

15       Q.    Did you do things socially together?

16       A.    A few things, yes.

17       Q.    And at some point did that stop?

18       A.    Yes.

19       Q.    Tell me about that.

20       A.    It stopped after the Chapter 11.

21       Q.    You stopped calling them?

22       A.    More or less they stopped calling us.

EXHIBIT F

4b64bd44-f10a-4d4d-8285-412befbe2ae0

Page 56

1       Q.    Was there a rift between the businesses

2   at some point?

3       A.    While they were working there?

4       Q.    Yes.

5       A.    No.

6       Q.    So Virginia Flood originally in 1989 when

7   you formed it was trading just as John C. Flood, like

8   all the rest of your businesses, correct?

9       A.    Of Virginia, yes.

10       Q.    It always traded as of Virginia?

11       A.    Yes, always traded John C. Flood of

12   Virginia, Incorporated.

13       Q.    Didn't -- John C. Flood of Virginia,

14   Inc. originally in 1989 when you incorporated it,

15   wasn't it just like your other locations?  Didn't it

16   just trade under the name and advertise under the name

17   John C. Flood originally for the first couple of

18   years?

19       A.    I can't answer that question.  As far as

20   I -- well, originally, yes, because we gave them -- we

21   gave them trucks and on the trucks it said John C.

22   Flood, Incorporated to start them out, to start the

EXHIBIT F

4b64bd44-f10a-4d4d-8285-412befbe2ae0

Page 57

1    business out.

2            Q.    Okay.

3            A.    So, yes, it probably had John C. Flood,

4    Incorporated until they eventually replaced the trucks

5    and put John C. Flood of Virginia on them.

6            Q.    And the same was true with the telephone

7    books and other advertisements too, correct?

8            A.    Yes, until they had to be renewed, then

9    they put John C. Flood of Virginia.

10           Q.    Okay.  Why did you incorporate a separate

11   entity in Virginia instead of just opening up another

12   office like you had done when you opened -- like you

13   did when you opened up the Washington office?

14           A.    Well, we -- we -- when we opened up John

15   C. Flood of Virginia, we wanted people to know that

16   they were a Virginia company, not a D.C. company, not

17   a Maryland company, but a Virginia company.  And

18   that's what we did it for.

19           Q.    You received money each month from

20   Virginia Flood, correct?

21           A.    Yes.

22           Q.    I believe it was about $400 or $500 a

Misty Klapper & Associates
703-780-9559

EXHIBIT F

4b64bd44-f10a-4d4d-8285-412befbe2ae0

1   month; does that sound right?

2        A.    I don't remember how much it was, but

3   that seems close to right.

4        Q.    And you did not do any work out of that

5   office, did you?

6        A.    Absolutely did.

7        Q.    You did?

8        A.    Yes.  When that office was first opened,

9   we put a manager over there named Steve Feldman to get

10  the office running right the way we want it run.

11  Steve Feldman had a heart attack.  I went and worked

12  in that office myself for, I don't know, two months,

13  maybe three months.

14       Q.    You had some expertise from your years in

15  the profession, correct?

16       A.    Yes.

17       Q.    And you are, I would say, at least ten

18  years older than Mr. Seltzer and Mr. Haislip?

19       A.    Well, I'd like to say five.  Yeah, over

20  ten years.  Yes.

21       Q.    And you've been in this business longer

22  than they have, right?

EXHIBIT F

4b64bd44-f10a-4d4d-8285-412befbe2ae0

Page 59

1          A.    Yes.

2          Q.    You were a very successful corporation

3    based in Maryland and in D.C. --

4          A.    Right.

5          Q.    -- when you opened up Virginia Flood,

6    correct?

7          A.    Right.

8          Q.    So you lent some of your expertise to

9    their operations, right?

10         A.    Absolutely.

11         Q.    And so did Mr. Crooks, right?

12         A.    Yes.

13         Q.    Tell me about that.

14         A.    Well, I mean, you have to understand, Moe

15   and Jimmy were both salespeople; therefore, the

16   technical part of it they didn't understand.  So,

17   therefore, we went over there and did the technical

18   part, helped them with the technical part.

