Westlaw.

Not Reported in F.Supp.2d                                                                 Page 1
Not Reported in F.Supp.2d, 2003 WL 22331254 (N.D.Ga.)

C

TOMMY HILFIGER LICENSING, INC., Plaintiff,
v. GOODY'S FAMILY CLOTHING, INC., Defendant.
N.D.Ga. 2003.
Only the Westlaw citation is currently available.
United States District Court, N.D. Georgia, Atlanta Division.
Atlanta County
TOMMY HILFIGER LICENSING, INC., Plaintiff,
v.
GOODY'S FAMILY CLOTHING, INC., Defendant.
**Civil Action No. 1:00-CV-1934-BBM**

May 9, 2003.

Trial Order

Beverly B. Martin, United States District Judge.
**\*1** Plaintiff Tommy Hilfiger Licensing, Inc. ("Hilfiger") filed suit against the defendant, Goody's Family Clothing, Inc. ("Goody's"), alleging violations of the Lanham Trademark Act of 1946 ("Lanham Act"), 15 U.S.C. §§ 1051-1127, as well as various state statutes. Hilfiger claims that Goody's violated its trademarks when it sold counterfeit Hilfiger t-shirts and jeans bearing labels similar to Hilfiger's trademarks. At the end of the discovery period, Hilfiger moved for partial summary judgment [Doc. No. 68-1], and the court granted Hilfiger's motion in part [Doc. No. 89-1]. Namely, the court found that Goody's had, in fact, sold counterfeit Hilfiger t-shirts. However, the court held that genuine issues of material fact remained regarding whether the sale of the counterfeit t-shirts was intentional, and whether Goody's jeans infringed on Hilfiger's trademarks.

To resolve these outstanding issues, the case was tried to the court without a jury on March 11-13, 2003. Based upon the evidence submitted at trial, as well as the post-trial submissions of the parties, the court makes the following findings of fact and conclusions of law:

*FINDINGS OF FACT*

*I. The Parties And The Trademarks*

1. Tommy Hilfiger Licensing, Inc. ("Tommy") is a Delaware corporation with its principal place of business at University Plaza, Bellevue Building, 262 Chapman Road, Suit 103A, Newark, Delaware.

2. Hilfiger, by and through its exclusive licensees, is engaged in the manufacture, distribution, and sale in interstate and foreign commerce of, among other goods, high quality apparel items, including men's, women's, and children's denim jeans.

3. Hilfiger is the owner of the HILFIGER trademarks that are the subject of this litigation, including:

a. The Flag Design Trademark, Registration Numbers 1,460,988; 1,727,470; 1,808,520; 2,030,406; 2,124,016; and 2,213,511. This trademark consists of a logo in the form of a flag with a combination of red, white, and blue geometric shapes. In its primary form, the Hilfiger flag logo is a rectangle, wider than it is high, with blue bars at the top and bottom. Between these two bars, the design is split in half, with the left half white and the right half red. When Hilfiger's name is used on the flag logo, it appears in white writing with the name "Tommy" in the top blue bar and the words "Hilfiger" or "Jeans" in the bottom blue bar.

b. The work mark TOMMY HILFIGER, Registration Numbers 1,398,612; 1,738,410; 1,833,391; 1,995,802; and 2,162,940.

c. The word mark "Tommy Hilfiger (Stylized)," which consists of the word mark written in script, like a signature, Registration Number 1,940,671.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

EXHIBIT M

Not Reported in F.Supp.2d                                                    Page 2
Not Reported in F.Supp.2d, 2003 WL 22331254 (N.D.Ga.)

d. The word mark TOMMY JEANS, Registration Numbers 1,812,970.

e. The word mark TOMMY, registered with the Georgia Secretary of State on December 8, 1998, Trademark Number T-17493.

**\*2** f. Each of these trademarks is valid and in full force and effect.

4. Hilfiger has licensed the right to use these trademarks for men's, women's, and children's apparel in the United States to Tommy Hilfiger U.S.A., Inc. ("THUSA").

5. THUSA is a wholesaler of apparel for men, women, and children. THUSA's customers are typically high-end department stores such as Nieman Marcus, Saks, Bloomingdale's, Macy's, and Dillard's. However, THUSA also sells products to stores like T.J. Maxx and Marshall's, off-price retailers who sell designer products at discount prices.

6. Tommy Hilfiger Retail, Inc. ("THRI") operates approximately 100 retail Hilfiger outlet stores throughout the United States. These stores sell only Hilfiger products.

7. Defendant Goody's Family Clothing, Inc. ("Goody's") is a Tennessee corporation with its principal place of business at 400 Goody's Lane, Knoxville, Tennessee.

8. Goody's is a moderately priced retailer of men's, women's, and children's clothing. Goody's operates approximately 330 stores, located in the southern and southeastern United States, under the name "Goody's Family Clothing." Goody's operates stores in the State of Georgia.

9. Goody's has over 10,000 employees, all based in the United States, and has been in business for over fifty years. Goody's gross sales averaged approximately 1.2 billion dollars in both 1999 and 2000.

10. Goody's sells inexpensively priced apparel,

moderately priced brand name apparel, and its own private label products. Goody's private label products have been sold under Goody's trademarks OLD COLLEGE INN, MOUNTAIN LAKE, and MONTANA BLUES.

11. Goody's is the owner of federal trademark registrations for the marks:

a. The word mark OLD COLLEGE INN SPORT.

b. The word mark OLD COLLEGE INN LOUNGEWEAR.

c. The word mark OLD COLLEGE INN JEAN COMPANY.

d. The word mark OLD COLLEGE INN.

e. The word mark MOUNTAIN LAKE.

f. The word mark MOUNTAIN LAKE CASUALS.

g. The word mark MOUNTAIN LAKE JEAN COMPANY.

12. Goody's is the owner of pending federal trademark applications for the following:

a. The word mark MONTANA BLUES.

b. The word mark "Montana Blues Jean Company (Stylized)."

## II. The Counterfeit T-Shirts

13. From approximately June 1999 through approximately July 2000, Goody's sold men's, women's, and children's t-shirts bearing the registered Hilfiger trademarks listed above on labels, hang tags, patches, and screen prints on the front of the garments.

14. These t-shirts were counterfeits of authentic Hilfiger t-shirts.

15. Goody's initially purchased the counterfeit Hilfiger t-shirts from B&L Enterprises ("B&L"). The

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

EXHIBIT M

Not Reported in F.Supp.2d                                                              Page 3
Not Reported in F.Supp.2d, 2003 WL 22331254 (N.D.Ga.)

owners and controlling officers of B&L are Jack Schwartz ("Schwartz") and Maria Foresta ("Foresta").

16. Undisputedly, B&L, Foresta, and Schwartz were not authorized licensees of Hilfiger or authorized sellers of Hilfiger merchandise.

**\*3** 17. In April 1999, a salesman named Rob Knowles ("Knowles") approached Doug Stone ("Stone"), a buyer for Goody's young men's department, to see if Goody's would be interested in purchasing Hilfiger t-shirts on the secondary market.

18. Knowles was acting in conjunction with another salesman, Steve Furchner ("Furchner").

19. At the time Knowles offered the Hilfiger t-shirts to Goody's, Stone had known Knowles and Furchner for three or four years. Knowles began selling to Goody's in 1997, when he met Stone at a trade show in Las Vegas. Since then, Knowles has been to Goody's offices in Knoxville regularly and knows many Goody's personnel.

20. However, prior to the Hilfiger t-shirt offer, Goody's had only done business with Knowles in his capacity as a sales agent for Point Zero, a company that manufactures young men's sportswear bearing its own trademark. Neither Stone, nor any other Goody's buyer, had ever purchased merchandise from Furchner, whom Stone understood to be another salesman for Point Zero.

21. Allen Markway ("Markway"), the Divisional Merchandise Manager of Goody's men's department, had known Knowles for over a year as a salesman for Point Zero goods.

22. When Knowles offered Goody's the Hilfiger t-shirts, it was the first time that Knowles had offered anything to Goody's other than Point Zero goods.

23. Knowles informed Stone that the Hilfiger t-shirts he could sell to Goody's were manufacturer overruns offered by B&L.

24. Manufacturer overruns are excess goods produced because a manufacturer has purchased more material and made more garments than it needs to fill its orders. Overruns occur due to cancellation of orders and other unforeseen events.

25. Stone had never done any business with B&L. He did not ask Knowles or Furchner if they had any prior experiences with B&L. Stone also did not attempt to contact B&L directly.

26. On April 26, 1999 Stone received a fax outlining the number of t-shirts that were available. The fax also informed Goody's that it would receive an authentication letter from B&L, as well as a company entitled "Athletic Brands." The fax suggested that 20,000 to 50,000 men's t-shirts and 20,000 boy's t-shirts would be available each month for the next six months, for a total of 295,000 t-shirts. The fax also indicated that larger quantities may be available.

27. Although Stone had known and worked with Knowles for several years, Stone told Knowles that he needed assurance in writing that the merchandise could legitimately be sold to Goody's. Stone was aware that Hilfiger did not normally sell products to a store like Goody's.

28. Knowles also spoke to Markway regarding the Hilfiger t-shirts. Markway asked Knowles if he had a release to sell the merchandise. Knowles assured Markway he could get all appropriate paperwork.

29. Markway believed that the Hilfiger t-shirts were a great opportunity for Goody's. However, he also was concerned that Hilfiger normally did not sell to Goody's tier of clothing stores.

**\*4** 30. Markway then told Tom Kelly ("Kelly"), Goody's Executive Vice President of Merchandise, that Stone had been offered Hilfiger t-shirts. Kelly told Markway that they needed a release letter.

31. Kelly's instructions to Markway are consistent with his deposition testimony, where he stated that Goody's had a policy to "never buy any branded

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

EXHIBIT M

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 22331254 (N.D.Ga.)

merchandise unless there was a letter."By letter, Kelly was referring to a letter from the manufacturer granting the seller the right to sell the merchandise to Goody's.

32. Stone then advised Regis Hebbeler ("Hebbeler"), Goody's General Counsel, about Goody's opportunity to purchase Hilfiger t-shirts. Hebbeler did not inquire into the supplier of the goods. He suggested that Stone obtain a written release.

33. In the face of Goody's concerns, Knowles and Furchner repeatedly reassured Goody's that the Hilfiger goods being offered were genuine. Knowles and Furchner did so because they had visited Schwartz's showroom in New York and accepted Schwartz and Foresta's repeated reassurances that the goods were genuine.

34. Eventually, Stone, Markway, Hebbeler, and Robert Goodfriend ("Goodfriend"), Goody's Chief Executive Officer, participated in a telephone conference with Knowles to discuss the deal. During that conversation, despite the persistent reassurances of legitimacy from all salespeople involved, the Goody's representatives asked Knowles to obtain a release signed by Hilfiger or an authorized Hilfiger agent or licensee to confirm that B&L was authorized to sell Hilfiger t-shirts. Knowles assured Goody's that he could get this documentation.

35. In response, Goody's received a blank letter of indemnification. The letter was not from Hilfiger, was not on Hilfiger letterhead, made no reference to any particular goods, and was signed only by Schwartz.

36. Stone gave the blank letter of indemnification to Hebbeler and Markway. Stone included a note saying that, when Goody's was ready to make a commitment, the letter would be printed on Hilfiger letterhead.

37. Markway skimmed over the letter of indemnification and told Stone to give it to Hebbeler. Mark-

way knew that the letter was not from Hilfiger.

38. Hebbeler reviewed the letter of indemnification. He understood that the letter was unsatisfactory as evidence that the goods were authentic because it was not signed by a Hilfiger agent nor was it on Hilfiger letterhead. Further, it made no mention of Hilfiger or the goods that were being purchased.

39. Hebbeler informed Stone that the letter of indemnification was not satisfactory evidence of authenticity of the merchandise or B&L's authority to sell Hilfiger merchandise.

40. On the bottom of the letter of indemnification, Hebbeler wrote: "Unless we can verify financial info to support this indemnity, [Goody's] may be stuck with legal bills, damages and perhaps return of the shirts. I would expect Tommy H. to pursue. I suggest getting financial info and an insurance policy."

**\*5** 41. Hebbeler directed this note to Markway. Hebbeler wanted to ensure that Markway was aware of the concerns he previously expressed verbally to Stone. He also wanted to ensure that Goody's avoided trademark litigation, as it had experienced a few years earlier regarding the sale of counterfeit Calvin Klein merchandise.

42. Importantly, Hebbeler instructed Markway to see him before moving forward with any Hilfiger t-shirt purchase.

43. At trial, Stone testified that he did not see Hebbeler's handwritten note to Markway until his deposition on October 24, 2001. Markway also testified that he did not see Hebbeler's handwritten note until it was shown to him at his deposition on October 25, 2001. Markway further testified that he never talked to Hebbeler about the comments Hebbeler made in the note or the sufficiency of the letter of indemnification.

44. Stone and Markway's testimony on this point is of questionable veracity. Hilfiger's attorneys did not obtain a copy of Hebbeler's handwritten note until

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 22331254 (N.D.Ga.)

Page 5

two months after Stone and Markway were de-posed, and therefore, the document could not have been shown to Stone and Markway at their depos-itions. Moreover, the offices of Stone, Markway, and Hebbeler are in close proximity. Stone and Hebbeler see each other about ten times a day. Thus, the court finds Markway and Stone's testi-mony that they did not discuss the sufficiency of the letter of indemnification with Hebbeler, and Markway's testimony that he did not see Hebbeler's handwritten note, to be implausible.

45. In any event, Hebbeler had a conversation with Furchner on April 28, 1999 regarding the authenti-city of the goods. Furchner contacted Hebbeler be-cause Knowles had conveyed Hebbeler's concerns to Furchner.

46. During this conversation, Hebbeler expressed concern regarding the letter of indemnification signed by Schwartz. Furchner reassured Hebbeler that he could obtain additional documentation demonstrating the authenticity of the goods. Furch-ner memorialized this phone conversation in a fax to Knowles.

47. Hebbeler felt reassured because Furchner prom-ised additional written documentation. Hebbeler never saw, nor asked to see, the additional written documentation promised by Furchner.

48. However, the additional documentation was provided to Stone. It consisted of a letter, difficult to decipher, from a company entitled "Athletic Brands."

49. The Athletic Brands letter is not what it pur-ports to be. The first paragraph of the document has been altered to substitute the word "tee" for "socks" in a typeface that is different from that used in the rest of the document. The alteration was done to make the document look like it refers to t-shirts, as opposed to socks, which are referenced in the second paragraph of the document.

50. Stone did not show this letter to Hebbeler or

Markway, although Hebbeler was aware that Goody's had received additional documentation. Hebbeler failed to follow-up on his concerns ex-pressed to both Markway and Stone.

**\*6** 51. No one at Goody's inquired about this new company, Athletic Brands.

52. Prior to working at Goody's, Markway had worked at Dillard's as a divisional merchandise manager, and, for at least seven years, he had direct contact with Hilfiger sales representatives. Mark-way testified that it would have been easy for him to contact one of Hilfiger's representatives. But, Markway never called any of his old contacts to in-quire into the validity of the B&L t-shirt sale.

53. Prior to the purchase of the B&L Hilfiger t-shirts, various Goody's employees examined sample t-shirts. Stone and Markway visited a nearby de-partment store and purchased authentic Hilfiger t-shirts. They made a side-by-side comparison with the samples sent by B&L. Through this review, Goody's employees determined that the goods were current and of good quality. They did not examine the goods for authenticity, as they were not con-cerned about the possibility that the t-shirts may be counterfeit.

54. Before Goody's ordered any t-shirts from B&L, Stone provided Knowles or Schwartz with a new vendor form. B&L filled out this form and returned it to Goody's. The form was approved by Stone and Kelly.

55. This document indicates that B&L used a factor. A factor is a bank that extends financing se-cured by accounts receivable and collects from pur-chasers, such as Goody's. Stone believed that a factor would not be involved with suspect vendors or the sale of counterfeit t-shirts. However, Stone never contacted nor investigated B&L's factor.

56. Stone then ordered around 150,000 t-shirts. Markway wanted to obtain as many t-shirts as he could.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

EXHIBIT M

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 22331254 (N.D.Ga.)

57. Goody's young men's department issued the first order to B&L in May 1999. The t-shirts were ordered in an assortment of colors on a predetermined size scale. The young men's department continued to order t-shirts through early Summer 2000.

