Westlaw.

Not Reported in F.Supp.
Not Reported in F.Supp., 1990 WL 300321 (N.D.Cal.), 16 U.S.P.Q.2d 1704

Page 1

First Interstate Bancorp v. Stenquist
N.D.Cal.,1990.

United States District Court, N.D. California.
FIRST INTERSTATE BANCORP, A Delaware Corporation Plaintiff,
v.
William A. STENQUIST d/b/a First Interstate Lending, Defendant.
No. C-89-4106 MHP.

July 13, 1990.

MEMORANDUM AND ORDER

PATEL, District Judge.
*1 Plaintiff, First Interstate Bancorp ("Bancorp"), brought this action for infringement of registered trademarks and unfair competition against defendant, William A. Stenquist d/b/a First Interstate Lending ("Lending"), alleging ownership of the name "First Interstate" and infringement of that trademark by defendant. Defendant filed a counterclaim, alleging its ownership of the name "First Interstate" and infringement of that trademark by the plaintiff. The parties are now before the court on plaintiff's motion for partial summary judgment on defendant's counterclaim. Having considered the arguments of the parties and the papers submitted, for the reasons stated below the court grants plaintiff's motion.

BACKGROUND

Plaintiff is the owner of a network of banks and other financial institutions collectively doing business under the name "First Interstate Bancorp." The service mark "First Interstate Banks" was first registered in California on May 21, 1980, and Bancorp alleges that the individual institutions in its network began operating under the name First Interstate Bancorp on or about June 1, 1981. From 1984-86, the name "First Interstate Bank" and various other names using the words "First Interstate" were registered with the United States Patent and Trademark Office.

Defendant is the owner of a real estate services business operating as a sole proprietorship under the names "First Interstate Realty" and "First Interstate Realty and Investment Company." Lending alleges that it has been doing business under those names since about March 1981, without knowledge of any prior use of the name "First Interstate" by Bancorp.

In a written agreement entered into on March 3, 1988, defendant transferred limited rights to use the names "First Interstate Realty and Investment Co." and "First Interstate Realty" to Jon D. Carson d/b/a Jon D. Carson & Associates ("Realty"). Under the terms of the agreement, Carson is required to be a licensed real estate broker in good standing and the broker of record for any businesses established under those names in Santa Clara or San Mateo County. The businesses are to be owned and operated independently of Lending, and Realty is "solely responsible for adequate supervision of agents and all other rules and regulations set forth by the state of California." Exh. A to Statement of Undisputed Facts. The agreement states that it is not intended to create a partnership or joint venture, and that neither party is responsible for the debts, losses or other liability of the other party. In addition, the agreement notes that Bancorp may contend that it has sole ownership of the rights to the name "First Interstate," and provides that Lending will be liable for all the costs of litigating that dispute and will indemnify Realty for up to $5,000 of the costs of complying with any settlement in Bancorp's favor.

Carson began operating a brokerage under the name "First Interstate Realty and Investment Company" on or about April 1, 1988. During its operation, Lending has not supervised any of Realty's activit-

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp. Page 2
Not Reported in F.Supp., 1990 WL 300321 (N.D.Cal.), 16 U.S.P.Q.2d 1704

ies or required it to meet any standards or criteria for performance other than those contained in the agreement. Lending has provided some sales materials to Realty. Also, Mr. Stenquist occasionally visits the office and discusses "how the business is doing and what direction it is going" with Mr. Carson. Carson Dep. at 26.

*2 Prior to granting the license, Mr. Stenquist had known Mr. Carson socially and professionally for six or seven years. Their business contacts or joint transactions numbered about ten to twelve over that period. The transactions were not of the type or quality now undertaken by Carson under the license; nor were the transactions extensive.

Bancorp filed a complaint against Lending for service mark infringement in November 1989, and Lending responded by filing an answer and a counterclaim alleging service mark infringement. The principal dispute between the parties is over ownership of the service mark "First Interstate." Bancorp claims that both its use and registration of the mark occurred prior to Lending's use, while Lending claims that its use was prior to Bancorp's use or registration. However, Bancorp also claims that even if Lending had a right to the mark, the agreement with Realty constituted uncontrolled licensing of the mark, which waived any right to bring an action for infringement. The present motion for summary judgment on Lending's counterclaims is grounded on the latter argument.

*LEGAL STANDARD*

Under Federal Rule of Civil Procedure 56, summary judgment shall be granted "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial ... since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322-23 (1986). *See also T.W. Elec. Serv. v. Pacific Elec. Contractors Ass'n,* 809 F.2d 626, 630 (9th Cir.1987) (the nonmoving party may not rely on the pleadings but must present specific facts creating a genuine issue of material fact); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986) (a dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.").

The court's function, however, is not to make credibility determinations. *Anderson,* 477 U.S. at 249. The inferences to be drawn from the facts must be viewed in a light most favorable to the party opposing the motion. *T.W. Elec. Serv.,* 809 F.2d at 631.

