**Westlaw.** 

216 U.S.P.Q. 210
1982 WL 52024, 216 U.S.P.Q. 210

Page 1

C

Yocum
v.
Covington

Patent and Trademark Office Trademark Trial and Appeal Board
Decided Nov. 29, 1982

United States Patents Quarterly Headnotes

TRADEMARKS
[1] Cancellation -- Pleading and practice -- Issues determined (§ 67.1815)

Burden of proof on party plaintiff, based on showing by preponderance of evidence, is no different in cancellation proceedings than in opposition proceedings.

TRADEMARKS
[2] Cancellation -- Pleading and practice -- Issues determined (§ 67.1815)

Petitioner that would be damaged by registration need not show sole or exclusive ownership rights as against other parties.

TRADEMARKS
[3] Abandonment -- In general (§ 67.031)

Abandonment because of uncontrolled licensing is purely involuntary forfeiture of trademark rights, for mark owner probably has no subjective intent to abandon mark; uncontrolled licensing causes symbol to lose its meaning as trademark; finding of uncontrolled licensing may result in several possible effects, such as abandonment of all rights in mark, cancellation of registration of mark, and break in chain of continuous use necessary to prove priority of use over another, and mark can become abandoned by any act or omission that causes mark to lose its significance as trademark.

TRADEMARKS
[4] Abandonment -- Intention necessary (§ 67.035)

While lack of intent to abandon would be relevant to voluntary relinquishment of mark, it is not sufficient defense against naked licensing activity.

TRADEMARKS
[5] Defense -- Fraud (§ 30.05)

Fraud in trademark cancellation is something that must be proved to hilt with little or no room for speculation or surmise, considerable room for honest mistake, inadvertence, erroneous conception of rights, and negligent omission, and any doubts resolved against charging party; standard of disclosure as to prior knowledge of facts and of possible other and earlier use is much lower in trademark than in patent proceeding, and statement of applicant that no other person to best of his knowledge has right to use mark does not require applicant to disclose those persons whom he may have heard are using mark if he feels that rights of such others are not superior to his; applicant who has at least "color of title" to mark is not guilty of fraud in making foregoing application recitals.

Trademark cancellation No. 12,430, by Clark Yocum, against Warren Covington, Registration No. 994,489, issued Oct. 1, 1974. Petition dismissed.

Walter W. Dosh, Kensington, Md., for Clark Yocum.

Javits & Javits, New York, N.Y., for Warren Covington.

Before Skoler, Rice, and Sams, Members.
Skoler, Member.

A petition has been filed by Clark Yocum to cancel the registration of the service mark "PIED PIPERS" issued to Warren Covington, doing business as the Warren Covington Orchestra, for "entertainment

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

EXHIBIT R

216 U.S.P.Q. 210                                                                                                   Page 2
1982 WL 52024, 216 U.S.P.Q. 210

service, namely providing live singing".[FN1]

As grounds for cancellation, petitioner asserts (i) ownership and prior use of the "PIED PIPERS" mark for the services of a four member vocal group originally formed in 1940, and (ii) fraudulent application for and procurement of respondent's registration based on knowledge of the existence of petitioner's group and of petitioner's use and right to use of the "PIED PIPERS" mark at the time of respondent's application for registration in 1973.

In his answer to the petition for cancellation, registrant denied the salient allegations of the petition and asserted, as affirmative defenses, (i) abandonment by petitioner of any rights he may have had in "PIED PIPERS" as a service mark, (ii) laches in pursuing petitioner's rights to protection, thereby barring him from maintaining this proceeding, (iii) knowing acquiescense in respondent's use of the mark, and (iv) "unclean hands" in maintaining this proceeding in order to "punish" registrant for seeking to recover a disputed debt with a third party who was financially associated with petitioner in this proceeding.

The record consist of the pleadings and respondent's registration file; discovery depositions (with numerous exhibits) of petitioner Yocum taken by respondent (May 20, 1980) and of respondent Covington taken by petitioner (March 20, 1981), each made of record pursuant to notice of reliance under Trademark Rule 2.120(a); and testimony (with exhibits) on behalf of petitioner (Clark Yocum on July 10, 1981) and on behalf of respondent (Irv Dinken on August 25, 1981 and Warren Covington on August 26, 1981). Both parties submitted trial briefs and presented oral argument at the hearing in this case.

