IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

JOHN C. FLOOD OF VIRGINIA, INC., et al.          )
                                                 )
    **Plaintiffs and Counter-Defendants,**       )
                                                 )
v.                                               )        **Judge Richard J. Leon**
                                                 )        **Case No.: 1:06CV01311**
**JOHN C. FLOOD, INC., et al.**                  )        **Deck Type:  General Civil**
                                                 )
    **Defendants and Counter-Plaintiffs.**       )

---

## MEMORANDUM OF POINTS AND AUTHORITIES
## IN SUPPORT OF DEFENDANTS' RENEWED
## MOTION FOR PARTIAL SUMMARY JUDGMENT

---

Pursuant to LCvR 7(a), Defendant/Counterclaim-Plaintiff John C. Flood, Inc., and

Defendants John C. Flood of D.C., Inc., Robert Smiley, Joanne Smiley (collectively, "the

Smileys"), Mark Crooks ("Crooks"), Mel Davis ("Davis") and J.C. Flood, Inc., J.C. Flood

Company, and JCF, Inc., (all collectively, "Defendants") hereby respectfully submit the

following Memorandum of Points and Authorities in Support of their Renewed Motion for

Partial Summary Judgment.

### I. INTRODUCTION

#### A.  *Background*

This is a servicemark and tradename priority dispute. It involves two groups of business

entities, one controlled by Joanne and Robert Smiley ("the Smileys"), and the other controlled by

Clinton Haislip ("Haislip") and James Seltzer ("Seltzer").  Each operate plumbing, heating and

air conditioning services businesses under the tradenames and service marks JOHN C. FLOOD

in the Washington, D.C. metropolitan area.

The Plaintiff and Counterclaim Defendants include "John C. Flood of Virginia, Inc." and

other corporations, owned and controlled by Haislip and Seltzer (collectively, the "Virginia

Flood Parties"). The Defendants and Counterclaim-Plaintiff John C. Flood, Inc. (a Maryland

corporation), and John C. Flood of D.C., Inc. (a D.C. corporation) ("1996 Flood"), movants here,

are businesses owned and operated by the Smileys.[1]

On July 18, 2007, after a year of litigating this case, which included preliminary motions

to dismiss and to amend, attempts to settle, and extensive exchanges of documents and

information in discovery, Defendants moved for partial summary judgment on Plaintiff's claims,

showing that, on the undisputed facts, Virginia Flood was not entitled to relief on the trademark

infringement and unfair competition.

At the time Defendants filed their first summary judgment motion, discovery had not

been completed. Also, there was pending Defendants' Motion for a Protective Order assigned,

to Magistrate Judge Facciola. *See Defendants' Motion for Protective Order and Memorandum

in Support* [#36]. The two motions were substantially intertwined. The Virginia Flood parties

opposed the summary judgment motion, in part, on the grounds that the Court could not grant the

motion before the Virginia Flood parties received additional discovery, including the documents

and information at issue in the Defendants' Protective Order motion. *See Virginia Flood's

Memorandum in Opposition to Defendants' Motion for Protective Order* [#41]. On October 31,

2007, this Court, denied Defendants' Motion for Partial Summary Judgment.

Another year has passed. During that interval, Defendants have produced additional

documents. Depositions of the parties, on both sides, have been taken. On February 1, 2008,

---

[1] Defendant JCF, Inc., no longer exists as a separate corporation, but was a corporation established and operated during the bankruptcy case of 1996 Flood's predecessors in interest, and Defendants J.C. Flood, Inc., J.C. Flood Company were trade names of that corporation, which was one of several entities brought under the control of a receiver appointed by the United States Bankruptcy Court for the District of Maryland in October 1995, and now have been effectively merged into the 1996 Flood corporations. *See Defendants' Answer to First Amended Complaint,* filed May 21, 2007, ¶ 6, and Additional Affirmative Defenses 9-12. Maryland corporation public records reveal evidence of an existing "J.C. Flood, Inc." This entity, a Virginia corporation registered to do business in the State of Maryland in 2001, identified Third party Counterclaim Defendant Clinton Haislip as its registered agent, and appears to be the Maryland alias of Plaintiff, John C. Flood of Virginia, Inc. Defendants believe Plaintiff has misaligned this entity as a Defendant.

Magistrate Judge Facciola issued a Memorandum Opinion granting Defendants' Motion for Protective Order. He essentially found irrelevant to the issues in this case (in particular, the key dispositive issues concerning use and non-use framed by the parties' positions on summary judgment) the financial and corporate records sought in discovery by the Virginia Flood Parties. *Memorandum Opinion and Order Granting Defendants' Motion for Protective Order*, [#54 & #55].

The Virginia Flood parties did not seek reconsideration of Magistrate Judge Facciola's Order, nor did they seek review of it by this Court.

Discovery is now complete and the dispositive motions deadline has arrived. The parties, each a small business with limited resources, have expended many thousands of dollars and countless hours litigating this case. At long last, the time has now come to determine decisively whether it is necessary for this extended and ruinously expensive battle to continue to tax the resources of the parties and this Court, or whether its core claims may be decided on summary judgment.

Defendants respectfully urge the Court to determine whether there is any genuine issue of fact worthy of trial concerning the Virginia Flood Parties' claim to priority and exclusive ownership of the JOHN C. FLOOD and FLOOD names and goodwill which 1996 Flood purchased from the bankruptcy Trustee some twelve years ago, and have used to identify, advertise and promote 1996 Flood's business ever since. Magistrate Judge Facciola's Opinion and Order, and the conclusion of discovery have only served to further reinforce an absence of material issues of fact in dispute and Defendants' entitlement to judgment as a matter of law on those claims, and on Defendants' counterclaims for relief which flows from Virginia Flood's lack of priority rights.

- 3 -

Accordingly, as we demonstrate below, Defendants are entitled without further ado, to: (a) judgment in their favor on all of Virginia Flood's claims for declaratory, injunctive, and monetary relief; (b) because it lacked the priority rights in those marks when it applied for the Registrations, judgment on Count V of 1996 Flood's counterclaim, declaring that Virginia Flood has no right to maintain the Registrations and directing the Patent Trademark Office to cancel the same; and (c) partial judgment on Count V of 1996's Flood's counterclaim, declaring that: (i) 1996 Flood has priority rights over all Virginia Flood Parties to use as tradenames and servicemarks JOHN C. FLOOD and other similar variations using the term FLOOD, in connection with plumbing, heating, air conditioning and electrical services, without interference from any of the Virginia Flood Parties; and (ii) that no Virginia Flood party has the right to register any mark including the terms JOHN C. FLOOD or FLOOD.

While the partial summary judgment requested here would not resolve all of 1996 Flood's counterclaims, it would settle the most significant and substantial controversies between the parties. Such a ruling would create conditions that may very well lead to an end to this case without the necessity of further proceedings. If the Court decides not to grant, in whole or in part, the relief requested by this Motion, then, for the sake of efficiency and economy of future proceedings, Defendants ask the Court, pursuant to Fed. R. Civ. Pro. 56(d)(1), to identify those material facts which are not genuinely at issue. Eliminating or limiting issues to be tried may also serve to create conditions that would promote an extra-judicial resolution.

/

/

/

- 4 -

**B.**    *Statement of the Case*[2]

In 1984 Davis and Crooks established John C. Flood, Inc. ("1984 Flood") to conduct a plumbing, heating and air conditioning business in the Metropolitan area. In 1989 they, along with two '84 Flood employees, Haislip and Seltzer, established Virginia Flood, of which Davis, Crooks, Haislip and Seltzer all owned equal shares. In 1991 Davis, Crooks, their wives and '84 Flood filed for Chapter 11 bankruptcy.

Throughout 1991 and into 1993, 1984 Flood continued to operate under the control of Davis and Crooks as Chapter 11 debtors-in-possession. Indeed, Virginia Flood contributed to that operation by paying for advertising and equipment for 1984 Flood that the latter's credit situation precluded. In March 1993 a Chapter 11 Trustee was appointed. Davis and Crooks left 1984 Flood in the hands of the Trustee and began conducting the same type of business as 1984 Flood, using variations of the Flood name. In September 1993 the bankruptcy converted to a Chapter 7.

Meanwhile, Haislip and Seltzer began negotiating with the Trustee to purchase Davis' and Crooks's shares in Virginia Flood. During these negotiations Haislip and Seltzer offered to provide the Trustee with evidence that Davis and Crooks were misappropriating assets of 1984 Flood, including tradenames and goodwill. The Trustee then petitioned the bankruptcy court and obtained the appointment of a receiver to take possession of the Flood-related business being conducted by Davis and Crooks.

---

[2]  In the interests of avoiding unnecessary duplication and burden on the Court, Defendants herein incorporate by reference, as if set forth here in their entity, the separately-filed Statement of Material Facts Not In Dispute filed herewith ("SMF") submitted in support of this Motion. Each statement in such SMF is supported by the materials cites in the corresponding paragraph of the SMF, including admissions in pleadings, deposition transcripts and certain exhibits attached thereto (referred to in the SMF as "Exhibits"), and declarations attached to the SMF, and documents attached to those declaration (referred to in the SMF as "Attachments"). The factual averments in this Section are derived from the SMF.

In October 1995 Haislip and Seltzer purchased from the Trustee Davis's and Crooks's stock in Virginia Flood. At their depositions in this case they both testified that it was by virtue of this transaction that they acquired their purported exclusive priority rights to the tradename and goodwill of JOHN C. FLOOD and all variations. They acknowledged that the transaction documents relating to this purchase make no mention of these or any other assets of 1984 Flood being purchased. They could offer no explanation as to how to reconcile their stated position with the objective documentats.

Thereafter, the Trustee for 1984 Flood offered to sell the remaining assets, including tradenames and associated goodwill. Rather than assert that the Trustee could not do that because of the previous sale of the stock of Crooks and Davis, Virginia Flood offered over $200,000 to purchase assets including the names which they claimed in their depositions and in their case before this Court that they already owned. They were unable to offer any explanation for this anomaly. Prior to bidding on the same assets they now claimed they owned at the time, but after closing the Virginia Flood stock sale from which their exclusive rights were purportedly derived, the Trustee wrote to Virginia Flood, complaining that it was using the Flood name without the "of Virginia" geographical designation in certain telephone books, in violation of the estate's rights in JOHN C. FLOOD. In response to this demand, Virginia Flood did not assert its purported exclusive rights, or challenge the Trustee's claim that JOHN C. FLOOD belonged to the estate. Instead, it directed Bell Atlantic to correct the omission.

