UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

JOHN C. FLOOD OF VIRGINIA, INC., *et al.*,

    Plaintiff/Counter-Defendants,

v().

JOHN C. FLOOD, INC., *et al.*,

    Defendants/Counter-Plaintiffs.

Civil Case No. 06-1311 (RJL)

## MEMORANDUM OPINION
(March 31, 2010) [#60 and 65]

This case involves two sister companies in the plumbing business that are, in effect, fighting over their "inheritance." They both claim exclusive rights to two trademarks—JOHN C. FLOOD and its abbreviated form FLOOD. The plaintiff John C. Flood of Virginia, Inc. ("Virginia Flood") brought this suit against the defendants John C. Flood, Inc., which does business as John C. Flood of DC, Inc., as well as other individuals and corporate entities (collectively, "1996 Flood").[1] Virginia Flood alleges four causes of action: (1) trademark infringement in violation of 15 U.S.C. § 1114(1) (Count 1), (2) unfair competition in violation of 15 U.S.C. § 1125(a) (Count 2), (3) common law service mark infringement and unfair competition (Count 3), and (4) declaration of Virginia Flood's priority over all defendants and its right to register the trademarks (Count 4). (Compl. [#1] at 9-11; Am. Compl. [#28] at 13-18). 1996 Flood responded by bringing a number of

---

[1] The additional defendants include J.C. Flood, Inc., J.C. Flood Company, John C. Flood of DC, JCF Inc., John Doe Companies 1 and 2, Mark Crooks, Mel Davis, Robert Smiley, and Joanna Smiley. (Am. Compl. [#28] at 2-3).

counterclaims against Virginia Flood and other parties (collectively, "Virginia Flood").[2] The counterclaims include: (1) false designation of origin, source, or sponsorship in violation of 15 U.S.C. § 1125(a) (Count 1); (2) cancellation of Virginia Flood's registration of the disputed trademarks (Count 2-4); (3) declaration of 1996 Flood's priority over Virginia Flood (Count 5); and (4) common law service mark infringement and unfair competition (Count 6). (Countercl. [#9] at 25-33). Now before the Court is Virginia Flood's Motion for Summary Judgment [#60] and 1996 Flood's Renewed Motion for Partial Summary Judgment [#65]. Unlike Virginia Flood, which has moved for judgment on all claims and counterclaims, 1996 Flood moves only for judgment on Virginia Flood's claims and for declaratory judgment as to its counterclaim for priority over Virginia Flood. 1996 Flood leaves its remaining counterclaims for future disposition. Having considered the pleadings and the record in this case, I have concluded that Virginia Flood, as the licensee of the FLOOD marks, is estopped from now claiming ownership of those marks. Accordingly, for the reasons set forth below, Virginia Flood's Motion for Summary Judgment is DENIED and 1996 Flood's Motion for Partial Summary Judgment is GRANTED.

## BACKGROUND

In 1984, defendants Mark Crooks and Mel Davis incorporated in Maryland a business by the name of John C. Flood, Inc. ("1984 Flood"). (Countercl. [#9] ¶ 11). This business provided plumbing, heating, and air conditioning services to customers in Maryland, the District of Columbia, and Virginia. (*Id.* ¶¶ 11-12; Davis Dep. [#63-6] at 81).

---

[2] The other parties include John C. Flood, Inc. (a Virginia corporation), John C. Flood Contractors, Inc., Clinton Haislip, and James L. Seltzer, Jr. (Countercl. [#9] at 1).

1984 Flood traded under the service marks JOHN C. FLOOD and FLOOD (or variations thereof). (Davis Decl. [#37-2] ¶¶ 3-5, 10-11).