19              And then when we were back in Maryland in

20   Cottage City, we'd bring them over for a meeting at

21   least once a week -- and maybe it went into later on

22   once every other week -- and went over paperwork and

EXHIBIT F

4b64bd44-f10a-4d4d-8285-412befbe2ae0

Page 60

1   what was expected and this and that and sales figures

2   and everything else.

3        Q.    Okay.  And part of what you were trying

4   to accomplish in Virginia was expanding your customer

5   base, correct?

6        A.    Yes.

7        Q.    Okay.  And it was understood among all

8   four of you that the name John C. Flood would be used

9   when you advertised for Virginia Flood, correct?

10       A.    No.  Again, we put John C. Flood, Inc.

11  trucks over there.  When it got renewed or replaced

12  the trucks or replace the advertisement, it's to be

13  advertised John C. Flood of Virginia, Incorporated and

14  the trucks changed to John C. Flood of Virginia.

15       Q.    Okay.  When was that?

16       A.    After -- when we first went over there.

17  That was the whole crux of the thing, that we wanted

18  to put them as a company, John C. Flood of Virginia,

19  so that people knew who they were dealing with.

20       Q.    But what period of time?

21       A.    It was --

22       Q.    It was incorporated in 1989.  How soon

EXHIBIT F

4b64bd44-f10a-4d4d-8285-412befbe2ae0

Page 61

1    after that did --

2         A.    Again, in 1989 we gave them trucks to run

3    from over there.  When their trucks got replaced, in

4    other words, when they had to buy a new truck, they

5    were to re-letter it the same way we letter ours but

6    add of Virginia.

7              And their advertisement was to change,

8    which it did.  Their advertisement changed from John

9    C. Flood, Incorporated, our advertisement, to John C.

10   Flood of Virginia, Incorporated.

11        Q.    So that was after 1991, though, correct?

12        A.    No, that was after 1989 in the next

13   renewal of the Yellow Pages, which would have probably

14   been maybe 1990.

15        Q.    Okay.  And we'll look at some of those

16   ads and we can see if that's correct or not.

17        A.    Sure.

18        Q.    And you're saying when they had to

19   replace the trucks.

20        A.    Yes.

21        Q.    That could have been any time, correct?

22        A.    Yes.

4b64bd44-f10a-4d4d-8285-412befbe2ae0

Page 80

1    the phone be answered?

2          A.    The phone -- the phone would ring John C.

3    Flood, Incorporated on Bladensburg Road.

4          Q.    Okay.   There was a period when -- was

5    there a period ever where the phones were transferred

6    to be answered by J. C. Flood Plumbing?

7          A.    No.

8          Q.    Okay.   Go ahead.

9          A.    Their phones were different.

10         Q.    How did J. C. Flood advertise?

11         A.    Let's see, I'm going to say Yellow Pages,

12   maybe some radio, something of that nature, maybe some

13   fliers.

14         Q.    Under what names?

15         A.    J. C. Flood.

16         Q.    Was J. C. Flood incorporated as J. C.

17   Flood, Inc. or was it the trade name of J. C. F.,

18   Incorporated?

19         A.    That I can't answer.   I think it was

20   incorporated -- well, when J. C. Flood -- I can't

21   answer that, to tell you the truth.   I just can't

22   answer it.   I could guess, but I don't want to guess.

EXHIBIT F

4b64bd44-f10a-4d4d-8285-412befbe2ae0

Page 81

1    Q.    And is it your testimony that J. C. Flood

2    always advertised as J. C. Flood and nothing else?

3    A.    That's the best of my knowledge.  I mean,

4    I'm not saying they didn't.

5    Q.    Plumbing, heating and air conditioning?

6    A.    Yes.

7    Q.    That's what all of your businesses have

8    done?

9    A.    Plumbing, heating, air conditioning, home

10   improvement.

11   Q.    Home improvement?

12   A.    Yeah.

13   Q.    Tell me about the home improvement.  What

14   do you mean?

15   A.    Home improvement is when plumbers have a

16   tendency to break open tile and break open walls and,

17   therefore, they always wanted us to repair them.  You

18   have to have a home improvement license to do it.