58. In the Spring of 1999, Goody's boy's buyer, Angela Barrington ("Barrington"), learned of the availability of Hilfiger t-shirts through Knowles and her supervisor, Phil Dangel ("Dangel"). Barrington and Dangel reviewed sample t-shirts.

59. Barrington and Dangel recognized that Hilfiger was not normally one of their vendors, and they discussed the issue of avoiding the purchase of counterfeit merchandise, because it was against Goody's policy to purchase counterfeit apparel. But, Barrington was told, and worked under the assumption, that Goody's had a release from Hilfiger to sell these t-shirts. She never saw, nor asked to see, such a release.

60. Barrington spoke with Schwartz, who told her that he was a manufacturer of t-shirts for Hilfiger and that the t-shirts were overruns. Barrington believed that Schwartz did screen-printing for Hilfiger.

61. This was the first time that Barrington had purchased name-brand apparel from someone other than the trademark owner or manufacturer.

62. Barrington indicated that she would have purchased as many t-shirts as she could, since the Hilfiger name and logo were recognizable, and the t-shirts sold well.

*7 63. Barrington ordered around 60,000 boys' t-shirts from B&L, based on her understanding that Goody's had a right to sell that merchandise.

64. Barrington's first shipment was to arrive by the end of May, but it did not arrive until July. In fact, Barrington received two faxes from B&L stating that Barrington's orders could not be filled as requested. These faxes referenced production delays at the mills. Such production delays are inconsistent

with the idea that the B&L t-shirts were overruns.

65. When Barrington experienced delays in delivery, she turned to Knowles for help. Knowles indicated to Barrington that she would have to deal with Schwartz directly, as Knowles could get no answers from Schwartz himself. Knowles referred Barrington to Schwartz.

66. Also, Barrington wanted to place advertisements in local newspapers referencing the Hilfiger t-shirts. Barrington was told she could not use the Hilfiger name in the advertisement due to B&L's concerns, which were unspecified at trial. Instead, she ran the advertisement referring to famous maker t-shirts.

67. Around September 1999, Laura Roberts ("Roberts"), Goody's buyer for junior knits and sweaters, spoke with Schwartz and was offered women's Hilfiger t-shirts. Roberts traveled to Schwartz's showroom and decided to purchase Hilfiger t-shirts. She ordered approximately 50,000 women's t-shirts.

68. Though this was the only time Roberts had ordered such a large quantity of designer t-shirts, she did not do any background check or investigation of B&L. She did not check to see if Goody's had a release to sell Hilfiger shirts.

69. The prices Goody's paid for the t-shirts were typical for Hilfiger and other brand name t-shirts.

70. After placing orders for the Hilfiger t-shirts with B&L, Goody's learned, in September 1999, that the t-shirts would be supplied by a different company, the 4F Club, Ltd. ("4F"). 4F had a different phone number and address. But, Goody's made no inquiry into the reason for the switch. Goody's accepted that the companies were the same and continued to order t-shirts from 4F.

71. In total, Goody's ordered a significant number of t-shirts from B&L and 4F; however, Goody's received around half of those t-shirts ordered, and many shipments were considerably delayed.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

EXHIBIT M

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 22331254 (N.D.Ga.)

72. Each buyer involved with the purchase of the Hilfiger t-shirts was aware of the danger of purchasing counterfeit goods on the secondary market. But, no one asked B&L to provide invoices tracing the goods back to the trademark owner. No Goody's employee contacted Hilfiger to determine if the shirts were authentic.

73. Once the t-shirts arrived at Goody's stores, Elaine Obenshain, Goody's visual presentation manager, sent a memo to Goody's stores announcing the arrival of the shirts. She described the t-shirts as a great value, which store managers should place "on a 'hot spot' round table in a high traffic area of [their] store."

*8 74. The Hilfiger t-shirts sold well and earned a higher profit margin for Goody's than similar apparel products.

75. In total, Goody's sold 92,136 counterfeit Hilfiger t-shirts. This total was derived by David Peek ("Peek"), Goody's Chief Financial Officer. Peek utilized the most accurate method to reach this number; he analyzed point-of-sale data for the "SKUs" in question.

76. Counterfeit Hilfiger t-shirts were sold under seven different SKU numbers: 116-3538, 116-4122, 125-3064, 125-3396, 125-3397, 141-8718, 141-8720.

77. Although Hilfiger asserts that counterfeit Hilfiger t-shirts were sold under six additional SKU numbers, Hilfiger has pointed the court to no reliable evidence that counterfeit Hilfiger t-shirts were sold under these additional SKU numbers: 140-4766, 140-4767, 140-4768, 140-4769, 140-4770, 140-4771. The unexplained reference to Tommy under these SKU numbers does not demonstrate that they were counterfeit Hilfiger t-shirts. In fact, these garments were sold to Goody's by a vendor other than 4F or B&L, indicating that they were not the counterfeit Hilfiger t-shirts at issue in this litigation.

78. The court found Peek to be a very credible and knowledgeable witness. The court accepts his testimony regarding the point-of-sale data for the number of counterfeit Hilfiger t-shirts sold, the cost of these t-shirts, the sale price of these t-shirts, and the resulting merchandise margin.

79. Based on Peek's research and calculations, Goody's gross revenue from the sale of 92,136 counterfeit Hilfiger t-shirts was $1,597,027.22.

80. Likewise, Peek determined that the direct cost of this merchandise was $908,032.03. This is the amount of money Goody's paid the vendors, 4F and B&L, for the counterfeit t-shirts. Again, the court accepts Peek's testimony as truthful and accurate.

81. Subtracting the cost of the t-shirts from the gross revenue on the t-shirts, Hilfiger made a net profit of $688,995.19 on the sale of the counterfeit t-shirts.

82. Goody's total sales in 1999 and 2000 amounted to $1.2 billion and $1.25 billion, for a total of $2.45 billion combined. Goody's combined sales in 1999 and 2000 of counterfeit t-shirts amounted to approximately $1,597,027.22, less than one percent of Goody's total sales for the two years.

### III. The Trim Packages

83. Also at issue in the current lawsuit are the trim packages used on Goody's private label denim products. The term "trim package" is a phrase used in the apparel industry to refer to the labels, tags, and design elements of garments that are visible to the customer when inspecting apparel for purchase. Items included in a trim package can include pocket flashers, joker tags, size stickers, waistband labels, and woven labels attached to other parts of garments.

84. A "pocket flasher" is a piece of paper trim that goes over the pocket of pants and is stapled to the garment. It generally bears the name of the jeans, describes the jean, and the fit. It is removed from

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

EXHIBIT M

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 22331254 (N.D.Ga.)

the jean after the product is purchased.

*9 85. Around 1996, Goody's developed the private label brand, Old College Inn ("OCI"). This brand was made for sale to young men.

86. Around the same time, Goody's developed a private label brand intended for sale to young women, or juniors, as well as a brand intended for sale to middle-aged women, or missy's. The junior's brand was entitled Montana Blues, and the missy's brand was entitled Mountain Lake.

87. After it introduced each of these private label brands, Goody's decided to unify its packaging for all its private label denim products.

88. For this project, Goody's reviewed a variety of different types of jeans. Around sixty pairs of jeans were collected by Goody's buyers, divisional managers, and product development department. Goody's also reviewed companies that were selling jeans effectively, including Bugle Boy, Polo Ralph Lauren, and Hilfiger. Goody's determined that the red, white, and blue color scheme was a common theme that seemed to be selling well.

89. Then, Goody's began working with Sun Apparel ("Sun"), a clothing manufacturer. The two companies met in January 1999. Carolyn Armbruster ("Armbruster"), Elaine Goldberg ("Goldberg"), and Eric Rothfield attended for Sun, and two Goody's buyers, along with Goodfriend and Kelly attended for Goody's. During the meeting, Sun pitched its capabilities. Goody's brought samples of jeans, including a pair of Hilfiger jeans. Goody's indicated that it wanted to give its private label jeans a "facelift."

90. Goody's directed Sun to use a red, white, and blue theme. Goody's wanted to use Hilfiger as its inspiration. Goodfriend also suggested that Goody's jeans should use contrast stitching on the eyelet of the buttonhole and a contrasting red color for the cloth part of the zipper.

91. As a result of this meeting, Goldberg and Arm-

bruster met with Steve Occhipinti ("Occhipinti"), who was Sun's representative to Paxar Corporation ("Paxar"), a company that sells apparel identification products. They discussed the ideas developed at the January 1999 meeting between Goody's and Sun. Occhipinti was asked to develop several renditions of trim packaging for Goody's approval for the Montana Blues line of jeans products.

92. During this meeting, Sun informed Occhipinti that Hilfiger was the brand that Goody's wanted to use as inspiration for its private label denim products. It is typical for a store to use a popular brand as the inspiration for the development of its private label products.

93. Occhipinti then developed a memo directed to Gerard Spinella, art director of Paxar. In that memo, Occhipinti says that Goody's wanted to "knock off 'Tommy Jrs' (pants enclosed) color and all. But they know they need to depart from it A LITTLE!"Attached to the memo were a pair of Hilfiger jeans. However, in that same memo, Occhipinti also noted that Goody's liked the red, white, and blue flasher used by Arizona Concept, a product developed for J.C. Penney.

*10 94. In his deposition, Occhipinti states that he uses the words "knock off" loosely. He indicates that, to him, "knock off" means to take a design as an example, and then change elements to create a new concept or design. He claims eighty percent of his work is creating knock offs. Occhipinti understood that Goody's wanted to emulate Hilfiger.

95. Paxar developed designs for the Montana Blues denim trim packages in March and April 1999. Occhipinti forwarded these designs to Sun.

96. One of these designs was more similar to the Hilfiger designs than the others. Goody's chose the design that was most similar to Hilfiger.

97. The trim piece designs selected for the Montana Blues denim line used a red, white, and blue color scheme for the background in a combination of

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

EXHIBIT M

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 22331254 (N.D.Ga.)

Page 9

rectangular shapes and displayed Goody's trade-marks "Montana Blues Jean Company," "MBJC," or some variation thereof. The primary trim pieces attached to these products included a joker tag, a pocket flasher, a hang tag, a size sticker, and a woven label attached to the coin pocket.

98. The pocket flasher selected as part of the Montana Blues trim package has two horizontal navy blue rectangles at the top and bottom of the flasher with "Montana Blues Jean Company" writ-ten in white in the top rectangle, and the particular style name written in the bottom rectangle. Between the two navy rectangles are three vertical blocks. The first and last are red. In the middle is a photograph of two happy girls in a faded blue color.

99. The joker tag used a similar design except the bottom bar was white, not blue. The hang tag util-ized a design consisting of horizontal rectangles at the top and bottom split into three smaller rect-angles colored red-white-red. In between these two rectangles was a horizontal blue rectangle in which Goody's trademark was written. The size sticker was written in red and white writing.

100. The coin pocket label was split in two halves, red on the left and blue on the right, with the ini-tials "MBJC" written across it.

101. After the designs for the Montana Blues denim trim pieces had been developed and selected, Goody's decided to use the same trim piece designs for the OCI denim line. However, the OCI trim pieces replaced the name on the Montana Blues trim package with OCI, and the OCI pocket flasher also replaced the photograph in the center with one of two happy men. Also, the joker tag consisted of a square design split in two halves, the top blue and the bottom red. The coin pocket label was a red rectangle with white bars at the top and bottom. The initials "O.C.I." appear on the label.

102. The OCI carpenter jeans and shorts contained an additional woven label on the hammer loop. This was a rectangular label that consisted of blue bars

on the top and bottom, red squares on the left and right, and a white rectangle in the middle. The words "Old College Inn Jean Company" were writ-ten in blue inside the white rectangle.

*11 103. The boards containing the designs for the OCI trim pieces were provided to Kelly, who re-viewed the designs. Kristin Rice, a men's denim buyer, as well as the Goody's product development department, also reviewed the designs.

104. During this review, there were discussions among Goody's employees regarding the pack-aging's similarity to Hilfiger. However, Markway and other Goody's employees felt that the photo-graph in the middle of the flasher and the promin-ence of the OCI name made the OCI packaging suf-ficiently distinct from the Hilfiger packaging.

105. Around April 1999, Goody's also began work-ing on its Mountain Lake denim line. Occhipinti again met with Sun about developing the Mountain Lake jeans trim designs. As a result of this meeting, Occhipinti suggested several options. One of these options used a Hilfiger flasher as an example. In a memo to Paxar, Occhipinti stated "split scene - like Tommy picture on left - writing on right. Would like a photo like this, but if we can't use this, try and 'touch out' Tommy flag."

106. Paxar developed designs which were sub-sequently provided to Goody's. As with the Montana Blues designs, one was more similar to the Hilfiger packaging than the others. Goody's se-lected the design most similar to the Hilfiger pack-aging.

107. The trim design selected by Goody's used geo-metric combinations of red, white, and blue. The trim pieces attached to these products included a pocket flasher, an inside waistband label, a coin pocket label, a size sticker, and a leather waistband patch.

108. The pocket flasher has two horizontal navy blue rectangles at the top and bottom. The top rect-

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

EXHIBIT M

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 22331254 (N.D.Ga.)

angle contains the word "Mountain" in white lettering, and the bottom rectangle contains the words "Lake Jean Company," also in white lettering. Between the two navy bars are two square blocks. The righthand block is red, and the lefthand block is white. On the line, between the white and red block, is a picture of a woman, from the waist down, wearing a pair of jeans.

109. The inside waistband label consisted of two blue rectangles separated by a red bar. The word "Mountain" appeared in the top blue rectangle and the words "Lake Jean Company" appeared in the bottom blue rectangle. The coin pocket label was a smaller version of the inside waistband label.

110. The size sticker contained a design at the top consisting of three stacked rectangles colored blue-red-blue from top to bottom. The word "Mountain" appeared in the top blue rectangle and the words "Lake Jean Company" appeared in the bottom blue rectangle in white writing. Below this design the size sticker used white writing. The leather waistband patch consisted of three stacked rectangles with a dark brown color on the top and bottom rectangles and a lighter brown color in the middle rectangle.

111. Goldberg expressed concerns within Sun that Goody's selected design for the Mountain Lake packaging was very similar to Hilfiger's pocket flasher. She did not express this concern to Goody's.

*12 112. Armbruster was also concerned that Goody's designs for the Mountain Lake packaging were similar to Hilfiger's designs. Goody's employees became aware of Sun's concerns.

113. In fact, Armbruster sent a letter to Kelly on April 9, 1999 indicating that Sun was "waiting for Bob Goodfriend to agree that he is comfortable with the similarity to a current popular brand."In that letter, the "current popular brand" referred to by Armbruster was Hilfiger.

114. Goodfriend reviewed the selected design packages for each of the denim lines, and he found them acceptable.

115. A number of Goody's employees noted the similarity between the trim packages selected and Hilfiger's packaging.

116. Goody's product development department was asked to look at the trim packaging for Montana Blues, OCI, and Mountain Lake after the designs had been selected. John Okvath ("Okvath"), Goody's Senior Vice President of Product Development, became concerned that the designs were similar to Hilfiger. Specifically, Okvath was concerned about the colors and the positioning of the colors. He expressed those concerns to Hebbeler.

117. Around May 1999, Okvath and Goodfriend brought the trim boards containing the designs to Hebbeler for his review. Hebbeler was told that Goody's was interested in using these designs, and Hebbeler was to give his opinion as to whether there were possible infringement problems.

118. Hebbeler then performed a trademark review. After reviewing the trim boards provided by Goodfriend and Okvath, Hebbeler went to other stores to look at Hilfiger products. He noted that the Hilfiger name was prominently displayed on all Hilfiger products, and that there was a difference between Hilfiger's name and Goody's private label denim names. He compared the shapes, colors, sizes, lettering, and fonts of the designs provided to him by Goody's and those in the stores. He then considered the similarities between Hilfiger and Goody's with respect to pricing, channels of trade, and advertising. He reviewed Goody's leases.

119. Goody's did not request an independent evaluation from its outside trademark counsel.

120. This review was conducted during the same time frame in which Goody's was considering purchasing the Hilfiger t-shirts from B&L, April and May 1999.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

EXHIBIT M

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 22331254 (N.D.Ga.)