*DISCUSSION*

The issue presented by this motion is whether the agreement between Carson and Lending was a valid transfer of the limited right to use the trademark allegedly held by Lending, or whether the agreement in fact had the effect of waiving Lending's rights to the trademark.

Plaintiff argues that the agreement is an uncontrolled "naked" license, which constitutes abandonment of the trademark and precludes any action for infringement. Defendant counters that the agreement was a valid license, and did not otherwise affect Lending's rights to the trademark. In order to resolve this issue, the court must look at the rationale behind the rule against naked licensing, the criteria for determining whether an agreement is a naked license, and whether those criteria are met in this case.

*3 The rule against naked licensing has its statutory basis in the Lanham Act, which provides that the use of a trademark by a related company "shall not affect the validity of such mark or of its registration, provided such mark is not used in such manner as to deceive the public." 15 U.S.C.A. 1055. The Act goes on to define "related company" as "any person who legitimately controls or is controlled by the registrant or applicant for registration

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.  Page 3
Not Reported in F.Supp., 1990 WL 300321 (N.D.Cal.), 16 U.S.P.Q.2d 1704

in respect to the nature and quality of the goods or services in connection with which the mark is used." 15 U.S.C.A. 1127. The rationale behind protecting use of a trademark only where the owner exercises control over the quality of products bearing the trademark is laid out in *Dawn Donut Co. v. Hart's Food Stores, Inc.,* 267 F.2d 358, 367 (2d Cir.1959):

Without the requirement of control, the right of a trademark owner to license his mark separately from the business in connection with which it has been used would create the danger that products bearing the same trademark might be of diverse qualities. [Citations omitted] If the licensor is not compelled to take some reasonable steps to prevent misuses of his trademark in the hands of others the public will be deprived of its most effective protection against misleading uses of a trademark.

Therefore, it is well established that where a trademark owner engages in naked licensing, without any control over the quality of goods produced by the licensee, such a practice is inherently deceptive and constitutes abandonment of any rights to the trademark by the licensor. *Id.*

The Ninth Circuit has recognized that some form of quality control is required to show that a license is not naked. *Siegel v. Chicken Delight, Inc.,* 448 F.2d 43, 51 (9th Cir.1971). However, the Ninth Circuit has also recognized that the amount of control a licensor must have over a licensee is limited to that which is necessary to prevent deception, since "[t]he purpose of the Lanham Act ... is to ensure the integrity of registered trademarks, not to create a federal law of agency." *Transgo, Inc. v. Ajac Transmission Parts Corp.,* 768 F.2d 1001, 1018 (9th Cir.1985), *quoting Oberlin v. Marlin American Corp.,* 596 F.2d 1322, 1327 (7th Cir.1979). In addition, "[b]ecause a finding of insufficient control essentially works a forfeiture, a person who asserts insufficient control must meet a high burden of proof." *Id.* at 1017,*quoting Edwin K. Williams & Co., Inc. v. Edwin K. Williams & Co.-East,* 542 F.2d 1053, 1059 (9th Cir.1976).

Defendant contends at the outset that a motion for summary judgment is inappropriate at this juncture because the facts necessary to show the existence or absence of control are in dispute. However, it is clear from review of the declarations and exhibits submitted that, while the parties disagree about the conclusions to be drawn from the facts, there is really no dispute about those underlying facts. Both parties have submitted identical copies of the written agreement between Lending and Carson. Except for the allegation that it grants a naked license, there is no allegation that the agreement is in otherwise incomplete or invalid. Also, the declarations of Mr. Carson and Mr. Stenquist submitted by Lending do not contradict any of the facts which Bancorp points to as indicating a lack of control. At best, the declarations suggest different characterizations of those facts. Furthermore, for the purposes of this motion the court interprets the facts in the light most favorable to Lending. Even in this light, plaintiff has met its high burden and has shown by this evidence that Bancorp is entitled to summary judgment.

*4 Both the terms of the agreement and the manner in which it was carried out support the conclusion that it was a naked license. The first indication that Lending did not exercise sufficient quality control to protect its trademark is the lack of any controls or restrictions in the agreement itself. While the agreement does require Carson to warrant that he is a broker in good standing, there are no other provisions which restrict the operation of the business or the quality of its work product. Exh. A to Statement of Undisputed Facts. At several points, the agreement emphasizes the limited legal relationship between the parties, providing that the businesses "are to be owned and operated independently," and that the agreement cannot be deemed or construed to create a partnership or joint venture. *Id.* More importantly, the agreement provides that Carson is "solely responsible for adequate supervision of agents and all other rules and regulations set forth by the state of California," which is an explicit disclaimer of Lending's responsibility to control activ-

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

EXHIBIT P

Not Reported in F.Supp.    Page 4
Not Reported in F.Supp., 1990 WL 300321 (N.D.Cal.), 16 U.S.P.Q.2d 1704

ities which are directly related to the quality of the services provided by a real estate brokerage. *Id.* Therefore, the agreement on its face does not appear to provide any means for Lending to ensure the quality of the services provided by Carson.