Petitioner in this proceeding is a musician (guitarist and vocalist) who joined a vocal group called the "PIED PIPERS" which originated in California as an 8-person aggregation and then became associated with the renowned Tommy Dorsey Orchestra as a 4-member group (one female and three male voices) in late 1939. That 4-person group, with some replacements, continued in Mr. Dorsey's employ until November of 1942, participating in live performances and making a number of "hit" recordings, frequently *212 in conjunction with and as backup to Dorsey's then star vocalist, Frank Sinatra.

Petitioner Yocum joined the Dorsey orchestra as a guitarist in April of 1940 and by autumn of that year had become one of the "PIED PIPERS" male vocalists (replacing singer Billy Wilson) after the original 4-voice group had made two or three recordings, including the famed "I'll Never Smile Again." With the accession of petitioner, the group then consisted of Jo Stafford, Charles Lowry, John Huddleston and Yocum until the break with Dorsey in 1942.[FN2] Throughout this period, the vocalists were paid by, booked by and appeared as a featured part of the Tommy Dorsey organization, apparently as employees of Mr. Dorsey. Thereafter, i.e., following the amicable November 1942 departure from the Dorsey Orchestra, the group continued to operate and perform as a unit under the name "PIED PIPERS", undertaking radio shows and guest appearances at dance engagements and concerts, and making records (including the hits "Dream", "Mamselle" and "Atchison, Topeka & the Santa Fe") through a series of contracts with Capitol Records, Inc. which ran from late 1943 to about 1950. During this period, the breakaway group of Stafford, Lowry, Huddleston, and Yocum was altered somewhat by the departure of Stafford and Huddleston and the addition of singers June Hutton and Hal Hopper in 1944. It was the Hutton-Lowry-Hopper-Yocum combination that entered into an agreement, alleged and relied on by petitioner Yocum, to the effect that each member would have an equal one-fourth interest in the group, such interest to revert to the remaining members on the demise of any member and with any replacement members to serve as employees rather than joint owners of the group and its trade name.[FN3]

It is this agreement which is the basis for petitioner's assertion, as sole survivor of the group, of

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

216 U.S.P.Q. 210
1982 WL 52024, 216 U.S.P.Q. 210

Page 3

100% title to the "PIED PIPERS" trade name and the service mark.[FN4] That group was eventually incorporated in 1947, allegedly for tax purposes and at least in part to protect the trade name, with the members becoming employees of the corporation. The evidentiary record is devoid, however, of any incorporation papers, stockholders' agreements, partnership pacts or other documents corroborating or confirming the precise features of this "PIED PIPERS" ownership and succession agreement or, for that matter, evidencing transfer of the service mark into or out of the corporation during its brief life as a California corporation and eventual dissolution for non-payment of franchise taxes some two to three years after organization (the record is not clear on exact dates).

After the demise of the corporation, petitioner's "PIED PIPERS" group (again with occasional changes in participating vocalists) continued to make tours and appearances (1963-66, both domestic and overseas appearances, including tours with the then "Tommy Dorsey Orchestra"), to undertake recording assignments and to do film, television and radio shows using the "PIED PIPERS" name until 1967. At this point, it appeared that Yocum was no longer physically capable of performing with a singing group. Notwithstanding, it is clear that he continued to claim ownership of the "PIED PIPERS" name, to receive royalties from previous recordings as to which he was a performer, and to seek suitable employment for a "PIED PIPERS" singing group in the capacity akin to owner-manager or licensor. These efforts, by and large, were patently unsuccessful during an era when public interest in big band sounds, both instrumental and vocal, was languishing, at least until the late 1970's when a licensing arrangement for the "PIED PIPERS" was made by petitioner with Dick Castle which appears to have enjoyed some success and economic viability.[FN5]