The Smileys (Davis's daughter and son-in-law) also bid to purchase '84 Flood's assets. Their bid was for $425,000. When the Trustee decided to sell the assets to a corporation formed by the Smileys ('96 Flood), Virginia Flood filed an objection with the Bankruptcy Court. Virginia Flood tried to persuade the Trustee that theirs was the superior bid. Neither in its communications with the Trustee, nor in its objection to the Court did Virginia Flood take the

- 6 -

position that it already owned the assets being sold, nor challenged the Trustee's right to sell

them. In their depositions Haislip and Seltzer were again unable to explain this anomaly. The

Bankruptcy Court overruled Virginia Flood's objection, and approved the sale of the John C.

Flood and Flood tradenames and associated goodwill to the Smileys on October 28, 1995.

Virginia Flood did not appeal that decision.

After the sale of the name and goodwill of 1984 Flood to 1996 Flood, the latter's attorney

wrote to Virginia Flood's attorney complaining that Virginia Flood was using the Flood

tradename without the geographical designator "of Virginia." Again, rather than challenge 1996

Flood's right to take that position – a challenge which would have inexorably flowed from the

core theory of Virginia Flood's case before this Court – Virginia Flood agreed to stop.

In 1999, Virginia Flood filed applications with the U.S. Patent and Trademark Office to

secure two federal registrations – one for JOHN C. FLOOD and another for a stylized logo

incorporating JOHN C. FLOOD as the dominant word element of the mark, and obtained

registrations on those applications in 2000, U.S. Trademark Registrations 2,345,161 and

2,355,004 (the "Registrations"). In those applications, despite knowing that 1996 Flood had

purchased those very rights in 1996, Virginia Flood averred that no other person, firm or

corporation, had the right to use the marks in commerce. In 2005, following attempts to

persuade Virginia Flood to trade under a variation that would help to distinguish Virginia Flood

from 1996 Flood, 1996 Flood filed a petition to cancel Virginia Flood's Registrations in the

Trademark Trial and Appeal Board of the U.S. Patent and Trademark Office ("TTAB Case").

After answering the TTAB Case cancellation petition, Virginia Flood essentially failed

and refused to defend the TTAB Case. It failed to respond first to a Motion to Compel filed by

1996 Flood, then failed to respond to an Order compelling discovery issued by the TTAB, and

finally, failed to respond to 1996 Flood's Motion for Sanctions, which, if granted, would have

resulted in cancellation of Virginia Flood's Registrations. Virginia Flood did not file an opposition to the Motion for Sanctions, but, instead, on July 25, 2006, filed a complaint in this Court, commencing this action, and simultaneously, a motion to suspend the TTAB cancellation proceeding on the grounds that a pending federal court action would have a bearing on the registrability issues before the TTAB. *See Virginia Flood's Answer to Counterclaim* [#17] ¶¶ 44-48. Thus began this action.

## II. SUMMARY OF ARGUMENT

As we demonstrate below, on the undisputed facts of this case, Defendants are entitled to judgment as a matter of law on Virginia Flood's claims for monetary, injunctive and declaratory relief, and on Defendants' counterclaims for cancellation of Virginia Flood's federal trademark Registrations, and for the specific declaratory and injunctive relief requested in this Motion. The Court must enter judgment for Defendants for two reasons, either of which is sufficient independently to dispose of each of the causes of action Virginia Flood asserts here, and the claim to priority that underlies them.

First, Virginia Flood is not entitled to enjoin any Defendants' use of JOHN C. FLOOD and similar marks, to any monetary remedy against corporate Defendants, or to a declaration of priority in its favor, or to maintain the Registrations, because Virginia Flood cannot establish the threshold requirement of ownership and priority of use in the disputed JOHN C. FLOOD mark. On the undisputed facts of record, Virginia Flood cannot demonstrate by the requisite clear and convincing evidence that the Trustee of bankruptcy estates from whom 1996 Flood purchased the names and goodwill in 1996 had nothing to sell, because he had previously abandoned by non-use the rights to those names, marks and goodwill as Virginia Flood claims. Nor can Virginia Flood establish its contention that Haislip and Seltzer's purchase from the same Trustee

of the individual debtors' Davis' and Crooks' 50% in Virginia Flood in 1995 somehow vested

Virginia Flood with the exclusive rights to JOHN C. FLOOD and all similar variants.

Far from abandoning the names and goodwill, the undisputed facts demonstrate clearly

that the Trustee considered them to be the single most valuable assets of the estate and took

affirmative steps to control their use and to protect them against infringement. It is undisputed

that from the inception of the bankruptcy case in 1993, to and including the sale in 1996, there

was unbroken continuity of use of the names and marks by the debtor 1984 Flood itself, or by

others for the benefit of the estate.

It is undisputed that the mark was used by 1984 Flood under the control of the individual

debtors in possession in Chapter 11. It is undisputed that, after appointment of a Trustee and

conversion of the case to a Chapter 7 case in March 1993, variations of JOHN C. FLOOD and

FLOOD were used by the individual debtors Davis and Crook, their family members, the

Smileys, and entities using variations of the dominant term FLOOD they formed and operated

during the bankruptcy, with the intention of continuing to trade on the goodwill and consumer

recognition associated with 1984 Flood's business and its longstanding use of JOHN C FLOOD.

In May 1995, the Chapter 7 Trustee petitioned the Bankruptcy Court to bring the FLOOD

entities and their assets back into the bankruptcy estates, expressly alleging that Davis, Crooks,

the Smileys and the FLOOD entities they formed were infringing the estate's rights in and to the

JOHN C. FLOOD and FLOOD marks, and improperly trading on 1984 Flood's goodwill. The

Bankruptcy Court, acting on the petition of the Chapter 7 Trustee, brought these entities back

into the bankruptcy estates under the control of a Court-appointed receiver, with orders that the

receiver operate the businesses as going concerns so that they could be sold for the benefit of

creditors. The entities in receivership under the control of the receiver appointed by the

Bankruptcy Court continued using FLOOD and JOHN C. FLOOD names and marks, until those names and goodwill were sold to the Smileys in 1996.

Assuming, *arguendo,* there were a lapse in use between March 1993, when the Chapter 7 Trustee was appointed and the corporate debtor 1984 Flood itself ceased operations, and May 1995 when the Bankruptcy Court appointed a receiver to take control of the FLOOD entities formed by the individual debtors and their family members and to bring the FLOOD names and goodwill back into the bankruptcy estate, such non-use would raise, at best, a presumption of abandonment.  Such a presumption is amply and indisputably rebutted by the undisputed facts of record, which bespeak an unmistakeable intention by the Trustee not to abandon the marks or the business in connection with which they were used, but to protect and preserve the marks and the business as a going concern and an asset of the estate of '84 Flood.  On such a record, the Virginia Flood parties cannot, as a matter of law, meet their burden of proving both non-use, *and the intention not to resume use,* by the requisite clear and convincing evidence.

Second, and in any event, Virginia Flood is barred by laches, waiver, estoppel, and release from disputing in this case, thirteen years after the bankruptcy court authorized the sale, and more than a decade after it was consummated, the validity of the bankruptcy Trustee's sale of the JOHN C. FLOOD and FLOOD tradenames and goodwill to Defendants.  As the materials offered in support of this Motion show, there is no question that Virginia Flood and its principals knew that the corporate Defendants were trading as JOHN C. FLOOD since at least early 1996, and that Virginia Flood did not seek any judicial recourse for monetary, injunctive, or declaratory relief against the Defendants until it filed this action in July 2006.

Moreover, twelve years ago, the Virginia Flood Parties were active participants in the Trustee's adversary proceeding which led to the Trustee's sale of the names and goodwill they challenge here.  They were witnesses to the use of the Flood names and marks by entities formed

- 10 -

and operated by the individual debtors the Trustee sought to bring under the control of the Court.
They received formal notice that the Trustee proposed to sell the assets *free and clear* of
competing claims and adverse interests of the very type they waited over ten years to assert here,
under Bankruptcy Code Section 363. In the bankruptcy proceedings in 1995 and 1996, they
were represented by counsel, appeared at hearings, filed an objection, and even submitted a
counteroffer proposing to purchase from the Trustee for $225,000 assets including the very trade
names they now claim they owned, and that the Trustee had no right to sell, at the time they
offered to purchase them.

It is undisputed that none of Flood of Virginia, Haislip or Seltzer, in their objection in
those proceedings, or in any other connection with the bankruptcy case, *ever* challenged the
Trustee's rights to sell the names and goodwill, or asserted any superior or exclusive rights to use
JOHN C. FLOOD and similar terms, or that the estate had abandoned, by non-use or otherwise,
its rights in the names and goodwill.

It is also undisputed that, despite notice of and active participation in the proceedings that
led to the bankruptcy court's authorizing the sale to 1996 Flood, Virginia Flood, Haislip and
Seltzer took no action to set aside, vacate, or appeal the Bankruptcy Court's October 1995 order
authorizing the sale, until they filed this action. That was in July 2006, many, many years after
the expiration of the time prescribed by the Bankruptcy Code and Bankruptcy Rules to
collaterally attack an order cutting off adverse claims and interests entered under authority of
Bankruptcy Code Section 363.

It is undisputed that, during the entire period between the Defendants' 1996 purchase and
to the present date, Defendants continued to trade, advertise and promote their services under the
names and marks JOHN C. FLOOD and FLOOD, and to develop further the goodwill that they
purchased. The bargained-for purchase price of $425,000 was paid off in full in early 2001.

For either reason independently, or for both of the foregoing reasons, Defendants are entitled to judgment on each of Virginia Flood's claims for declaratory, injunctive and monetary relief, to an order directing cancellation of Virginia Flood's JOHN C. FLOOD Registrations, and to the declaratory and injunctive relief on Defendants' counterclaims specified in this Motion.

### III. ARGUMENT AND AUTHORITIES

**A.** *Summary Judgment Standard: Movant's Burden*

A party is entitled to summary judgment if the pleadings, depositions, and affidavits demonstrate that there is no genuine issue of material fact in dispute and that the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c); *Tao v. Freeh*, 27 F.3d 635, 638 (D.C. Cir. 1994). Summary judgment is appropriate if the pleadings and the evidence demonstrate that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *Globalaw Ltd.* v. *Carmon & Carmon Law Offices,* 452 F.Supp.2d 1, 22 (D.D.C. 2006); *Dorn* v. *McTigue*, 157 F.Supp.2d 37, 42 (D.D.C. 2006). The moving party bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, which it believes demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986), *Globalaw,* 452 F.Supp.2d at 22; *Washington* v. *Thurgood Marshall Academy*, 2006 U.S. Dist. LEXIS 40318, *16 (D.D.C. June 19, 2006).