Four years later, to further expand their operations in Virginia, Crooks and Davis incorporated another business under the name John C. Flood of Virginia, Inc. ("Virginia Flood"). (*Id.* ¶ 6). Crooks and Davis invited Clinton Haislip and James Seltzer, who then were employees of 1984 Flood, (Seltzer Decl. [#63-11] ¶ 5), to join Virginia Flood as non-controlling shareholders. (Davis Decl. [#37-2] ¶ 7). Haislip and Seltzer initially owned 49% of the stock, while Crooks and Davis owned 51%, (Davis Dep. [#63-6] at 83), but eventually, Crooks and Davis gave Haislip and Seltzer an additional 1% share in the company, making Crooks and Davis equal owners with Haislip and Seltzer, (*id.* at 83-84, 94). Because Haislip and Seltzer lacked the technical expertise to run the business by themselves at the outset, Crooks and Davis regularly helped with the technical aspects of the business, maintained the books and records, and appointed a manager to oversee day-to-day operations. (*Id.* at 58-60).

There is no dispute that Virginia Flood had permission—that is, a license—to use the marks JOHN C. FLOOD and FLOOD without the modifier "of Virginia." The parties disagree, however, about the nature and scope of that license. In his declaration, Seltzer testified that Crooks and Davis made a verbal agreement to allow Virginia Flood to use the marks on, among other things, its service trucks, contracts, invoices, and telephone book advertisements. (Seltzer Decl. [#63-11] ¶ 6). In exchange, Virginia Flood paid Crooks and Davis a weekly sum. (*Id.*). Davis testified, however, that Virginia Flood was allowed to use the marks JOHN C. FLOOD or FLOOD only until it replaced the service trucks that already

3

bore the marks and until it replaced old advertising spots with new ones. (Davis Dep. [#63-6] at 57, 60-61). In any event, neither party disputes that Virginia Flood, whether or not it had authority to do so, has used the disputed marks continuously since it was formed in 1989. (*See id.* at 91; Seltzer Decl. [#63-11] ¶ 7).

In June 1991, 1984 Flood and its principals, Crooks and Davis, filed for bankruptcy reorganization under Chapter 11 of the Bankruptcy Code. (Countercl. [#9] ¶ 15). Sometime after filing for bankruptcy, Crooks and Davis discontinued their involvement in Virginia Flood. (Davis Dep. [#63-6] at 26-27). They resigned as officers of the company in July 1991. (Haislip Decl. [#41-1] ¶ 7). Nearly two years later, in March 1993, the bankruptcy court appointed a trustee over 1984 Flood, and in September of that year, the bankruptcy court converted the case to Chapter 7 liquidation. (Countercl. [#9] ¶ 15). Until the trustee was appointed, Crooks and Davis continued to operate 1984 Flood and to trade under the marks JOHN C. FLOOD and FLOOD. (Davis Decl. [#37-2] ¶ 11). Once the trustee took control of 1984 Flood, however, Crooks and Davis shut down operations, turned the keys over to the trustee, and disconnected all the phones. (Davis Dep. [#63-6] at 104-06). At that point, 1984 Flood no longer generated any revenue. (*Id.* at 105-06). Crooks and Davis also stopped monitoring Virginia Flood, (*id.* at 99), and relinquished its books, (*id.* at 96). In 1995, the trustee sold the 50% interest in Virginia Flood owned by Crooks and Davis to Haislip and Seltzer. (Countercl. [#9] ¶ 17; Rinn Decl. [#37-3] at 234-35; Defs.' Resp. and Counterstatement to Virginia Flood Parties' Statement of Undisputed Material Facts [#73] ¶ 30).

Even though Crooks and Davis no longer operated 1984 Flood after the trustee assumed control of the company, they nevertheless carried on their plumbing, heating, and air conditioning business. (Davis Decl. [#37-2] ¶ 12). Together with Robert and Joanna Smiley, Davis's son-in-law and daughter, both Crooks and Davis did business through various corporations known as J.C.F., Inc., J.C. Flood, John C. Flood of DC, Inc., and John C. Flood of MD, Inc. (collectively, "new Flood entities"). (*Id.*). These entities used the marks JOHN C. FLOOD and FLOOD, as well as other assets belonging to 1984 Flood. (*Id.*; Rinn Decl. [#37-3] ¶¶ 5-6). To preserve those assets, the trustee commenced an adversary proceeding in the bankruptcy court in May 1995. (Rinn Decl. [#37-3] ¶¶ 5-6). The trustee sought to enjoin the new Flood entities from misappropriating the assets of 1984 Flood, including its service marks. (*Id.* ¶ 6). The trustee also requested that the bankruptcy court appoint a receiver to take control of 1984 Flood's assets and to preserve them for the creditors of the bankruptcy estate. (*Id.*). In June 1995, the bankruptcy court entered a consent order for a preliminary injunction against the new Flood entities and for the temporary appointment of a receiver with the authority to take charge of the new Flood entities and their assets, including the JOHN C. FLOOD and FLOOD trade names. (*Id.* ¶ 10). The bankruptcy court renewed the receiver's authority in August 1995, (*id.* ¶ 12), and the following month, the court entered a consent order making the receivership and the injunction permanent, (*id.* ¶ 16).