19   Therefore, we advertised plumbing, heating, air

20   conditioning and home improvement.

21   Q.    Okay.  Have you ever done any stand-alone

22   home improvement?  Do people call you up and say hey,

EXHIBIT F

4b64bd44-f10a-4d4d-8285-412befbe2ae0

1      I need help replacing my door sill?

2          A.    I don't think we've ever done that, no.

3          Q.    You know what I'm saying?  The home

4      improvement you're talking about, if I understand

5      correctly, is always related to the plumbing, heating

6      or air conditioning in some way?

7          A.    Yeah, I would say probably all the time,

8      basically.

9          Q.    Is there any difference between your

10     customer base today and the customer base of 1984

11     Flood?

12         A.    Oh, absolutely.

13         Q.    What's the difference?

14         A.    The difference is you don't have the same

15     customers.  You don't have --

16         Q.    Different than that.  I'm not looking for

17     are there different customers.  I mean, when you're

18     describing them broadly, with a very broad brush, do

19     you do residential and commercial and have you always

20     done that, for example?

21         A.    We do residential, very, very light

22     commercial, very light.

EXHIBIT F

4b64bd44-f10a-4d4d-8285-412befbe2ae0

Page 83

1      Q.    And what about Virginia Flood?

2      A.    You'll have to ask them that.

3      Q.    When you formed it in 1989.

4      A.    When we formed it they were doing all

5    residential and they looked at some light commercial

6    to do.  In their eyes the profit wasn't high enough

7    for them, so I don't know if they ever even did a

8    light commercial job then.

9      Q.    You initially owned 51 percent of

10   Virginia Flood with Mr. Crooks, correct?

11     A.    Yes.

12     Q.    And at some point it became 50/50

13   ownership --

14     A.    Yes.

15     Q.    -- with Mr. Haislip and Mr. Seltzer,

16   right?

17     A.    Yes.

18     Q.    Why did you make that decision to make it

19   50/50 instead of 51/49?

20     A.    Well, what we agreed with to them is we

21   held 51 percent.  We held all the books, checkbook,

22   everything.  And we told them we'll give them a period

EXHIBIT F

4b64bd44-f10a-4d4d-8285-412befbe2ae0

Page 84

1    of a year.  I think it was a year or maybe more than

2    that.  And then if it came around what expected, that

3    we expected and they expected, then we would make them

4    partners in Virginia 50/50.

5         Q.    And you did that?

6         A.    Yes.

7         Q.    And then, I believe, the documents were

8    backdated to make it 50/50 from the incorporation; do

9    you recall that?

10        A.    No, I don't recall that.  It's possible,

11   but I don't recall it.

12        Q.    Who is in charge of answering the phones

13   at 1996 Flood today?

14        A.    In 1996?

15        Q.    No, in our calling the present day

16   corporation 1996 Flood --

17        A.    Oh, okay.

18        Q.    -- who is in charge of answering

19   telephones?

20        A.    Let's see.  Robert Davis, Stanley Davis,

21   Pete Brady, Vicky Blankenship, Debbie O'Bryhim,

22   myself, Joanne and Bill Gallagher, Jr., among

Page 85

1    estimators that come in the door and also answer

2    phones.

3         Q.    How many locations do you have today?

4         A.    We have D.C. and Maryland.

5         Q.    What percentage of your work today is in

6    D.C. and Maryland and Virginia, if any in Virginia?

7         A.    I couldn't even guess.

8         Q.    Who would know that?

9         A.    Probably the computer geek.  He would

10   know.  He's the one who could break it down.  I mean,

11   that's what I rely on.

12        Q.    You don't have any offices in Virginia

13   today?

14        A.    No.

15        Q.    Has 1996 Flood had offices or locations

16   in Virginia since 1996?

17        A.    We had an office in Virginia, but I don't

18   know what year it was.

19        Q.    Do you recall testifying on February 25th

20   1994 before a meeting of creditors?  It was under

21   oath.

22        A.    You're kidding, right?

Misty Klapper & Associates
703-780-9559

EXHIBIT F

4b64bd44-f10a-4d4d-8285-412befbe2ae0

Page 90

1    I can tell you what the hopes were for the whole

2    corporation.