121. Based on this review, Hebbeler approved the Mountain Lakes, OCI, and Montana Blues trim packaging. No written opinion was drafted.

122. In late 1999 and early 2000, Barbara Thoreson ("Thoreson"), Goody's Vice President for Special Sizes, decided to include denim in the Mountain Lake II product line. Thoreson and other Goody's personnel worked with Sun on this project.

123. Those involved intended to use the Mountain Lake trim packaging designs already in use on the Mountain Lake jeans.

124. However, one important change was made for the Mountain Lake II jeans. Since they were for plus-sized women, the Mountain Lake II trim pieces removed the picture of the missy-sized woman in the middle of the Mountain Lake pocket flasher. No picture replaced the removed photo.

*13 125. Sun became very concerned with the new pocket flasher for the Mountain Lake II jeans.

126. Okvath did not believe that the new pocket flasher was a problem, since the Mountain Lake product with its flasher had been in the stores for a year.

127. But, Armbruster requested a letter of indemnification from Goody's to protect Sun. Armbruster stated in an email that "[t]he pocket flasher artwork your 'Product Dev' area is wanting can be accomplished provided we receive a letter of indemnification - as it is so close to Tommy. I am starting to sweat."Armbruster sent follow-up emails pressing Goody's about the letter of indemnification.

128. Testimony from Armbruster and Goldberg indicates that Sun asked for letters of indemnification as a matter of routine practice, and that a letter should have been requested as soon as Sun began producing jeans for Goody's. However, there is evidence that Sun had never requested such a letter from Goody's previously.

129. Eric Rothfield, the Chief Executive Officer of

Sun, pushed strongly for the letter of indemnification at the time of the production of the Mountain Lake II jeans. His employees were to do nothing without the letter of indemnification.

130. Eventually, Goody's provided the requested letter of indemnification to Sun. Kelly signed the letter and found it to be a unique request.

131. In July 2000, prior to the filing of this lawsuit, Goody's made a decision to alter the trim packaging on its private label denim. This decision was made to give Goody's stores a fresh, new look. Goody's has no intention of reintroducing the controverted trim packaging.

132. In 1999 and 2000, Goody's total revenue from the sale of Mountain Lake and Mountain Lake II jeans was $4,833,949.27. Goody's paid $3,040,224.74 for these jeans. Subtracting the cost from the total revenue, Goody's profits on the sale of Mountain Lake jeans amount to $1,793,724.53.

133. In 1999 and 2000, Goody's total revenue from the sale of OCI jeans was $13,656,474.47. Goody's paid $8,282,576.46 for these jeans. Subtracting the cost from the total revenue, Goody's profits on the sale of OCI jeans amount to $5,373,898.01.

134. In 1999 and 2000, Goody's total revenue from the sale of Montana Blues jeans was $4,441,864.73. Goody's paid $2,633,046.69 for these jeans. Subtracting the cost from the total revenue, Goody's profits on the sale of Montana Blues jeans amount to $1,808,818.04.

135. Adding the profits for the OCI, Montana Blues, and Mountain Lake jeans, the total profits on these denim products equals $8,976,440.58.

### IV. Hilfiger's Quality Control and Investigation of Goody's

136. Hilfiger's contracts with its suppliers forbid the suppliers from selling overruns, irregulars, seconds, or any other goods bearing the Hilfiger

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

EXHIBIT M

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 22331254 (N.D.Ga.)

trademarks on the secondary market.

137. Hilfiger itself purchases all of its suppliers' overrun, irregular, second, and other goods bearing the Hilfiger trademarks in order to ensure that its goods are not sold in channels of trade that are not approved by Hilfiger.

*14 138. Hilfiger keeps personnel in all its factories, to ensure that all unwanted products bearing Hilfiger trademarks are sold back to Hilfiger.

139. A retailer that is offered Hilfiger goods on the secondary market can authenticate where the goods are coming from by obtaining unaltered original documents tracing the goods back to the retailer that purchased the goods directly from Hilfiger.

140. No one from Goody's asked for such documents.

141. On July 9, 1999, Brian Logan ("Logan"), a Hilfiger merchandise manager located in Tennessee, visited a Goody's store in Clarksville, Tennessee and purchased a t-shirt in accordance with instructions from Kristin Carabees ("Carabees"), a Hilfiger account manager.

142. A few days after the purchase, Logan sent the t-shirt and the receipt for it to Carabees. Carabees then forwarded the items to Hilfiger's outside intellectual property counsel.

143. Hilfiger's outside intellectual property counsel did not ask Hilfiger's associate counsel, Jade Huang, to examine the Hilfiger t-shirt purchased at Goody's until early or mid-2000. To explain this delay, Hilfiger's Chief Executive Officer, Joel Horowitz ("Horowitz"), testified that the Goody's case got lost in the shuffle, as Hilfiger opened numerous other anti-counterfeiting files.

144. No cease-and-desist letter was ever sent to Goody's, although Hilfiger has an extensive anti-counterfeiting program.

145. With the proper expertise and references, a person can determine in a short period of time whether a Hilfiger t-shirt is a counterfeit t-shirt. In fact, Hilfiger's associate counsel, Jade Huang, testified at her deposition that she has examined from twenty-five up to fifty garments a week to determine if they are counterfeit.

146. In March 2000, Geanie Johansen ("Johansen"), a self-employed consultant and investigator, was contacted by Hilfiger's outside counsel and asked to investigate Goody's sales of Hilfiger merchandise.

147. Johansen purchased Hilfiger items at a Goody's store, and in April 2000, at Johansen's request, Tammy Tuggle ("Tuggle") also purchased Hilfiger items at a Goody's store.

148. The merchandise purchased by Tuggle and Johansen was forwarded to Hilfiger's outside intellectual property counsel.

149. Also in March 2000, another investigator, Talmadge Scott Perkins ("Perkins") was told to go to Goody's and purchase Hilfiger merchandise. He purchased t-shirts at two Goody's stores.

150. Perkins noticed the trim packaging on Goody's private label jeans and reported this information to his supervisor. Later, he was instructed to purchase a pair of Goody's private label jean shorts.

### V. Hilfiger Initiates Lawsuit Against Goody's

151. On July 31, 2000, Hilfiger's outside counsel sent a letter to Goody's on behalf of Hilfiger, advising Goody's that Hilfiger had filed this lawsuit.

152. On August 1, 2000, Goody's received Hilfiger's complaint, without any prior notice of the claims stated in the complaint.

*15 153. Thereupon, Hebbeler contacted Schwartz regarding the Hilfiger t-shirts and the suit filed by Hilfiger. Schwartz, again, told Hebbeler that the shirts were not counterfeit. Schwartz told Hebbeler

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

EXHIBIT M

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 22331254 (N.D.Ga.)

he would send the documentation he had relating to the authenticity of the merchandise; however, Schwartz did not provide any additional documentation.

154. Upon receipt of the complaint, John Payne ("Payne"), Goody's General Merchandise Manager for Men's, sent a memo to Dangel and Markway instructing that all Hilfiger t-shirts be removed from Goody's stores and returned to the Knoxville, Tennessee distribution center. Payne sent the memo on the advice of Hebbeler.

155. The recall resulted in approximately 13,000 t-shirts being returned to Goody's distribution center. However, Goody's continued to sell the jeans with the trim designs alleged to be infringing.

156. When Hebbeler did not receive additional documentation from Schwartz, he tried to contact Schwartz, but could only reach Foresta. She demanded payment and assured Hebbeler that the goods were authentic.

157. On November 9, 2000, Goody's filed suit against B&L, 4F, and Schwartz in Tennessee state court. The court entered judgment in favor of Goody's on October 3, 2002.

158. Between July 9, 1999, when Logan first purchased the Hilfiger t-shirt at a Goody's store in Tennessee, and July 31, 2000, when Hilfiger filed suit against Goody's, Hilfiger made no attempt to contact Goody's regarding the t-shirts. Hilfiger did not try to contact Goody's, despite the fact that Hilfiger knew that Goody's did not have Hilfiger's authorization to sell its merchandise.

159. Had Hilfiger sent a cease-and-desist letter, or otherwise contacted Goody's, Hilfiger could have prevented almost all of the sales of the counterfeit t-shirts, because production delays prevented any shirts from reaching Goody's stores until June 1999.

*VI. Other Facts Relevant to the Trademark Infringement Claims*

160. Hilfiger has used its flag logo since 1985. Since formation of the company, Hilfiger has directed its marketing approach toward developing consumer awareness of its flag design trademark. As such, the Hilfiger trademark is used in multiple ways and locations on virtually every garment or other product Hilfiger sells.

161. Jeans sold by Hilfiger incorporate the flag design trademark and variants thereof on several elements of the paper and cloth trim designs of the jeans.

162. For example, the Hilfiger pocket flasher used in Hilfiger products from 1996 until the present incorporates a two-part, white-red design logo. The pocket flasher has a navy rectangle at the top and bottom of the flasher with "Tommy" written in white on the top rectangle and "Hilfiger" written in white on the bottom rectangle. Between the two rectangles are two blocks of color, white and red. The white block contains a picture of a woman, from the waist down, wearing a pair of jeans.

*16 163. Goody's admits that the Hilfiger flag design logo has priority over any marks or trim packaging used by Goody's. Accordingly, the court finds that the Hilfiger trademark has priority.

164. Goody's admits that Hilfiger's flag design logo is incontestable. Goody's also admits that Hilfiger's trademark is an arbitrary mark. The court finds Hilfiger's mark incontestable and arbitrary.

165. Various clothing manufacturers use a red, white, and blue color scheme in their trademarks and product identification packages. Examples include Polo Ralph Lauren, Nautica, and J. Crew.

166. Bugle Boy has used a red, white, and blue block-style design on its trim packaging.

167. Public Clothing Company has also used a red, white, and blue block-style design in connection with its "Frenchcuff" brand of clothing.

168. At Last Sportswear has also used a red, white,

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

EXHIBIT M

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 22331254 (N.D.Ga.)

and blue design in connection with its clothing products.

169. Alexander Julian has used block-style designs in connection with its apparel. Some of these include red, white, and blue rectangles.

170. Gucci America also uses a block-style design with color combinations of red and blue or red and green.

171. Hilfiger jeans normally retail for $45.00 for a regular pair of jeans and $60.00 for a pair of fashion jeans. However, these jeans can be found at significantly discounted prices in department stores. Similarly, they can also be found for prices as low as $14.99 in an off-price retail outlet.

172. Hilfiger also offers the same jeans for a one-third discount at its own outlets, for a starting price of around $29.99.

173. The average selling price of a pair of Hilfiger junior jeans is currently around $20.00, and the average selling price of a pair of Hilfiger men's jeans is around $25.00.

174. Hilfiger products are sold in retail stores, including department stores, throughout the United States. Authorized Hilfiger products are sold at off-price discount retail stores such as T.J. Maxx and Marshall's. Of the four types of stores Goody's competes with, namely department stores, specialty stores, off-price apparel stores, and discount stores, Hilfiger sells to three of these stores.

175. Hilfiger's competitors in the market for denim jeans include Levi, Polo Ralph Lauren, Calvin Klein, Gap, Abercrombie & Fitch, and American Eagle. They also include private label brands of stores like Macy's and J.C. Penney.

176. Goody's stores sell a wide variety of private label and brand name apparel products, including denim jeans. Goody's sells brand name apparel products from Levi, Liz Claiborne, and Nike.

177. Goody's competitors include department stores like Dillard's, Parisian, and Proffitt's, where Hilfiger goods are also sold. In its denim products, Goody's has targeted customers that buy products at Abercrombie & Fitch and American Eagle.

178. Goody's advertises primarily through inserts in local newspapers of the cities and towns in which its stores are located. Goody's also does some local television and radio advertising.

*17 179. Hilfiger advertises its products generally through print ads in nationally distributed periodicals, in nationally viewed television ads, in outdoor ads, and in cinema ads. Hilfiger also does advertising in conjunction with the local retailers offering its goods.

180. Hilfiger advertises in music, fashion, and life-style magazines. These include Rolling Stone, Spin, Details, Glamour, GQ, Elle, Vogue, W, and Jane.

181. Hilfiger has also sponsored major events, such as Formula One racing and concert tours. Hilfiger has outfitted professional athletes and musicians.

182. There is no evidence that any Hilfiger or Goody's customer has experienced any actual confusion between Goody's denim products and Hilfiger's products.

### CONCLUSIONS OF LAW

#### I. Did Goody's Knowingly Infringe on Hilfiger's Trademark by Selling Counterfeit T-Shirts?

At the summary judgment stage of this lawsuit, Goody's conceded that it sold counterfeit Hilfiger t-shirts from July 1999 until July 2000. By this concession, Goody's admits that it is in violation of section 1114(1)(a) of the Lanham Act for selling, "without the consent of the registrant . . . [a] counterfeit . . . of a registered mark."15 U.S.C. § 1114(1)(a). Accordingly, at the summary judgment stage, the court determined that Goody's is liable

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

EXHIBIT M

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 22331254 (N.D.Ga.)

Page 15

for trademark infringement, counterfeiting, false designation of origin, and unfair competition. See Babbit Elecs., Inc. v. Dynascan Corp., 38 F.3d 1161, 1181 (11th Cir. 1994); Chanel, Inc. v. Italian Activewear of Fla., Inc., 931 F.2d 1472, 1475 n.3 (11th Cir. 1991); Amstar Corp. v. Domino's Pizza, Inc., 615 F.2d 252, 265 (5th Cir. 1980). The outstanding issue to be resolved by the court is the amount of damages Hilfiger is entitled to recover for Goody's sale of the counterfeit t-shirts.

The remedies available to a trademark registrant whose mark has been infringed are outlined in 15 U.S.C. § 1117. In addition to injunctive relief, a registrant whose rights are violated may generally recover the defendant's profits from the infringing activity together with the costs of the action. Id. at 1117(a); see also Chanel, Inc., 931 F.2d at 1475-76. "Based on equitable considerations, the trial court may, in its discretion, reduce or enhance the resulting award up to three times the original amount, and in exceptional cases, award attorneys' fees." Id. If the defendant's infringement is intentional, however, section 1117(b) governs: unless the court finds extenuating circumstances, treble damages and attorneys' fees are mandated. 15 U.S.C. § 1117(b); see also Babbit Elecs., Inc., 38 F.3d at 1183; Chanel, Inc., 931 F.2d at 1476; Hard Rock Café Licensing Corp. v. Concession Servs., Inc., 955 F.2d 1143, 1151 (7th Cir. 1992). Where there is intentional infringement, the court has no choice but to treble the defendant's profits. Id.

*18 Together, sections 1117(a) and 1117(b) demonstrate that "a showing of intent or bad faith is unnecessary to establish a violation of § 1114(1)(a), or to seek remedies pursuant to § 1117(a). But where, as here, a registrant seeks the mandatory treble damages and attorneys' fees provided for in § 1117(b), the plaintiff must prove the defendants' intent to infringe." Chanel, Inc., 931 F.2d at 1476. In the Eleventh Circuit, "willful blindness" is sufficient to satisfy the intent requirement under section 1117(b). Id. Accordingly, "[w]illful blindness is knowledge enough." Id. (quoting Louis Vuitton, S.A.

v. Lee, 875 F.2d 584, 590 (7th Cir. 1989)); Monsanto Co. v. Campuzano, 206 F. Supp. 2d 1271, 1274-75 (S.D. Fla. 2002); Microsoft Corp. v. CMOS Techs, Inc., 872 F. Supp. 1329, 1340 (D.N.J. 1994) (quoting legislative history saying "if the prosecution proves that the defendant was 'willfully blind' to the counterfeit nature of the mark, it will have met its burden of showing 'knowledge'"); Levi Strauss & Co. v. Diaz, 778 F. Supp. 1206, 1208 (S.D. Fla. 1991). However, "whether a defendant has been willfully blind will depend on the circumstances." Chanel, Inc., 931 F.2d at 1476.