Defendant correctly points out that the lack of an express contract right to inspect and supervise a licensee's operations is not conclusive evidence of lack of control. *Dawn Donut,* 267 F.2d at 368. However, where the courts have excused the absence of a contractual right of control, they have still required that the licensor demonstrate actual control through some sort of inspection or supervision. *See Embedded Moments, Inc. v. International Silver Co.,* 648 F.Supp. 187, 194 (E.D.N.Y.1986); *Carl Zeiss Stiftung v. V.E.B. Carl Zeiss, Jena,* 293 F.Supp. 892, 918 (S.D.N.Y.1968). The facts in this case show that Lending did not engage in any meaningful supervision or inspection. In his deposition, Mr. Carson stated at various points that Lending does not supervise him or tell him how to operate his business; does not supervise the activities of his agents or employees; does not mandate that he use any sales procedures or materials; and does not interfere in any manner with the operation of the business. Carson Dep. at 31-32.

In support of his contention that he did supervise or control Carson's activities, Mr. Stenquist points to the fact that he had "numerous contacts" in person or over the telephone with Mr. Carson where they discussed various aspects of the real estate business. Stenquist Dec., para. 3. However, those kinds of informal contacts fall short of the kinds of supervision and inspection which have been found adequate in other cases. For example, in *Dawn Donut* the court distinguished between "periodic and thorough inspections by trained personnel" and "chance, cursory examinations of licensees' operations by technically untrained salesmen." 267 F.2d at 369. Other cases have also involved more frequent and detailed supervision than is shown by these facts. *See Transgo, Inc.,* 768 F.2d at 1017-1018 (licensor of trademark for auto parts kit was consulted on all product changes and periodically tested individual parts); *Stock Pot Restaurant, Inc. v. Stockpot, Inc,,* 737 F.2d 1576, 1580 (Fed.Cir.1984) (licensor of restaurant trademark lived on the premises of the restaurant and provided constant supervision).

*5 Defendant further argumes that control is evidenced by the fact that he has known Mr. Carson professionally and socially for six or seven years, and trusts in his integrity, experience and professionalism. Stenquist Dec., par. 1-2. Defendant relies particularly on the holding in *Transgo,* which found that in deciding whether a naked license had been granted, the court could properly consider the fact that the licensor had a long association with the licensee and trusted him to maintain quality control. 768 F.2d at 1018.

However, the facts in *Transgo* and other cases make it clear that while reasonable reliance on the licensee's own quality control is one factor which may be considered, it is not alone sufficient to show that a naked license has not been granted. In *Transgo,* the licensor had worked fairly closely with the licensee for ten years, during which time he had the same type of responsibilities conferred by the license. The *Transgo* court also relied on the fact that the licensor had never received any complaints about the licensee's performance. In addition, the court found it persuasive that the licensor did not rely solely on his confidence in the licensee, but exercised additional control by virtue of the fact that the licensor himself manufactured 90 percent of the goods sold by the licensee, periodically inspected and tested those goods, and was consulted regarding any chages in the product. *Id.* at 1017. Other cases relying on the licensor's confidence in the licensee have also found additional indicia of control before holding that there was not a naked license. *See e.g. Land O'Lakes Creameries, Inc. v. Oconomowoc Canning Co.,* 330 F.2d 667 (7th Cir.1964) (licensor's name appeared on trademark product label, and product was sold under license for forty years without complaints about quality);

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

EXHIBIT P

Not Reported in F.Supp.  
Not Reported in F.Supp., 1990 WL 300321 (N.D.Cal.), 16 U.S.P.Q.2d 1704

Page 5

*Syntex Laboratories, Inc. v. Norwich Pharmacal Co.,* 315 F.Supp. 45, 56 (S.D.N.Y.1970) (licensee drug manufacturer given specific instructions on how to manufacture trademark product, and required to comply with FDA regulations governing manufacturing practices). In the present case, there are no analogous facts which show that Lending can or does control the quality of Realty's work.

The court recognizes that it is more difficult to set specific standards or quality controls in the context of providing real estate services than where the trademark relates to a discrete product such as a drug or an automobile part. However, in this case neither the agreement nor Lending's actions show any significant attempt to control the quality of Carson's work, or to otherwise ensure that the trademark would not lose its significance because of the license. Because the quality of the work provided under the trademark could vary widely under the terms of the agreement, it can only be considered a naked license which results in the abandonment of the trademark by defendant.

*CONCLUSION*

Defendant's grant of a license to use his trademark without any significant control over the quality of the services provided by the licensee constituted a naked license, and resulted in abandonment of rights to the trademark. Accordingly, plaintiffs' motion for partial summary judgment is GRANTED.

**\*6** IT IS SO ORDERED.

N.D.Cal.,1990.  
First Interstate Bancorp v. Stenquist  
Not Reported in F.Supp., 1990 WL 300321 (N.D.Cal.), 16 U.S.P.Q.2d 1704

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

EXHIBIT P