Respondent Covington, a trombonist with a number of major dance bands (Vincent Lopez, Horace Heidt, Les Brown, Gene Krupa) and studio orchestras, signed a contract after Tommy Dorsey's death to lead the Dorsey orchestra in 1958 (which he undertook for some three and one half years). He was selected for this assignment by Mr. Dorsey's widow, Jane Dorsey, who signed the contract as president of State Amusement Corporation. This relationship was amicably terminated and Covington thereupon formed the Warren Covington Orchestra in 1964 which he has led to date as a "big band" or studio orchestra. In 1970 pursuant to a paid assignment *213 from RCA Records, respondent appeared as orchestra leader with an ad hoc studio group called the "PIED PIPERS" which was organized by former member Jo Stafford to produce a recorded album of some of the big band hits of Tommy Dorsey days featuring the Pied Pipers. In 1973 Covington organized his own "PIED PIPERS" group to enhance his orchestra which group (also, presumably, with changes in vocalists from time-to-time) has remained intact and continues to perform with Covington, sometimes in conjunction with the Covington Orchestra and sometimes as a hired vocal group apart from that orchestra.

After adopting the "PIED PIPERS" name in 1973, Covington retained legal assistance and applied for registration of the service mark "PIED PIPERS", alleging first use in January of 1973. Registration issued in October of 1974. The record establishes continuous use of that service mark by registrant up to the present time, mostly for tours and live concert appearances.[FN6]

[1] The issues before the Board are whether petitioner has demonstrated (i) prior ownership and continuing use of the mark "PIED PIPERS", or (ii) fraudulent procurement by respondent of his registration and, if petitioner succeeds in one of these issues, (iii) whether any of registrant's affirmative defenses preclude the granting of cancellation pursuant to this petition. The conclusions of the Board are that petitioner has failed to fully meet his statutory burden of proof on these issues [FN7] and, therefore, his cancellation petition must fail.

As regards prior ownership and use, the Board finds

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

EXHIBIT R

that: (a) petitioner has established no use or ownership rights in the "PIED PIPERS" name from the time he joined the group until it left the Dorsey Orchestra (1940-1942); (b) petitioner has failed to make a clear showing of title to and use of the name by virtue of an alleged agreement between certain members of the "PIED PIPERS" made after leaving the Dorsey Orchestra until dissolution of the corporation which was established to handle the engagements and business of the group (1943-1950); (c) petitioner has, however, demonstrated valid service mark and trade name use of "PIED PIPERS" either as sole or joint owner thereof, following dissolution of the corporation and until petitioner was forced, for reasons of health and physical incapacity, to discontinue his participation as a performer with the group (1950-1966); and (d) after petitioner discontinued singing and until the time of respondent's adoption of the mark and application for registration (1967-1973), there were two instances of uncontrolled licensing by petitioner which produced a break in the chain of petitioner's continuous use necessary to prove priority over respondent and caused the mark to lose trademark significance during that period.

As regards petitioner's fraud allegations and mindful of the heavy burden which must be met in challenging a registration on this ground, the Board finds these to be not adequately supported by the record before it. First, since we find that it is respondent, not petitioner, who has superior rights in the mark "PIED PIPERS", the oath in the application which matured into respondent's registration was not in fact false. Further, even if we had found that petitioner had superior rights and that the oath was false, the evidence of record would not be sufficient to persuade us that the oath was made with fraudulent intent. Although registrant may have been aware of petitioner's status as a member of the "PIED PIPERS" group in earlier years and even petitioner's claims to rights in such name (and the record is speculative on these points), petitioner's admittedly minimal level of commercial activity with his "PIED PIPERS" group and the lack of trade visibility thereof in the 6 years preceding registrant's adoption and use of the "PIED PIPERS" mark made it plausible and understandable for respondent to assume when he sought registration (as he has asserted) that the once famous "PIED PIPERS" name was not currently in trade use and was therefore subject to appropriation by one seeking to recapture and market the nostalgia of Dorsey days and the sweet vocal sounds that accompanied those days, regardless of whether such assumption was correct.

*214 The reasons for the foregoing conclusions are detailed below.

*Petitioner's Rights during Dorsey Days*

Petitioner was not an original member of the 8-vocalist or 4-vocalist "PIED PIPERS" group, although he joined the latter shortly after it came under the wing of the Dorsey Orchestra. Petitioner was an employee of Tommy Dorsey, and title to the "PIED PIPERS" mark, if anything, remained in Mr. Dorsey during the period (the record being silent as to whether the prior members who joined Dorsey in 1939 had either retained or made an explicit transfer of trade name rights to Mr. Dorsey). It is clear, however, that it was the Dorsey organization that used the mark during this period.