To determine what facts are "material," a court must look to the substantive law on which the particular claim or defense as to which judgment is sought rests. *Dorn,* 157 F.Supp.2d at 42, *citing Anderson* v. *Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). Only those factual assertions capable of affecting the substantive outcome of such a claim or defense are "material." *Globalaw,* 452 F.Supp.2d at 22; *Washington,* 2006 U.S. Dist. LEXIS 40318, at * 18. To be

"genuine," "the issue must be supported by sufficient admissible evidence that a reasonable trier-of-fact could find for the non-moving party." *Globalaw,* 452 F.Supp.2d at 22, *citing Laningham v. U.S. Navy*, 813 F.2d 1236, 1242-43 (D.C. Cir. 1987); and *Liberty Lobby*, 477 U.S. at 251 (the court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law").

Where, as in this case, in which neither side has demanded a jury, the district court would be the trier-of-fact on an issue were the case to proceed to trial, the Court is not confined to deciding questions of law only, but may draw derivative inferences from undisputed subsidiary facts, even if those facts would support a contrary inference, so long as the inference does not depend on an evaluation of witness credibility. *Derose* v. *Rice,* 2006 U.S. Dist. LEXIS 5182, * 29-30, *quoting Cook* v. *Babbit*, 819 F.Supp 1, 11 & n.11 (D.D.C. 1993). In such a case, a conflict between the parties concerning the ultimate and decisive conclusion to be drawn from undisputed facts does not prevent rendition of summary judgment. *Ramallo* v. *Reno,* 931 F.Supp. 884, 888 (D.D.C. 1996).

In this case, Virginia Flood brings three claims for injunctive and monetary relief against the corporate Defendants: (1) infringement of a registered trademark under 15 U.S.C. § 1114(1) (*Plaintiff's First Amended Complaint* [#28] ¶¶ 54-63); (2) unfair competition in violation of 15 U.S.C. § 1125(a) (*Id.* ¶¶ 64); and (3) common law servicemark infringement and unfair competition. It also seeks a declaration of its priority rights to JOHN C. FLOOD and similar names and marks against all Defendants. *Id.* ¶¶ 80, 81 & Prayer for Relief ¶¶ 2 & 4. Each one of Virginia Flood's causes of action depends on the following allegation: "Virginia Flood's use of such names and marks predates and is senior to use of JOHN C. FLOOD and similar names and marks by each of the Corporate Defendants." ¶¶ 56 & 72. 1996 Flood's Counterclaim includes Count V, seeking a declaration of 1996's Flood's priority of usage over all Virginia

- 13 -

Flood Parties, and all Virginia Flood Parties' lack of rights to register the JOHN C. FLOOD marks. *See Answer, Affirmative Defenses and Counterclaims of John C. Flood, Inc.* [#7] and [#9] ¶¶ 76-78 and Prayer for Relief therein, Section 2.

As we demonstrate in this motion and supporting materials, for two reasons, under the undisputed facts of this case, all Defendants are entitled to judgment as a matter of law on all Virginia Flood's claims, and, on Count V of 1996 Flood's counterclaim, to a declaration that 1996 enjoys priority rights to use JOHN C. FLOOD and variations of FLOOD as tradenames and servicemarks over all Virginia Flood Parties, and cancellation of Virginia Flood's Registrations on the grounds that Virginia Flood lacks such priority. First, Virginia Flood is not entitled to enjoin any Defendants' use of JOHN C. FLOOD and similar marks, to any monetary remedy against corporate Defendants, or to a declaration of priority in its favor because Virginia Flood cannot establish the threshold requirement of ownership and priority of use in the disputed mark. Second, Virginia Flood is barred by laches, waiver, estoppel, and release from disputing in this case, twelve years after the fact, the validity of the bankruptcy Trustee's sale of the JOHN C. FLOOD and FLOOD tradenames and goodwill to Defendants.

> **B.**    ***Defendants Are Entitled to Judgment as A Matter of Law On Virginia Flood's Claim that it Owns and Has Priority of Use of the JOHN C. FLOOD Names and Marks Because the Names and Marks Were Not Abandoned in 1984 Flood's Bankruptcy***

As threshold matter and an essential element, to prevail on a claim of trademark infringement in the D.C. Circuit, "the plaintiff must show . . . that it owns a valid trademark." *Globalaw,* 452 F.Supp. at 1, 27-28, *citing Malarkey-Taylor Assocs., Inc. v. Cellular Telecomm. Indus. Ass'n,* 929 F. Supp. 473, 476 (D.D.C. 1996) (citing *Sears, Roebuck and Co. v. Sears Fin. Network,* 576 F. Supp. 857, 861 (D.D.C. 1983)); *see Partido Revolucionario Dominicano (PRD) Seccional Metropolitana de Washington-DC, Maryland y Virginia v. "Partido Revolucionario*

- 14 -

*Dominicano, Seccional de Maryland y Virginia,*" 312 F. Supp. 2d 1, 11 (D.D.C. 2004) (same);
*Am. Ass'n for Advancement of Science v. Hearst Corp.*, 498 F. Supp. 244, 254 (D.D.C. 1980)
(same). Courts have announced that the elements of unfair competition under 15 U.S.C. §
1125(a) and common law infringement and unfair competition mirror those for a claim of
trademark infringement. *See Globalaw,* 452 F.Supp.2d. at 25, *citing PRD*, 312 F. Supp. 2d at
11("The analysis for unfair competition under Section 43(a) of the Lanham Act is essentially the
same as the analysis for trademark infringement"); *Hearst,* 498 F. Supp. At 261-62 (noting that
"the essential elements are the same for either a trademark infringement or unfair competition
action" and "the remedy for unfair competition, injunctive relief, is the same as that provided by
the infringement law"); *see also Tommy Hilfiger Licensing, Inc. v. Goody's Family Clothing,
Inc.*, 2003 U.S. Dist. LEXIS 8788 at *78, Civ. A. No. 00-1934 (BBM), 2003 WL 22331254, at
*30 n.5 (N.D. Ga. May 9, 2003) ("the standards for the federal claims of false designation of
origin and unfair competition are the same as those for trademark infringement") (citations
omitted).

> **1.** ***Virginia Flood's Federal Registrations Do Not Establish Its Priority;
> Even Without Relying on 1984 Flood's First Use, Defendants' Use is
> Senior to the Constructive Priority Date Conferred by Virginia Flood's
> Registrations***

Virginia Flood is the holder of the Registrations, which, if properly admitted, would be
prima facie evidence (and confer a presumption) of validity and ownership of the registered
marks, and their exclusive right to use them. 15 U.S.C. §§ 1057(b), and 1115(a). *See also First
Amended Complaint* [#28], ¶ 42 (Virginia Flood alleges *prima facie* evidentiary effect of
registration). However, that presumption is not conclusive, but rebuttable, and for the reasons
explained below, has no practical significance in the context of this motion.

The very section of the Lanham Act conferring the evidentiary presumption concludes by providing that a registration "shall not preclude another person from proving any legal or equitable defense or defect, including those set forth in subsection (b), which might have been asserted had the mark not been registered." 15 U.S.C. § 1115(a). According to McCarthy, a leading commentator on trademarks and unfair competition:

> [A]ny common law defense can be raised to attack the validity of the mark, and any equitable defense can be interposed. Thus, the validity of the mark and its registration may be collaterally attacked by a defendant who is charged with infringement. This 'collateral attack' can take the form of both (1) an affirmative defense to infringement; and (2) a counterclaim for cancellation of the registration.

5 J.T. McCarthy, *McCarthy on Trademarks,* § 3:139, at 32-257 -58 (4th Ed. 2007).

Defendants, in their Answer and Counterclaim, challenge directly the validity of Virginia Flood's registrations, seeking cancellation, and raise a number of affirmative defenses cognizable under the Lanham Act, including the equitable laches and estoppel, and the legal waiver and release, defenses discussed in this motion. In connection with this motion, we also present affirmative proof of the invalidity of the claims of trademark ownership underpinning the registrations. The net effect is that the presumptions are pierced and evaporate:

> [t]he presumption of validity that federal registration confers . . . evaporates as soon as evidence of invalidity is presented. . . Its only function is to serve as evidence and when that function has been performed the presumption drops out of the case.

*Door Systems, Inc.* v. *Pro-Line Door Systems, Inc.*, 83 F.3d 169, 172 (7th Cir. 1996).

Further, as a matter of law, any statutory priority conferred by Virginia Flood's federal trademark registrations relates back only to the filing date of the applications for registration. *See* 15 U.S.C. § 1057(c) ("Contingent on the registration of a mark . . . the filing of an application to register shall constitute constructive use conferring a right of priority . . .."); 4 J.T. McCarthy, *supra*, § 26.38 (constructive priority accorded registration dates from application

date). The registration *per se* is proof of use only as of the filing date, not the date of first use claimed in the application. 2 J.T. McCarthy, *supra,* § 16:19, at 16-37 & n.4.

Virginia Flood filed its applications in 1999. *First Amended Complaint* at ¶¶ 39 & 40. Yet Virginia Flood itself expressly asserts that 1996 Flood's use commenced in 1996, some three years before Virginia Flood even filed its applications. *Id.* ¶ 57. Defendants agree that 1996 Flood's use commenced in 1996, when the Smileys purchased JOHN C. FLOOD and FLOOD and associated goodwill from the Trustee. SMF ¶¶ 48-51. Thus, it is undisputed that Defendants' use of the JOHN C. FLOOD mark is senior to the statutory constructive priority date conferred by Virginia Flood's federal registrations. By its terms, Section 7(c) of the Lanham Act provides that constructive priority conferred by the filing of a federal trademark registration *does not* confer a right of priority over a person who used the mark prior to such application. 15 U.S.C. § 1057(c). Thus, Plaintiff's claim to ownership of the JOHN C. FLOOD name and mark must rest on some basis other than "constructive use" priority.

> **2.    *1984 Flood, Davis and Crooks Were the Senior
> Users and Owners of the JOHN C. FLOOD Names, Marks and
> Goodwill, and Ownership of Those Assets Passed to Their
> Bankruptcy Estates Pursuant to 15 U.S.C. § 541***

"[O]wnership is governed by priority of use . . . . the first to use a designation as a mark in the sale of goods or services is the 'owner' and 'senior user.'" 2. J.T. McCarthy, *supra,* at 16:4, at 16-6-16-7. As this Court stated the rule in *Globalaw*: "[i]n the ordinary case of parties competing under the same mark in the same market, it is correct to say that prior appropriation settles the initial question of ownership, and that the service mark rights of the senior user trump those of the junior user." 452 F.Supp.2d at 27.