In October 1995, the trustee proposed that the assets and stock of the new Flood entities held in receivership, along with the trade names JOHN C. FLOOD, INC. and FLOOC, INC., be sold to Crooks, Davis, and the Smileys. (*Id.* ¶ 18). Haislip and Seltzer,

as creditors of the bankruptcy estate, filed an objection to the proposed sale on the ground that Crooks, Davis, and the Smileys had unlawfully diverted and concealed estate assets to the detriment of creditors. (*Id.* ¶ 20). Haislip and Seltzer also offered a bid of their own to purchase only the trade names and telephone numbers of 1984 Flood. (*Id.* ¶ 21 & Attachment B-12 ¶¶ 9-10). In response to Haislip's and Seltzer's objections, both Crooks and Davis withdrew, leaving only the Smileys, who chose to increase their bid. (*Id.* ¶ 22). After evaluating the competing bids, as well as Haislip's and Selter's objections, the bankruptcy court approved the sale of the assets and stock of the new Flood entities, as well as the trade names of John C. Flood, Inc. and Flood, Inc., to the Smileys. (*Id.* ¶ 22 & Attachment B-13). Several months later, in February 1996, the Smileys incorporated a business in Maryland under the name John C. Flood, Inc. ("1996 Flood"). (Pl.'s Mot. for Summ. J., Ex. B [#63-2]). Later the same month, the trustee executed a bill of sale conveying the stock of the new Flood entities and the trade names of John C. Flood, Inc. and Flood, Inc. to the Smileys pursuant to the proposal approved by the bankruptcy court. (*Id.*, Ex. A [#63-1]).

Like Virginia Flood, 1996 Flood operates in the metropolitan Washington, D.C. area and uses the marks JOHN C. FLOOD and FLOOD. (Countercl. [#9] ¶ 53). Because the two companies compete for the same customers, their use of the same or similar trade names has—not surprisingly—caused confusion in the marketplace. (*Id.*; Davis Dep. [#63-6] at 131-32). In an effort to secure its right to the disputed marks, Virginia Flood sought and eventually obtained in 2000 two trademark registrations from the U.S. Patent and Trademark Office ("USPTO")—one for the word JOHN C. FLOOD and another for a logo

incorporating the mark JOHN C. FLOOD. (Virginia Flood Parties' Statement of Undisputed Material Facts [#61] ¶¶ 41-42). Nearly five years later, 1996 Flood commenced an action before the Trademark Trial and Appeal Board ("TTAB") of the USPTO, seeking to cancel the registrations. (Countercl. [#9] ¶ 44). In July 2006, more than a year into the TTAB action, Virginia Flood brought this trademark infringement suit, (*see id.* ¶ 48), in which both parties claim exclusive rights to the trademarks JOHN C. FLOOD and its abbreviated version FLOOD.

## DISCUSSION

This case comes before the Court on Virginia Flood's Motion for Summary Judgment and 1996 Flood's Motion for Partial Summary Judgment. Summary judgment is warranted where the evidence shows "that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2). Here, there is no meaningful dispute as to any fact that bears on the Court's disposition of the case. As a result, the question is simply which party is entitled to prevail as a matter of law. For reasons discussed more thoroughly below, the Court believes that 1996 Flood, as the successor-in-interest to the licensor of the disputed marks, is entitled to prevail because Virginia Flood, the licensee, is barred by the equitable doctrine of licensee estoppel from asserting claims of priority over and above the licensor.