3        Q.    And when you say the whole corporation,

4    you mean all of your entities?

5        A.    Yeah, John C. Flood, Incorporated,

6    basically.

7        Q.    You mean 1984 Flood and Virginia Flood

8    collectively?

9        A.    Yeah.

10        Q.    What were the hopes?

11        A.    We were hoping to expand farther than

12    what we were.

13        Q.    Did you have other geographic locations

14    in mind?

15        A.    Oh, absolutely.

16        Q.    Where were you thinking?

17        A.    We were talking about Richmond in

18    Virginia.  We were talking about going past Baltimore.

19    We were talking about going farther in Montgomery

20    County.

21        Q.    Was your plan when you opened up an

22    office in Virginia to have that under the umbrella of

Page 91

1    Virginia Flood?

2         A.    That's something we never talked about.

3         Q.    You have no dispute that Virginia Flood

4    has used the marks John C. Flood or John C. Flood of

5    Virginia continuously since 1989, right?

6         A.    No, I have no dispute on that.

7         Q.    Why were your wives brought into the

8    bankruptcy?

9         A.    I don't know.  I can only tell you I

10   don't know, but it wasn't a pretty picture.

11        Q.    You mean coming home that night wasn't

12   very pretty?

13        A.    No, especially when they had to testify.

14   I can't answer that question.  I mean, it wasn't

15   voluntarily.  That's all I can tell you.

16        Q.    Were they co-owners or cosigners on some

17   notes?

18        A.    Yeah, on buildings.  I guess they got

19   drug in that way.

20        Q.    Did you co-own any real estate or

21   buildings with Mr. Crooks?  Did the two of you co-own

22   any buildings with Mr. Haislip and Mr. Seltzer?

Page 92

1          A.    Just --

2                MR. LAMBIOTTE:  Objection, that's been

3    asked and answered.

4                But you can go ahead and answer.

5                THE WITNESS:  Just the one in Virginia is

6    the only one we were co-owners on.

7                BY MR. ZRALEK:

8          Q.    Was that 50/50?

9          A.    Yes, 50/50.

10         Q.    Has your wife ever worked for you?

11         A.    Yeah.

12         Q.    And what about Mr. Crooks' wife?

13         A.    I don't believe she ever did.

14         Q.    Does your wife still work for the

15   business today?

16         A.    Once in awhile, yes.  She does

17   bookkeeping and stuff that meets the -- what they call

18   them, I don't know.

19         Q.    She helps do other things that nobody

20   else wants to do?

21         A.    Yeah.

22                MR. ZRALEK:  I'll mark this as

4b64bd44-f10a-4d4d-8285-412befbe2ae0

Page 93

1   Exhibit 18.

2              (Thereupon, Davis Deposition Exhibit

3              Number 18 was marked for identification.)

4              BY MR. ZRALEK:

5        Q.    I'll hand you what's marked as

6   Exhibit 18, Mr. Davis.

7              Do you recognize this document?

8              MR. LAMBIOTTE:  Take a minute and go

9   through it.

10             THE WITNESS:  Okay.  Sure.

11             BY MR. ZRALEK:

12       Q.    I just am asking for you to acknowledge

13  that this was the agreement of sale.

14             Do you recognize this?

15       A.    Yes.

16       Q.    And that's your signature and Mr. Crooks'

17  signature on the last page?

18       A.    I can speak for mine, not his.  His is

19  too scribbly for me.

20       Q.    It's dated November 8, 1989; is that

21  correct?

22       A.    Yes.

EXHIBIT F

4b64bd44-f10a-4d4d-8285-412befbe2ae0

Page 94

1          Q.     That's all I have on that document.

2                 Earlier you were telling me about how you

3    changed from 51/49 ownership to 50/50 and there was

4    sort of a probationary period; is that right?

5          A.     Yes.

6          Q.     Tell me about that.

7          A.     Well, again, they worked as, basically, I

8    would say, office people and salesmen, sales mostly.

9    And we internally sent checks over there to help them

10   too, along with what they had over there.  And they

11   drove their sales up to a certain amount, which we

12   were satisfied with.  And then we gave them 50 percent

13   after that.