To assess whether Goody's has been willfully blind, the court must determine what the defendant knew. Id. at 1476-77. "Under the doctrine of willful blindness or deliberate ignorance, which is used more often in the criminal context than in civil cases, knowledge can be imputed to a party who knows of a high probability of illegal conduct and purposefully contrives to avoid learning of it." Williams v. Obstfeld, 314 F.3d 1270, 1271 (11th Cir. 2002); Hard Rock Café Licensing, Inc., 955 F.2d at 1149 (stating that to be willfully blind, "person must suspect wrongdoing and deliberately fail to investigate"); Louis Vuitton, S.A., 875 F.2d at 590 (finding willful blindness occurs when defendant fails to inquire further because he is afraid of what the inquiry might yield; Monsanto Co., 206 F. Supp. 2d at 1275 (holding that willful blindness occurs when person suspects unlawful activity and purposefully fails to investigate); see also United States v. Morris, 286 F.3d 1291, 1301 (11th Cir. 2002) (failing to perform due diligence is willful blindness where investments of dubious existence); United States v. Peddle, 821 F.2d 1521, 1524 n.1 (11th Cir. 1987) (quoting deliberate indifference charge to state that "knowledge may be established if the defendant is aware of a high probability of [a fact] . . . and deliberately and consciously tried to avoid learning [the fact]"). Importantly, willful blindness requires more than mere negligence. Splunge v. Shoney's, Inc., 97 F.3d 488, 491 (11th Cir. 1996) (differentiating between actions flowing from negligence and those flowing from willful

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

EXHIBIT M

blindness); *A Touch of Class Jewelry Co. v. J.C. Penney Co.*, No. CIV. A. 98-2949, 2000 WL 1224804, at *1 (E.D. La. Aug. 28, 2000) (finding that negligence, and even gross negligence, are insufficient to support a finding of willful infringement or blindness)."A showing of negligence or mistake is not sufficient to support a finding of willfulness or knowledge."*United States v. Adair*, 951 F.2d 316, 319 n.6 (11th Cir. 1992); *see also**Hard Rock Café Licensing, Inc.*, 955 F.2d at 1149. A negligence standard is an objective one: "would a reasonably prudent [person] in the [defendant's] shoes have known that the t-shirts were counterfeits?"*Id.* at 1151 n.5. In contrast, the willful blindness standard is a subjective one: "what did [the defendant] suspect, and what did he do with his suspicion?"*Id.*

**\*19** Despite Goody's protestations to the contrary, the company's conduct regarding the Hilfiger t-shirts constitutes willful blindness to the counterfeit nature of the t-shirts. Various circumstances indicate that Goody's was aware of "a high probability of illegal conduct."*Williams*, 314 F.3d at 1271. First and foremost, Goody's was purchasing Hilfiger t-shirts on the secondary market, and the Goody's officials involved with the purchase were aware that counterfeit merchandise is often offered on the secondary market. Notably, Goody's was sued by Calvin Klein a few years earlier for selling counterfeit Calvin Klein merchandise. Although the Calvin Klein suit was settled, and no judgment was rendered against Goody's, company officials, like Hebbeler, had the Calvin Klein experience in mind while assessing the propriety of the Hilfiger purchases. Specifically, Hebbeler informed Furchner that he wanted to avoid a "Calvin Klein problem."

Likewise, Goody's officials, like Barrington, Dangel, Hebbeler, Markway, Stone, and Roberts, were aware that Hilfiger does not sell merchandise to the tier of clothing stores to which Goody's belongs. These employees knew that Hilfiger sells its goods to upscale department stores such as Macy's, Saks, Bloomingdale's, and Nieman Marcus. Sometimes,

Hilfiger sells products to T.J. Maxx and Marshall's, off-price retailers who sell designer products at discount prices, but Goody's is not such an off-price retailer. In fact, for many of Goody's buyers, this was a very unique situation. Not only were the buyers purchasing popular brand name merchandise, but they were also purchasing such merchandise from an entity other than the trademark holder. For a buyer like Barrington, this was the first time she had ever purchased products from a party other than the trademark registrant.

To protect themselves in this unique situation, company officials recognized that a written release was necessary. Indeed, Kelly testified that it was Goody's policy to obtain a letter demonstrating that an intermediary had a right to sell brand name products to Goody's, prior to purchasing such merchandise through a third party. Goody's appears to have tried to apply this policy when Kelly, Markway, Hebbeler, and Stone informed Knowles during a telephone conference that written authorization was required. Even Goodfriend, the company's Chief Executive Officer, participated in this telephone conference. Knowles promised to provide the requested documentation. Barrington purchased boy's t-shirts under the assumption that written permission had been granted.

Despite a clear awareness that a proper release was needed, none was ever obtained. In fact, Goody's received two legally worthless documents. The first document was a blank letter of indemnification. It was signed by Schwartz, but did not describe the goods at issue or reference Hilfiger. It was not printed on Hilfiger letterhead, and it did not describe any connection between Schwartz and Hilfiger. This letter of indemnification was passed to Hebbeler, who explicitly noted its inadequacy. He instructed Markway to see him before purchasing any t-shirts, and he indicated that Hilfiger would file suit against Goody's, if Schwartz's letter of indemnification was Goody's only documentation of authenticity and authorization to sell Hilfiger merchandise.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

EXHIBIT M

Not Reported in F.Supp.2d                                                                Page 17
Not Reported in F.Supp.2d, 2003 WL 22331254 (N.D.Ga.)

**\*20** Faced with Hebbeler's explicit warning, Markway and Stone claim to have never seen nor heard about Hebbeler's note. This claim is implausible, as Markway, Stone, and Hebbeler work together and see each other on a daily basis. The court does not believe that they never again discussed the requisite documentation for the important Hilfiger purchase decision. Instead, the court can only conclude that Markway and Stone ignored Hebbeler's advice regarding the need for more documentation. Even if Markway and Stone's claim of noncommunication were true, Hebbeler failed to follow-up with these men, a legally necessary step under the circumstances. Instead, Hebbeler simply assumed that appropriate documentation had been received by Goody's. In making this assumption, he relied on a phone conversation with Furchner, during which Furchner reassured Hebbeler that proper documentation would be provided. Although the initial letter of indemnification was provided based on the same promise, Hebbeler never asked to review the new document promised by Furchner. Furchner sent the new document to Stone, not Hebbeler. Hebbeler never saw the letter.

The new document provided to Stone purports to allow B&L to sell Hilfiger t-shirts. But, the document is printed on the letterhead of a third company, Athletic Brands. Upon inspection, even a layperson can recognize that the document is not what it purports to be, as the document is barely legible. In the first paragraph, the word "socks" has been erased, and the word "tee" has been inserted. But, the alteration of the document was left incomplete, as the second paragraph refers to the "socks aforementioned." However, by replacing the word "socks" with "tee" in the first paragraph, there are no "socks aforementioned" to be referenced by the second paragraph. Stone did not pass this document along to Hebbeler, and Hebbeler did not ask to review it. As the first letter of indemnification was so legally inadequate, Hebbeler should have requested to see the Athletic Brands release. In any case, the presence of two questionable documents put Goody's on notice that unlawful activity may be occurring.

Other circumstances involved with the purchase of the Hilfiger t-shirts indicate that there was a "high probability" of illegal activity. Goody's was dealing with a salesman, Knowles, with whom Goody's had dealt for years. Knowles was trusted as a seller of goods for a company called Point Zero. Knowles had never sold Goody's merchandise other than Point Zero merchandise, especially popular brand name merchandise such as Hilfiger. Also, during the time it sold merchandise to Goody's, B&L suddenly changed its name to the 4F Club, Ltd. Simultaneously, B&L changed its location and address. No explanation was provided for this switch, and none was sought.

Likewise, Goody's understood that it was being offered "overruns" of Hilfiger t-shirts. By industry definition, overruns are products that have already been produced but cannot, for whatever reason, be sold as intended. A manufacturer does not purposefully produce overruns. When sold on the secondary market, they are available in limited quantities. However, Schwartz offered Goody's 295,000 t-shirts, with larger quantities possible. Such significant availability is inconsistent with the notion that the Hilfiger t-shirts were actually factory overruns. Similarly, many of the Hilfiger t-shirt orders were significantly delayed. Barrington, in particular, experienced considerable delays. She received a fax from Schwartz indicating that the delivery delays were being caused by production delays at the mill. However, such an explanation is inconsistent with the idea that these items were pre-produced manufacturer overruns.

**\*21** Moreover, when Barrington began to experience repeated problems with deliveries, Barrington contacted Knowles regarding these problems. Knowles referred Barrington to Schwartz directly, as Knowles could get no straight answers from Schwartz. Barrington's conversation with Knowles indicated that Schwartz was not performing as expected and that Knowles was frustrated with Schwartz. In total, Goody's received less than half

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

EXHIBIT M

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 22331254 (N.D.Ga.)

of the t-shirts it ordered from B&L. Further, Barrington wanted to run an advertisement in local newspapers, promoting the Hilfiger t-shirts received from B&L. Due to unspecified concerns of B&L, Barrington was not allowed to use the name "Hilfiger" in the advertisements. Instead, she simply advertised famous maker t-shirts. Again, B&L's unwillingness to permit advertising of the product it purported to be selling is inconsistent with the authorized sale of Hilfiger t-shirts.

Taken together, these facts indicate that Goody's was aware that there was a high probability of unlawful activity. *Williams*, 314 F.3d at 1271. Goody's knew that it was involved in a unique situation for which special legal protection was necessary. Officials requested releases and considered the possibility of counterfeit sales. Goody's attorney knew that Schwartz's letter of indemnification was insufficient, but no proper documentation was ever obtained. Other Goody's employees experienced unusual delays and circumstances. In combination, the facts indicate knowledge of a high probability of unlawful counterfeiting activity. *Id.*

While it is clear to the court that the facts of this case demonstrate knowledge of a high probability of illegal activity, the court must also determine, under the doctrine of willful blindness, if Goody's "purposefully contrive[d] to avoid learning of [the illegal activity]"*Id.*The court finds that Goody's did so. To begin with, company officials were admittedly excited about the t-shirt opportunity. Markway and Barrington wanted to get as many t-shirts as possible, since Hilfiger is a popular and recognizable brand name. Goodfriend even took an interest in arranging the purchase of the t-shirts. The company officials' excitement was warranted, as the Hilfiger t-shirts sold at a profit margin higher than average and were good money-makers for the company. Such eagerness on the part of Goody's employees, even high-ranking corporate officers, certainly provides a motive for Goody's to avoid educating itself as to the truth of the situation.

Moreover, various Goody's employees were aware

of the atypical circumstances surrounding the transaction. Markway and Kelly knew Hilfiger does not sell merchandise to Goody's. Stone was aware of the unusually large quantities being offered as overruns, and Barrington experienced significant delays. Hebbeler knew that B&L's documentation was legally inadequate. Barrington knew that Schwartz was not cooperating with Knowles. Although new vendors are to be approved by the company, no significant investigation of B&L or 4F was performed. In the face of these circumstances, important questions were not asked. No one questioned the reason for B&L's name change. No one asked where B&L got the t-shirts. No one asked why such large quantities of t-shirts were available as overruns. See*Levi's Strauss & Co.*, 778 F. Supp. at 1208;*Levi's Strauss & Co. v. Sunrise Int'l Trading, Inc.*, No. 93-6547-CIV, 1995 U.S. Dist. LEXIS 21949, at *4 (S.D. Fla. July 28, 1995).

**\*22** Importantly, it would have been very easy for Goody's to verify the legitimacy of B&L's offer. At trial and deposition, Markway testified that he had worked with authorized Hilfiger representatives for years while employed by Dillard's Department Stores. He admitted it would have been simple for him to call his old Hilfiger contacts to verify the legitimacy of B&L. In fact, any employee could have called the Hilfiger corporation to request information regarding the legality of the t-shirt sale. But, in spite of the unusual circumstances, no calls were made. Any such call would have revealed that the Hilfiger t-shirts were not authentic and not sold by an authorized representative. Indeed, research on the Hilfiger corporation would have revealed that Hilfiger itself buys back its factory overruns.

By ignoring all the signs of the illegality of Goody's purchase of Hilfiger t-shirts from B&L, Goody's purposefully contrived to avoid learning of the illegal activity. *Williams*, 314 F.3d at 1271. Goody's did not simply act negligently by failing to take the precautionary steps a reasonable person would have taken. *Hard Rock Café Licensing, Inc.*, 955 F.2d at 1151 n.5. In contrast, Goody's actions indicate that

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

EXHIBIT M

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 22331254 (N.D.Ga.)

it suspected unlawful activity, yet failed to take the steps necessary to allay its suspicion. *Id.* Goody's deliberately declined to ask questions and follow through, and in so doing, Goody's remained willfully blind of the illegality of its actions. *Chanel, Inc.*, 931 F.2d at 1476.

## II. What Amount of Profits is Hilfiger Entitled to Recover from Goody's for the Sale of the Counterfeit T-Shirts?

### A. What is the Proper Amount of Goody's Profits?

Pursuant to section 1117(a), "[i]n assessing profits, the plaintiff shall be required to prove defendant's sales only; defendant must prove all elements of cost or deduction claimed."Accordingly, the plaintiff need only show the defendant's gross sales. *Maltina Corp. v. Cawy Bottling Co.*, 613 F.2d 582, 586 (5th Cir. 1980). Thereafter, the burden shifts to the defendant to demonstrate that the plaintiff's sales calculations are fallacious. *Vuitton S.A. v. Spencer Handbags Corp.*, 765 F.2d 966, 973 (2d Cir. 1985). The defendant also bears the burden of proving any costs that should be deducted from the gross revenue of sales of the goods. *Maltina Corp.*, 613 F.2d at 586. In the Eleventh Circuit, such costs may only be deducted when they are "actually related" to the sale of the infringing product. *Id.;see alsoBurger King Corp. v. Pilgrim's Pride Corp.*, 934 F.Supp. 425, 426 (S.D. Fla. 1996); *Playboy Enters. v. P.K. Sorren Exp. Co.*, 546 F. Supp. 987, 998 (S.D. Fla. 1982).

**23** In the instant litigation, Hilfiger submitted documents evidencing total sales of counterfeit Hilfiger t-shirts. However, Peek, Goody's Chief Financial Officer, through affidavit and live testimony, demonstrated that Hilfiger's calculations regarding the total sales of counterfeit t-shirts were inaccurate. Notably, Hilfiger overstated the number of t-shirts sold by failing to account for returns and exchanges. Similarly, Hilfiger included garments in its sales total that are not the counterfeit Hilfiger t-shirts in question in this litigation. In contrast, Peek

used point-of-sale data to calculate the number of t-shirts sold. Accepting Peek as a credible witness, and the point-of-sale data as the best information regarding sales and revenues, the court finds that 92,136 counterfeit t-shirts were sold by Goody's, for a total sales revenue of $1,597,027.22. Again relying on Peek's testimony, the court finds that Goody's paid $908,032.03 for the counterfeit Hilfiger t-shirts. Therefore, the net profit, or merchandise margin, for the counterfeit Hilfiger t-shirts was $688,995.19. *SeeWesco Mfg. Inc. v. Tropical Attractions of Palm Beach*, 833 F.2d 1484, 1487-88 (11th Cir. 1987) (finding that exact evidence of infringing sales is not required, rather court can accept the best evidence of infringing sales offered); *Vuitton S.A. v. Ummat's*, No. 1:87-CV2660HTW, 1992 WL 317523, at **4-5 (N.D. Ga. Feb. 10, 1992) (Ward, J.) (considering both plaintiff's and defendant's evidence reaching profit award).

After determining the merchandise margin on the Hilfiger t-shirts, Goody's asks the court to deduct various costs and expenses. First, Goody's asks the court to deduct a percentage of its overhead expenses, entitled Costs of Goods Sold, or "COGS." For Goody's, COGS include freight charges, shrinkage or stolen product, and occupancy costs. Peek estimates that Goody's COGS reach approximately eight or nine percent of the total revenue derived from any goods sold. Despite accepting the veracity of Peek's estimation, the court declines to deduct these costs. There is no evidence that the sales of the infringing t-shirts actually increased Goody's COGS. *Maltina Corp.*, 613 F.2d at 586. Instead, it appears that these costs "would have been incurred even without the sale of the prohibited product."*Abbott Labs. v. Unlimited Beverages, Inc.*, 218 F.3d 1238, 1242 (11th Cir. 2000). Importantly, in a case where the defendants asked the court to deduct a proportionate share of overhead costs, the former Fifth Circuit held that "a proportionate share of overhead is not deductible when the sales of an infringing product constitute only a small percentage of total sales."*Maltina Corp.*, 613 F.2d at 586. Here, the revenue derived from the Hilfiger t-shirts

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

EXHIBIT M

Not Reported in F.Supp.2d                                                                 Page 20
Not Reported in F.Supp.2d, 2003 WL 22331254 (N.D.Ga.)