*Rights after Dorsey Break-Away Until Dissolution of Corporation*

From Thanksgiving of 1942, when the then 4-member "PIED PIPERS" group began using the name on its own, until dissolution of the corporation which was established by the group in 1947 to protect the name and manage bookings, petitioner asserts ownership of the mark by virtue of an agreement, allegedly in writing (although petitioner introduced no documents nor even collateral written references), under which petitioner emerged as sole owner of the name because of his survivorship of the four members of the group who allegedly entered into that agreement. Petitioner asserts that

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

216 U.S.Q. 210  
1982 WL 52024, 216 U.S.P.Q. 210

Page 5

the agreement arose out of the "partnership papers" executed concurrently with the corporation papers by which the four incorporating members (Hutton, Lowry, Huddleston, and Yocum) explicitly agreed to freeze ownership in those individuals with neither heirs nor replacements participating and rights passing only to survivors. The Board, however, is unable to find on the evidence presented that use of the mark during this period evolved into the 100% ownership status claimed by petitioner because of the striking lack of corroboration of the agreement and several evidentiary facts inconsistent therewith: (i) in 1952, Charles Lowry, one of the alleged parties to the agreement asserted by petitioner, entered into an exclusive agency contract for representation of a "PIED PIPERS" group involving parties other than the Hutton-Lowry-Hopper-Yocum combination (thus suggesting non-recognition of petitioner's alleged agreement by one of the original parties to it); [FN8] (ii) formation of a corporation by the Hutton-Lowry-Hopper-Yocum team, especially for the protective purposes alleged by petitioner, would normally imply ownership of the mark by the business entity and not the individual members or stockholders thereof, and here there is no countervailing evidence to show either a license by the incorporators to the corporation (with retention of ultimate trade name ownership) or to suggest, after the corporate dissolution, a transfer of the trade name back to the petitioner or anyone else, see *Giammarese v. Delfino*, 197 USPQ 162, 163 (N.D. Ill. 1977) (trade name normally resides in business entity and not individual members thereof); and (iii) in 1970, original member Jo Stafford put together an ad hoc "PIED PIPERS" group to make a recording with RCA Records, again suggesting unawareness of the existence of prior or continuing rights in the mark, including those of petitioner. Thus, not only are petitioner's allegations of a survivorship-type succession agreement under which he has succeeded to sole ownership of the name unsubstantiated, but successive history tends to throw doubt on the existence thereof, at least in the precise form alleged. FN9

*Petitioner's Rights after Corporate Dissolution and until Withdrawal as a Performing Member*

[2] Contrary to the Board's conclusions as to earlier periods, the Board finds that at least for the extensive period from 1950 to 1967, petitioner has established valid and prior use of the "PIED PIPERS" name for vocal group entertainment services (which probably existed as well in the preceding period if one ignores petitioner's pleaded ownership and succession agreement). Whether petitioner's rights were sole or joint, or 100% or 50% or 25%, is not clear but during this period his use of the "PIED PIPERS" service mark was well-established by the record. Live performances were documented and continuing recording activities were established under the Capital Records and other recording company contracts. Moreover, as one of the continuing members of this group (and, at times, apparently the sole continuing member), it is clear that Yocum rose to a position of leadership and at least a quasi-managerial position for the group, his name appearing more frequently*215 than others as a signatory to documents or correspondent member in connection with recording and performance contracts, royalty arrangements and other business transactions. In this regard, it is not essential that Yocum, as petitioner, has been a sole owner or user, as alleged, rather than a joint owner and user of the mark, in order for him to maintain this proceeding as a party who would suffer damage by continuance of the registration of a junior user (as he claims respondent to be). Petitioner, if his claims of priority and a continuing use were fully established, would be damaged by the instant registration in either event and he would not need to show sole or exclusive ownership rights as against other parties. See *Yasutomo & Co. v. Commercial Ball Pen Co., Inc.*, 184 USPQ 60, 61 (TTAB 1974) and cases cited therein; *S. C. Johnson & Son, Inc. v. Morton Norwich Products, Inc.*, 185 USPQ 573 (TTAB 1975); *Bellbrook Dairies, Inc. v. Hawthorn Mellody Farms*, 117 USPQ 213, 215 (CCPA 1958).