Virginia Flood does not dispute that 1984 Flood's use of JOHN C. FLOOD in connection with plumbing, heating and air conditioning services in the Washington, D.C. geographic market

was senior to Virginia Flood's, and that 1984 Flood began using the mark nearly four years before Virginia Flood was even formed. SMF ¶¶ 1-3. Virginia Flood asserts that 1984 Flood's and its principals' filing of a petition for relief under Chapter 11 of the Bankruptcy Code in 1991, and the appointment of a Trustee upon the conversion of the case to a proceeding under Chapter 7 means that 1984 Flood ceased to be a "going concern," causing an abandonment of 1984 Flood's prior and senior rights in and to JOHN C. FLOOD and similar variations thereof. *Plaintiff's First Amended Complaint* [#28], ¶¶ 24-25. Virginia Flood's claims of trademark infringement and unfair competition are based entirely on allegations in their Complaint that "[a]t the time the Trustee and Receiver attempted to sell JOHN C. FLOOD, INC. and FLOOD, INC. to 1996 Flood, 1984 Flood was no longer using JOHN C. FLOOD and/or similar variations thereof, and, as a consequence, any goodwill that may have been symbolized thereby had been destroyed by 1984 Flood's abandonment and non-use of the same," *Id.* at ¶ 33. With this abandonment claim, Virginia Flood seeks to trump the undisputed seniority that the estate of 1984 Flood, and, in turn, its assignee, Defendants, would otherwise enjoy.

A trademark is "deemed abandoned" under the Lanham Act "when its use has been discontinued with intent not to resume. Intent not to resume may be inferred from circumstances." 15 U.S.C. § 1127. Currently, the statute further provides: "Non-use for three consecutive years shall be prima facie evidence of abandonment." Prior to January 1, 1996, the effective date of Public Law 103-465, which extended the period to three years, non-use for two consecutive years constituted prima facie evidence of abandonment. Pub. Law. No. 103-465, Title V, § 521, 108 Stat. 4981 (December 8, 1994).

As the plain language of the statute states, the essence of abandonment is the mark-holder's *intention* to abandon, and proof of non-use is not dispositive of that question. Proof of continuous non-use for the requisite statutory period raises no more than a presumption of

abandonment, and "[a]bandonment being in the nature of a forfeiture, it must be strictly proved." *Dial-A-Mattress Operating Corp.* v. *Mattress Madness, Inc.,* 841 F.Supp. 1339, 1355 (E.D.N.Y 1994) (internal quotation marks and citation omitted).

"*Therefore, the presumption of abandonment following from two years of non-use is rebuttable, if the owner of the mark presents facts that would negate the inference of intent to abandon.*" *Seidelmann Yachts d/b/a Pacemaker* v. *Pace Yacht Corp.*, 1989 U.S. Dist. LEXIS 17486 *16 (D. Md. 1989) (emphasis added, internal citations omitted), *aff'd* 898 F.2d 124 (4th Cir. 1990). *Accord EH Yacht LLC* v. *Egg Harbor LLC*, 84 F.Supp. 2d 556, 565-566 (D.N.J. 2000) (proponent of abandonment must show that the circumstances clearly and convincingly establish an intent not to resume use of the mark; Supreme Court has held that almost total non-use for over four years, and a resulting near total loss of goodwill was insufficient) *citing Beech-Nut Packing Co.* v. *P. Lorillard Co.*, 273 U.S. 629 (1927). *See also Skippy, Inc.* v. *CPC Int'l, Inc.*, 674 F.2d 209 (4th Cir.) *cert. denied* 459 U.S. 969 (1982) (23 year hiatus in use did not constitute abandonment).

A *prima facie* showing of abandonment shifts only the burden of production, leaving the ultimate burden of persuasion of both elements, by strict proof, on the party alleging abandonment. *Cumulus Media, Inc.* v. *Clear Channel Comm., Inc.*, 304 F.3d 1167, 1175-78 (11th Cir. 2002). If the presumption is triggered, the owner of the mark has the burden of bringing forward evidence of either actual use during the relevant period or intent to resume use. *Id.* at 1176-77; *Emergency One, Inc.* v. *American FireEagle, Ltd.,* 228 F.3d 531, 536 (4th Cir. 2000). Once a party brings forward evidence of actual use, or an intention that use be resumed, "any presumption deriving from the proof of the prima facie case drop[s] out, and the [party arguing abandonment is] obligated to prove both continuous non-use and intent not to resume use." *Emergency One,* 228 F.3d at 536 n.1.

Because abandonment results in a forfeiture of rights, which is disfavored in law and equity, courts are reluctant to find it. A party arguing abandonment is obliged to prove all of its elements by clear and convincing evidence. 2 J.T. McCarthy, *supra,* § 17:12, at 17-20, and cases cited therein; *Cash Processing Servs.* v. *Ambient Entertainment*, 418 F.Supp2d 1227, 1231-33 (D. Nev. 2006) (strict proof; proponent of abandonment must bear burden of persuasion by clear and convincing evidence); *EH Yacht LLC* 84 F.Supp at 564("strict proof" standard means that each element of abandonment must be proven by clear and convincing evidence); *Seidelmann Yachts, Inc.* v. *Pace Yacht Corp.*, 14 U.S.P.Q.2d 1497, 1501 (D. MD 1989), *aff'd* 898 F.2d 147 (4th Cir. 1990) ("Because abandonment constitutes a forfeiture of a property interest, both non-use and intent not to resume use must be strictly proved."). In reviewing a motion for summary judgment, the District Court must consider the materials marshaled in support and in opposition in the light of the appropriate standard of proof, here, clear and convincing evidence. *Anderson* v. *Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).

Contrary to the core premise of Virginia Flood's abandonment argument, filing of a bankruptcy petition – and even one looking toward liquidation of the business – does not automatically extinguish or cause abandonment of a trade name, mark and associated goodwill. The commencement of a bankruptcy case creates a bankruptcy estate comprised generally of all legal and equitable interests of the debtor as of the commencement of the case, wherever located and by whomever held, except for some enumerated exceptions not pertinent here. 11 U.S.C. § 541(a). It also includes property recovered from others by the Trustee for the estate. 11 U.S.C. § 541(a)(3) & (4).

It is well settled that the mere fact that an entity files for bankruptcy protection does not cause forfeiture and abandonment of the rights it has in its tradenames, servicemarks and associated goodwill. 2 J.T. McCarthy, *supra,* 17:16, at 17-30 & n.4 and cases cited therein;

*Official Pillowtex LLC* v. *Hollander Home Fashions Corp.,* 379 F.Supp.2d 744, 750-51 (S.D.

Ohio 2007) *quoting Merry Hull & Co.* v. *Hi-Line Co.,* 243 F.Supp. 45, 50 (D.N.Y.1965) ("A

right in a given trademark is "created by its adoption and use in connection with that business ...

that is not to say that goodwill can exist only in connection with an active going business ..." nor

that goodwill cannot be transferred in a bankruptcy sale"). Tradenames, servicemarks and

associated goodwill are valuable estate assets, which can be validly sold, assigned or transferred

by the estate, provided the goodwill is not separated from the names and marks. *Official*

*Pillowtex LLC,* 379 F.Supp.2d at 750-51 (marks and goodwill may be sold out of bankruptcy,

even when business is no longer active); *American Sleek Craft, Inc.* v. *Nescher,* 131 Bankr. 991,

996-97 (D. Az. 1991)(noting that when ownership of business is conveyed, its tradename and

goodwill are also conveyed; enjoining use of bankrupt business' trademark); *EC Yachts,* 84

F.Supp at 567-78 (Trustee in bankruptcy has power to sell the goodwill and symbolic

trademarks); *Impact Distributors, Inc.* v. *Cuzcatlan Beverages, Inc.,* 260 Bankr. 48, 56 (Bankr.

S.D. Fla. 2001)(Court ruled that trademark and goodwill were property of estate and subject to

sale under Bankruptcy Code Section 363); *Merry Hull & Co.* v. *Hi-Line Co.,* 243 F.Supp 45, 52

(S.D.N.Y 1965)(court concludes "defendant became the owner of the mark "Merry Mites" by

purchase from the Trustee in Bankruptcy; and that its title was confirmed by long continued and

public use). After a valid assignment of trademarks and their good will, the assignee succeeds to

all the rights and

priorities of the assignor. 2 J.T. McCarthy, *supra,* § 18:15, at 18-33 n.2; *Johanna Farms, Inc.* v.

*Citrus Bowl,* 468 F.Supp. 866 (E.D.N.Y. 1978) (purchaser "becomes transfixed to the position of

his predecessor").

        In this case, because the estate was the party in interest in the disputed marks and

goodwill during the bankruptcy, the estate's intentions with respect to use of the mark are

decisive. As the Court held in *Egg Harbor*, Congress's use of the term "deemed abandoned" in
the abandonment statute signals its intent that any:

> determination of intent not to resume use should be based on the totality of objective
> evidence of intent to resume use, not simply the intent of the . . . trademark owner.
> Under this standard, so long as there is power to do so, any valid intent to resume use
> within a reasonable time becomes relevant. *Thus, the Court holds that . . . .the party
> wishing to show intent not to resume use under § 1127 must point to objective evidence
> that clearly and convincingly establishes that, among those that had an interest and a
> right to do so, there was no intent to resume use of the Egg Harbor name within a
> reasonable time.* Defendant's proposed interpretation would render meaningless most
> secured creditors' interests in a trademark.

84 F.Supp.2d at 566 (emphasis added).

In that case, the Court concluded that evidence that the company's principals intended to

sell the business to another concern, or allow its creditors to seize its assets and operate as a

going concern until a buyer could be found, necessitated finding against clear and convincing

evidence of an intent not to resume use. *Id. See also Cash Processing Servs.* v. *Ambient

Entertainment*, 418 F.Supp.2d 1227, 1230-34 (D. Nev. 2006) and *Burgess* v. *Gilman*, 475

F.Supp.2d 1051, 1061-62 (D. Nev. 2007) (discussing evidence of U.S. Government's intention,

after seizure of a brothel, that the infamous "Mustang Ranch" mark be sold to a buyer who

would operate a brothel, as negating an intention to abandon). Thus, the requisite "intention to

resume use" can be a party in interest's intention to sell the assets to a person who will resume

use, or to operate the assets until a buyer can be found.