The threshold issue in any trademark infringement case is whether the plaintiff can show "that it owns a valid trademark." *Globalaw Ltd. v. Carmon & Carmon Law Office*, 452 F. Supp. 2d 1, 26 (D.D.C. 2006) (internal quotation marks omitted). The same requirement applies to statutory and common law claims of infringement as well as statutory

and common law claims of unfair competition. *See, e.g.*, *Info. Superhighway, Inc. v. Talk Am., Inc.*, 395 F. Supp. 2d 44, 56 (S.D.N.Y. 2005) ("The elements necessary to prevail on common law causes of action for trademark infringement and unfair competition mirror Lanham Act claims."); *Am. Ass'n for Advancement of Sci. v. Hearst Corp.*, 498 F. Supp. 244, 262 (D.D.C. 1980) ("Where [the mark] is not inherently distinctive, the essential elements are the same for either a trademark infringement or unfair competition action."). Obviously, a plaintiff cannot claim infringement, or unfair competition, if it cannot rightfully establish ownership of the disputed marks.

Virginia Flood offers two theories to support its claim of ownership over the FLOOD marks. First, Virginia Flood contends, quite simply, that it has "priority." In other words, it owns the marks by virtue of having used them first. "In the ordinary case of parties competing under the same mark in the same market, it is correct to say that prior appropriation settles the initial question of ownership, and that the service mark rights of the senior user trump those of the junior user." *Globalaw*, 452 F. Supp. 2d at 27. Because Virginia Flood has used the FLOOD marks continuously since its formation in 1989, whereas 1996 Flood did not begin using them until its incorporation in 1996, Virginia Flood contends that it has priority over 1996 Flood and thus an exclusive right to use the marks.[3]

---

[3] Virginia Flood also contends that the two registrations it obtained from the USPTO in 2000 establish a presumption that it has an exclusive right to the marks. Although a registration is "prima facie evidence of the validity . . . of the registrant's ownership of the mark, and of the registrant's exclusive right to use the registered mark," 15 U.S.C. § 1115(a), that presumption runs only to the date on which the registrant filed its trademark application. *See id.* § 1057(c) ("Contingent on the registration of a mark . . . , the filing of the application to register such mark shall constitute constructive use of the mark, conferring a right of priority . . . ."). In this case, Virginia Flood filed its application to register the FLOOD marks in 1999, (Am. Compl. [#28] ¶¶ 39-40), three years after 1996 Flood began

This theory is unconvincing, however, because it conveniently disregards how 1996 Flood came to use the marks. 1996 Flood did not obtain the marks surreptitiously. To the contrary, it *purchased* the marks from the trustee of the bankruptcy estate, who in turn had obtained the marks when 1984 Flood, the original owner of the FLOOD marks, entered into Chapter 7 bankruptcy. (*See* Pl.'s Mot. for Summ. J., Ex. A [#63-1]). There is no reason to believe—and Virginia Flood certainly offers none—that a company's priority of ownership over its trademark ceases *merely* because the company goes bankrupt. The company's trademark and associated goodwill are valuable assets that become part of the bankruptcy estate and can be validly sold, assigned, or transferred by the estate. *See, e.g., McKay v. Mad Murphy's, Inc.*, 899 F. Supp. 872, 878 (D. Conn. 1995) ("A trustee in bankruptcy has the power to sell the trademarks and accompanying good will of the bankrupt...."); *Johanna Farms, Inc. v. Citrus Bowl, Inc.*, 468 F. Supp. 866, 874 (E.D.N.Y. 1978) ("[U]pon the bankruptcy of the trademark owner, the trademark together with the goodwill it symbolizes becomes vested in the Trustee in Bankruptcy, and may be sold by him as an asset of the estate." (internal citation omitted)); *Merry Hull & Co. v. Hi-Line Co.*, 243 F. Supp. 45, 52 (S.D.N.Y. 1965) (holding that the "defendant obtained good title to the mark through [the defendant's] purchase at the bankruptcy sale"). Because 1996 Flood acquired the FLOOD marks from the bankruptcy estate, it is the successor-in-interest of 1984 Flood, the original owner of the marks. Therefore, the fact that Virginia Flood can demonstrate

---

using the marks, (*id.* ¶ 57). Because the registrations are later in time, they cannot establish Virginia Flood's priority over 1996 Flood. In any event, the presumption claimed by Virginia Flood is not conclusive. It may be overcome by "any legal or equitable defense or defect ... which might have been asserted if such mark had not been registered." 15 U.S.C. § 1115(a).