14         Q.     How did you monitor their work to make

15   sure they were doing a good job?

16         A.     We had all the books.

17         Q.     You had all the books?

18         A.     Absolutely.

19         Q.     So you could see how they were doing?

20         A.     Absolutely.

21         Q.     And you could see how much they were

22   doing in terms of sales and how much revenue they were

Page 95

1   helping bring in; is that right?

2        A.    Yes.

3        Q.    And did you occasionally visit their

4   office?

5        A.    They visited us more than we visited

6   them.  We did go over there and visit them once in

7   awhile, but not very often.

8        Q.    But you had meetings collectively

9   where --

10       A.    Yes.

11       Q.    -- you and Mr. Crooks had input on the

12  advertising that they were doing, correct?

13       A.    Everything.

14       Q.    On everything?

15       A.    Yes.

16       Q.    You had input on everything that they

17  were doing?

18       A.    Yes.

19       Q.    And until they proved themselves to you,

20  you did not make them 50/50 co-owners; is that right?

21       A.    Yes.

22       Q.    So I know we're unclear on the date when

4b64bd44-f10a-4d4d-8285-412befbe2ae0

Page 96

1    it changed from 51/49 to 50/50 --

2         A.    Yeah.

3         Q.    -- but I want to ask, did you continue to

4    keep these books and records up until the time that

5    you filed bankruptcy?

6         A.    After we filed bankruptcy, when we were

7    in 11, we still kept the books.  I think right when we

8    went 7 I believe we gave them the books.  It was in

9    our best interest for them to have their own books.

10        Q.    But up until the time you filed Chapter

11   7, you had the ability to monitor what was going on

12   with the Virginia corporation?

13        A.    Yes.

14        Q.    And you kept a close watch; is that

15   right?

16        A.    Yes.

17        Q.    Do you remember why you filed bankruptcy?

18        A.    Oh, yeah.  I mean, it can be a number of

19   reasons.  I couldn't give you one reason.  We owned a

20   lot of real estate, number one.  The economy went

21   booming and somebody pulled the rug from underneath of

22   it and it happened very quick.  I mean, very quick.

1   So, I mean, I can't give you any answer other than

2   that.  Then we were forced into it by the creditors.

3        Q.   So you had some outstanding bills that

4   you were unable to pay and then the creditors forced

5   you into it?

6        A.   Well, I mean, more or less the creditors

7   felt -- forced us into it, but we had a building we

8   were trying to renegotiate.  And the main -- the main

9   creditor was Citizens Bank of Maryland.  Believe me

10  when I tell you we didn't want to do that.

11       Q.   So when you filed bankruptcy, I assume

12  that had an impact on the business of 1984 Flood?

13       A.   Yes.

14       Q.   Tell me about that.

15       A.   I can't give you exact.  Things -- I

16  mean, we lost -- we lost ability to advertise some

17  places.  We lost employees and, therefore, that

18  changed the business a little bit.

19            MR. ZRALEK:  Would you read back the

20  answer?

21            (The record was read as requested.)

22            BY MR. ZRALEK:

4b64bd44-f10a-4d4d-8285-412befbe2ae0

Page 98

1    Q.    How else did your business change after

2    you filed bankruptcy?

3    A.    That's all I can remember.

4    Q.    What do you mean when you say you lost

5    ability to advertise?

6    A.    It was COD after that.

7    Q.    Which means what?

8    A.    They wouldn't advertise unless we paid

9    them up front.

10    Q.    And was that everywhere?

11    A.    I would say probably, yes, everywhere.

12    Q.    This was in -- when you filed Chapter 11?

13    A.    Right.

14    Q.    How about when you say you lost

15    employees, tell me about that.

16    A.    Well, I mean, employees -- no one wants

17    to work for a company that's in bankruptcy, even

18    though it's in debtor in possession.  So some

19    employees left and went to work for other companies.

20    Q.    Did you have to fire any employees

21    because you had run out of money to pay them?

22    A.    I can't remember that.

Page 99

1          Q.     Who was in charge of HR at the time?

2          A.     The employees?

3          Q.     Yes.

4          A.     Rodney Lazear.  Rodney Lazear, he was the

5     foreman at that time involved.  He did all the hiring

6     and firing.