"constitute[s] only a small percentage of [Goody's] total sales."*Id.* As such, the court cannot say that the sale of the Hilfiger t-shirts increased Goody's overhead expenses. Therefore, Goody's COGS will not be deducted from the profits made on the Hilfiger t-shirts.

*24 Goody's also asks the court to deduct the legal fees it incurred in pursuing an action in Tennessee against 4F, B&L, and Schwartz, as well as the amount of taxes it paid on the gross t-shirt profits. Again, the court declines to deduct these expenses. To begin with, the court does not believe that Goody's legal fees for its lawsuit in Tennessee should be deducted, because Goody's turned a blind eye to the counterfeit nature of the t-shirts it sold. Although these legal expenses can be said to be directly and actually related to the sale of the infringing goods, the court declines to make Hilfiger pay for Goody's legal action. A contrary holding would allow a defendant to act with willful blindness in purchasing counterfeit products and make a profit by selling those products, but force the innocent trademark holder to bear the expense of legal action caused by the purchase of the products. In this sense, allowing a deduction for the cost of Goody's litigation expenses in Tennessee would force trademark owners to fund litigation to vindicate willful infringers. Such a deduction would violate congressional intent in enacting the Lanham Act. *See Burger King Corp. v. Mason,* 855 F.2d 779, 781 (11th Cir. 1988) (noting congressional purpose of making infringement unprofitable). Affirming this result, the former Fifth Circuit has held that a defendant's "claims of deductions of legal fees . . . would not be allowable in any case."*Maltina Corp.,* 613 F.2d at 586.

The court also refuses to deduct Goody's income taxes, as requested by the defendant. Most importantly, in 1928, the United States Supreme Court held that, in accounting for the profits of a willful trademark infringer, a district court may not deduct federal income taxes. *L.P. Larson, Jr. Co. v. Wm. Wrigley, Jr. Co.,* 277 U.S. 97 (1928). In so holding,

the Court noted that the defendant will be entitled to an income tax deduction for the payment of the judgment. *Id.; see also A&H Sportswear Co. v. Victoria's Secret Stores, Inc.,* 967 F. Supp. 1457, 1463 (E.D. Pa. 1997); *Stuart v. Collins,* 489 F. Supp. 827, 834 n.23 (S.D.N.Y. 1980). Based on this precedent, the court will not deduct Goody's taxes from its assessment of profits.

Accordingly, without the deductions requested by Goody's, the total profits derived from the sale of the counterfeit t-shirts total $688,995.19.

**B. What Effect do the "Principles of Equity" Have on the Amount of Profits that Should be Awarded to Hilfiger?**

After deciding that Goody's profits from the sale of the counterfeit t-shirts amount to $688,995.19, the court must determine the effect the "principles of equity" should have on the award of profits. *SeeLone Star Steakhouse & Saloon, Inc. v. Longhorn Steaks, Inc.,* 106 F.3d 355, 363 (11th Cir. 1997).Section 1117(a) provides that all monetary awards for a Lanham Act violation,[FN1] including an award of the defendant's profits, are "subject to the principles of equity."*Burger King Corp. v. Mason,* 710 F.2d 1480, 1496 n.11 (11th Cir. 1983). In fact, because of the application of equitable principles, "no hard and fast rules dictate the form or quantum of relief" under the Lanham Act. *Id.; see also Burger King Corp.,* 855 F.2d at 782-83.

> FN1. The "principles of equity" apply to awards made under both subsections (a) and (b) of 15 U.S.C. § 1117. *SeeRolex Watch U.S.A., Inc. v. Michel Co.,* 179 F.3d 704, 711 (9th Cir. 1999) (stating that awards under both 1117(a) and 1117(b) are subject to the principles of equity). Upon passage of the 1984 amendments to the Lanham Act, Congress explained that "[t]he provisions of subsection (a) remain applicable in counterfeiting cases except insofar as they are inconsistent with sub-

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

EXHIBIT M

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 22331254 (N.D.Ga.)

Page 21

section (b)." Joint Explanatory Statement, 130 Cong. Rec. H12076, H12083 (daily ed. Oct. 10, 1984). The requirement that profits be trebled in subsection (b), absent extenuating circumstances, is consistent with the idea that the principles of equity should temper the amount of profits assessed under subsection (a). Even with the 1984 amendment, subsection (a) provides the standard for determining profits, and subsection (b) simply provides that, once that amount of profits is determined, it must be trebled, if the defendant's actions were intentional.

*25 In the instant lawsuit, Goody's encourages the court to consider Hilfiger's delay in filing its complaint. Specifically, Goody's points out that Hilfiger was aware that Goody's was selling counterfeit t-shirts in July 1999, when Hilfiger sent an investigator to a Goody's store to purchase a counterfeit Hilfiger t-shirt. This investigator promptly forwarded the t-shirt to a Hilfiger account manager. Within a few days, the account manager forwarded the t-shirt and purchase receipt to Hilfiger's outside counsel. Because Hilfiger has an extensive counterfeit detection program, a person with the requisite expertise could have determined that the t-shirt was counterfeit within a short period of time. Even Horowitz, Hilfiger's Chief Executive Officer, confirmed at trial that he was personally aware of Goody's t-shirt sales by the Fall of 1999. But, Hilfiger did not send a cease-and-desist letter to Goody's, and Hilfiger did not file suit until July 31, 2000. As such, Hilfiger was aware of Goody's infringement for at least eight months before it filed suit.[FN2]

> FN2. Hilfiger asserts that the principles of equity do not support a reduction of the award of profits in this case because Goody's cannot establish the requisite elements of the defense of laches. *Ambrit, Inc. v. Kraft, Inc.*, 812 F.2d 1531, 1545-56 (11th Cir. 1986) (finding that (1) delay (2)

which is inexcusable (3) causing undue prejudice must be established to prevail on the defense of laches). However, although Hilfiger attempts to characterize Goody's argument as such, Goody's does not assert the defense of laches as a complete bar to recovery. Instead, Goody's argues that Hilfiger's delay reduces the total amount of profits Hilfiger is entitled to recover under section 1117 of the Lanham Act. Accordingly, the cases cited by Hilfiger are inapposite, as they deal with laches as a defense to an entire claim or action. None deal with a reduction in the award of profits for a plaintiff's delay in filing suit. Hilfiger has directed the court to no case law that demands Goody's demonstrate all three elements of a laches defense to have the amount of profits reduced under section 1117, "subject to the principles of equity."

Further, immediately upon receipt of Hilfiger's complaint, Goody's recalled the Hilfiger t-shirts from its stores. Around 13,000 t-shirts were removed from the shelves. Such prompt action on Goody's part indicates that Hilfiger could have stopped the vast majority of the infringing t-shirt sales, if it had promptly informed Goody's that the t-shirts were counterfeit. But, Hilfiger's attorneys' oversight is ameliorated by the fact that the court did, indeed, find that Goody's acted with willful blindness when it purchased and sold the counterfeit Hilfiger t-shirts. Goody's ignored significant signals that the products it was purchasing were counterfeit. As between the willful infringer, Goody's, and the innocent infringed, Hilfiger, the court believes that Goody's should bear the burden of its actions. Hilfiger is entitled to take some time before determining that it should file suit against Goody's. *SeeBellSouth Adver. & Publ'g Corp. v. Real Color Pages, Inc.*, 792 F.Supp. 775, 785 (M.D. Fla. 1991) (finding that a plaintiff is entitled to "some latitude to assess the importance of another's use of an allegedly infringing trademark, as

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

EXHIBIT M

Not Reported in F.Supp.2d                                                    Page 22
Not Reported in F.Supp.2d, 2003 WL 22331254 (N.D.Ga.)

well as the wisdom of pursuing litigation on the is-sue"). Goody's must be responsible for the products it sells in its stores, and it cannot rely on trademark owners to keep it updated regarding the owners' rights.

**\*26** Therefore, the court does not believe that the principles of equity entitle Goody's to a reduction in the amount of profits awarded to Hilfiger. Goody's deliberate indifference to Hilfiger's rights tips the equities in favor of Hilfiger. Accordingly, the court rejects Goody's argument that the profit award should be reduced based on the "principles of equity."

### C. Must the Court Treble the Profits Award?

Because the court has found that Goody's sale of counterfeit Hilfiger t-shirts was intentional, due to willful blindness, "[section] 1117(b) governs: un-less the court finds extenuating circumstances, treble damages and attorneys' fees are mandated."*Chanel, Inc.*, 931 F.2d at 1476;J. Thomas McCarthy, *McCarthy on Trademarks & Unfair Competition* § 25:15 (4th ed. 2003). Under the 1984 amendments to the Lanham Act, absent extenuating circumstances, "federal courts are ex-pected, and not merely authorized, to enter judg-ment for three times such profits."*Fendi S.a.s. Di Paola Fendi E Sorelle v. Cosmetic World, Ltd.*, 642 F. Supp. 1143, 1147 (S.D.N.Y. 1986) (internal quo-tations omitted); *see also Rolex Watch U.S.A., Inc. v. Meece*, 158 F.2d 816, 823 (5th Cir. 1998) (finding that under section 1117(b), treble damages must be awarded, unless there is extenuating cir-cumstances). What constitutes "extenuating circum-stances" is not defined in the statute and is to be de-termined on a case-by-case basis. *Id.;see also Levi Strauss & Co. v. Shilon*, 121 F.3d 1309, 1314 (9th Cir. 1997); *Microsoft Corp.*, 872 F. Supp. at 1339.

However, the exception for extenuating circum-stances is very narrow.*Shilon*, 121 F.3d at 1314. Congress indicated that "it will be a rare case in which a defendant who has trafficked in goods or services using a mark that he or she knows to be counterfeit can show that he or she should not be assessed treble damages."Joint Explanatory State-ment, 130 Cong. Rec. H12076-H12083 (daily ed. Oct. 10, 1984). The example of extenuating circum-stances provided by Congress is where the defend-ant is "an unsophisticated individual, operating on a small scale, whose conduct posed no risk to the public's health or safety, and for whom the imposi-tion of treble damages would mean that he or she would be unable to support his or her family."*Id.;see Microsoft Corp.*, 872 F. Supp. at 1339;*Fendi*, 642 F. Supp. at 1147. In such a situ-ation, knowing sales of counterfeit goods would not justify treble damages.

**\*27** Accordingly, reference to the legislative his-tory of the Lanham Act precludes a finding of ex-tenuating circumstances in this case. Extenuating circumstances are only to be found in rare cases, and Goody's does not fit the profile provided by Congress. Joint Explanatory Statement, 130 Cong. Rec. H12076-H12, 083 (daily ed. Oct. 10, 1984). Goody's is hardly a small scale operation or an un-sophisticated individual. *Id.* Further, because Goody's business produces annual gross sales of ap-proximately 1.2 billion dollars, an award of treble damages will not prevent any family from being supported.*Id.* Although Hilfiger delayed in filing suit against Goody's, such delay does not constitute the type of extenuating circumstances envisioned by Congress in section 1117(b). Hilfiger's delay does not change the fact that Goody's ignored vari-ous indications that the t-shirts it purchased from B&L and 4F were counterfeit. Only by trebling Goody's profits can the court satisfy the purpose of the 1984 amendments of the Lanham Act: to re-move all economic incentive from the sale of coun-terfeit goods. *See Burger King Corp.*, 855 F.2d at 781 (noting congressional purpose of making in-fringement unprofitable); *Nutrivida, Inc. v. Immuno Vital, Inc.*, 46 F. Supp. 2d 1310, 1316 (S.D. Fla. 1998). Therefore, Hilfiger is entitled to an award of trebled profits, in the amount of $2,066,985.57.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

EXHIBIT M

Not Reported in F.Supp.2d                                                                 Page 23
Not Reported in F.Supp.2d, 2003 WL 22331254 (N.D.Ga.)

**D. Is Hilfiger Entitled to Prejudgment Interest?**

Section 1117(b) provides that "the court may in its discretion award prejudgment interest" on an award of profits for willful counterfeiting. 15 U.S.C. § 1117(b); *see also Babbit Elecs., Inc.*, 38 F.3d at 1183. The purpose of prejudgment interest is to compensate the plaintiff for "the foregone use of the money between the time of infringement and the date of the judgment."*General Motors Corp. v. Dervex Corp.*, 461 U.S. 648, 656 (1983). In this case, though, the court does not believe that Hilfiger is entitled to compensatory prejudgment interest on the t-shirt profit award. Notably, Hilfiger was aware that Goody's was selling counterfeit t-shirts months before Hilfiger filed suit against Goody's, and upon notification by Hilfiger, Goody's immediately ceased selling the controverted t-shirts. Because it was aware of Goody's infringement, Hilfiger made a choice to forgo the use of money that rightfully belonged to it between the time of Goody's infringement and the filing of the lawsuit. Although Hilfiger is now entitled to recover this money, such unwarranted delay in filing suit makes an award of prejudgment interest unjust under the facts of this case.

**E. Is Hilfiger Entitled to an Award of Statutory Damages?**

**\*28** As an alternative form of relief, Hilfiger asks the court to award it statutory damages under 17 U.S.C. § 1117(c).Section 1117(c) provides:

In a case involving the use of a counterfeit mark . . . in connection with the sale, offering for sale, or distribution of goods or services, the plaintiff may elect, at any time before final judgment is rendered by the trial court, to recover, instead of actual damages and profits . . ., an award of statutory damages . . . in the amount of -

(1) not less than $500 or more than $100,000 per counterfeit mark per type of goods or services sold, offered for sale, or distributed, as the court con-

siders just; or

(2) if the court finds that the use of the counterfeit mark was willful, not more than $1,000,000 per counterfeit mark per type of goods or services sold, offered for sale, or distributed, as the court considers just.

15 U.S.C. § 1117(c). The option of statutory damages serves as an alternative to traditional awards based on actual losses under subsections 1117(a) and (b).*See Sara Lee Corp. v. Bags of New York, Inc.*, 36 F. Supp. 2d 161, 165 (S.D.N.Y. 1999). Congress added this language in a 1996 Amendment to the Lanham Act, recognizing that infringer nondisclosure during fact-finding sometimes leaves actual damages uncertain. *Id.* Indeed, Congress reported that "[t]he creation of this alternative to the more traditional damage remedies . . . reflected a harsh reality - counterfeiters often do not keep or secrete records of their unlawful activities, thus making proof of . . . the counterfeiters' profits impossible as a practical matter."S. Rep. No. 104-777, p. 10 (1995). Accordingly, statutory damages are most appropriate where there is little or no evidence of a counterfeiters' profits. *Sara Lee Corp.*, 36 F. Supp. 2d at 165;*see also Cable/Home Communication Corp. v. Network Prods., Inc.*, 902 F.2d 829, 850 (11th Cir. 1990).

Although it is clear that a court may assess damages up to $1,000,000 per trademark for willful counterfeiting, beyond this language, "[t]he statute itself does not afford much guidance as to how the courts are to fix appropriate amounts in statutory damage cases."*Guess?, Inc. v. Gold Star Jewelry*, 997 F. Supp. 409, 411 (S.D.N.Y.), *rev'd on other grounds*, 158 F.3d 631 (2d Cir. 1998). However, this limited textual guidance is purposeful; it allows district courts broad discretion in setting statutory damage awards.*Vuitton v. Veit*, 211 F. Supp. 2d 567, 583-84 (E.D. Pa. 2002); *Microsoft Corp. v. Tierra Computer, Inc.*, 184 F. Supp. 2d 1329, 1331 (N.D. Ga. 2001) (Thrash, J.); *Sara Lee Corp.*, 36 F. Supp. 2d at 166. In fact, the statute specifically permits a court to assess damages, even where there has been

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

EXHIBIT M

willful infringement, "as the court considers just." 15 U.S.C. § 1117(c). For guidance, various courts have turned to cases assessing statutory damages under the Copyright Act, 17 U.S.C. § 504(c), which "is not only similar in principle to the [Lanham] Act but identical in much of its statutory damages language." *Sara Lee Corp.*, 36 F. Supp. 2d at 166; *see also Vuitton*, 211 F. Supp. 2d at 583-84.