*Petitioner's Rights and Use after Withdrawal as a*

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

EXHIBIT R

216 U.S.P.Q. 210 Page 6
1982 WL 52024, 216 U.S.P.Q. 210

*Performer*

Although the Board finds that the record established a valid and continuing prior use by petitioner (alone or with others) for at least the 17-year period form 1950-1967, the picture becomes more murky after petitioner discontinued activity as a performer. This is not by virtue of his inability to continue singing, because it does appear that petitioner continued to assert rights to the name, to try to activate other vocalists to perform as "PIED PIPERS" and to attempt to obtain recording and performance contracts with petitioner acting in a managerial and owner capacity. The problem arises from two actions on petitioner's part which can only be characterized as unsupervised "licensing in gross", i.e., agreements to allow use of the name without adequate supervision and quality control, and which led to an interruption of the continuous use that petitioner must show to establish priority over registrant. The first of the two incidents was petitioner's intrusion into a recording session in 1970 of an ad hoc "PIED PIPERS" group (the Jo Stafford-RCA Records special for Reader's Digest previously referred to) with a claim of illegal use of petitioner's "PIED PIPERS" mark. This resulted in payments by RCA Records of $300 and $400 to petitioner to settle his claims of name ownership but no more than that. Petitioner's own testimony is informative on this incident:

In respect to Miss Jo Stafford because of her being an original member, I said well, give me some loot and use the name. He [producer of the album who talked to petitioner] recognized this and did pay me for the sides that were being done by the so-called Pied Pipers. That can be verified with monies I received. (Yocum deposition, 5-20-80, p. 60)

In subsequent questioning, petitioner admitted that he made no inquiry of what was being recorded, what arrangements were being used, and made no request to monitor the sessions.[FN10] Petitioner explains that by virtue of his late notice of the RCA recording project, he could do nothing but acquiesce and did not want to hurt Miss Stafford, so that exercising a normal mark owner's supervisory role was not feasible on this occasion. An isolated incident of this kind might well be so regarded. However, during the 1967-1973 period petitioner entered into another uncontrolled licensing arrangement without such pressures. This was the July 1967 agreement with Lee Gotch,[FN11] a former participant in petitioner's "PIED PIPERS" combinations (said to have joined the group in 1952 or thereabouts). The 1-page agreement contains no hint of supervision, quality control or performance standards, its primary and virtually only provision, so far as petitioner was concerned, being an agreement to pay petitioner 5% of the gross income of Gotch's group in return for allowing him to use the "PIED PIPERS" name "as purporting to be the name of a vocal group you are about to form." The only explicit recapture conditions were Gotch's failure to adhere to the agreement (i.e., his 5% "commission" obligation to Yocum) and inability to obtain employment for Gotch's group for 6 consecutive months (whereupon Yocum could rescind). Petitioner's testimony and evidence suggest no collateral oral agreements as to retention of supervisory controls from which we might infer something other than a simple sale or "renting" of the "PIED PIPERS" name to Gotch, see Haymaker Sports, Inc. v. Turian, 198 USPQ 610, 614 (CCPA 1978); nor is it clear that such oral arrangements would cure the uncontrolled licensing arrangement, see Robinson Co. v. Plastics and Research Development Corp., 153 USPQ 220, 230 (W.D. Ark. 1967).

[3] The Board finds, therefore, that in the six years preceding respondent's adoption, use and registration of the mark, petitioner engaged in inadequately controlled licensing, thereby working an "abandonment" that negated such priority of use as petitioner may have established in earlier years and divested the "PIED PIPERS" mark of origin-INDICATING*216 significance in petitioner's hands. The definition of abandonment in the Trademark Act (Section 45) reads: "A mark shall be deemed to be abandoned * * * (b) when any course of conduct of the registrant, including acts of omis-