### 3. *Virginia Flood's Claims of Abandonment by Non-Use Are Belied By the Undisputed Facts of This Case*

Recognizing, as it must, that the bankruptcy Trustee is the conduit through which priority

of rights passed to the Defendants, Virginia Flood's claim to priority over 1996 Flood is based

on an asserted loss of the Trustee's rights prior to the sale. Virginia Flood contends: "[a]t the

time the Trustee and Receiver attempted to sell JOHN C. FLOOD, INC. and FLOOD, INC., to

1996 Flood, 1984 Flood had no interest or control in the use of JOHN C. FLOOD and/or similar variations thereof," because "1984 Flood was no longer using JOHN C. FLOOD and or similar variations thereof, and, as a consequence, any goodwill that may have been symbolized thereby had been destroyed by 1984 Flood's abandonment and non-use thereof." *Plaintiff's First Amended Complaint* [#28] ¶¶ 32 & 33. Specifically, Virginia Flood claims, non-use and abandonment occurred in March 1993, when Davis, Crooks and 1984 Flood's Chapter 11 bankruptcy cases were converted to a Chapter 7. *Id.* ¶¶ 24-25. Accordingly, Virginia Flood alleges, the Bill of Sale they admit 1996 Flood and the Smileys received from the Trustee for JOHN C. FLOOD and FLOOD, INC. and the goodwill symbolized thereby was invalid and of no effect, because the Trustee's sale of Davis' and Crooks' 50% interest in Virginia Flood to Haislip and Seltzer in March 1995 had vested them with the "exclusive right" to use JOHN C. FLOOD and/or similar variations thereof. *Id.* ¶ 34.

Haislip and Seltzer testified in their depositions that, in their view, they acquired the *exclusive* rights in JOHN C. FLOOD and variations thereof at the time they purchased from the Trustee Davis' and Crooks' stock in Flood of Virginia. SMF ¶ 35. Prior to then, they admitted, they did not have exclusive rights. *Id.* As contemporaneous documents produced in discovery and deposition testimony now prove conclusively, Haislip and Seltzer actually acquired the remaining ½ interest in Virginia Flood's stock on or about October 11, 1995, not March 1995, as Virginia Flood asserts in its First Amended Complaint. *See* SMF ¶¶ 14-18, 36-37. Of course, by October 11, 2005, the Trustee had, some six months earlier, in May 1995, forcefully asserted his rights in the JOHN C. FLOOD and FLOOD marks, by seizing control and placing in receivership the "New Flood" entities who had been using them. SMF ¶¶ 19-21, 36-37.

In any event, the undisputed facts show that the there was never any hiatus in the debtors' estates' use, much less any evidence of an intention by the Trustee to abandon the JOHN C.

- 23 -

FLOOD name and goodwill during the 1984 Flood bankruptcy. Indeed, the facts overwhelmingly show that the Trustee intended to preserve them to be sold along with other assets of the business, as a going concern. They show further that the Trustee acted on that intention, by operating 1984 Flood's business and continuing to trade under the FLOOD names and marks under the stewardship of a receiver appointed by order of the Bankruptcy Court, until 1984 Flood's names and goodwill, and stock of the Flood entities then in receivership, were sold to Defendants.

> **a.** ***There Was No Cessation of Use of the JOHN C. FLOOD and FLOOD Names and Marks By or for the Benefit of the Bankrupts' Estates, During the Chapter 11 or After Conversion to a Chapter 7***

From 1991 until March 1993, when Davis turned 1984 Flood's premises over to the then-newly appointed Chapter 11 Trustee, 1984 Flood, Davis and Seltzer, as Chapter 11 debtors-in-possession, continued trading and advertising as JOHN C. FLOOD and variations of FLOOD. SMF ¶¶ 5-9. A Chapter 11 Trustee, Francis Hunt, was appointed for 1984 Flood in March 1993, and Davis surrendered possession of 1984 Flood's business premises to him at that time, because they were unable to reach agreement on how to operate the business. SMF ¶¶ 9-10. The corporate debtor, 1984 Flood itself effectively ceased operations then. The consolidated Chapter 11 case was converted to a Chapter 7 on September 21, 1993. SMF ¶ 9.

But it is undisputed that, even after the appointment of a Chapter 11 Trustee, and surrendering 1984 Flood's business premises to him, and conversion of the case to a Chapter 7, Davis and Crooks, individual debtors then still in bankruptcy, and the Smileys, members of Davis' family, continued to carry on the same type of plumbing, heating and air conditioning business of 1984 Flood in the Washington D.C. metropolitan area under the FLOOD banner, but through different entities established and managed by the Smileys. *Id.* ¶¶ 10-13.

Those entities traded and advertised under various corporations and trade names, using variations of JOHN C. FLOOD and FLOOD, including J.C.F., Inc., J.C. Flood, John C. Flood of D.C, Inc., and John C. Flood of MD, Inc. These "New Flood" entities (as the Trustee called them) displayed FLOOD names and marks and on service trucks, signage, business forms, brochures and advertising, continuously, from and after March 1993, and through and after June 1995. *Id.* ¶ 11. Their intentions in doing so were to continue in the same business as 1984 Flood, to use FLOOD names recognizable to the public, and to operate using the goodwill of 1984 Flood's business. *Id.* ¶ 12.

Indeed, their carrying on of that business using FLOOD names and marks led directly to the Trustee's filing in May 1995 of an adversary proceeding against them all in the Bankruptcy Court, seeking appointment of a receiver to assume control over the "New Flood" entities. These entities, the Trustee expressly claimed, were successors to 1984 Flood and were trading on, infringing and misappropriating the estate's JOHN C. FLOOD trade names and marks. The gravamen of the Trustee's complaint was that Davis, Crooks and the Smileys, through these entities, were essentially continuing the business of 1984 Flood without interruption, using variations of the JOHN C. FLOOD and FLOOD trade names, goodwill and other assets owned by the bankruptcy estate. SMF ¶¶ 19-20 *and see* Rinn Dec. SMF ¶¶ 5-8 & Att. B-1 (Verified Complaint), *passim, and* B-2 (Memorandum in Support of Verified Motion for Ex Parte Appointment of Receiver), at 12-13. *See also* SMF ¶ 37 *citing* Haislip Dep. 116:19-22 & 117:1-8 (admitting that one of prime functions of receiver was to bring the operations set up by Davis, Crooks and others using Flood marks back into the bankruptcy estate) and Seltzer Dep. 39:2-22 (Seltzer admitting his belief that, as of September 1995, Trustee had put a receiver in place and sought to bring back into the bankruptcy estate assets including 1984 Flood name and goodwill that was being used by "new" Flood entities).

In June and August 1995, the Bankruptcy Court entered orders appointing and renewing the appointment of a receiver to take control over these entities on a temporary basis, and specifically charged the receiver to:

> [t]ake immediate possession and charge of the right title and interest of all tangible and intangible property of New Flood, wherever located . . . . and assets of every kind and nature (collectively the "Assets") and to manage, operate, secure, and control same so as to protect and preserve New Flood as *ongoing business entities* until further Order of the Court"

In September 1995, the Bankruptcy Court entered an order appointing the receiver on a permanent basis, and specifically charged him to:

> take immediate possession and charge of the right title and interest of all tangible and intangible property of New Flood, wherever located . . . . and assets of every kind and nature (collectively the "Assets") and to manage, operate, secure, and control same so as to protect and preserve New Flood *as ongoing business entities until consummation of sale to a purchaser*, subject to further Order of this Court" and "[t]o prohibit any confusingly similar or otherwise infringing uses of the common law tradename JOHN C. FLOOD, INC., by any individual or entity. . . ."

SMF ¶ 21 & Rinn Dec. ¶¶ 10, 12 and Att. B-4 & B-6 (temporary receivership orders).

These explicit judicial charges from the Bankruptcy Court, directing the receiver to operate and manage the entities the Trustee regarded as the successors to 1984 Flood as *"ongoing business entities" until sale to a purchaser*, conclusively belies Virginia Flood's core contention that 1984 Flood's business ceased to be a "going concern" or that the estate evinced the intention to abandon JOHN C. FLOOD and FLOOD, prior to Haislip and Seltzer's acquisition of their so-called "exclusive" rights to the JOHN C. FLOOD marks by October 1995.

In fact, it is undisputed that, during the entire period of the temporary and permanent receiverships, from June 1995 through and after the sale of the names and goodwill in 1996, the businesses in receivership never ceased trading and advertising under the JOHN C. FLOOD and FLOOD names and marks. The companies continued to perform plumbing, heating and air

- 26 -

conditioning services throughout the metropolitan Washington, D.C. area, and to use variations of JOHN C. FLOOD and FLOOD, on service trucks, on business forms, and in advertisements, and the like.  SMF ¶¶ 25.

As we have demonstrated, it is beyond dispute that the Trustee caused the Bankruptcy Court to seize control of the "new" Flood entities assets and properties used by them in the same type of business as 1984 Flood, including the FLOOD names and marks, and to appoint a receiver to operate the business as a going concern until it could be sold.  Because the estate and the Bankruptcy Court seized the assets and benefits of the "New Flood" business conducted by Davis, Crooks and the Smileys on the theory that the new entities were merely continuing the business of 1984 Flood, and using the goodwill symbolized by 1984 Flood's JOHN C. FLOOD name and mark to boot, logically, the uses of the FLOOD names and marks by Davis, Crooks the Smileys, and the "new" Flood entities they formed, must be credited to the estate, which ended up taking those assets and benefits.

The undisputed facts of record show that there was no discontinuity of use.  Accordingly, the Virginia Flood Parties simply cannot meet their burden of establishing enough evidence of "non-use" necessary to even raise the statutory presumption of abandonment upon which they rely, much less evidence sufficient to persuade a reasonable finder of fact to find in their favor as to non-use of the mark under the demanding ultimate "clear and convincing" standard of proof applicable here.  *See Globalaw,* 452 F.Supp.2d at 22, *citing Laningham v. U.S. Navy,* 813 F.2d 1236, 1242-43 (D.C. Cir. 1987); and *Liberty Lobby,* 477 U.S. at 251 (the court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law").

/

/

**b.** ***The Trustee Evinced No Intention to Abandon the Goodwill of the Business Symbolized By the JOHN C. FLOOD and FLOOD Names and Marks, and It Remained Intact Upon the Sale in 1996***

But even if those uses of FLOOD names and marks are not credited to the estate, and the 2-year hiatus between the Chapter 11 Trustee Hunt's taking possession of 1984 Flood and the cessation of its business activities in March 1993 and the Chapter 7 Trustee's forceful efforts in May 1995 to bring the "new" Flood entities' business operations and assets under the control of a receiver appointed by the Bankruptcy Court, are regarded as a period of non-use, the undisputed facts are more than sufficient to rebut any presumption of abandonment that might arise from such non-use. The undisputed facts of record are devoid of any evidence that the bankruptcy estate, personified by its Trustee, intended to abandon the disputed marks. Far from evincing any intention to abandon them, the Trustee, in fact, took extraordinary measures to protect the JOHN C. FLOOD and FLOOD names and marks and associated goodwill, and obviously regarded them as valuable and important assets of the 1984 Flood estate. In support of his May 17, 1995, motion for appointment of a receiver, the Trustee wrote:

> Debtor, under its common law tradename JOHN C. FLOOD, INC., has spent large sums of money since 1984 in advertising (since the business' inception), and has built up considerable good will over that time. The public in the metropolitan Baltimore and Washington D.C. area has come to recognize that the heating and cooling services offered by by JOHN C. FLOOD emanate from a particular source, and that the JOHN C. FLOOD INC.'s name is synonymous with high quality work by skilled technicians. In other words, consumers could likely turn to "J.C. Flood Inc." for its services while wrongfully depriving the creditors of JOHN C. FLOOD, INC., of much needed funds.