9

continuous use prior to 1996 Flood's acquisition of the marks does not necessarily entitle Virginia Flood to priority over 1996 Flood.

Of course, a trustee can lose ownership or priority over trademarks that are within the bankruptcy estate. Even though a trademark and its associated goodwill may survive the temporary cessation of business activities during the course of a bankruptcy, the trustee may nevertheless, "by his actions or inaction[,] effect the demise" of the trademark or trade name. *Hough Mfg. Corp. v. Va. Metal Indus., Inc.*, 453 F. Supp. 496, 500 (E.D. Va. 1978) (citing *Merry Hull & Co.*, 243 F. Supp. at 50). This principle is the basis for Virginia Flood's second theory of ownership. According to Virginia Flood, 1996 Flood did not acquire the FLOOD marks from the bankruptcy estate because the estate had already abandoned ownership of the marks through naked licensing.[4] Simply put, the trustee had nothing to sell. Because the bankruptcy estate abandoned the FLOOD marks, Virginia Flood claims that it now has priority ownership by virtue of its continuous use of the marks since 1989.

Abandonment by naked licensing occurs when a trademark owner licenses its trademark but fails "to exercise appropriate control and supervision over its licensees." *Exxon Corp. v. Oxxford Clothes, Inc.*, 109 F.3d 1070, 1075 (5th Cir. 1997); *see also Boersma v. Executive Travel Club, Inc.*, 256 F. Supp. 289, 290 (D.D.C. 1966) (stating that

---

[4] The only theory of abandonment raised by Virginia Flood in its Motion for Summary Judgment is naked licensing. All other theories, even if alluded to in the Complaint, are therefore waived. *See Grenier v. Cyanamid Plastics, Inc.*, 70 F.3d 667, 678 (1st Cir. 1995) ("Even an issue raised in the complaint but ignored at summary judgment may be deemed waived."); *Head Start Family Educ. Program, Inc. v. Coop. Educ. Serv. Agency 11*, 46 F.3d 629, 635 (7th Cir. 1995) (holding that an argument not raised by a party in its motion for summary judgment is waived).

"the owner of a registered mark may license its use to others so long as such agreements are not merely naked license agreements"). The licensor, however, need not micromanage the licensee. To the contrary, "[r]etention of a trademark requires only minimal quality control." *Ky. Fried Chicken Corp. v. Diversified Packaging Corp.*, 549 F.2d 368, 387 (5th Cir. 1977). Because naked licensing is treated as an unintentional abandonment of the trademark, "which triggers the loss of trademark rights against the world, anyone attempting to show such abandonment via naked licensing faces a stringent burden of proof." *Creative Gifts, Inc. v. UFO*, 235 F.3d 540, 548 (10th Cir. 2000); *see also Exxon Corp.*, 109 F.3d at 1075-76. The rationale for abandonment by naked licensing is rather straightforward: "If a trademark owner allows licensees to depart from its quality standards, the public will be misled, and the trademark will cease to have utility as an informational device. A trademark owner who allows this to occur loses its right to use the mark." *Ky. Fried Chicken*, 549 F.2d at 387.

Typically, naked licensing is used as a shield by the licensee against infringement claims brought by the licensor. *See Exxon Corp.*, 109 F.3d at 1078 ("The naked licensing defense has traditionally been used in the context of infringement claims brought by the trademark owner . . . ."). Here, however, the licensee is using naked licensing as a sword to pry ownership rights from the licensor. Indeed, Virginia Flood does not contend that the oral agreement made by Crooks and Davis to allow Virginia Flood to use the FLOOD marks was a naked license. Instead, it contends that the arrangement became a naked license in September 1993, at the latest, when Crooks and Davis, and then the trustee, ceased monitoring Virginia Flood's operations. From that point forward, says Virginia Flood, the

licensor exercised absolutely no control over the quality of services performed by Virginia Flood under the FLOOD trade name.