7          Q.     Where is he today?

8          A.     He's passed away also at an early age.

9          Q.     I was asking you earlier about how you

10    monitored what was happening at Virginia Flood.  And

11    you said you maintained the books and records all the

12    way up until the time that you converted to a Chapter

13    7, right?

14          A.     Pretty close.  I don't have the exact

15    date.

16          Q.     How did that change after you converted

17    to a Chapter 7?  How did your monitoring Virginia

18    Flood's activities change, if at all?

19          A.     For monitoring?

20          Q.     Yes.

21          A.     Well, then there was no monitoring.  We

22    gave them their own books.  And then, like I say, then

EXHIBIT F

4b64bd44-f10a-4d4d-8285-412befbe2ae0

1    phone calls stopped in between both of us.

2          Q.    You mean you stopped calling them and

3    they stopped calling you or you mean customers?

4          A.    We called them, but there's no returned

5    calls or whatever.

6          Q.    Do you know what trade names my clients

7    were using after you converted your bankruptcy to

8    Chapter 7?

9          A.    John C. Flood of Virginia, Incorporated.

10         Q.    And that's all?

11         A.    To the best of my knowledge.

12         Q.    Why were they doing that?

13               MR. LAMBIOTTE:   Objection, calls for

14   speculation.

15               BY MR. ZRALEK:

16         Q.    Do you know why they were trading under

17   the name with the modifier of Virginia as opposed to

18   without the modifier?

19         A.    Well --

20         Q.    If you know.

21         A.    I would only assume that that's their

22   name.

EXHIBIT F

4b64bd44-f10a-4d4d-8285-412befbe2ae0

Page 101

1      Q.    Talking still about the period after 1993

2  when you converted to Chapter 7, to the extent that

3  you know, was Virginia Flood using the name John C.

4  Flood of Virginia on its trucks?

5      A.    I can't answer that.  I don't know.

6      Q.    Or in its yellow page ads?

7      A.    If we could look at the yellow page ads I

8  could answer that, but I can't answer that.  It's too

9  far away -- I mean, it's too long ago.

10      Q.    And you had stopped monitoring by the

11  time you had transferred the books and records to

12  them --

13      A.    Yes.

14      Q.    -- after the Chapter 7?

15          Do you recall the drop in revenues that

16  1984 Flood experienced by the time that you filed

17  Chapter 11 in 1991?

18          MR. LAMBIOTTE:   Objection, assumes facts

19  that aren't in testimony.

20          BY MR. ZRALEK:

21      Q.    Did we talk a second ago about how there

22  was a drop in revenue?

Page 102

1          A.     Yes, but I don't know anything about it.

2    Like I said, amounts and things like that come from a

3    computer geek.

4          Q.     Do you recall whether it was drastic?

5          A.     No.  All I can tell you is there was a

6    recession at the time in my opinion.  I can't give you

7    the figures, no.

8          Q.     If the Notice of Filing that your

9    attorney filed on your behalf with the bankruptcy

10   court states, when you filed the Chapter 11, that your

11   business had yearly sales of $10,000,000 a year in

12   1988, does that sound correct?

13         A.     If that's what he's got, he -- he should

14   know.

15         Q.     Okay.  And he stated that at the peak of

16   operations Flood employed over 200 workers; does that

17   sound familiar?

18         A.     Sure.

19         Q.     Operated over 90 trucks; is that correct

20   from what you recall?

21         A.     I can't -- I can't -- I don't know.

22         Q.     Generated monthly sales over $700,000;

4b64bd44-f10a-4d4d-8285-412befbe2ae0

Page 103

1    does that sound familiar?

2        A.    That's probably right.

3        Q.    The advertising budget ran close to

4    $1 million a year; does that sound correct?

5        A.    You know, again, I can't be specific.  I

6    can -- if that's what he's got down -- I don't know.

7    I don't know.

8        Q.    You don't have any reason to dispute --

9        A.    I don't have a reason to dispute it, but,

10   again, I don't know for certain.

11       Q.    And then he stated that by the time you

12   filed bankruptcy, that the business operations

13   screeched to a halt.