**\*29** In analyzing appropriate statutory damage awards under the Copyright Act, "courts consider the defendant's profits, as well as saved expenses, the plaintiff's lost revenues, and the defendant's state of mind." *Id.* at 584. Courts also consider the deterrent effect of any statutory damage award. *Cable/Home Communication Corp.*, 902 F.2d at 851. In essence, the appropriate considerations in assessing a statutory damages award under section 1117(c) are nearly identical to those analyzed in reaching the traditional profits award under section 1117(b). Previously, the court found that Goody's obtained profits from the sale of the counterfeit t-shirts in the amount of $688,995.19. The court derived this amount from Goody's reliable sales records and information. The court also found that Goody's behavior was willful, and therefore, the profits should be trebled. By trebling the profits, the court reached an amount of damages that it believed would adequately compensate Hilfiger, while deterring Goody's from future infringement.

Hilfiger argues that, under the statutory damages provision, the court should award it $5,000,000.00 in damages for the infringement of five federally-registered Hilfiger trademarks.[FN3] Hilfiger also argues that it is entitled to $10,000.00 under Ga. Code Ann. § 10-1-450 for its single state-registered trademark. *See Lone Star Steakhouse & Saloon, Inc.*, 106 F.3d at 364. However, the court believes that such a sizeable award would serve as an unjust windfall to Hilfiger. In cases involving multiple marks, "courts have been inclined to either award the maximum award without multiplication or to lower the per mark award." *Vuitton*, 211 F. Supp. 2d

at 585-86; *see also Rolex Watch U.S.A., Inc. v. Brown*, No. 01 CIV.9155JGK AJP., 2002 WL 1226863, at \*2 (S.D.N.Y. June 5, 2002); *Playboy Enters., Inc. v. Asiafocus Int'l, Inc.*, No. CIV.A. 97-734-A., 1998 WL 724000, at \*\*8-9 (E.D. Va. Apr. 10, 1998). Given these considerations, the court believes that Hilfiger is entitled to half the maximum statutory damages, or $500,000.00, for each of the four federally-registered trademarks, $90,000.00 for the "Flag in Motion" federally-registered trademark, and $10,000.00 for the Georgia-registered trademark.[FN4] Therefore, the total statutory damages award under section 1117(c) that this court considers just is $2,100,000.00. This amount serves to compensate Hilfiger, while deterring Goody's by making infringement more costly than abiding by the law. *See Sara Lee Corp.*, 36 F. Supp. 2d at 165; *Dream Dealers Music v. Parker*, 924 F. Supp. 1146, 1153 (S.D. Ala. 1996).

> FN3. Notably, there were only four federally-registered trademarks alleged to have been counterfeited in the pretrial order. On the eve of the last day of trial, Hilfiger found an additional trademark on one of the counterfeit t-shirts that had been in evidence since the discovery period of the litigation. The "Flag in Motion" trademark is not mentioned in the amended complaint. Accordingly, Hilfiger asserts that it is entitled to $5,000,000 in statutory damages, as opposed to the maximum of $4,000,000 in statutory damages that it would be entitled to pursuant to the pretrial order. The court considers Hilfiger's last minute trademark addition in assessing the appropriate amount of statutory damages. *See* 15 U.S.C. § 1117(c) (allowing the court to assess statutory damages "as the court considers just").

> FN4. The court does not believe a separate analysis is necessary to determine if liquidated damages are available under Georgia law because in *University of Georgia Ath-*

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

EXHIBIT M

Not Reported in F.Supp.2d                                                                          Page 25
Not Reported in F.Supp.2d, 2003 WL 22331254 (N.D.Ga.)

*letic Association v. Laite*, the Eleventh Circuit found that the standards to be applied under the Lanham Act are similar, if not identical, to those to be applied under Georgia's trademark laws. 756 F.2d 1535, 1539 n.11 (11th Cir. 1985). Likewise, in *Rolls-Royce Motors Ltd. v. A&A Fiberglass, Inc.*, this court found that, in the absence of state authority interpreting Georgia's trademark statute, "federal law standards, as outlined by the cases, will be used to construe state law."428 F. Supp. 689, 694 (N.D. Ga. 1976). Accordingly, the court finds the bases it articulated for awarding statutory damages under the Lanham Act, sufficient to warrant statutory damages under Ga. Code Ann. § 10-1-450. Because Goody's acted with willful blindness, the court finds the knowledge requirement of section 10-1-450(2) satisfied. Indeed, since the trademarks used on the counterfeit t-shirts were replicas of the Hilfiger trademarks, the court finds that the trademarks were used with the intent to confuse, cause mistake, or deceive. The court rejects Goody's argument that there has been no finding to that effect, since in counterfeiting cases, such intent is generally presumed.

*30 Hilfiger will have ten days from the issuance of this order to elect the award of statutory damages under section 1117(c) or the award of profits under section 1117(b).*SeeJordan v. Time, Inc.*, 111 F.3d 102 (11th Cir. 1997); *Glazier v. First Media Corp.*, 532 F. Supp. 63, 68 (D. Del. 1982). If no election is made, the court will enter judgment for the profits award assessed under section 1117(b).

### III. Does the Trim Packaging on Goody's Private Label Jeans Infringe Hilfiger's Flag Logo Trademark?

The Lanham Act allows the owner of a federally-registered trademark to sue any person for trade-

mark infringement, if the person reproduces or imitates the registered trademark without the registrant's consent. 15 U.S.C. § 1114(1). To prevail on a claim of trademark infringement, a plaintiff must show: "(1) that its mark has priority; and (2) that the defendant's mark is likely to cause consumer confusion."*Lone Star Steakhouse & Saloon, Inc. v. Longhorn Steaks, Inc.*, 122 F.3d 1379, 1382 (11th Cir. 1997).[FN5] In this case, Goody's concedes the priority, validity, and incontestability of Hilfiger's flag logo trademark. Hilfiger has used the logo since 1985, and the trademark is registered. Most of the mark's registrations are incontestable, as they have been registered for more than five years. Accordingly, there is no dispute about the priority of Hilfiger's mark. Instead, the crucial issue is whether a likelihood of consumer confusion exists between Hilfiger's flag design trademark and Goody's private label jeans trim packages.

> FN5. The parties agree that Georgia law and federal law share the same standard for trademark infringement. *SeeAckerman Sec. v. Design Sec.*, 201 Ga. App. 805, 806, 412 S.E.2d 588 (1991) (using federal law to decide an infringement claim based on a state-registered trademark). They also agree that the standards for the federal claims of false designation of origin and unfair competition are the same as those for trademark infringement. *Amstar Corp.*, 615 F.2d at 258;*see also Ross Bicycles, Inc. v. Cycles USA, Inc.*, 765 F.2d 1502, 1503-04 (11th Cir. 1985); *Gold Kist, Inc. v. Con Agra, Inc.*, 708 F. Supp. 1291, 1303 (N.D. Ga. 1989) (Shoob, J.). The federal and state claims for false designation of origin, unfair competition, and trademark infringement all involve a determination regarding likelihood of confusion. *Amstar Corp.*, 615 F.2d at 265;*Original Appalachian Artworks v. Topps Chewing Gum*, 642 F. Supp. 1031, 1039 (N.D. Ga. 1986) (Tidwell, J.); *Rolls-Royce Motors Ltd.*, 428 F. Supp. at 698-99.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

EXHIBIT M

Not Reported in F.Supp.2d                                                                 Page 26
Not Reported in F.Supp.2d, 2003 WL 22331254 (N.D.Ga.)

**\*31** In the Eleventh Circuit, a multi-factored ana-
lysis determines if there is a likelihood of
trademark confusion. *Frehling Enters., Inc. v. Interna-
tional Select Group, Inc.*, 192 F.3d 1330, 1335
(11th Cir. 1999). The court must evaluate and
weigh seven factors "to determine, as a matter of
fact, whether consumers are likely to confuse the
defendant's [trim packaging] with the plaintiff's
[trademark]."*Jellibeans, Inc. v. Skating Clubs of
Ga., Inc.*, 716 F.2d 833, 840 (11th Cir. 1983).
Namely, the court must consider: (1) the type of
mark; (2) the similarity of the marks; (3) similarity
of products the marks represent; (4) the similarity
of the parties' retail outlets and customers; (5) the
similarity of advertising media; (6) the defendant's
intent; and (7) whether any consumers were actu-
ally confused by the marks. *Frehling Enters., Inc.*,
192 F.3d at 1335. Of these, the type of mark and
the evidence of actual confusion are the most im-
portant. *Id.;Lone Star Steakhouse & Saloon, Inc.*,
122 F.3d at 1383;*Dieter v. B&H Indus.*, 880 F.2d
322, 326 (11th Cir. 1989). Each factor is analyzed
in turn.

### A. What Type of Mark is Hilfiger's Flag Design Trademark?

The "type of mark" is a measure of the strength of a
trademark. *Frehling Enters., Inc.*, 192 F.3d at 1335.
There are four categories of marks: (1) generic; (2)
descriptive; (3) suggestive; and (4) arbitrary. *Two
Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 768
(1992)."Generic marks are the weakest and not en-
titled to protection."*Frehling Enters., Inc.*, 192 F.3d
at 1335. On the opposite end of the spectrum, arbit-
rary marks are the strongest of the four categories.
*Id.* A mark is arbitrary, if it bears no direct relation-
ship to the product it represents. *Dieter*, 880 F.2d at
327. This means that an arbitrary mark in no way
describes or suggests a quality or feature of the
product. *Id.* Because the Hilfiger flag design logo is
not descriptive of the clothing line it designates, the
Hilfiger mark is an arbitrary mark. Goody's has
conceded this fact. Accordingly, the Hilfiger mark
is presumptively a strong mark. *Jellibeans, Inc.*,

716 F.2d at 841 n.18.

In addition to the category of the mark, the Elev-
enth Circuit requires a district court to consider oth-
er factors when assessing the strength of the trade-
mark at issue. *Frehling Enters., Inc.*, 192 F.3d at
1336. First, the court must consider whether the
mark is incontestable. *Id.* A mark becomes incon-
testable when it has been registered for five years
with the Patent and Trademark Office. *Id.* Again,
Goody's has conceded that Hilfiger's flag design
trademark is incontestable. Such "incontestability
serves to enhance [the mark's] strength."*Id.;see
alsoBoard of Regents v. Buzas Baseball, Inc.*, 176
F. Supp. 2d 1338, 1351 (N.D. Ga. 2001) (Pannell, J.).

**\*32** Also important in gauging the strength of the
mark is the degree to which third parties make use
of the mark. *John H. Harland Co. v. Clarke Checks,
Inc.*, 711 F.2d 966, 975 (11th Cir. 1983); *Safeway
Stores, Inc. v. Safeway Discount Drugs, Inc.*, 675
F.2d 1160, 1164-65 (11th Cir. 1982)."The less that
third parties use the mark, the stronger it is, and the
more protection it deserves."*Frehling Enters., Inc.*,
192 F.3d at 1336. In this analysis, the court must
consider the significance of any third party uses of
the mark. *Safeway Stores, Inc.*, 675 F.2d at 1165.
As such, the court should look at the entire trade-
mark employed by a third party, as well as the kind
of business in which the third party is engaged. *Id.*
Third party users that incorporate the red, white,
and blue theme with distinctive additions, or that
engage in different types of businesses, may not
significantly affect the strength of Hilfiger's mark. *Id.*

This factor, unlike the category of the mark and its
incontestability, does not heavily favor Hilfiger.
Goody's introduced various testimony and exhibits
into evidence, demonstrating that other clothing
manufacturers use the colors red, white, and blue in
their trademarks. Likewise, some of these manufac-
turers use a rectangular block scheme, similar to the
rectangular blocks used in Hilfiger's logo. Goody's
has pointed out eight specific clothing manufactur-

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                                                           Page 27
Not Reported in F.Supp.2d, 2003 WL 22331254 (N.D.Ga.)

ers, employing the red, white, and blue scheme, with at least three manufacturers using these colors in rectangular blocks. "That number is, however, substantially less than in other cases in which [the Eleventh Circuit] has found significant third-party use."*Safeway Stores, Inc.*, 675 F.2d at 1165 (noting that it has found significant third-party use in cases where there were 4400 users, 72 users, and 85 users). Although each entity pointed out by Goody's manufactures and sells clothing, so that the businesses of these entities and Hilfiger are similar, Goody's has not demonstrated that a significant number of clothing manufacturers use marks sufficiently similar to Hilfiger's to diminish the strength of the Hilfiger mark. Key differences distinguish the marks noted by Goody's, such as the incorporation of other colors or phrases. Therefore, the third-party use demonstrated by Goody's is insufficient to transform Hilfiger's presumptively strong mark into a weak mark.

Accordingly, by considering the category of the Hilfiger mark, the contestability of the mark, and the third-party use of the mark, the court finds that the Hilfiger design logo is a strong mark. As a strong mark, the Hilfiger flag logo is entitled to protection by this court.

### B. How Similar are the Marks Used by Hilfiger and Goody's?

*33 Next, the court is to analyze the similarity of the marks utilized by the parties. *John H. Harland Co.*, 711 F.2d at 975-76. "Here, the court compares the marks and considers the overall impressions that the marks create, including the sound, appearance, and manner in which they are used."*Frehling Enters., Inc.*, 192 F.3d at 1337. The Eleventh Circuit has emphasized that the similarity determination "must be based on the overall effect of the designs, not individual features."*Safeway Stores, Inc.*, 675 F.2d at 1165. The underlying purpose in considering the similarity of the marks is that "the closer the marks are, the more likely reasonable consumers will mistake the source of the product

that each represents."*Frehling Enters., Inc.*, 192 F.3d at 1337.

First, the court considers the "appearance" of the marks. *Id.* Both the Hilfiger flag logo and Goody's trim packaging use a red, white, and blue color scheme. Likewise, both the Hilfiger trademark and Goody's packaging utilize geometric blocks of these colors. All the designs at issue include two horizontal, navy blue rectangles at the top and bottom of the designs. Within these blue rectangles the brand name of each of the products is written in white. Because of the similar color scheme and block design, all of the Goody's products at issue bear a resemblance to the appearance of the Hilfiger flag design trademark.

However, in assessing the overall appearance of the products, the court notes that the OCI and Montana Blues trim packages are much less similar to the Hilfiger flag logo than the Mountain Lake and Mountain Lake II trim packages. Both the Mountain Lake products and the Hilfiger trademark use a two-part split block design. The left block is white, and the right block is red. The trim packages on both products display a woman, wearing a pair of jeans, photographed from the waist down.[FN6] In essence, the Mountain Lake jeans utilize the Hilfiger trademark with some minor variations in color shading, photograph placement, product description, and brand name. Even the font of the product names is similar. In contrast, the OCI and Montana Blues trim packages include a three-part block design with two red blocks surrounding a full photograph of happy girls and men. The full name of the OCI and Montana Blues product is written in the top rectangle, while the style of the jean is written in the bottom rectangle, and the fonts of the product names are different. Accordingly, the appearance of the Mountain Lake trim packaging is substantially more similar to the Hilfiger flag design logo than the OCI and Montana Blues trim packaging.

> FN6. The Mountain Lake II trim package omits the display of the woman, leaving a

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

EXHIBIT M

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 22331254 (N.D.Ga.)

Page 28

plain split block design which is also strikingly similar to the Hilfiger flag logo.

**\*34** Next, the court considers the "sound" of the marks. *Id.* Notably, the brand names of the jeans at issue are not at all similar to the Hilfiger brand name. Old College Inn, Montana Blues, Mountain Lake, and Mountain Lake II are in no way confusingly similar to Tommy Hilfiger. There is no similarity in the "sound" of the trademarks at issue. *Frehling Enters., Inc.*, 192 F.3d at 1337. But, when analyzing overall effect, the particular product name is only a part of the impression given a customer. *Id.* Importantly, the court must also assess the "manner" in which the marks are used. *Id.* Here, both Hilfiger's flag trademark and Goody's trademarks are used in very similar manners. In this case, Goody's and Hilfiger's marks are used to sell apparel and denim products. The Hilfiger flag logo is prominent in Hilfiger's packaging. Goody's packaging also displays likenesses of the Hilfiger trademark. Both Goody's and Hilfiger have used their marks on hammer loops and coin pockets. Accordingly, the manner of the use of the marks is similar.