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

216 U.S.P.Q. 210 Page 7
1982 WL 52024, 216 U.S.P.Q. 210

sion as well as commission, causes the mark to lose its significance as an indication of origin."Although not dealing with a registered mark in the case of petitioner's use of "PIED PIPERS", we believe that the operative principles of the Act apply to petitioner's situation. As one commentator has characterized the pertinent law:
Abandonment because of uncontrolled licensing is purely an involuntary forfeiture of trademark rights, for the mark owner probably has no subjective intent to abandon the mark. Uncontrolled licensing causes a symbol to lose its meaning as a trademark * * *.
A finding of uncontrolled licensing may result in several possible effects: abandonment of all rights in the mark, cancellation of a registration of the mark, and a break in a chain of continuous use necessary to prove priority of use over another * * *. A mark can become abandoned by any act or omission which causes the mark to lose its significance as a trademark." J. T. McCarthy, Trademarks and Unfair Competition, §18.15 at p. 636 (1973).

The involuntary forfeiture having taken place, it is clear that respondent in 1973 could legitimately adopt and use the "PIED PIPERS" service mark, as indeed it did. See Acme Valve and Fittings Co. v. Wayne, 183 USPQ 629, 632 (S.D. Tex. 1974); Sutton Cosmetics (P. R.) Inc. v. Lander Co., Inc., 170 USPQ 461, 462 (S.D.N.Y. 1971).

[4] The Board has no reason to disbelieve petitioner's continued assertions that he never intended to give up the "PIED PIPERS" mark nor his hopes that the malaise of public interest in "big band" vocal music of the sort that brought earlier fame to the various Pied Piper singers would end and reacceptance would permit a return of public popularity acceptance and commercial appetite. Indeed, this is what, in fact, appears to have happened with respect to respondent's adoption and successful use of the mark starting in 1973 and petitioner's 1978 launching through an "assignment" agreement with musician Lee Castle (nearly identical in its essential terms to the unrestricted sale of a trade name, as was found with respect to the Gotch agreement) of a competing "PIED PIPERS" aggregation that appears to have achieved some commercial success.FN12 However, while lack of intent to abandon would be relevant to voluntary relinquishment of the mark, it is not a sufficient defense against applicant's naked licensing activity. [FN13]

*The Fraud Allegations*

With petitioner's uncontrolled licensing of its mark "PIED PIPERS" and his admittedly sporadic (indeed, virtually non-existent) public use of the "PIED PIPERS" name in a trademark sense in the six-year period preceding respondent Covington's appropriation of the mark, the Board finds no colorable basis for finding fraud in respondent's 1973 application for his "PIED PIPERS" registration and his representations therein that
"* * * to the best of his knowledge and belief no other person, firm or corporation or association has the right to use said mark in commerce * * * as may be likely, when applied to the product of such other person, to cause confusion, or to cause mistake, or to deceive." [FN14]

[5] Fraud in a trademark cancellation is something that must be "proved to the hilt" with little or no room for speculation or surmise; considerable room for honest mistake, inadvertence, erroneous conception of rights, and negligent omission; and any doubts resolved against the charging party. See Smith International, Inc. v. Olin Corp., 209 USPQ 1033 (TTAB 1981): J. G. Hook, Inc. v. David H. Smith, Inc., 214 USPQ 622 (TTAB 1982) and cases cited therein. The standard of disclosure as to prior knowledge of facts and of possible other and earlier uses is much lower in a trademark than a patent proceeding. Morehouse Manufacturing Corp. v. J. Strickland & Co., 160 USPQ 715 (CCPA 1969); and the statement of an applicant that no other person "to the best of his knowledge" has the right to use the mark does not require the applicant to disclose those persons whom he may have heard are *217 using the mark if he feels that the rights of

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

EXHIBIT R

such others are not superior to his. Thus, an applicant who has at least "color of title" to the mark is not guilty of fraud in making the foregoing application recitals.Griffin Wellpoint Corp. v. AMSTED Industries, Inc., 172 USPQ 503 (TTAB 1971); J. T. McCarthy, supra, §31.21 B & C. Clearly, respondent, as the owner of rights in the mark "PIED PIPERS" superior to any rights which petitioner might have therein, was under no duty to make any disclosure concerning petitioner. Further, even if petitioner had succeeded in proving that his rights in the mark were superior to respondent's, respondent could not, with the inactivity preceding respondent's registration, be demonstrated, on this record, to have secured his registration by fraud under the heavy burden facing petitioner in advancing such allegations.