SMF ¶ 20 Rinn Dec.Att. B-2, Memorandum in Support of Verified Motion for Ex Parte Appointment of Receiver, etc., at 12.

The clearest objective evidence of the Trustee's intent is the adversary proceeding itself. In that case, the Trustee seized control of the "New Flood" entities' assets, including the FLOOD

marks, from the individual debtors and their relatives, and forced them to operate and use them under the stewardship of a Court-appointed receiver, until the business could be sold as a going concern. SMF ¶¶ 19-25. Haislip and Seltzer, in their deposition testimony, admitted that the primary reason for the appointment of the receiver was to bring back into the control of the estate the FLOOD names and goodwill. SMF ¶ 37 *citing* Haislip Dep. 116:19-22 & 117:1.8; Seltzer Dep. 39:2-22.

During the receivership, the Trustee continued to enforce and defend those trade names and goodwill, *even against Virginia Flood itself.* On October 4, 1995, *seven months after* the Trustee agreed to sell the Virginia Flood stock to Haislip and Seltzer, *over a week before* Haislip and Seltzer executed the Stock Purchase Agreement and made a payment effectuating the transfer, and *one day* before the Trustee filed a motion with the Bankruptcy Court to approve the sale of the names and goodwill to the Defendants, the Trustee also asserted the estate's trademark rights in the JOHN C. FLOOD marks against Virginia Flood.

On October 4, 1995, The Trustee wrote a letter to Virginia Flood's counsel, pointedly objecting to Virginia Flood's confusing use of JOHN C. FLOOD in certain telephone book advertising. The Trustee wrote: "without belaboring the point, I consider your client's use of the name without the clarification John C. Flood of Virginia in the same category as the issues which led to litigation of the received entities." SMF ¶ 42 & Att. B-16 to Rinn Dec. (October 4, 1995, Rinn to Weltmann letter, also attached as Ex. 8 to Haislip Dep.).

In their depositions, Haislip and Seltzer admitted that Trustee asserted that Virginia Flood were using a mark they were not entitled to use, and reflected the Trustee's view that Virginia Flood did not have the exclusive right to the JOHN C. FLOOD trademark and all FLOOD variations, as they claim in this case. SMF ¶ 43. Further, they testified, they did not recall what, if anything, they did in response to the Trustee's assertions. *Id.* The record provides an answer:

in the face of the Trustee's clear challenge to their rights to use a mark they now claim they owned exclusively, they took no action to inform the Trustee of their purported exclusive rights, or his alleged abandonment.

The Trustee avers in his declaration that neither Virginia Flood or its principals *ever* claimed or asserted that the estate lacked the right to sell the JOHN C. FLOOD names and goodwill, or that any such sale would be invalid because of sale of the remaining Virginia Flood stock to Haislip and Seltzer. SMF ¶ 41 & Rinn Dec. 20-23. In fact, after receiving the Trustee's letter objecting to the omission of the distinguishing term "of Virginia" from a Virginia Flood telephone book ad, on November 30, 1995, Virginia Flood's counsel wrote to Bell Atlantic, complaining that Bell Atlantic's failure to run a newly designed directory add that corrected "certain appearances/omissions" in the old ad, exposed his client to the "danger" of threatened legal action, by a "competitor with a similar name." SMF ¶¶ 44, 52 & Att. C-6 to Smiley Dec. (November 30, 1995, Weltmann to Bell Atlantic letter). Surely these reactions to the Trustee's letter are incongruous responses on the part of persons who believed at the time that the Trustee had no rights to make such demands because the estate had previously abandoned the marks, and agreed, through the sale of Flood of Virginia stock, to cede exclusive rights to JOHN C. FLOOD and all variations, to them. More to the point, they manifestly show no intention on the Trustee's part to abandon the marks to Virginia Flood.

In a letter from their counsel to the Trustee dated October 16, 1995, and in their objections to the proposed sale to the Defendants filed with the Bankruptcy Court on October 20, 1995, Haislip and Seltzer submitted a competing bid of $225,000 for the Flood names and phone numbers. SMF ¶ 29 & Haislip Dep. Ex. 7 (October 16, 1995, Weltmann to Sweeney letter); SMF ¶¶ 30-32, & 37-38 & Haislip Dep. Ex. 14 (October 20, 1995 Objection to Sale of Stock and Other Assets Free and Clear of Liens, also attached to Rinn. Dec. as Att. B-12). This itself

stands as powerful evidence that the names had not lost their significance through non-use, but remained valuable property symbolizing goodwill. *See, e.g., Seidelmann Yachts, supra,* (buyer's willingness to pay $5,000 for PACEMAKER mark for yachts indicated that goodwill has not wholly dissipated). *See also Official Pillowtex LLC,* 479 F.Supp.2d at 755 ("Plaintiff paid a substantial sum of money to purchase these rights out of bankruptcy. It is unlikely that a sophisticated corporate entity would pay money for rights that were defunct. Moreover, it is unlikely that bankruptcy court would allow the sale of items with no value").

When confronted in their depositions with the undisputed, but anomalous, fact that they offered the Trustee nearly a quarter of a million dollars for phone numbers and for trade names they believed they already owned, and asked to explain, Haislip and Seltzer offered no cogent explanation. Seltzer testified that he was uncertain why his counsel would have done so, but admitted that his counsel's actions were authorized. Seltzer offered by way of explanation a vague hope on his counsel's part that buying the names "would sort of clear the air in the metropolitan area of the bankruptcy issue and how it was dragging everything down," and "that [Crooks and Davis] would go away and the bad will that went with it," but conceded that, if their counteroffer had been accepted, and if Haislip and Seltzer had purchased the names and phone numbers, it probably would not have made Davis & Crooks go away. SMF ¶ 39.

In the end, the Trustee sold not only the tradenames and associated goodwill in JOHN C. FLOOD and FLOOD to 1996 Flood and the Smileys, but also stock in two of the "New Flood" corporations, John C. Flood of MD, Inc. and John C. Flood of DC, Inc., which passed to the buyers title to certain operating assets used in the business, including a number of service trucks. SMF ¶ 27 & Rinn Dec. ¶ 18 & Att. B-10 (Motion For Approval of Sale Free and Clear), Exhibits A and B thereto (listing operating assets and liabilities that passed with the corporate stock). SMF ¶ 45 & Smiley Dec. ¶ 6 & Att. C-2 (purchase documents showing purchased assets). Thus,

the names and goodwill were sold together with operating assets used to continue 1984 Flood's

business substantially as it had been conducted before the bankruptcy case commenced. *Cf.*

*Impact Distributors,* 260 Bankr. at 53-559 (discussing effect of purported assignment of mark

apart from goodwill or assets permitting continuation of assignor's business).

Accordingly, Virginia Flood's entire case for priority as a result of abandonment by non-

use is fatally and fundamentally flawed. In the face of the undisputed facts of records set forth

above, as a matter of law, Virginia Flood cannot establish by the requisite clear and convincing

proof that: (i) it was entitled to register the mark JOHN C. FLOOD and that its registration is

valid; (ii) it owns and has the exclusive right to use and priority over Defendants in their use of,

JOHN C. FLOOD, and the other variants thereof; (iii) in using and trading as JOHN C. FLOOD,

that Defendants infringed Virginia Flood registered trademarks, or violated Section 1125(c) of

the Lanham Act, or unfairly competed with Plaintiff by trading under the names and marks

purchased out of bankruptcy, willfully or otherwise. Accordingly, Defendants are entitled to

summary judgment on all Virginia Flood's claims, to cancellation of Virginia Flood's

Registrations, and to the declaration of 1996 Flood's priority rights requested in this motion.

**B.     *Virginia Flood's Claims Against the Defendants Are Barred By Laches, Estoppel, Waiver and Release***

In any event, even though Virginia Flood's recently-concocted abandonment theory

would have never had merit, no matter when asserted, Virginia Flood is certainly barred from

asserting it now. There is no question that Virginia Flood's principals knew or were on notice

that the corporate Defendants were trading as JOHN C. FLOOD since at least early 1996, and

that Virginia Flood did not seek recourse until it filed this action in July 2006. SMF ¶¶ 52-59.

The Court, Trustee and the Defendants who purchased of the trade names and goodwill

all closed the sale without notice of the Virginia Flood Parties' adverse, but undisclosed, claim

- 32 -

~~that the Trustee had nothing to sell, and in reliance on the Trustee's valid right to sell the names~~

and goodwill he purported to sell. *Id.* ¶¶ SMF ¶¶ 30, 32, 38, 40-41, 46-47, 55-56. During the

entire period between 1996 and the commencement of this case in 2006, Defendants continued to

trade, advertise and promote their services under the names and marks JOHN C. FLOOD and

FLOOD, and to develop further the goodwill that they purchased. *Id.* ¶ 36. The bargained-for

purchase price of $425,000 was paid in full in 2001. *Id.* ¶ 35.

## 1.   *Virginia Flood's Claims, Particularly its Claims for Monetary Relief, Are Barred by Laches and Estoppel*

In this case, filed a decade after the purchase, Virginia Flood has the temerity to claim

that, not only does it have the right to stop 1996 Flood from using the marks for which it paid

nearly half a million dollars, but to reach into 1996 Flood's pockets for profits and damages, as

well. Virginia Flood seeks monetary relief exclusively under the Lanham Act, 15 U.S.C.

§ 1117(a), which provides, in part:

> When a violation of any right of the registrant of a mark registered in the Patent
> and Trademark Office . . . . or a willful violation under section 1125(c) of this
> title, shall have been established in any civil action arising under this chapter, the
> plaintiff shall be entitled . . . *subject to the principles of equity,* to recover (1)
> defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of
> this action.

15 U.S.C. § 1117(a).

Monetary remedies under Section 1117 are not automatically available in every case,

even where infringement is proven. The remedy of an accounting for profits is discretionary,

rare, and severe. *Champion Spark Plug Co.* v. *Sanders,* 331 U.S. 125, 131 (1947). In order to

recover any damages, the plaintiff must prove a violation of its trademark rights, damage, and

that the violation was the cause of damage, and where it cannot establish that it has the rights in

the mark it claims, it cannot recover either an accounting or damages. *See Globalaw,* 452

F.Supp.2d at 61 ("[b]ecause C&C has not -- and cannot -- succeed on the merits of its claims, it

is simply not entitled to damages, or an accounting relating to those damages."). By its terms, the statute expressly makes recovery of any monetary relief is subject to the principles of equity.