Whatever the merits of this naked licensing argument, Virginia Flood is in no position to make it. Virginia Flood's status as the licensee bars it from using the naked licensing doctrine as a weapon to pry ownership of the FLOOD marks from 1996 Flood, the successor-in-interest of the licensor 1984 Flood. "The licensee is estopped from claiming any rights against the licensor which are inconsistent with the terms of the license. . . . He is estopped from contesting the validity of the mark, . . . or challenging the license agreement as void or against public policy, e.g., because it granted a naked license." *Creative Gifts*, 235 F.3d at 548 (internal quotation marks omitted).[5]

> By entering into the license agreement, the licensee recognizes the licensor's ownership of the mark and by implication, covenants not to challenge the licensor's rights. This implied covenant also estops the licensee from claiming that the licensor abandoned his rights by failing to exercise adequate quality control during the terms of the license.

*Westco Group, Inc. v. K.B. & Assocs., Inc.*, 128 F. Supp. 2d 1082, 1089 (N.D. Ohio 2001) (internal quotation marks and emphasis omitted). Indeed, "'[t]he case for estoppel is strongest when the licensee's challenge rests on its own conduct under the license, such as . . . a claim of abandonment based on inadequate supervision of the licensee by the licensor.'"

---

[5] *See also Prof'l Golfers Ass'n of Am. v. Bankers Life & Cas. Co.*, 514 F.2d 665, 671 (5th Cir. 1975) (noting that "a licensee is estopped to contest the validity of the licensor's title during the course of the licensing arrangement"); *Heaton Distrib. Co. v. Union Tank Car Co.*, 387 F.2d 477, 482 (8th Cir. 1967) ("Even in the absence of any proviso in the contract not to contest the validity of the trademark or trade name, we think that the dealer, in recognizing the manufacturer as the owner of the trademark or trade name under the terms of the agreement, would be estopped to claim otherwise."); *E.G.L. Gem Lab Ltd. v. Gem Quality Inst., Inc.*, 90 F. Supp. 2d 277, 292 (S.D.N.Y. 2000) (holding that the licensee "is precluded from contending that the [marks] are invalid by virtue of his acceptance of a sublicense to use them").

*Id.* (quoting Restatement (Third) of Unfair Competition § 33 (1995) (emphasis omitted)). The reason is clear: "[A] licensee claiming that its own license is a naked license essentially seeks to benefit from its own misfeasance." *Id.* To make out a claim of naked licensing, the licensee must show that the quality of its goods or services suffered due to the lack of supervision by the licensor. "[B]y relying on its own ability to offer inferior or nonuniform goods and services under the trademark or trade name, the licensee seeks to free itself of the constraints imposed by the licensor's ownership of the trademark or trade name." *Id.* A naked licensing claim is particularly self-serving (and contrary to the consuming public's interests) when used, as it is here, as a sword against the licensor.

The Court recognizes, of course, that licensee estoppel is an equitable defense. "[T]he doctrine is not subject to rigid application. Instead, a court considering the doctrine's application remains free to consider the particular circumstances of the case, including the nature of the licensee's claim." *Id.* at 1090 (internal quotation marks and alterations omitted). Here, the equities weigh in favor of applying licensee estoppel.

First, as I have already mentioned, Virginia Flood seeks to employ the naked licensing doctrine, not as a defense to 1996 Flood's infringement claims, but as an offensive claim to transfer ownership of the marks from the licensor to the licensee based solely on the licensee's allegations that it is not adequately supervised. The equitable considerations that justify licensee estoppel are particularly relevant in this case given that Virginia Flood is the only licensee. Had Virginia Flood pointed to other licensees the quality of whose services had also declined due to inadequate control by 1996 Flood and its predecessors, the scales might have tipped against licensee estoppel. "The case for applying the licensee estoppel

13

doctrine is weak when the licensee asserts a lack of control by the licensor over *other* users." *Id.* (internal quotation marks omitted and emphasis added). That is because a licensee loses the value of its licensed trademark "[w]hen a licensor fails to control the quality of goods or services sold by other licensees." *Id.* Unfortunately for Virginia Flood, that is not the case here. As the only licensee, Virginia Flood has complete control over the value of its license. So long as it provides quality services on par with the licensor's services, the value of the license will not diminish. Virginia Flood cannot claim that the license is void and that it now has exclusive rights to the FLOOD marks because it has failed to maintain the quality of services that customers have come to expect from the FLOOD name. The point of licensee estoppel is to foreclose the sort of claim, like the one here, where the licensee blames the licensor for the licensee's own failure to preserve the value of the license, and it is particularly warranted where the claim is raised offensively to deprive the licensor of its ownership of the licensed trademark.