14             Does that sound correct?

15       A.    I won't say to a halt.  I would say we

16   lost business.  As I said, the amount I don't know.

17       Q.    But you don't have any reason to dispute

18   what your attorney filed with the bankruptcy --

19       A.    No.

20       Q.    -- court, do you?

21       A.    No.

22       Q.    He would have made statements based on

Page 104

1    interviews and communications with you, correct?

2         A.    Probably talking to the bookkeeper more

3    than anything else.

4         Q.    But that would have been authorized by

5    you and Mr. Crooks, right?

6         A.    Absolutely.

7              MR. LAMBIOTTE:  Could we go off the

8    record a second?

9              MR. ZRALEK:  Sure.

10             (Thereupon, a discussion was had off the

11             record.)

12             BY MR. ZRALEK:

13        Q.    Mr. Davis, when you testified on February

14   25th 1994 at the first meeting of creditors of John C.

15   Flood, Inc., 1984 Flood, you testified that the sales

16   had gone -- that the sales had gone down to zero after

17   Mr. Hunt, the trustee, got involved.

18        A.    Sure, I handed him the keys and the sales

19   would go down to zero.

20        Q.    Do you know the next time that John C.

21   Flood, Inc., 1984 Flood, did any business?

22        A.    You mean after -- after what period of

Page 105

1    time?

2         Q.    Well, Mr. Hunt, I believe, came in in

3    March 1993.

4         A.    Right.

5         Q.    And after that you said the sales were

6    zero.  You had handed him the keys, correct?

7         A.    Right.

8         Q.    Did it ever do any sales after that

9    point?

10        A.    Not John C. Flood, Incorporated.  All the

11   phones were turned off.

12        Q.    Not 1984 Flood?

13        A.    No, all the phones were disconnected.

14        Q.    And all the new entities that operate

15   today are new entities?

16        A.    Completely different phone numbers, yes.

17        Q.    So as of that date in March 1993 when

18   Mr. Hunt came through the door, you handed him the

19   keys, the sales were down to zero --

20        A.    Talked -- no, sales were fine, but I

21   talked to him for a few hours and then when I handed

22   him the keys the sales went to zero, yes.

1          Q.    After you handed him the keys the sales

2     went to zero?

3          A.    Yes.

4          Q.    Do you recall why the judge appointed a

5     trustee in March 1993?  What were the facts that led

6     up to that?

7          A.    A receivership or a trustee?

8          Q.    A trustee.

9          A.    I think we had a trustee the whole --

10     from day one.  I couldn't answer the question for the

11     judge.

12          Q.    You filed bankruptcy in June 1991,

13     correct?

14          A.    Yeah, '91.

15          Q.    And we've just established that Mr. Hunt

16     came in in approximately March 1993 and he was the

17     trustee, right?

18          A.    Yes.

19          Q.    So there was a period in there where

20     there was no trustee from June 1991 to March 1993.

21          A.    Okay.

22          Q.    You don't recall one way or the other; is

Misty Klapper & Associates
703-780-9559

EXHIBIT F

4b64bd44-f10a-4d4d-8285-412befbe2ae0

Page 130

1          A.    Do you have the counterclaim with you?

2          Q.    I want to know -- without you looking at

3    it, I want to know your understanding of this dispute.

4          A.    Well, I'm not going to say anything

5    without reading it.

6          Q.    What I want is this -- that counterclaim

7    speaks for itself.  I want to know what is your

8    understanding of why you filed a lawsuit against my

9    clients.

10          A.    And, again, if I can look at the

11    counterclaim, I'd be more than happy to talk to you

12    about it.

13          Q.    So you have no independent understanding

14    of why you filed --

15          A.    Yes, I do, but I want to read the

16    counterclaim before I can -- so I can answer

17    intelligently.  Other than that, I won't answer it.  I

18    don't know, then.

19          Q.    Let's do this.  I'll let you read the

20    counterclaim.  Right now before I show it to you I

21    want to know your understanding of why you filed the

22    lawsuit.

1          A.    After I read it, I'll be glad to tell

2    you.

3                MR. ZRALEK:  Ben, I'd like an independent

4    answer.