Therefore, when assessing the overall impression of the marks in light of Eleventh Circuit precedent, the court feels compelled to find that the Mountain Lake products are strikingly similar to the Hilfiger flag design trademark. For the Mountain Lake jeans, this factor favors Hilfiger. A reasonable consumer could be confused about the source of the products. However, when assessing the overall impression of the OCI and Montana Blues products, the court cannot ignore the dissimilarities between Goody's trim packages and the Hilfiger flag design logo. Although Goody's trim packages may be similar to advertisements issued by Hilfiger, there are significant differences in the trademark names, as well as the design layout of the OCI and Montana Blues trim packages and the Hilfiger flag trademark. For the OCI and Montana Blues jeans, this factor is neutral or weighs slightly in favor of Goody's.

### C. Are the Products Sold by Hilfiger and Goody's Similar?

This factor requires the court to assess the similarity of the parties' goods. *Frehling Enters., Inc.*, 192 F.3d at 1338. The court must focus on "whether the products are the kind that the public attributes to a single source, not whether the purchasing public can readily distinguish between the products of the respective parties."*Id.* Importantly, the Eleventh Circuit requires a district court to ask: are the goods "so related in the minds of consumers that they get the sense that a single producer is likely to put out both goods [?]"*Id.*(citing *E. Remy Martin & Co., S.A. v. Shaw-Ross Int'l Imps., Inc.*, 756 F.2d 1525, 1530 (11th Cir. 1985)).

Here, the products are not merely similar, they are identical. At issue in this lawsuit are the sales of jeans and jean shorts by Hilfiger and Goody's. As both parties' products are apparel and jeans, they are the kind of products "that the public attributes to a single source."*Frehling Enters., Inc.*, 192 F.3d at 1338. The products are related such that consumers could get the sense that "a single producer is likely to put out both goods."*Id.*

**\*35** Goody's argues that the prominence of the names on the product, as well as the price differential, requires the court to find that the products are not similar. However, even with the name prominently displayed and a difference in price, the underlying products are still jeans. *See id.*(emphasizing general qualities of products when assessing their similarity, not details such as function, price, and composition); *Carnival Brand Seafood Co. v. Carnival Brands, Inc.*, 187 F.3d 1307, 1312 (11th Cir. 1999) (stressing that both parties sold seafood, although there were some differences in the products). Likewise, a price differential is an insufficient basis for distinguishing between the parties' jeans. *See Frehling Enters., Inc.*, 193 F.3d at 1338 (holding district court factual finding regarding product similarity clearly erroneous where district court relied on price as one factor differentiating the products). Notably, Horowitz testified at trial

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

EXHIBIT M

Not Reported in F.Supp.2d                                                    Page 29
Not Reported in F.Supp.2d, 2003 WL 22331254 (N.D.Ga.)

that Hilfiger jeans are often marked down in department stores and off-price retail outlets. Such markdowns attenuate any price differential between Hilfiger and Goody's products.

Therefore, the court finds that this factor - the similarity of the products -favors Hilfiger because both parties are selling jeans. Consumers could reasonably believe that Hilfiger was the source of jeans, no matter where the products are sold.

### D. Do Hilfiger and Goody's Have Similar Retail Outlets and Customers?

Under this factor, the court must consider "where, how, and to whom the parties' products are sold."*Frehling Enters., Inc.*, 192 F.3d at 1339. This is because "[d]issimilarities between the retail outlets for and the predominant customers of plaintiff's and defendant's goods lessen the possibility of confusion, mistake, or deception."*Id.* (quoting *Amstar Corp.*, 615 F.2d at 262). Although strong evidence in favor of a likelihood of confusion, "[d]irect competition between the parties is not required for this factor to weigh in favor of a likelihood of confusion."*Id.*

Goody's argues that its retail outlets and customers are dissimilar from Hilfiger's. In making this argument, Goody's emphasizes that Hilfiger products are sold in "high-end" department stores, while Goody's only sells its denim products at its value-priced stores. Likewise, Goody's notes that Hilfiger's customers are generally younger and more affluent than Goody's customers. However, "[d]irect competition between the parties is not required for this factor to weigh in favor of a likelihood of confusion."*Id.*

Notably, in *Frehling Enterprises, Inc. v. International Select Group*, the Eleventh Circuit warned against "dividing the world up into distinct segments of 'affluent' and 'less affluent' for the purpose of determining the balance of this factor."192 F.3d at 1339. The court rejected the district court's

distinction between "high-end" department stores and other general retail outlets, stressing that customers generally "cross-shop" different types of retailers. *Id.* Rather than focusing on the level of retail outlets, the court notes that both Hilfiger and Goody's sell their products at general service department stores. Accordingly, this court cannot accept Goody's argument that Hilfiger's sales to Macy's and Bloomingdale's differentiates Goody's and Hilfiger's retail outlets.

**\*36** Likewise, the court must reject Goody's attempt to differentiate its customer base from that of Hilfiger. Although there may be age differences between the parties' customers, both Goody's and Hilfiger sell to customers interested in purchasing apparel and jeans. "[E]ven if the particular individuals buying [the parties' goods] differ, the parties would cater to the same general kinds of individuals ...."*Safeway Stores, Inc.*, 675 F.2d at 1166;*see also*Jellibeans, Inc., 716 F.2d at 842 (holding that, even if parties' attract patrons of different ages, there is still sufficient overlap in customers and services to find a similarity of retail outlets and customers). Moreover, various witnesses testified that Goody's and Hilfiger compete with the same types of stores, and Hilfiger admits that it sells its products to off-price retailers. With this showing, Hilfiger has demonstrated that there is some competition between the parties. Such competition weighs in favor of finding a likelihood of confusion. *Frehling Enters., Inc.*, 192 F.3d at 1339.

Thus, the court concludes that Hilfiger and Goody's have similar retail outlets and customers. Again, this factor weighs in favor of Hilfiger and of finding a likelihood of confusion.

### E. Do Hilfiger and Goody's Employ Similar Advertising Media?

The fifth factor used in evaluating the likelihood of confusion is the similarity between the parties' advertising campaigns. *John H. Harland Co.*, 711 F.2d at 976. "[T]he standard is whether there is

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

EXHIBIT M

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 22331254 (N.D.Ga.)

likely to be significant enough overlap in the readership of the publications in which the parties advertise that a possibility of confusion could result." *Frehling Enters., Inc.*, 192 F.3d at 1340. The greater the similarity in the campaigns, the greater the likelihood of confusion. *Id.*

In the instant action, there is only minimal overlap in the advertising campaigns employed by the parties. Hilfiger spends money advertising in national magazines and high-circulation newspapers. Hilfiger also advertises on national television broadcasts and sponsors professional athletes and concert tours. In contrast, Goody's utilizes local advertising media. Goody's primary advertising consists of circular inserts in local, low-circulation newspapers, supplemented by a small amount of local television and radio advertising. Where the plaintiff advertises heavily "on television and radio and in high-circulation newspapers," and the defendant advertises through more local and low-cost means, the parties' advertising is unlikely to result in a likelihood of confusion. *Freedom Sav. & Loan Ass'n v. Way*, 757 F.2d 1176, 1185 (11th Cir. 1985); *see also* *Amstar Corp.*, 615 F.2d at 262 (finding that where plaintiff advertises in "nationally circulated magazines, newspapers and trade journals, and spends substantial sums of money on radio and television commercials," and the defendant focuses its advertising locally, there is little likelihood of confusion between the parties' advertisements). Therefore, the court finds that this factor weighs in favor of Goody's and against a finding of a likelihood of confusion.

### F. Did Goody's Intend to Infringe Hilfiger's Trademark?

**\*37** The court must also consider Goody's subjective intent in adopting the trim packages. *John H. Harland Co.*, 711 F.2d at 976. If a plaintiff can show that the defendant adopted a mark with the intent of deriving benefit from the reputation of the plaintiff, "that fact alone may be sufficient to justify the inference that there is confusing

*Id.* (internal quotations omitted); *see also* *Frehling Enters., Inc.*, 192 F.3d at 1340. Indeed, in the Eleventh Circuit, intent to copy creates a rebuttable presumption of likelihood of confusion. *Babbit Elecs., Inc.*, 38 F.3d at 1179; *Bauer Lamp Co. v. Shaffer*, 941 F.2d 1165, 1172 (11th Cir. 1991).

From the evidence presented in this case, the court finds that Goody's acted with an intent to copy Hilfiger's trademark and an intent to derive benefit from Hilfiger's reputation. Undisputedly, Goody's looked to Hilfiger for inspiration in developing its private label denim products. Goody's adopted the red, white, and blue color scheme, after determining that it was a common denominator in denim brands that were selling well, such as Bugle Boy, Hilfiger, and Polo Ralph Lauren. Goody's took a pair of Hilfiger jeans to its product development meetings with Sun, and Sun understood that Goody's was interested in emulating the Hilfiger style and designs. This information was conveyed to Paxar, and Paxar designed trim packages resembling Hilfiger's packages. Although Paxar provided other design alternatives with a red, white, and blue Americana theme, Goody's selected the trim packages that most closely resembled Hilfiger's labeling. Accordingly, the court finds that Goody's was aware of Hilfiger's success and acted with an intent to emulate the Hilfiger model. *See* *John H. Harland Co.*, 711 F.2d at 977 (finding intent to derive benefit from plaintiff's reputation by relying on evidence that showed defendant was aware of plaintiff's mark and success and tried to emulate plaintiff's product).

Not only was Goody's aware of Hilfiger's success, but Goody's was also aware that its selected trim packages were close to the Hilfiger mark. Goody's trim package selections created concerns within the company, as well as within Sun. Sun employees expressed concern that the trim packages selected by Goody's were too close to Hilfiger's trim packaging and trademark. Goody's employees noted the similarities between Goody's selected designs and the Hilfiger mark. Sun requested a letter of indemnific-

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

EXHIBIT M

Not Reported in F.Supp.2d                                                        Page 31
Not Reported in F.Supp.2d, 2003 WL 22331254 (N.D.Ga.)

ation from Goody's and pushed hard for this letter when Goody's asked Sun to produce the Mountain Lake II apparel. As such, Goody's was aware of the potential problems with its packaging.

In fact, when Goody's Chief Executive Officer, Goodfriend, and Goody's Senior Vice President for Product Development, Okvath, became aware of the concerns of their employees, they took the trim boards developed by Paxar to Hebbeler, Goody's in-house counsel. Okvath and Goodfriend asked Hebbeler to determine if the private label denim trim packages infringed on Hilfiger's trademark. Hebbeler performed a review of the trim packages and indicated that Goody's could use them without infringing on Hilfiger's trademark. Goody's believes that this request for advice from counsel demonstrates that it did not intend to infringe on Hilfiger's trademark, but rather that it meant to avoid any such possible infringement.

**38** However, the fact that Goody's sought the advice of Hebbeler does not dictate a finding that Goody's acted in good faith. *John H. Harland Co.,* 711 F.2d at 977-78. Seeking the advice of counsel might actually demonstrate that, given the facts of the case, the defendant "merely was attempting to come as close to [Hilfiger's] mark as the law would allow."*Id.* at 977."Thus, the fact that [Goody's] officials sought legal advice before adopting the [denim trim packages] does not preclude a finding that [Goody's] intended to trade on the goodwill associated with [Hilfiger's] mark by adopting a mark which approached so near to [the Hilfiger mark] that the public may fail to distinguish between them."*Id.* at 978 (internal quotations omitted).

Moreover, the circumstances surrounding Hebbeler's review of the trim packages reduce the weight to be given Goody's request for legal advice. Hebbeler was not shown any potential alternative designs; instead, he was made aware that Goody's was interested in using the pre-selected designs. Moreover, there is no evidence that the circumstances regarding the selection of the Montana Blues, OCI, and Mountain Lake trim packages were

fully explained to Hebbeler. Most notably, though, Goody's requested advice only from its in-house counsel. Goody's did not ask for an independent, outside opinion regarding infringement, as it had done in the past when prosecuting new design trademark applications. No written opinion was drafted. Given these facts, Goody's request for legal advice cannot shield it from a finding that it intended to copy and derive benefit from the Hilfiger trademark. Thus, the court concludes that this factor also weighs in favor of Hilfiger.

In making this finding, the court is cognizant of the fact that it is standard practice in the apparel industry to use competitors' products as inspiration. Occhipinti, Sun's contact for Paxar, admits that around eighty percent of his work involves developing new product identification materials from designs used by popular brands. Likewise, Sun employees testified that their customers regularly identify a product they would like to emulate. However, through its various denim trim designs, Goody's developed packaging that drifted progressively closer to the Hilfiger mark. Indeed, by the time it adopted the Mountain Lake II packaging, Goody's was using a design obviously imitating the Hilfiger flag logo. By taking these incremental steps, Goody's demonstrated that, even with its initial products, it had an intention to derive benefit from Hilfiger's reputation.

### G. Were Consumers Actually Confused by Goody's Trim Packaging?

Undisputedly, evidence of actual confusion is the best evidence of a likelihood of confusion. *Frehling Enters., Inc.,* 192 F.3d at 1340;*E. Remy Martin & Co., S.A.,* 756 F.2d at 1529-30. However, evidence of actual confusion is not a prerequisite to a finding of a likelihood of confusion.*Id.;John H. Harland Co.,* 711 F.2d at 978. Because such evidence is not necessary, it is up to the district court to assess this factor in light of the particular facts of each case. *Amstar Corp.,* 615 F.2d at 263;*see alsoMontgomery v. Noga,* 168 F.3d 1282, 1302 (11th Cir. 1999)

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

EXHIBIT M

(stating that "actual confusion is merely one of several factors that may be relevant in analyzing whether there is a likelihood of confusion between the marks").

**\*39** No evidence of actual consumer confusion has been introduced in this case. Hilfiger could not identify a single consumer who was actually confused by the Goody's trim packaging. Although such evidence is unnecessary for a finding of a likelihood of confusion, this factor favors Goody's. The absence of evidence of actual confusion weighs against a finding of a likelihood of confusion.

### H. Conclusion of Likelihood of Confusion Factors

Evaluating the overall balance of these seven likelihood of confusion factors, the court finds that Hilfiger has demonstrated a likelihood that its flag design trademark could be confused with the trim packaging Goody's used on its private label denim products. In so holding, the court finds that factors one, three, four, and six clearly weigh in favor of Hilfiger. Hilfiger's mark is strong, both parties sell jean products, both parties sell to the same general customers, and Goody's intended to copy the Hilfiger trademark. In contrast, factor two, the similarity of the marks, weighs in favor of Hilfiger on the Mountain Lake products and slightly in favor of Goody's on the Montana Blues and OCI products. However, only factors five and seven fully favor Goody's. The advertising media of the parties are different, and there is no evidence of actual consumer confusion. In sum, the balance tilts in favor of Hilfiger, and the court finds that Hilfiger has sustained its burden of demonstrating a likelihood of confusion. Accordingly, Hilfiger is entitled to prevail on its trademark infringement, unfair competition, and false designation of origin claims under the Lanham Act and analogous Georgia stat- utes.

### IV. What Amount of Profits is Hilfiger Entitled to Recover on the Infringing Jean Products?

Because Hilfiger has succeeded on its claims regarding Goody's private label denim products, the court must determine the amount of damages Hilfiger is entitled to recover. The remedies available to a trademark registrant are set forth in 15 U.S.C. § 1117. Under section 1117(a), a registrant whose rights are violated may generally recover the defendant's profits from the infringing activity together with the costs of the action.[FN7]*Chanel, Inc.*, 931 F.2d at 1475-76. However, in determining the proper award amount, section 1117(a)"vests considerable discretion in the district court."*Burger King Corp.*, 710 F.2d at 1495;*see alsoHoliday Inns, Inc. v. Alberding*, 683 F.2d 931, 935 (5th Cir. 1980). Equitable considerations govern the court's assessment of profits. *Burger King Corp.*, 710 F.2d at 1495. Additional relief, such as treble damages, is available under the statute, only if the district court believes such an assessment would be just. *Id.* Likewise, the court may reduce or enhance the resulting profits award, if the court finds the award inadequate or excessive. *Chanel, Inc.*, 931 F.2d at 1476. "This remedial accommodation clearly envisions the exercise of the trial court's discretion."FN8*Burger King Corp.*, 710 F.2d at 1495;*see alsoBurger King Corp.*, 855 F.2d at 781.