For the foregoing reasons, the Board concludes that petitioner has not met his burden in establishing either prior and continuing rights on his part or fraudulent application behavior on respondent's part that would justify the cancellation of respondent's registration of the "PIED PIPERS" mark. Having so decided, the Board will not address in detail respondent's affirmative defenses of laches and "unclean hands", noting only that we do not believe that these are clearly established by the record, as is required of those who advance such contentions.

### Decision

The petition to cancel is dismissed and respondent's registration shall remain in force.

> FN1 Reg. No. 994,489, issued Oct. 1, 1974, Section 8 affidavit accepted.
>
> FN2 There was apparently another replacement before Yocum came on. This was a gentleman who preceded Billy Wilson for a short time. See Yocum deposition, 5-20-80, p. 9).
>
> FN3 Cancellation petition, pars. 4 & 5, and Yocum deposition, 5-20-80, pp. 69-71.

FN4 The record is not fully clear as to whether Mr. Lowry is deceased or still alive. Although the petition for cancellation alleges that petitioner is the sole surviving member of this "PIED PIPERS" group (par. 5), petitioner's own testimony indicates only that he presumes death, not having heard from Lowry in ten years, and being aware that he suffered serious mental impairment (Yocum testimony, 7/10/81, p. 54).

FN5 See petitioner's exhibit No. 36 ("Letter of Agreement and Assignment" between Yocum and Castle dated November 1, 1978) Yocum testimony, 5-20-80, pp. 76-78.

FN6 Respondent's testimony, pp. 95-103 (indicating numerous appearances from 1973 to the time of testimony) and Exhibit 56 (evidencing concert appearances from 1973 through 1977 for the orchestra and the Pied Pipers group).

FN7 Respondent has argued that petitioner bears a "heavy burden of proof" in this cancellation on the issues of ownership and priority in the "PIED PIPERS" name, relying on such cases as W. D. Byron & Sons, Inc. v. Stein Bros. Mfg. Co., 153 USPQ 749 (CCPA 1967) and Prince Dog and Cat Food Co. v. Central Nebraska Packing Co., 134 USPQ 336 (CCPA 1962). However, the Court of Customs and Patent Appeals has made it clear that the burden of proof on the party plaintiff, based on a showing by the preponderance of evidence, is no different in cancellation proceedings than opposition proceedings and the Board has evaluated this case accordingly.Department of Justice, Federal Bureau of Investigation v. Calspan Corporation, 198 USPQ 147, 150 (CCPA 1978); Massey Junior College v. Fashion Institute of Technology, 181 USPQ 272, 275 (CCPA 1974).

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

EXHIBIT R

FN8 Dinken testimony, pp. 10-11, and respondent's exhibit 49 thereto.

FN9 It might also be noted that although the alleged agreement provided for reversion of rights to surviving members of the group upon the death of any member, petitioner acknowledged in his testimony, somewhat inconsistently, that royalties would be payable to heirs of deceased members if he could locate them. Yocum testimony, 7 11 81, p. 55.

FN10 Yocum deposition, 7/10/81, pp. 47-49.

FN11 Yocum testimony, 5-20-80, p. 74 and Ex. 35.

FN12 See f.n. 5, supra.

FN13 This is also true with respect to petitioner's continuing receipt of royalties for earlier "PIED PIPERS" recordings which, under Giammarese v. Miccolis, 314 PTCJ A-15 (7th Cir. 1977, unpublished, Civ. No. 76-1160), cited by petitioner, was viewed as probative evidence of continued use of a trade name notwithstanding the disbandment of the singing group asserting such use, Cf. Giammarese v. Delfino, 197 USPQ 162, 163 (N.D. Ill. 1977). While that may be so, it does not alter the petitioner's unrestricted licensing activity in this case nor the origin-diluting effect thereof on which the Board's holding is premised.

FN14 Excerpted text from respondent's original application for registration of the "PIED PIPERS" service mark, filed May 4, 1973.

P.T.O. T.T.A.B.

Yocum v. Covington

1982 WL 52024, 216 U.S.P.Q. 210

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

EXHIBIT R

https://web2.westlaw.com/print/printstream.aspx?prft=HTMLE&destination=atp&sv=Split...   9/12/2008