As the U.S. Supreme Court recognized long ago, "[c]ases frequently arise where a court of equity will refuse the prayer of the complainant for an account of gains and profits, on the ground of delay in asserting his rights. . ." *McLean* v. *Fleming,* 96 U.S. 245, 257 (1878). This principle is recognized in this Circuit. In the D.C. Circuit held in *NAACP* v. *NAACP Legal Defense and Educational Fund, Inc.*:

> The essential elements of laches are well-defined by common law. There are three affirmative requirements: (1) a substantial delay by a plaintiff prior to filing suit; (2) a plaintiff's awareness that the disputed trademark was being infringed; and (3) a reliance interest resulting from the defendant's continued development of good-will during this period of delay.

753 F.2d 131, 137-38 & n. 65 (D.C. Cir. 1985).

The reason why a delay in asserting rights to monetary recovery bars such recovery, even in a case of alleged willful infringement, is the inherent "inequity of a plaintiff waiting for a defendant to build up its business and profits and years later files suit and demands an accounting of those profits." 5 J.T. McCarthy, *supra*, § 31:4, at 31-21.

According to the case law, Virginia Flood's sleeping on its purported "rights" to profits and damages while Defendants traded under the names and marks they purchased for over ten years is more than enough delay and prejudice to Defendants to bar monetary recovery, even if, as it alleges, Defendants' purported infringement was willful and in bad faith. *See e.g., Grotrian, Helfferich, Schuelz, Th. Steinweg Nachf.* v. *Steinway & Sons,* 523 F.2d 1331 (2d. Cir. 1975) (ten year delay bars accounting and damages remedies). *See also Skippy, Inc.* v. *CPC Int'l Inc.,* 674 F.2d 209 (4th Cir. 1982) *cert. denied* 450 U.S. 969 (1982) (laches for decade bars monetary claims for bad faith infringement).

The Virginia Flood Parties were very active participants in the Trustee's adversary proceeding which led to the sale of the names and goodwill they seek to challenge here. They knew of Davis, Crooks, and the Smileys' use of FLOOD names and marks during the Chapter 7 case. SMF ¶¶ 15 & 35. Haislip and Seltzer were witnesses the Trustee subpoened twice to testify about the "New Flood" companies' use of the names and marks. SMF ¶ 15 & Rinn Dec. ¶¶ 9, 11 & Att. B-3 & B-5 thereto (subpoenas to Haislip and Seltzer)). Months before the Trustee even commenced the adversary proceeding, as part of their negotiations to obtain Davis' and Crooks' ½ interest in Virginia Flood, they offered information to the Trustee concerning Davis' and Crooks' use of estate assets. In a December 29, 1994, letter to the Trustee's counsel, Haislip/Seltzers' counsel prefaced his offer with the bold statement: "my clients possess a good deal of information concerning the Debtors' post-petition actions which could lead the estate to additional funds." Rinn Dec. ¶ 24 Att. B-14 (December 29, 1994 Letter from Weltmann to Sweeney) Bates No. Flood DCDC 1848-49.

Their counsel attended a hearing concerning the settlement of the adversary proceeding and the appointment of a receiver. SMF ¶¶ 22-24, 26 & Rinn Dec.¶ 14 & Att. B-7 (transcript cover, showing appearance by Weltmann). They received formal notice of the Trustee's motion for approval of the sale of the names, goodwill, and operating assets to Defendants free and clear of all liens, claims and interests, and a copy of the moving papers  SMF ¶¶ 26-28 & Rinn Dec. SMF Ex. B ¶¶ 17, 18  & Att. B-10 & B-11 (Motion and Notice of Motion). On October 20, 1995, they filed an objection complaining of the proposed purchasers' fraud, unclean hands and diversion of estate assets. SMF ¶ 30 & Rinn Dec. ¶¶ 19-20 & Att. B-12 (Objection).

It is undisputed that none of Flood of Virginia, Haislip or Seltzer, in their October 20, 1995, Objection, or in any other connection with the bankruptcy case, ever objected to the Trustee's rights to sell the names and goodwill, or asserted any superior or exclusive rights to use

JOHN C. FLOOD and similar terms, or that the estate had abandoned, by non-use or otherwise, its rights in the names and goodwill. SMF ¶¶ 30, 32, 38, 40-41, 46-47, 55-56. They certainly could reasonably be expected to have done so, as that objection was filed weeks *after* Haislip and Seltzer executed the Stock Purchase Agreement effectuating the purchase from the Trustee of Davis' and Crooks' Virginia Flood stock, which purchase they now claim caused Virginia Flood to gain "exclusive rights" to JOHN C. FLOOD and all similar variants. SMF ¶¶ 35, 37.

In their objection, Haislip and Seltzer acknowledged the Trustee's rights to sell the names and goodwill by offering a competing bid of $225,000 for those names and the telephone numbers of the entities in receivership. SMF ¶¶ 29-32, & 37-38 & Haislip Dep. Ex. 7 (October 16, 1995 offer letter from Weltmann to Sweeney) and Ex. 14 (October 20, 1995 Objection, including counteroffer, also attached to Rinn. Dec. as Att. B-12). They thereby affirmatively acted in a manner consistent with the Trustee's right to sell, and diametrically inconsistent with the position that they had exclusive rights they assert here, over a decade later. SMF ¶ 23 & Rinn Dec. ¶ 20.

Such conduct amounts to more than just standing mute before the Trustee, the Court and competing bidders in the face of the Trustee's claim of ownership of the JOHN C. FLOOD names and goodwill. Their conduct actively induced action by the Defendants and the Trustee The purchasers restructured and increased their bid in response to the Virginia Flood Parties' objection. SMF ¶ 33. The Trustee and Court approved and the buyers consummated the sale without notice of a challenge by Virginia Flood to the Trustee's rights to sell validly the JOHN C. FLOOD and FLOOD names and goodwill – reliance actively promoted by the competing bid and Haislip, Seltzer and Virginia Flood's failure to object on that basis prior to and even after the sale. SMF ¶¶ 32, 38, 40-41, 46-47, 55 & 56.

In *American Sleekcraft,* the Court confronted very similar conduct on the part of a former

owner of a bankrupt corporation who failed to assert his claim that the marks sold out of

bankruptcy were not the company's, but his. In holding him equitably estopped from asserting

his "the company only had an implied license" theory, the court had no difficulty concluding:

> [h]is subsequent conduct after SSBN went into bankruptcy lead[s] this court to conclude
> that Nescher, believing he could use the names regardless of what the bankruptcy court
> did, was content to allow American to pay $335,000 for the benefit of the creditors of
> Nescher's bankrupt corporation without mentioning that part of what American was
> buying was, in Nescher's view, really his. Thus, the court finds that Nescher's failure to
> object to the sale of the trade names when he was identifying his objections to the
> proposed sale is inconsistent with the position he now attempts to take. American relied
> to its detriment upon Nescher's failure to object under circumstances when any objection
> should reasonably have been voiced. Therefore, Nescher is estopped from claiming
> individual ownership of the trade names in question.

131 Bankr. at 1000.

Like Mr. Nescher in *American Sleekcraft,* before and even after they were outbid, and an

order of sale was approved by the Court, Haislip, Seltzer and Virginia Flood said nothing, sought

no recourse, nor took any steps to assert their secret alleged exclusive rights. Indeed, the striking

inequity of their position here exceeds even that of Mr. Nescher's, in that they not only kept to

themselves their claim to exclusive ownership in the face of the Trustee's sale of the names they

now assert the Trustee did not own, *they bid over $200,000* for assets including those names!

Haislip and Seltzer had ample notice and a full and fair opportunity to challenge the

Trustee's title and to raise their abandonment theories before the Bankruptcy Court, or to appeal

or collaterally attack the order approving the sale in a timely manner in an appropriate forum.

They did none of these things. Despite notice of Defendant's use of JOHN C. FLOOD going

back to before the 1996 purchase, they pressed before no one, including the Court, Trustee, or

the buyers, the adverse claim of ownership and exclusive rights they have waited over a decade

to litigate here and now. SMF ¶ 56-59.

The Defendants consummated the transaction in reliance on the absence of any challenge to the Trustee's rights to sell the names and goodwill. Only now, in a case filed in July 2006, some eleven years after the sale was approved, does Plaintiff attempt to invalidate the Trustee's rights in the particular names and goodwill sold to the Defendants, and only now, some ten years after Defendants purchased and began trading, advertising, and building good will around those names and marks, does Virginia Flood seek monetary, injunctive, and declaratory relief against any of the Defendants. Accordingly, all of its claims are barred by laches and estoppel.

> **2.**     ***The FLOOD Names and Goodwill Were Sold Free and Clear of Virginia Flood's Claim of Exclusive Rights Pursuant to a Court Order Entered Under Bankruptcy Code Section 363, And Virginia Flood Waived its Right to Attack the Order of Sale By Failing to Challenge the Order of Sale in Within the Time Prescribed in the Bankruptcy Code and Rules***

In addition to being barred in equity by laches and estoppel, Virginia Flood also waived any claim that the sale was invalid by failing to mount within the time prescribed by applicable law on the Bankruptcy Court's order approving the sale. The Trustee's motion for approval of the sale expressly cited Section 363 of the Bankruptcy Code, and expressly provided that the trade names were to be sold "free and clear of all liens, claims and encumbrances" except for certain enumerated liabilities. SMF ¶¶ 27-28 & Rinn Dec. Att. B-10 (Motion), at p. 3 ("New Flood will continue under the ownership and operation of the purchaser free and clear of all liens, encumbrances, claims and debts owing not otherwise assumed by the purchaser by virtue of acquisition of the Stock in New Flood or by virtue of the Purchaser's specific assumption of any particular debt or claim as part of the acquisition."). The Notice of Motion specifically gave notice that the tradenames of JOHN C. FLOOD, INC. and FLOOD, Inc. and goodwill were to be sold, and directed parties in interest to file objections within 20 days. Rinn Dec. Att. B-11 (Notice of Motion).

Counsel for Virginia Flood, Haislip, and Seltzer (Gary Weltmann) was on the service list,

and there is no question that he received the Notice and Motion, because both were referenced

expressly in the objection he filed for Haislip and Seltzer on October 20, 1995. SMF ¶¶ 28, 30 &

Rinn Dec. Att. B-11 (Notice) & Att. B-12 (Objection). It is undisputed that Haislip and Seltzer's

objections to the sale of assets which included the JOHN C. FLOOD and FLOOD names and

goodwill did not assert that Haislip, Seltzer, or Virginia Flood had any adverse right, claim or

interest in or to the tradenames and goodwill the Trustee proposed to sell. SMF ¶¶ 30, 32, 38, 40-

41, 46-47, 55-56. On October 28, 1995, the Bankruptcy Court entered an Order granting the

Motion and approving the sale to the Smileys, free and clear, assets including the JOHN C.