Second, although Virginia Flood's principals could have asserted their claim of ownership over the FLOOD marks when the trustee proposed in October 1995 to sell the marks to the Smileys, (Rinn Decl. [#37-3] ¶ 18-19), they did not do so. Instead, Haislip and Seltzer challenged the sale, not on the basis that they owned the marks by virtue of naked licensing, but on the basis that Crooks, Davis, and the Smileys had unlawfully diverted and concealed estate assets to the detriment of creditors. (*See id.* ¶ 20 & Attachment B-12). They even offered a bid to purchase the marks. (*Id.* ¶ 21 & Attachment B-12 ¶¶ 9-10). To say the least, it is curious that Haislip and Seltzer offered to pay for the very marks that they now claim to have owned since September 1993, at the latest, when Crooks and Davis, and

then the trustee, ceased exercising control over Virginia Flood. It is even more curious that Haislip and Seltzer failed to even mention their claim of ownership at that time. As such, Virginia Flood's utter failure to assert its ownership rights when afforded an obvious opportunity to do so weighs decisively in favor of applying licensee estoppel to its claims here.[6]

## CONCLUSION

Because 1996 Flood is the successor-in-interest of 1984 Flood, the original owner of the FLOOD marks, and because Virginia Flood is barred by the doctrine of licensee estoppel from asserting its naked licensing claim to obtain priority over the marks, 1996 Flood is entitled to summary judgment on all of Virginia Flood's claims. For the same reasons, it is also entitled to summary judgment on Count 5 of its Counterclaim for a declaration of its priority over Virginia Flood and of its exclusive right to use and register the marks JOHN C. FLOOD and FLOOD.[7] Accordingly, Count 5 of 1996 Flood's

---

[6] Virginia Flood contends that 1996 Flood cannot seek equitable relief because it has "unclean hands." (Virginia Flood Parties' Reply to Defs.' Opp'n to Pls.' Mot. for Summ. J. [#74] at 16). Virginia Flood points specifically to evidence that Crooks, Davis, and the Smileys misappropriated assets from the bankruptcy estate. (*Id.* at 17). Although it is true that their unauthorized use of estate assets prompted the trustee to seek and obtain appointment of a receiver, it is not altogether clear why that should foreclose 1996 Flood from obtaining equitable relief now that it has purchased the marks from the trustee. That the trustee decided to sell the marks to 1996 Flood, even over the same objections now raised by Virginia Flood, weighs heavily against Virginia Flood's unclean hands argument.

[7] Because 1996 Flood requested relief only on Count 5 of its Counterclaim, the Court reserves judgment as to the remaining counts. The Court notes, however, that even though licensee estoppel forecloses Virginia Flood from using naked licensing as a sword, it does not necessarily foreclose Virginia Flood from asserting naked licensing as an estoppel defense against 1996 Flood's infringement and unfair competition counterclaims. *See Exxon Corp.*, 109 F.3d at 1076 n.7 (noting that a licensee in a purported naked license may "invoke the naked licensing defense as a form of estoppel"); *Sheila's Shine Prods., Inc. v. Sheila Shine, Inc.*, 486 F.2d 114, 124 (5th Cir. 1973) ("Failure to exercise such control and

15

Renewed Motion for Partial Summary Judgment is GRANTED and Virginia Flood's Motion for Summary Judgment is DENIED. An Order consistent with this Memorandum Opinion is attached herewith.

/s/ Richard J. Leon
RICHARD J. LEON
United States District Judge

---

supervision for a significant period of time may estop the trademark owner from challenging the use of the mark and business which the licensee has developed during the period of such unsupervised use."). A word to the wise is sufficient.

16