5                MR. LAMBIOTTE:  Let me go off line a

6    second.

7                MR. ZRALEK:  Sure.  Actually, I want

8    knowledge in his mind without influence from his

9    attorney.

10               MR. LAMBIOTTE:  I understand.  I don't

11   plan on influencing him.  I'm going to give him advice

12   as to whether it's appropriate to answer.

13               (Thereupon, a brief recess was taken.)

14               MR. LAMBIOTTE:  Okay.  Mr. Davis is going

15   to answer the question.  He understands he's obliged

16   to do so.

17               MR. ZRALEK:  Okay.  Go ahead, Mr. Davis.

18               THE WITNESS:  What's the question?

19               BY MR. ZRALEK:

20         Q.    What is your understanding of the basis

21   for why you filed a counterclaim against my clients?

22         A.    A number of reasons.  The first reason, I

EXHIBIT F

4b64bd44-f10a-4d4d-8285-412befbe2ae0

1    think people are totally confused in Washington,

2    D.C -- I don't care if it's Washington, D.C., Maryland

3    or Virginia -- which Flood they're calling or

4    whatever.  I think the customers want to know which

5    one they're calling, if they're in Virginia, Maryland

6    or D.C.

7              Second of all -- well, that's my main

8    reason.  Second of all, I think we -- we had to

9    countersuit because from the trade name, from them

10   taking the name John C. Flood.  And that's basically

11   my reasons.

12        Q.    What are you seeking out of your

13   Complaint or your counterclaim against my clients?

14   What sort of relief?

15        A.    Well, I think you can ask your clients.

16   We've asked them a number of times what we wanted, to

17   sign something stating that that's what they would

18   advertise, as John C. Flood of Virginia, their trucks

19   say John C. Flood of Virginia, the trucks say John C.

20   Flood of Virginia, complete letters from John to

21   Virginia the same size; their letterhead say John C.

22   Flood of Virginia and -- and -- and don't mislead

4b64bd44-f10a-4d4d-8285-412befbe2ae0

1    customers.  That's what we're looking for.

2         Q.    So you would like for my clients to

3    always modify the name John C. Flood with the words of

4    Virginia?

5         A.    Yeah.

6         Q.    Have you quantified how your company has

7    been damaged, if at all, by my clients?

8         A.    No.

9         Q.    Have you conducted any surveys in the

10   marketplace to see -- related to this case in any way?

11        A.    No.

12        Q.    Have you maintained a log of any sort or

13   any documentation from customers who have indicated

14   that they're confused by the various uses of the name

15   John C. Flood?

16        A.    Yes.

17        Q.    And if you have those, have you produced

18   those to your attorney?

19        A.    No.

20        Q.    When did you begin making this log?

21        A.    This log was made probably in the '90s

22   somewhere.  The first person that complained was a

4b64bd44-f10a-4d4d-8285-412befbe2ae0

Page 156

1  CERTIFICATE OF DEPONENT

2         I, Melville Davis, do hereby certify that

3  I have read the foregoing pages, 4 through 155,

4  inclusive, which contain a correct transcript of the

5  answers given by me to the questions propounded to me

6  herein, except for changes, if any, duly noted on the

7  enclosed errata sheet.

8

9

10  _____
                        WITNESS

11

12

13

14         Sworn and subscribed to before me this

15  26th day of June_____, 2008.

16

17  My commission expires:          Notary Public:

18  _____

19  ┌─────────────────────────────────┐
     │      PAMELA E. GERMAS           │
     │ Notary Public, District of Columbia │
20   │ My Commission Expires August 14, 2008 │
     └─────────────────────────────────┘

21

22

Misty Klapper & Associates
703-780-9559

EXHIBIT F

4b64bd44-f10a-4d4d-8285-412befbe2ae0

Page 157

```
 1    CASE:  Flood v. Flood
      DEPOSITION OF:  Melville Davis
 2    TAKEN:  June 4, 2008

 3

 4    PAGE  LINE  ERROR          CORRECTION          REASON

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21                                          _____
                                            Witness
22
```

EXHIBIT F

4b64bd44-f10a-4d4d-8285-412befbe2ae0