> FN7. The full text of section 1117(a) is as follows:
>
> **§ 1117. Recovery for violation of rights**
>
> **(a) Profits; damages and costs; attorney fees**
>
> When a violation of any right of the registrant of a mark registered in the Patent and Trademark Office, a violation under section 1125(a) or (d) of this title, or a willful violation under section 1125(c) of this title, shall have been established in any civil action arising under this chapter, the plaintiff shall be entitled, subject to the provisions of sections 1111 and 1114 of this title, and

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

EXHIBIT M

Not Reported in F.Supp.2d                                                            Page 33
Not Reported in F.Supp.2d, 2003 WL 22331254 (N.D.Ga.)

subject to the principles of equity, to recover (1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action. The court shall assess such profits and damages or cause the same to be assessed under its direction. In assessing profits the plaintiff shall be required to prove defendant's sales only; defendant must prove all elements of cost or deduction claimed. In assessing damages the court may enter judgment, according to the circumstances of the case, for any sum above the amount found as actual damages, not exceeding three times such amount. If the court shall find that the amount of the recovery based on profits is either inadequate or excessive the court may in its discretion enter judgment for such sum as the court shall find to be just, according to the circumstances of the case. Such sum in either of the above circumstances shall constitute compensation and not a penalty. The court in exceptional cases may award reasonable attorney fees to the prevailing party.

FN8.Section 1117(b) is inapplicable to the damages award for the infringing denim products. Importantly, the trim packages for the OCI, Montana Blues, and Mountain Lake jeans do not include a counterfeit Hilfiger mark. 15 U.S.C. § 1127 (defining a counterfeit mark as "a spurious mark which is identical with, or substantially indistinguishable from, a registered mark"). Rather, the trim packages for these jean products contain a "colorable imitation" of the Hilfiger mark. See15 U.S.C. § 1127 (defining colorable imitation as "any mark which so resembles a registered mark as to be likely to cause confusion or mistake or to deceive").

*40 As with the t-shirts, Hilfiger carries the burden of showing the amount of the defendant's sales of the infringing products. *Maltina Corp.*, 613 F.2d at 586. The defendant carries the burden of showing all elements of cost or other deductions. *Id.* In the instant action, Goody's produced three documents, each entitled "Profitability Analysis." Therein, Goody's lists the items bearing the infringing trim packaging, the gross revenue earned on those items, and the cost of those items. Subtracting the merchandise cost from the gross revenue generated by these items, Goody's earned $1,793,724.53 on the sale of Mountain Lake jeans, $5,373,898.01 on the sale of OCI jeans, and $1,808,818.04 on the sale of Montana Blues jeans. Accordingly, the profits on the infringing denim total $8,976,440.58.[FN9]

> FN9. For the reasons set forth in the t-shirt damages discussion, the court declines to deduct Goody's COGS, other expenses, and federal income taxes.

Hilfiger asserts that, in calculating its profits, Goody's excluded eleven types of jeans. Hilfiger bases this assertion on the fact that it found eleven SKU numbers in documents produced by Goody's which are not included on Goody's Profitability Analyses. However, Hilfiger has not demonstrated that the eleven additional SKU numbers and jean types that it identifies actually bore the infringing trim packaging. Under section 1117(a), it is the plaintiff's burden to demonstrate the amount of the defendant's sales of the infringing product. Because Hilfiger has pointed to no proof that the additional types of jeans carried the infringing packaging, Hilfiger has failed to demonstrate that these additional products should be included in the damage calculation.

Similarly, Hilfiger asserts that it is entitled to an award of treble profits. Hilfiger argues that Goody's intentional and egregious behavior entitles it to such enhanced damages. SeeBabbit Elecs., Inc., 38 F.3d at 1183 (finding that the court "may, in its discretion, reduce or enhance the resulting award up to three times the amount of profits or damages,

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

EXHIBIT M

whichever is greater, as justice shall require"). Despite Hilfiger's argument, the court declines to treble, or otherwise enhance, Hilfiger's award of profits. Such an enhanced award "is discretionary, but it may not be punitive, and must be based on a showing of actual harm."*Id.* In the instant action, there is no indication that Hilfiger was actually harmed by the sale of Goody's private label denim products. In fact, there is no evidence that any consumers were confused by Goody's trim packages. Without any actual harm to Hilfiger, an enhanced damages award would result in an unjustifiable windfall to Hilfiger. Indeed, any such award would be impermissibly punitive. *SeeBurger King Corp.*, 710 F.2d at 1495 n.11 (finding there is "no automatic right to enhanced damages" and stating that "judges have wide latitude in determining a just amount of recovery for trademark infringement"); *American Farm Bureau Fed'n v. Alabama Farmers Fed'n*, 935 F. Supp. 1533, 1552 (M.D. Ala. 1996).

**\*41** In contrast to Hilfiger's argument, Goody's asserts that the court should award an amount less than the full value of its profits. *See*15 U.S.C. § 1117(a) (allowing district court to reduce profit award where amount is determined to be excessive). Goody's contends that the clothing industry is not a high margin business and that it did not earn substantial profits on the sales of its jeans. Likewise, Goody's argues that there was no actual damage to Hilfiger as a result of its sales of the infringing jeans. Because the plaintiff was not actually harmed, Goody's believes the court would be justified in reducing the profits award. While these may be persuasive reasons to reduce the amount of profits in some cases, this is not such a case. Importantly, in the likelihood of confusion analysis, the court found that Goody's acted with an intent to copy Hilfiger's trademark. Such a finding limits the court's ability to reduce the award of profits. Notably, the Eleventh Circuit has held that "it is the district court's assessment of the particular conduct involved that governs the exercise of its discretion in fixing an appropriate remedy."*Burger King Corp.*, 855 F.2d at 782. Because the court has found

Goody's conduct to be intentional, the court believes that any reduction in the profits award would be inappropriate. *Id.*

Therefore, the court awards Goody's profits on the sale of the infringing jean products, in the amount of $8,976,440.58, to Hilfiger.[FN10]

> FN10. The court declines to award Hilfiger prejudgment interest on this amount. Importantly, the Lanham Act makes no reference to prejudgment interest for claims other than willful counterfeiting claims. As a matter of federal common law, the court does not believe that Hilfiger is entitled to recover more from Goody's than it has already been awarded. Hilfiger has experienced no actual harm as a result of Goody's infringing denim sales. Without any such harm, the court finds that Hilfiger is well compensated by the damage award of $8,976,440.58. This is especially so, as the court did not deduct any general operating expenses from the profit award. *SeeNutrivida, Inc.*, 46 F. Supp. 2d at 1317 (noting that purpose of prejudgment interest awards is to compensate the plaintiff for the "forgone use of the [plaintiff's] money"). Any increase in the damage award for prejudgment interest would result in a windfall for Hilfiger.

### V. Is Hilfiger Entitled to Prevail on its Claim for Trademark Dilution?

In addition to its trademark and unfair competition claims, Hilfiger also seeks injunctive relief pursuant to the Federal Trademark Dilution Act ("FTDA"), 15 U.S.C. § 1125(c). Pursuant to section 1125(c),

**\*42** The owner of a famous mark shall be entitled, subject to the principles of equity and upon such terms as the court deems reasonable, to an injunction against another person's commercial use in commerce of a mark or trade name, if such use be-

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

EXHIBIT M

gins after the mark has become famous and causes dilution of the distinctive quality of the mark.

15 U.S.C. § 1125(c)(1). To establish a claim of dilution under the FTDA, a plaintiff must demonstrate five elements: (1) the senior mark must be famous; (2) the senior mark must be distinctive; (3) the junior use must be a commercial use in commerce; (4) the junior use must begin after the senior mark becomes famous; and (5) the junior use must cause dilution of the distinctive quality of the senior mark.[FN11]*Nabisco, Inc. v. PF Brands, Inc.*, 191 F.3d 208, 215 (2d Cir. 1999).

> FN11. In its post-trial brief, Hilfiger quotes the Georgia Anti-Dilution Statute. Ga. Code Ann. § 10-1-451(b). Under the Georgia statute, a plaintiff need only prove a likelihood of dilution, rather than actual dilution. *Original Appalachian Artworks, Inc.*, 642 F. Supp. at 1039-40. However, Hilfiger has not brought a state claim for dilution. Instead, Hilfiger's complaint only alleges violation of the FTDA. *See* Doc. No. 47. Accordingly, the court need not apply Georgia law to the facts of this case.

At issue in the instant litigation is the final element of an FTDA claim. In a recent case, the Supreme Court held that section 1125(c)(1)"unambiguously requires a showing of actual dilution, rather than a likelihood of dilution."*Moseley v. V Secret Catalogue, Inc.*, 123 S. Ct. 1115, 1117 (2003). According to the Supreme Court, the FTDA affords no protection where "[t]here is a complete absence of evidence of any lessening of the capacity of the [plaintiff's] mark to identify and distinguish goods or services sold."*Id.* The Court found that "the mere fact that consumers mentally associate the junior user's mark with a famous mark is not sufficient to establish actionable dilution."*Id.* Instead, dilution under the FTDA now requires proof of actual dilution through consumer surveys or other reliable circumstantial evidence.*Id.*

Goody's believes that Hilfiger has not presented

any such evidence of actual dilution, while Hilfiger believes it has provided sufficient circumstantial evidence. In so arguing, Hilfiger concedes that it has no direct evidence of dilution of its mark. Rather, Hilfiger argues that evidence of the similarity of Goody's trim packaging to the Hilfiger mark, along with evidence of Goody's intent and the strength of Hilfiger's mark, is sufficient to sustain its dilution claim. However, the factors Hilfiger encourages the court to use in assessing actual dilution are identical to those employed by the court in the likelihood of confusion analysis. In *Moseley*, the Supreme Court foreclosed the use of such "likelihood" factors in assessing actual dilution. 123 S. Ct. at 1117. The Hilfiger mark and Goody's trim packaging are not sufficiently similar to infer actual dilution. *Id.* (stating that actual dilution is proven through reliable circumstantial evidence where junior and senior marks are identical); *see also Pinehurst, Inc. v. Wich*, No. CIV. 1:01 CV 00441, 2003 WL 1870238, at *6 (M.D.N.C. Mar. 21, 2003) (finding actual dilution where defendant used domain names identical and nearly identical to plaintiff's trademarks).

**\*43** Hilfiger has not presented any evidence of actual dilution, and therefore, Hilfiger is not entitled to prevail on its claim for trademark dilution. Accordingly, Count VIII of Hilfiger's amended complaint, alleging trademark dilution under section 1125(c), is dismissed as a matter of law. *See* Doc. No. 47.

### VI. Is Hilfiger Entitled to an Award of Attorneys' Fees?

The Lanham Act enables a prevailing plaintiff to obtain an award of attorneys' fees in certain circumstances. 15 U.S.C. § 1117. Where there is willful counterfeiting, the court must award the plaintiff reasonable attorneys' fees.*Id.* at § 1117(b). Otherwise, attorneys' fees are warranted only "in exceptional cases." *Id.* at § 1117(a). In the Eleventh Circuit, "an exceptional case is one that can be characterized as malicious, fraudulent, deliberate and will-

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

EXHIBIT M

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 22331254 (N.D.Ga.)

ful."*Tire Kingdom, Inc. v. Morgan Tire & Auto, Inc.*, 253 F.3d 1332, 1335 (11th Cir. 2001) (internal quotations omitted). A case may also be considered exceptional where there is evidence of fraud or bad faith.*Lipscher v. LRP Publ'ns., Inc.*, 266 F.3d 1305, 1319 (11th Cir. 2001). However, even in exceptional cases, the court retains discretion to deny attorneys' fees. *Dieter*, 880 F.2d at 329.

Pursuant to section 1117(b), the court is obligated to award Hilfiger attorneys' fees on its claims for willful counterfeiting. The court also believes Hilfiger is entitled to reasonable attorneys' fees under section 1117(a). Because Goody's infringing activity was intentional, the court finds that this lawsuit constitutes an exceptional case under section 1117(a). Accordingly, Hilfiger is directed to submit an application for attorneys' fees, including affidavits and other evidence, within twenty (20) days of the issuance of this order. *SeeHensley v. Eckerhart*, 461 U.S. 424 (1983); *ACLU v. Barnes*, 168 F.3d 423 (11th Cir. 1999); *Norman v. Montgomery Housing Auth.*, 836 F.2d 1292 (11th Cir. 1988).

### VII. Is Hilfiger Entitled to a Permanent Injunction?

When a plaintiff's rights under the Lanham Act have been violated, a court "shall have power to grant injunctions, according to the principles of equity and upon such terms as the court may deem reasonable, to prevent the violation of any right of the registrant of a mark . . . ."15 U.S.C. § 1116(a). Accordingly, a plaintiff is entitled to an injunction under section 1116(a), if he or she succeeds on the merits, and the equities weigh in favor of an injunction. *SeeNeva, Inc. v. Christian Duplications Int'l, Inc.*, 743 F. Supp. 1533, 1548 (M.D. Fla. 1990). However, "[t]here is no ground for injunctive relief if the infringement has been effectively discontinued."*Coca-Cola Co. v. Howard Johnson Co.*, 386 F. Supp. 330, 339 (N.D. Ga. 1974) (Hill, J.) (citing *Fram Corp. v. Boyd*, 230 F.2d 931, 934 (5th Cir. 1956)); *seealsoBoard of Regents*, 176 F. Supp. 2d at 1350 (denying as moot request for permanent in-

junction where plaintiff changed name from its previously infringing name). The key inquiry, then, is whether an injunction is necessary as a matter of equity to prevent future infringements. *Coca-Cola Co.*, 386 F. Supp. at 339.

**\*44** In the instant lawsuit, the allegedly infringing trim designs on Goody's private label denim have been discontinued. In fact, at the time Hilfiger filed its complaint, Goody's was already in the process of altering its trim packaging. Testimony at trial indicated that Goody's has no intention of reintroducing the infringing designs, or any other designs that would infringe on Hilfiger's trademarks. Similarly, Goody's ceased selling the counterfeit t-shirts immediately upon notification by Hilfiger. "As the acts and practices complained of by [Hilfiger] have been stopped, and the defendants have made clear that they do not intend to resume such, it appears to the court that there is no basis upon which an injunction could issue."*Johnny Carson Apparel, Inc. v. Zeeman Mfg. Co.*, No. C75 -544A, 1978 WL 21356 (N.D. Ga. Dec. 20, 1977) (Edenfield, J.). These actions on the part of Goody's render a permanent injunction unnecessary and unwarranted. The equities of this case do not merit the granting of a permanent injunction.

### VIII. Summary

In sum, the court finds that Goody's acted with willful blindness when it purchased counterfeit Hilfiger t-shirts. Given Goody's willful actions, Hilfiger is entitled to recover treble profits under 15 U.S.C. § 1117(b), in the amount of $2,066,985.57. However, in the alternative, Goody's is also entitled to an award of statutory damages under 15 U.S.C. § 1117(c), in the amount of $2,100,000.00. Hilfiger has ten (10) days from the issuance of this order to make an election regarding statutory damages. If no election is made, the court will enter judgment for the profits award assessed under 15 U.S.C. § 1117(b).

Likewise, Hilfiger is entitled to prevail on its feder-

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

EXHIBIT M

al and state claims for trademark infringement, un-
fair competition, and false designation of origin re-
garding Goody's private label denim products. Un-
der 15 U.S.C. § 1117(a), Hilfiger is entitled to an
award of profits in the amount of $8,976,440.58.
Further, Hilfiger is also entitled to an award of
reasonable attorneys' fees and costs. Hilfiger must
submit applications for attorneys' fees and costs
within twenty (20) days of the issuance of this or-
der. Goody's is entitled to file responses to these
applications.

However, Hilfiger's claim for trademark dilution
under 15 U.S.C. § 1125(c) fails as a matter of law.
Therefore, the dilution claim is dismissed, and the
court denies Hilfiger's request for a permanent in-
junction. No injunction shall issue.

IT IS SO ORDERED, this 9th day of May, 2003.

BEVERLY B. MARTIN, United States District
Judge

N.D.Ga. 2003.
TOMMY HILFIGER LICENSING, INC., Plaintiff,
v. GOODY'S FAMILY CLOTHING, INC., De-
fendant.
Not Reported in F.Supp.2d, 2003 WL 22331254
(N.D.Ga.)

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

EXHIBIT M