FLOOD and FLOOD names and goodwill. SMF ¶ 34 & Rinn Dec. Att. B-13 (Order).

Where assets are sold free and clear of liens and competing interests by a Trustee in

bankruptcy pursuant to an order of a U.S. Bankruptcy Court under Section 363 of the U.S.

Bankruptcy Code, as they were here, a party claiming an adverse interest in the assets,

particularly one with actual notice of the proposed sale announcing the Trustee's intention to

sell the assets free of adverse claims, is obliged to assert that interest and deny the Trustee's title

before the court, lest the party be deemed to have consented to the sale. Collier states, in relation

to sales permitted under Bankruptcy Code Section 363(f)(2), 11 U.S.C. § 363(f)92):

> The trustee may sell property of the estate free of liens or other interests when the
> holder of the lien or interest consents to such a sale. This provision is similar to section 9-
> 315(a) of the Uniform Commercial Code, which permits a sale free of a security interest
> when the secured party consents to such a sale. The consent required is consent to a sale
> free of liens or interests, not merely consent to sale of the assets. The consent may be
> express or may be implied from circumstances surrounding the sale.

3 *Collier on Bankruptcy* P363.06[3] & n.27 (15th ed. 2006).

In any event, Bankruptcy Code Section 363(m), 11 U.S.C. § 363(m), reflects a policy in

favor of promoting certainty and reliance by persons who purchase assets out of bankruptcy in

good faith and for value, and an order approving a bankruptcy Trustee's sale of assets free and

clear under Section 363 of the Bankruptcy Code is subject to the provisions of Federal Rule of

Civil Procedure 60(b), by operation of Bankruptcy Rule 9024. Bankruptcy Rule 9024;

*FutureSource LLC v. Reuters Ltd.*, 312 F.3d 281 (7th Cir. 2002), *cert. denied,* 538 U.S. 962, 123

S. Ct. 1769, 155 L. Ed. 2d 513 (2003). Therefore, such an order and a resulting asset sale is only

subject to attack within the time limits set forth in Federal Rule of Civil Procedure 60(b). *Id.* As

the Seventh Circuit noted in the *FutureSource* case:

> It is true that the Bankruptcy Code limits the conditions under which an interest
> can be extinguished by a bankruptcy sale, but one of those conditions is the consent
> of the interest holder, and lack of objection (provided of course there is notice)
> counts as consent. It could not be otherwise; transaction costs would be prohibitive
> if everyone who *might* have an interest in the bankrupt's assets had to execute a
> formal consent before they could be sold.
>
> And in any event the order approving a bankruptcy sale is a judicial order and
> can be attacked collaterally only within the tight limits that Fed.R.Civ.P. 60(b)
> imposes on collateral attacks on civil judgments. FutureSource has made no effort to
> bring itself within those limits; and now that more than a year has passed since the
> order was issued, it is doubtful, to say the least, that FutureSource could succeed in
> such a collateral attack.

*Id.* at 285-286 (Italics in original; internal citations omitted). *See also Colorusso* v. *Ragossa*, 382

F.3d 51 (1st Cir. 2004) (adverse possession claimant who bid for land sold at a Trustee's sale

pursuant to Section 363 who had notice of the sale, submitted a competing bid, was represented

by counsel, and failed to assert her ownership interest was barred by Bankruptcy Code Section

363(m) and equitably estopped from challenging sale).

Where a party with notice who participated in proceedings leading to a sale of assets

under Section 363 fails to assert an alleged adverse interest in the asset, or to challenge the order

after entry within the time prescribed by Federal Rule of Civil Procedure 60(b) (made applicable

to bankruptcy proceedings by Bankruptcy Rule 9024), that party is barred from asserting such a

claim in subsequent proceedings. *Colorusso,* 382 F.3d 51; *FutureSource LLC*, 312 F.3d 281.

In *La Preferida, Inc.* v. *Cerveceria Modelo, S.A. de C.V*, the U.S. Court of Appeals for

the Seventh Circuit described the effect of the failure of an alleged trademark holder to assert its

rights before the Bankruptcy Court or to collaterally attack within the time prescribed by

Bankruptcy Rule 9024, an order approving the sale of trademarks free and clear of adverse

interests:

> It is quite clear that, correctly or incorrectly, the bankruptcy court purported to sell *all* of
> Corona's trademarks "free and clear of all liens, claims and encumbrances" and that La
> Preferida, a party to the proceeding with full rights of participation, including discovery,
> acquiesced in that sale on that basis. La Preferida neither appealed the judgment of the
> district court nor requested, according to Bankruptcy Rule 9024, that the matter be
> reconsidered. At the time of the bankruptcy court's order, La Preferida acquiesced in the
> sale -- without encumbrance -- of *all* the trademarks of Corona evidenced by registrations
> in the United States Patent and Trademark Office. By contrast, La Preferida's 1987 suit
> now asks that the district court undo one of the essential terms of the sale order and
> determine that, even now, La Preferida has an interest in the trademarks. In short, the
> 1987 suit is nothing other than a collateral attack on the final judgment of the bankruptcy
> court. However, except for the narrow exceptions set forth in Rule 60(b), bankruptcy
> sales, if they are to fulfill their role, must be final when made. *See Matter of Met-L-Wood
> Corp.*, 861 F.2d 1012, 1019 (7th Cir. 1988), *cert. denied*, 490 U.S. 1006, 104 L. Ed. 2d
> 157, 109 S. Ct. 1642 (1989).

914 F.3d 900, 908 (7th Cir. 1990).

It is undisputed that Haislip and Seltzer's objections to the sale of assets which included

the JOHN C. FLOOD and FLOOD names and goodwill did not assert that Haislip, Seltzer, or

Virginia Flood had any right, claim or interest in or to those assets. SMF ¶¶ 30, 32, 38, 40-41,

46-47, 55-56. It is also undisputed that they *never* before or after the sale approval process,

raised such claims or assertions in any connection with the bankruptcy case. SMF 40-41 ¶¶

Accordingly, the Bankruptcy Court's October 28, 1995 unchallenged Order approving the sale

and granting the Trustee's motion that expressly invoked Section 363 of the Bankruptcy Code

became final, and extinguished all claims and interests in the JOHN C. FLOOD and FLOOD

names Haislip, Seltzer and/or Virginia Flood may have had. In any event that Order is a final

judgment, not subject to collateral attack in this Court over a decade later. *See* Fed. R. Civ. P.

60(b) *and* Bankr. Rule 9024.

> **3.    *The Virginia Flood Parties' Claim to Ownership of the JOHN C.
> FLOOD Names and Goodwill By Operation of Abandonment and
> Non-Use Upon Conversion of Bankruptcy to a Chapter 7 in 1993 is
> Barred by the Release and Assignment in Favor of the Trustee that
> Was Part of the Consideration for the Sale of Virginia Flood Stock to
> Haislip and Seltzer in 1995***

Finally, any claim Virginia Flood, Haislip and Seltzer may have had to challenge the

Trustee or the debtors' estate's right to sell the JOHN C. FLOOD and FLOOD tradenames and

goodwill was expressly released and assigned to the Trustee. Virginia Flood asserts in

Paragraphs 24 and 25 of the First Amended Complaint [#28], that the debtors' estates had

abandoned by non-use the JOHN C. FLOOD and FLOOD names, upon the conversion of the

case to a Chapter 7 in 1993, thereby destroying the goodwill symbolized by them.  If that were

true, then such claim had accrued and was ripe in October 1995, when Haislip and Seltzer

acquired the balance of the Virginia Flood stock, and in March 1995, when they agreed to do so.

It is undisputed that an essential term of that transaction was that Haislip and Seltzer

expressly agreed to ***release and assign*** to the Trustee any claims they or John C. Flood of

Virginia, Inc., had against the Trustee and the estates of the bankrupt debtors. *First Amended

Complaint* [#28] ¶ 27; SMF ¶ 17 & Rinn Dec. Att. B-14 (March 16, 1995, Letter from Sweeney

to Weltmann re terms of sale of Virginia Flood stock, Bates No. 2437-38, 2442-43).  If they had

any claim against the estate to exclusive ownership of the trade names and goodwill, they

assigned it expressly to the Trustee, and they released any claims that the estate, debtors or

entities in receivership had infringed or were infringing on those rights. They cannot be heard to

assert such claims against 1996 Flood, the successors of the Trustee and received entities, now.

## IV. CONCLUSION AND PRAYER FOR RELIEF

**WHEREFORE,** for the foregoing reasons, Defendants respectfully request this Court to enter an Order granting them summary judgment on each and every one of the Plaintiff Virginia Flood's, claims against them, and partial summary judgment on Count V of Defendants' counterclaims, as set forth in the Motion and Proposed Order accompanying this Memorandum.

Respectfully submitted,

**COUNTERCLAIM PLAINTIFF/DEFENDANT
JOHN C. FLOOD, INC., & DEFENDANTS JOHN
C. FLOOD OF D.C., INC., ROBERT SMILEY,
JOANNE SMILEY,  MARK CROOKS AND MEL
DAVIS, J.C. FLOOD, INC., J.C. FLOOD
COMPANY, & JCF, INC.**

By their attorneys:    /s/ Benjamin J. Lambiotte
Benjamin J. Lambiotte
D.C. Bar No. 421288
blambiotte@gsblaw.com
Robert A.W. Boraks
D.C. Bar No. 72132
rboraks@gsblaw.com
**GARVEY SCHUBERT BARER**
1000 Potomac Street, Fifth Floor
Washington, D.C. 20007
(202) 965-7880

## CERTIFICATE OF SERVICE

I certify that I served a copy of this MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS' RENEWED MOTION FOR PARTIAL SUMMARY JUDGMENT upon counsel for the Virginia Flood Parties via ECF and electronic mail, on this 12th day of September, 2008.

Stephen J. Zralek, *appearing pro hac vice*
BONE McALLESTER NORTON PLLC
511 Union Street, Suite 1600
Nashville, TN 37219
Tel: (615) 238-6300
Fax: (615) 238-6391
szraleck@bonelaw.com

Lisa Dunner, DC Bar #452004
DUNNER LAW
1010 Wisconsin Avenue, N.W.
Washington, DC 20007
Tel: (202) 298-2002
Fax: (202) 403-3030
ldunner@dunnerlaw.com

/s/ Benjamin J. Lambiotte